UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATOIL (NIGERIA) LIMITED and TEXACO NIGERIA OUTER SHELF LIMITED,

    Petitioners,

– against –

NIGERIAN NATIONAL PETROLEUM CORPORATION,

    Respondent.

Case No. _____

**DECLARATION OF BABATUNDE FAGBOHUNLU, SAN
IN SUPPORT OF PETITIONERS' PETITION TO RECOGNIZE AND ENFORCE
FOREIGN ARBITRAL AWARDS AND REQUEST FOR PRE-JUDGMENT SECURITY**

Pursuant to 28 U.S.C. § 1746, Babatunde Fagbohunlu, SAN deposes and says:

1. I am a partner at the law firm Aluko & Oyebode, a Nigerian law firm specialising in, *inter alia*, commercial litigation and arbitration, particularly in Nigeria's energy and natural resources sector. At Aluko & Oyebode, I head the litigation, arbitration, and alternative dispute resolution practice group. I was called to the Nigerian Bar in 1988, and in 2008, I was conferred with the rank of Senior Advocate of Nigeria (the Nigerian equivalent of an English Queen's Counsel).

2. I respectfully submit this declaration in support of the Petition to Recognize and Enforce Foreign Arbitral Awards and Request for Pre-Judgment Security filed by the Petitioners, Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited (the ***Petitioners***), dated 16 March 2018, to recognise and enforce the arbitral award made on 17 March 2015 (the ***Award***) and final award made on 6 August 2015 (***Final Award***, together the ***Awards***), in the arbitration captioned *Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited v Nigerian National Petroleum Corporation* (the ***Arbitration***).

3. I acted as co-counsel for the Petitioners in the Arbitration, in which the Petitioners asserted breach of contract claims against the Nigerian National Petroleum Corporation (**NNPC**), the Nigerian state-owned oil corporation.

4. I also act as counsel for the Petitioners in the following legal proceedings in Nigeria, which all relate to the Arbitration or the acts underlying the Arbitration:

   a. *Federal Inland Revenue Service v Nigerian National Petroleum Corporation & 2 Ors*, docketed at FHC/ABJ/CS/765/2011 at the Nigerian Federal High Court at Abuja, at CA/A/235/2012 at the Nigerian Court of Appeal at Abuja, and at SC/734/2014 at the Nigerian Supreme Court, is a suit initiated by Nigeria's tax authority, the Federal Inland Revenue Service (**FIRS**), to enjoin the Arbitration from concluding and the Petitioners from enforcing any Awards arising from the Arbitration (the **FIRS Injunction Action**).

   b. *Nigerian National Petroleum Corporation v Statoil (Nigeria) Limited & 4 Ors*, docketed at FHC/L/CS/1043/2012 at the Federal High Court at Lagos, is a suit initiated by NNPC to enjoin the Arbitration (the **NNPC Injunction Action**).

   c. *Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited v Nigerian National Petroleum Corporation*, docketed at FHC/L/CS/837/2015 at the Federal High Court at Lagos, and at CA/L/1094M/2017 at the Court of Appeal at Lagos, is a suit initiated by the Petitioners to enforce the Award (the **Award Enforcement Proceedings**).

   d. *Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited v Nigerian National Petroleum Corporation*, docketed at FHC/L/CS/1469/2015 at the Federal High Court at Lagos, and at CA/L/1095M/2017 at the Court of Appeal at Lagos, is a suit initiated by the Petitioners to enforce the Final Award (the **Final Award Enforcement Proceedings**).

   e. *Nigerian National Petroleum Corporation v Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited*, docketed at FHC/L/CS/638/2015 at the Federal High Court at Lagos, and at CA/L/1061/2017 at the Court of Appeal at Lagos, is a suit initiated by NNPC to set aside the Award (the **Set Aside Proceedings**).[1]

---

[1] The Federal High Court consolidated the Award Enforcement Proceedings, the Final Award Enforcement Proceedings, and the Set Aside Proceedings and heard them together.

2

  f. *Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited v Nigerian National Petroleum Corporation*, docketed at FHC/L/CS/1275/2016 at the Federal High Court at Lagos, is a proceeding initiated by the Petitioners to preserve their ability to have their substantive contractual claims against NNPC heard in a Nigerian court in the event the Award is set aside for lack of arbitral jurisdiction (the **Substantive Proceedings**).

  g. Finally, the Petitioners have challenged certain tax assessments in the Tax Appeal Tribunal (the **TAT**) (the **TAT Proceedings**). Some of these are currently on appeal to the Federal High Court.

5. I am therefore familiar with and have personal knowledge of the arbitral proceedings which culminated in the Awards, as well as the Nigerian court and administrative proceedings. I provide the following testimony based on my personal knowledge, and based on my review of the record of the Arbitration and the Nigerian proceedings identified above. If called as a witness, I could and would testify as follows:

**I. The Contractual Relationship between the Petitioners and NNPC**

6. As the evidence in the Arbitration showed, in the early 1990s, Nigeria solicited investment by international oil companies in Nigeria's large, deep-water offshore oil fields, including the area at issue in this dispute, which is governed by Oil Mining License 128 (**OML 128**). At the time, Nigeria did not have the technological ability or financial capacity to develop OML 128 (and the country's other deep-water oil fields) itself, so it turned to international oil companies to do so.

7. To develop the country's deep-water oil fields, Nigeria invited international oil companies, including those in the United States, to enter into production sharing contracts with its state-owned oil company, NNPC. On 18 May 1993, Statoil (Nigeria) Limited, BP Exploration (Nigeria) Limited, and NNPC entered into the Production Sharing Contract covering OML 128 (the **PSC**), which: (i) obliged Statoil (Nigeria) Limited and BP Exploration (Nigeria)

3

Limited to explore for and develop crude oil deposits in OML 128; and (ii) set out all of the parties' rights with respect to the oil that would be produced there.  *See* Ex. A (Award) at ¶ 6.

8. In 1996, Statoil (Nigeria) Limited and BP Exploration (Nigeria) Limited each assigned a fifteen percent interest in the PSC to Texaco Nigeria Outer Shelf Limited.  In 1999, BP Exploration (Nigeria) Limited assigned the remainder of its interest to Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited.  Thus, from 1999 onwards, Statoil (Nigeria) Limited has held a 53.85% interest and Texaco Nigeria Outer Shelf Limited a 46.15% interest in the international oil companies' rights under the PSC.  The Arbitration concerned the parties' rights and obligations under that PSC.  *See* Ex. A (Award) at ¶¶ 9-10.

9. The PSC contemplated an initial exploration period of ten years, during which the Petitioners would (and did) invest heavily in exploring and developing the contract area.  The PSC required the Petitioners to shoulder all of the costs and risks of these activities.  For example, the Petitioners did not know how much oil actually existed in OML 128, and whether the costs involved in extracting it would make the endeavour economically viable.  In other words, if OML 128 proved commercially unfeasible, the Petitioners alone would bear the cost.

10. Given the substantial costs and risks involved to the Petitioners, the PSC contains a number of terms designed to compensate the Petitioners for their efforts.  *See* Ex. A (Award) at ¶ 60.  As I understand it, without these incentives, the Petitioners would not have agreed to invest.

11. *First*, the PSC codifies a framework of favourable, guaranteed tax and royalty rates payable by the Petitioners on the proceeds from OML 128.  Ex. D (PSC) at Annex B, Art. III.  Further, the Petitioners have the sole right and responsibility under the PSC to calculate the amount of taxes owed, and are required to prepare tax returns on behalf of OML 128 and

submit them to NNPC for "onward filing" with the tax authorities.  Ex. D (PSC) at Annex B, Art. III.

12.     *Second*, the PSC contains a detailed breakdown of how the oil extracted from OML 128 will be shared between the Petitioners and NNPC.  The PSC states that the Petitioners shall allocate all of the oil extracted, or oil "lifted", from OML 128 into four tranches: (i) Royalty Oil, which is allocated to NNPC for the payment of lease fees and royalties to Nigeria; (ii) Cost Oil, which is allocated to the Petitioners to recover their capital expenditures and costs; (iii) Tax Oil, which is allocated to NNPC to cover tax payments to Nigeria; and (iv) Profit Oil, which is shared between the Petitioners and NNPC under a formula in the PSC. Ex. D (PSC) at Clause 8.1.  The PSC gives the Petitioners the sole right to calculate, under the terms of the PSC, how much oil is to be allocated to each tranche, and thus to determine how much oil each party is allowed to lift (***Lifting Allocation***).  Ex. D (PSC) at Annex C, Art. III.

13.     *Third*, the PSC contains a stabilisation clause (the ***Stabilisation Clause***) which ensures that in the event of any change in Nigerian law or policy that adversely affects the Petitioners' economic rights under the PSC (including their rights as to the allocation of oil), the PSC will be modified so as to compensate the Petitioners for the change.  Ex. D (PSC) at Clause 19.2.

14.     *Finally*, the PSC contains an arbitration clause, providing that any dispute arising out of the PSC would be submitted to binding arbitration.  Ex. D (PSC) at Clause 21.

## II.     NNPC's Overlifting and Other Breaches of the PSC

15.     I am aware that the Petitioners spent over a decade and hundreds of millions of dollars to explore and develop OML 128.  The Petitioners first produced oil from the field in

2008.  The dispute between the parties emerged shortly thereafter.  *See* Ex. A (Award) at ¶¶ 64-66, 138.

16. At its core, the dispute concerns how much oil each party is entitled to under the PSC, and who has the contractual right to determine that allocation.  *See* Ex. A (Award) at ¶ 67.  As the Tribunal found, the words of the PSC are unambiguous on this point: the Petitioners hold the exclusive right to determine, in line with the contractual formula, how much oil will be lifted by the parties.  *See* Ex. A (Award) at pp 114-15.  NNPC may lift only what is properly allocated to it by the Petitioners.

17. However, in September 2010, NNPC began to insist that it should be allowed to lift more oil than was provided for under the PSC and the Petitioners' calculations.  NNPC appeared to believe that the Petitioners were not respecting the terms of the PSC by allocating too much Cost Oil to themselves and too little Tax Oil to NNPC.  The PSC provided arbitration as a method to resolve this disagreement, but NNPC did not follow this agreed contractual route.  Instead, it began lifting oil from OML 128 in excess of its Lifting Allocation.  *See* Ex. A (Award) at ¶¶ 13, 66.  This became known as NNPC's "overlifting".

18. In addition, instead of forwarding to FIRS the tax returns prepared by the Petitioners as the PSC requires, NNPC started unilaterally preparing and submitting its own tax returns for OML 128.  NNPC's returns stated a significantly higher tax liability for OML 128 than the returns prepared by the Petitioners.[2]  *See* Ex. A (Award) at ¶¶ 69, 182-84.

---

[2] NNPC's returns have, in turn, led to higher tax assessments levied by FIRS against the Petitioners and NNPC.  These tax assessments are the subject of the Petitioners' appeals to the TAT in the TAT Proceedings referenced above, *supra* ¶ 4(g).  The TAT Proceedings have taken place in parallel with the Arbitration and related Nigerian litigation, but they will have no bearing on the outcome of the Arbitration and related Nigerian litigation (and vice versa).  The TAT issued a decision in 2016 which largely agreed with the Petitioners and

6

### III. The Arbitration

19. On 23 May 2011, after unsuccessful attempts to negotiate a resolution with NNPC, the Petitioners initiated the Arbitration under the terms of the PSC. I led the Aluko & Oyebode team that represented the Petitioners as co-counsel in that Arbitration.

20. The Petitioners asserted that NNPC breached the PSC by: (i) lifting volumes of oil that exceeded NNPC's Lifting Allocation, as correctly calculated by the Petitioners; and (ii) unilaterally preparing and filing tax returns on behalf of the Petitioners instead of filing those prepared by the Petitioners. NNPC's breaches improperly inflated the Tax Oil allocated to NNPC, and reduced the amount of Cost Oil and Profit Oil allocated to the Petitioners under the PSC. This denied the Petitioners the benefit of the key economic incentives in the PSC, including that oil is to be allocated according to a certain, agreed-upon contractual framework. The Petitioners sought declaratory relief, specific performance, and damages for NNPC's contractual breaches.

21. Pursuant to the arbitration clause in the PSC, the Arbitration was conducted in Abuja, Nigeria under the arbitration rules of the Nigerian Arbitration and Conciliation Act.

22. The arbitral tribunal (*Tribunal*) was constituted in May 2011 and consisted of three arbitrators: Professor Paul Obo Idornigie, a Nigerian national and law professor, appointed by NNPC; Lord Mark Saville of Newdigate, a UK national and former UK Supreme Court justice, appointed by the Petitioners; and Professor Lawrence Geok Seng Boo, a Singaporean national and law professor, appointed jointly by Professor Idornigie and Lord Saville.

23. The parties submitted lengthy written pleadings to the Tribunal in advance of the Arbitration hearing, including six substantive briefs in total. In addition, the parties collectively

---

ordered FIRS to conduct a new tax assessment, and is currently being appealed by NNPC to the Federal High Court.

submitted eight factual witness statements, three expert reports, and more than 90 exhibits. Each party also submitted two post-hearing briefs.

24. The hearing took place on 21-23 April 2014. NNPC participated in the hearing through its counsel, Perchstone & Graeys.

25. The Petitioners called three fact witnesses, who provided testimony about the PSC and NNPC's contractual breaches, and one expert witness, who testified on the validity of the PSC and the proper methodology for calculating the lifting allocations under Nigerian law and the PSC.

26. NNPC called five fact witnesses, who testified on the administration of petroleum profits taxes and FIRS's tax policies with respect to petroleum operations and production sharing contracts, and one expert witness, who testified on the legal interpretation of the PSC and the Petroleum Profits Tax Act (**PPT Act**).

    A.    **NNPC's Attempts to Avoid Arbitration**

27. Throughout this process, NNPC did all that it could to avoid arbitration. In its pre-hearing briefs to the Tribunal, NNPC argued that the Tribunal lacked jurisdiction because the dispute between the Petitioners and NNPC was allegedly a "tax dispute", which NNPC argued could not be resolved by arbitration, rather than a contractual one. This argument turned on the fact that some of the Petitioners' claims required the Tribunal to refer to and apply Nigeria's Petroleum Profits Tax Act, as the claims related in part to the amount of Tax Oil correctly allocable to NNPC. In its written pleadings, NNPC raised three related arguments on the issue. Below I summarise each of these arguments as well as the Petitioners' responses.

28. *First*, NNPC attempted to characterise the dispute between the parties as a tax dispute solely "arising from tax laws and accordingly [being] within the jurisdiction of the Tax Appeal Tribunal", and therefore having nothing to do with the PSC.

29. The Petitioners responded that the disputes relate to the interpretation and performance of the PSC and are therefore contractual in nature. That these contractual disputes require consideration of Nigerian tax legislation does not transform them into tax disputes. Moreover, a number of the Petitioners' claims, including those involving the Stabilisation Clause (addressed below), did not touch on matters of taxation at all.

30. *Second*, NNPC argued that resolution of the disputes would affect the amount paid to FIRS as Petroleum Profits Tax (**PPT**). NNPC portrayed the Petitioners as asking the Tribunal to exercise FIRS's statutory functions, such as assessing tax and imposing fines for non-payment of taxes, and therefore, NNPC argued, the dispute was a tax dispute.

31. The Petitioners made it clear in their pre-hearing briefing that they were not seeking relief related to FIRS's powers. Rather, the Petitioners asked the Tribunal to "decide, as between [the parties to the PSC], which of the disputed interpretations and modes of performance of the PSC is correct". That was purely a matter of contractual interpretation, which did not implicate FIRS's statutory functions.

32. *Third*, NNPC relied on Section 251 of the 1999 Nigerian Constitution to argue that tax disputes are not arbitrable, and are only capable of resolution by the Tax Appeal Tribunal (**TAT**) or the Nigerian Federal High Court.

33. Section 251 of the Constitution establishes the scope of the Federal High Court's jurisdiction by setting out specific areas of civil law that are exclusively subject to the Federal High Court's jurisdiction, as opposed to the jurisdiction of state courts. Among these are civil

matters "connected with or pertaining to the taxation of companies".  NNPC contended that this provision—which is contained within a chapter describing the Nigerian public judicial system—operates to divest all other adjudicative bodies, including private arbitral tribunals, of jurisdiction over such matters.

34. The Petitioners argued that Section 251 of the Constitution relates only to the allocation of jurisdiction as between Nigeria's state and federal courts, and says nothing about the jurisdiction of arbitral tribunals.  By contrast, for example, Section 285(2) of the Constitution, a jurisdictional section dealing with election tribunals, specifically excludes matters related to elections from the jurisdiction of arbitration tribunals.  The Petitioners also argued that NNPC's reliance on Section 251 of the Constitution was misplaced, as NNPC's interpretation would prevent arbitration of all disputes falling within any subsection of Section 251.  That would make almost all commercial disputes inarbitrable, including matters relating to banks or financial institutions, contracts in respect of the carriage of goods by sea, maritime disputes, and contracts relating to aviation or aircraft maintenance, all of which are contained in Section 251.  Yet those matters are frequently subject to arbitration in Nigeria, and the resulting awards enforced by the Nigerian courts.

35. The Petitioners also argued that the TAT could not possibly have jurisdiction over this dispute.  As an initial matter, FIRS would have to be a party to the action for it to fall within the TAT's purview because the TAT is only empowered to hear appeals from FIRS's decisions or appeals brought by FIRS.  Here, of course, the dispute was between the Petitioners and their contractual counterparty, NNPC.  Moreover, the Fifth Schedule to the FIRS Act enumerates the specific subject areas that the TAT has jurisdiction over, and this dispute did not fall into any of those subject areas.  Therefore, the TAT would not have jurisdiction over the parties' dispute.

36. Curiously, even though NNPC argued that the Tribunal lacked jurisdiction to determine the Petitioners' claims, NNPC argued that the Tribunal had jurisdiction over NNPC's counterclaim, which was based on the very same provisions of the PSC.

**B.  The Award**

37. On 17 March 2015, a majority of the Tribunal (with Professor Idornigie dissenting) found in favour of the Petitioners and ordered declaratory and injunctive relief against NNPC and ordered NNPC to pay damages.

38. The Tribunal first rejected NNPC's jurisdictional arguments.  The Tribunal found that the Petitioners' claims were contractual in nature, and that the TAT's jurisdiction did not extend to the Petitioners' claims just because a subset of those claims related tangentially to tax.  The Tribunal also found that it had jurisdiction over the Petitioners' claims relating to the Stabilisation Clause.

39. The Tribunal then ruled in the Petitioners' favour on the substance of their claims.  The Tribunal found that NNPC had breached the PSC by overlifting oil (in other words, by taking more oil than the Lifting Allocation calculated by the Petitioners), and by filing its own tax returns instead of the returns prepared by the Petitioners.  Specifically, the Tribunal found that NNPC had improperly reduced the Cost Oil allocated to the Petitioners, and the Profit Oil available to the Petitioners, resulting in yet another breach of the PSC.

40. The Tribunal also found in favour of the Petitioners on their Stabilisation Clause claims.  The Tribunal found that Nigerian tax policy had changed since the PSC was entered into, and that a modification to the PSC was required to offset that change for the remaining duration of the contract.

41. With respect to compensation, the Tribunal ruled that the Petitioners' damages were the difference between (a) the amount of oil NNPC lifted and (b) the amount NNPC should have lifted according to the Lifting Allocations. Having decided that point of principle, the Tribunal ordered the parties to agree upon the appropriate sum of damages.

### C. The Final Award

42. The parties could not agree on the appropriate damages amount due to the Petitioners. Thus, the Petitioners sought the Tribunal's assistance. NNPC refused to participate because it had moved to set aside the Award in the Nigerian courts, and argued to the Tribunal that any further action in the Arbitration must be stayed as a result. The Tribunal rejected NNPC's argument. On 6 August 2015, the Tribunal ordered NNPC to pay US$941,557,083 plus interest up to 28 February 2015 amounting to US$50,821,615.58 (and the costs included in the Award of US$2,882,922.08 and £626,872.03). In all, NNPC owed a total of US$995,261,621. The Tribunal also ordered NNPC to pay continuing interest on the damages from 1 March 2015 until payment is made, costs for the Final Award fixed at US$25,000, and additional costs for the arbitration fixed at £13,773.71.

### IV. Other Overlifting Disputes in Nigeria

43. Before I describe NNPC's efforts to escape the Award, it is important to put this case into context. The Petitioners were not the only international oil companies affected by NNPC's actions. NNPC engaged in similar behaviour with respect to other deep-water oil fields developed by other international oil companies, and was the respondent in several parallel overlifting disputes (the ***Overlifting Disputes***). All of the oil fields involved in the Overlifting Disputes, including OML 128, are subject to virtually identical production sharing contracts, all of which contain a broad arbitration clause. And all of the similarly harmed international oil

companies brought arbitration claims against NNPC and won these arbitrations. Those international oil companies which the Nigerian courts did not bar from so-doing tried to enforce their awards in the Nigerian courts. None of these awards has been enforced in Nigeria, however.

44. The Awards at issue here are therefore only one set of several arbitral awards that have been issued against NNPC in the various Overlifting Disputes to date. Collectively, international oil companies, including the Petitioners, are owed several billion dollars in damages as a result of NNPC's overlifting and NNPC's other breaches of its obligations in production sharing contracts. To the best of my knowledge, those international oil companies have not received a cent in payment of those awards.

45. Below are two examples of the Nigerian courts refusing to enforce awards issued in the Overlifting Disputes. On 30 May 2013, the claimants in an Overlifting Dispute related to the deep-water Bonga oil field obtained a multi-billion dollar arbitral award against NNPC. The Bonga claimants have attempted to enforce their arbitral award in Nigeria. They have not been successful.

46. I have been surprised by the clearly erroneous reasoning employed by the Nigerian courts in order to rule for NNPC in the Bonga case. For instance, they have ruled that because the Bonga claimants' notice of arbitration had not been signed by an *individual attorney* admitted to practice in Nigeria, but instead had been signed in the names of the international and Nigerian *law firms* representing the Bonga claimants, the entire arbitration proceeding was void and without any legal effect. That holding relies on statutory provisions relating to court proceedings that have, to my knowledge, never before been applied to set aside an arbitral award in Nigeria.

47. A similar Overlifting Dispute involves the Erha oil field. In that case, the claimants were awarded approximately US$1.8 billion in damages by an international arbitration tribunal. NNPC moved to set aside the Erha award on jurisdictional grounds very similar to those NNPC asserted in the OML 128 Arbitration – essentially that the dispute raises matters of taxation which are inarbitrable. The Federal High Court agreed and set aside the Erha award on that basis. On appeal, the Court of Appeal held that the arbitral tribunal *did* have jurisdiction to adjudicate the Erha claimants' claims concerning their right to prepare PPT returns and calculate the lifting allocations because those claims were contractual in nature (***Erha Decision***). The Court of Appeal also agreed with the tribunal's conclusion that NNPC had breached its contractual obligations by failing to submit the PPT returns prepared by the claimants and by failing to abide by the claimants' lifting allocations. However, the Court of Appeal then concluded that, while the Tribunal could adjudicate liability, it could not award damages because doing so would implicate matters of taxation.

**V.    Efforts by NNPC and FIRS to Block Enforcement of the OML 128 Award**

48. The Claimant's experience in the Nigerian courts has been no different. NNPC has not complied with its contractual obligation to satisfy the Award or the Final Award. Instead, NNPC and other agencies of the Nigerian government appear to be engaged in a concerted effort to prevent the enforcement of the Awards, just as they have done with the other awards generated by the Overlifting Disputes.

49. The Petitioners have lodged several appeals and continue to litigate in the Nigerian courts. If Nigerian law is properly applied, these appeals should result in the enforcement of the Awards in the Petitioners' favour. In my experience, that result is far from guaranteed and NNPC appears prepared to spare no effort in opposing the Petitioners, as I

describe below.  To date, the Petitioners have received none of the compensation to which they are entitled, and they face many years of further litigation in Nigeria before they can even hope to be made whole.

### A. NNPC and FIRS Seek to Enjoin the Arbitration

50. Two of Nigeria's instrumentalities, NNPC and FIRS, sought to stop the Arbitration before the Tribunal could render an award.  NNPC's application was ultimately unsuccessful.  FIRS tried to both enjoin the Arbitration and prevent the Petitioners from enforcing any award.  While the Arbitration proceedings have concluded, thereby mooting part of FIRS's application, FIRS's request to prevent enforcement of the Awards remains pending.

51. Before the Overlifting Disputes, I was not aware of a Nigerian government agency, like FIRS, inserting itself into a private arbitral process (a private process to which it was not a party) in an attempt to secure a judicial ruling in favour of another government entity.  At a basic level, FIRS lacks standing to challenge the Arbitration.  FIRS is not a party to the Arbitration or to the PSC.  There is, to my knowledge, no cause of action in Nigerian law that would allow FIRS to involve itself in the Arbitration in this way.  Before the Overlifting Disputes, I had never encountered any case in which a Nigerian court allowed a third-party to obtain a ruling purporting to divest an arbitral tribunal of its jurisdiction.  None of that, however, persuaded the Nigerian courts, which ignored this precedent and permitted FIRS to intervene in a private dispute to which it was not a party.  Thus, the Federal High Court and the Court of Appeal have agreed to allow a complete stranger to the dispute to prevent the Petitioners from vindicating their contractual rights and enforce the Awards.

52. Currently, this request remains pending while the Petitioners are seeking leave to appeal to the Supreme Court.  Given the systemic delays in the Nigerian court system, that appeal may not be heard until 2022.  The Federal High Court action remains pending while the

appeal is heard, as does the FIRS's request to enjoin the Petitioners from seeking to enforce the Awards. I should note that delays in Nigerian courts are a well-known phenomenon, and have been acknowledged as such by courts of other jurisdictions. *See IPCO (Nigeria) Ltd. v. Nigerian National Petroleum Corp. (No. 3)* [2015] EWCA Civ 1144 & 1145, ¶ 170.

### B. NNPC Seeks to Set Aside the Award

53. The Petitioners moved to have both the Award and the Final Award enforced in the Nigerian courts shortly after each Award was issued. On 5 May 2015, NNPC applied to have the Award set aside.[3] The Federal High Court consolidated the enforcement and set aside actions.

54. In the set aside action, NNPC repeated the jurisdictional arguments it had presented in the Arbitration, and which the Tribunal rejected. NNPC characterised the Petitioners' claims concerning the calculation of lifting allocations and preparation of PPT returns as tax claims, and it advanced the same constitutional interpretation of Section 251 that it raised in the Arbitration.

55. In response, Petitioners argued that NNPC's arguments were foreclosed by previous Supreme Court and Court of Appeal precedent. In addition, while NNPC's set aside application was pending, the Court of Appeal issued the Erha Decision. There, the Court of Appeal concluded that similar claims concerning the calculation of lifting allocations and the right to prepare PPT returns—based on nearly identical conduct, asserted against the same defendant, and arising out of a nearly identical contract—were contractual in nature and therefore arbitrable. Thus, the Court of Appeal concluded that the arbitration tribunal had jurisdiction to find that NNPC breached its contractual obligations under an analogous PSC by

---

[3] NNPC did not seek to set aside the Final Award, and can no longer do so because the deadline within which NNPC could seek set aside expired long ago.

lifting oil in excess of its allocations and failing to submit the tax returns prepared by the international oil companies. Because the Erha Decision came down after the initial briefing in our action, my colleagues and I submitted supplemental briefing to the Federal High Court on the decision and its importance to our case. In essence, we argued that the Erha Decision itself was either *per incuriam* (in that it contradicted controlling authorities in suggesting that the damages part of the dispute in Erha was inarbitrable), or at the very least allowed for the Award in our case to be enforced in relevant part.

56. Nonetheless, the Federal High Court ruled in NNPC's favour and set aside the Award. The Court's decision, issued on 7 March 2017, did not engage with or distinguish Petitioners' arguments that Section 251 allows for arbitration of disputes concerning the topics enumerated therein, and that this was well-established precedent. Instead, the Federal High Court rested on the conclusion that the matter submitted to the Tribunal was an inarbitrable tax dispute (the ***Set Aside Decision***).

57. In so doing, the Federal High Court also ignored the Court of Appeal's Erha Decision. Indeed, the Erha Decision is not discussed in the Set Aside Decision, despite it being issued by a higher court and having precedential value (to the extent that it was not considered to be *per incuriam*). Instead, the Set Aside Decision relied on the reasoning rejected by the Court of Appeal in the Erha Decision and held that Section 251 of the Constitution barred the tribunal from adjudicating the claimants' contractual claims related to their rights to prepare PPT returns and calculate lifting allocations, because those claims purportedly concerned taxation. This holding relies on an incorrect interpretation of Section 251 of the Constitution and a mistaken belief that the dispute between the parties was a tax dispute. In my experience, until the Overlifting Disputes, Section 251 had always been interpreted to determine which Nigerian

courts—state or federal—could hear disputes, not whether the issues listed in the Section could be arbitrated.  Indeed, as the Petitioners argued in the Arbitration, the language of Section 251 states that the Federal High Court has jurisdiction over certain subject matters "to the exclusion of any other *Court*", not to the exclusion of any other Court *or tribunal*.  Only when the Overlifting Disputes crystallised did the Nigerian courts begin to interpret Section 251 as a bar to the arbitrability of certain disputes.

58.	The Petitioners appealed the Set Aside Decision to the Court of Appeal on 2 June 2017.  NNPC was scheduled to file its brief on 5 November 2017, and actually filed it on 7 March 2018.  Given NNPC's tardiness with its filings, as well as systemic delays in the Nigerian court system, we anticipate at least two years before the Court of Appeal reaches a decision in this action.  And, of course, any such decision would likely be appealed to the Supreme Court, resulting in further delays.

**C.	NNPC Seeks to Block the Petitioners from Obtaining Any Remedy in the Substantive Proceedings**

59.	When setting aside the Award, the Federal High Court held that the Petitioners would instead have to commence an action in Nigerian courts in order to recover on their contractual claims.  Recognising the possibility of such a decision, the Petitioners had brought an action in September 2016 against NNPC for the same contractual violations they alleged in the Arbitration (***Substantive Action***).  Though the Petitioners continue to appeal the Set Aside Decision, they brought the Substantive Action because the statute of limitations to bring these contractual claims in Nigerian courts was expiring.  Thus, the Petitioners immediately moved to stay the Substantive Action pending the resolution of the appeals of the Set Aside Decision.

60.	Contrary to its previous position that the Federal High Court was the appropriate forum for the Petitioners' contractual claims, NNPC objected to the stay and immediately moved

to dismiss the Petitioners' complaint as an abuse of process. The gist of NNPC's argument was that the Petitioners' application was an abuse of process since the Petitioners would not simultaneously waive their rights to appeal the Set Aside Decision and enforce the Award. NNPC's dismissal motion remains pending. If the experience of other international oil companies is any indication, the Petitioners cannot be confident that the Substantive Action will survive. The Federal High Court dismissed a similar action brought by claimants in connection with the Erha dispute as an abuse of court process. If that were to happen here, the Petitioners will be left without a forum in which to seek relief for NNPC's contractual breaches.

## VI. Exhibits

61. Attached hereto as Exhibit A is a true and correct copy of the Award dated 17 March 2015.

62. Attached hereto as Exhibit B is a true and correct copy of the Final Award dated 6 August 2015.

63. Attached hereto as Exhibit C is a true and correct copy of the Nigerian National Petroleum Corporation Act.

64. Attached hereto as Exhibit D is a true and correct copy of the PSC dated 18 May 1993, between NNPC on one hand and Statoil (Nigeria) Limited and BP Exploration (Nigeria) Limited on the other.

65.     Attached hereto as Exhibit E is a true and correct copy of the curriculum vitae of Lord Mark Saville of Newdigate, who was appointed by the Petitioners to the Tribunal.

66.     Attached hereto as Exhibit F is a true and correct copy of the curriculum vitae of Professor Paul Obo Idornigie, who was appointed by Respondent to the Tribunal in the Arbitration.

67.     Attached hereto as Exhibit G is a true and correct copy of the curriculum vitae of Professor Lawrence Geok Seng Boo, who was jointly appointed President of the Tribunal by Professor Idornigie and Lord Saville.

68.     Attached hereto as Exhibit H is a true and correct copy of the Federal High Court decision issued in the Set Aside Proceedings on 7 March 2017.

69.     Attached hereto as Exhibit I is a true and correct copy of the Court of Appeal decision issued in the Erha case on 22 July 2016.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed:   Uxbridge, England
            16 March 2018

_____
Babatunde Fagbohunlu, SAN