# Exhibit A

IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT NO. 11 OF 1988

(CHAPTER A18 LAWS OF THE FEDERATION OF NIGERIA 2004)

AND

IN THE MATTER OF AN ARBITRATION

Between

**1. STATOIL (NIGERIA) LIMITED**
**2. TEXACO NIGERIA OUTER SHELF LIMITED**

*(Claimants)*

And

**NIGERIAN NATIONAL PETROLEUM CORPORATION**

(*Respondent*)

---

# AWARD

---

***The Arbitral Tribunal:***

Professor Lawrence Boo (Chairman)
Lord Mark Saville of Newdigate
Professor Paul Obo Idornigie

***Secretary to the Tribunal:***
Earl J Rivera- Dolera

17 March 2015
NIGERIA

## Table of Contents

The Parties ..................................................................................................................... 4

The Representatives ........................................................................................................ 4

The Contract and Arbitration Agreement ..................................................................... 6

The Tribunal .................................................................................................................. 8

Seat and Language of Arbitration .................................................................................. 9

Applicable Rules and Law ............................................................................................. 9

Procedural History ........................................................................................................ 10

Brief Background of the Dispute ................................................................................... 16

The Claims and Defence ............................................................................................... 18

     The Claimants' Claims .......................................................................................... 18

     The Respondent's Defence .................................................................................... 30

Issues for determination ............................................................................................... 37

Findings and Reasons .................................................................................................... 39

     Jurisdiction and Arbitrability ................................................................................ 39

     I.      Claimants' claims: ....................................................................................... 45

     a. Claimants' engagement in petroleum operations/ liability to PPT ..................... 45

     b. Cost recovery pursuant to Clause 8.1(b); ........................................................... 50

     c. Cost recovery of home office overhead charges ................................................. 53

     d. Amortization and timing  of recovery of capital costs ....................................... 55

     e. Timing of capital allowances .............................................................................. 58

     f.  Consolidation for PPT purposes pursuant to Clause 8.1(e) ............................... 62

     g.  Investment Tax Credit: whether deductible from cost of capital assets prior to the computation of capital allowances? ....................................................................... 68

     h. Signature bonuses and ........................................................................................ 74

     i. Production Bonuses .............................................................................................. 74

j.   Interest expense ...................................................................................... 76

k.  Sole costs ................................................................................................ 81

l.   PPT administration ................................................................................ 81

m. Modification of the 217 PSC pursuant to Clause 19.2 .......................... 84

II.    The Counterclaim ................................................................................. 90

a. Lifting Allocation .................................................................................. 90

b. Tax savings ........................................................................................... 96

Relief and Remedies ............................................................................................ 100

Damages ........................................................................................................ 100

Interest ........................................................................................................... 101

Declaratory relief .......................................................................................... 102

Costs 108

Summary of Decisions ........................................................................................ 110

We FIND, HOLD and DECLARE that: .............................................................. 114

We hereby ORDER and DIRECT - .................................................................... 117

And we AWARD and ADJUDGE that - ............................................................. 118

And we further DIRECT that: ............................................................................. 119

## The Parties

1.  The Claimants in these proceedings are:

    a.  **STATOIL (NIGERIA) LIMITED**, ("Statoil / 1st Claimant") a company incorporated under the laws of the Federal Republic of Nigeria ("Nigeria"), with registered office at 1A Bourdillon Road, Ikoyi, Lagos, Nigeria and another office address at Jiton Court, 1 Oyinkan Abayomi Drive, Ikoyi, Lagos, Nigeria. It is wholly owned by Statoil Nigeria AS which in turn is wholly owned by Statoil ASA, a company incorporated under the laws of Norway; and

    b.  **TEXACO NIGERIA OUTER SHELF LIMITED** ("TNOS/ 2nd Claimant"), a company incorporated under the laws of Nigeria, with registered office at 2 Chevron Drive, Lekki Peninsula, Lagos, Nigeria. It is an indirect subsidiary of Chevron Corporation, a company incorporated in the United States of America.

    The 1st Claimant and the 2nd Claimant are collectively referred to as the "Claimants".

2.  The Respondent is **NIGERIAN NATIONAL PETROLEUM CORPORATION.** ("NNPC /Respondent"), a company incorporated pursuant to the Nigerian National Petroleum Act 1977 Cap N123 Laws of the Federation of Nigeria 2004 with head office at NNPC Towers, Herbert Macaulay Way, Central District, Garki, Abuja, Nigeria and of  7, Kofo Abayomi Street, Victoria Island, Lagos, Nigeria.  It is wholly owned by the state of Nigeria.

3.  The Claimants and the Respondent may each be referred to as a "Party" and are collectively referred to as the "Parties" hereinafter.

## The Representatives

4.  The Claimants are jointly represented in these proceedings by:

**Messrs Aluko & Oyebode**
Mr Babatunde FAGBOHUNLU, SAN
Mr Chukwuka IKWUAZOM
Mr Hamid ABDULKAREEM
1 Murtala Muhammed Drive
(formerly Bank Road)
Ikoyi, Lagos
Nigeria
or
35 Moloney Street
P.O. Box 2293
Marina, Lagos
Nigeria
Tel: +234 1 2600080/ 462 8360
Fax: +234 1 2632249
Email: tunde.fagbohunlu@aluko-oyebode.com
        chukwuka.ikwuazom@aluko-oyebode.com
        hamid.abdulkareem@aluko-oyebode.com
and

**Messrs Hogan Lovells International LLP**
Mr Simon NESBITT
Mr Jerome FINNIS
Mr Robert SHOESMITH
Atlantic House
50 Holborn Viaduct
London EC1A 2FG
United Kingdom
Tel: +44 20 7296 2000
Fax: +44 20 7296 2001
Email: simon.nesbitt@hoganlovells.com
        jerome.finnis@hoganlovells.com
        robert.shoesmith@hoganlovells.com

5.   The Respondent is represented in these proceedings by:

**Messrs Perchstone & Graeys**
Mr. Osaro EGHOBAMIEN, SAN
Mr. Olawale ADEBAMBO
Mr. Tolulope ADEREMI
1, Perchstone & Graeys Close,
Off Remi Olowude Street
Lekki Epe Express Way Lagos
Lagos, Nigeria
P.O. Box 52593, Falomo, Ikoyi, Lagos
Lagos, Nigeria

Tel: +234 1 761 1051/ 899 0681 / 342 9131
Email: osaroeghobamien@perchstoneandgraeys.com
      olawaleadebambo@perchstoneandgrayes.com
      toluaderemi@perchstoneandgraeys.com

## The Contract and Arbitration Agreement

6.    By a Production Sharing Contract entered into on 18 May 1993 by the Respondent, the 1st Claimant and BP Exploration (Nigeria) Limited ("BP"), the 1st Claimant and BP were engaged to conduct petroleum operations in the area of Oil Prospecting Licence ("OPL") No. 217 (Deep Offshore) ("OPL 217") (the "217 PSC") [Hearing Bundle ("HB")-A/1]. Following the finding of oil in commercial quantities, OPL 217 was subsequently converted to Oil Mining Lease ("OML") No. 128 ("OML 128").

7.    The 1st Claimant, BP and the Respondent had also entered into other Production Sharing Contracts dated 18 May 1993 for OPL 213 (the "213 PSC") [HB-C1/26] and OPL 218 (the "218 PSC") [HB-C1/111]. OPL 213 was subsequently also converted to OML 132, and OPL 218 to OML 129.  The 217 PSC, 213 PSC and the 218 PSC are collectively referred to as the "Statoil/ BP PSCs".

8.    The 1st Claimant, BP and the Respondent also entered into a memorandum entitled "Production Sharing Contracts for OPLs 213, 217 and 218 Memorandum" dated 18 May 1993 to clarify and supplement the Statoil/ BP PSCs. (the "Memorandum of 18 May 1993"). [HB-A/2]

9.    By a Deed of Assignment dated 27 March 1996[HB-C1/278], the 1st Claimant and BP each assigned to the 2nd Claimant a 15% undivided participating interest in the Statoil/ BP PSCs.

10.    On 20 April 1999 [HB-C1/ 296], BP assigned the remainder of its participating interest in the 217 PSC to the Claimants resulting in the 1st Claimant now holding 53.85% participating interest and the 2nd Claimant, 46.15% interest under that PSC.

11. The Claimants' case is that the Respondent has breached the 217 PSC by denying the Claimants of their entitlement to lift quantities of Available Crude Oil ("ACO") determined in accordance with the provisions of the 217 PSC, and (since November 2010) by unilaterally lifting ACO to which the Respondent is not entitled. The Claimants allege that the Respondent had deprived the Claimants of funds which they are entitled to receive in order to recover their operating costs and enjoy their contractual share of the profits.

12. The Respondent opposes the Claimants' claims, raising both jurisdictional and substantive defences. It urges the Tribunal to decline jurisdiction as the subject matter in dispute in its view is not arbitrable as it is concerned with matters that could have direct or indirect impact on taxation, which matters properly lie within the jurisdiction of the Nigerian revenue authorities and the Nigerian courts. It also denies any breach of the 217 PSC and asserts it had not overlifted ACO. The Respondent also raised counterclaims alleging that the Claimants had in fact overlifted ACO and were in breach of 217 PSC.

13. Clause 21 of the 217 PSC provides for the arbitration agreement as follows:

   "**CLAUSE 21**

   **CONSULTATION AND ARBITRATION**

   If a difference or dispute arises between the CORPORATION and the CONTRACTOR, concerning the interpretation or performance of this Contract, and if the parties fail to settle such difference or dispute by amicable agreement, then either Party may serve on the other a demand for arbitration.  Within thirty (30) days of such demand being served, each party shall appoint an arbitrator and the two arbitrators thus appointed shall within a further thirty (30) days appoint a third arbitrator and if the arbitrators do not agree on the appointment of such third arbitrator, or if either Party fails to appoint the arbitrator to be appointed by it, such an arbitrator or third arbitrator shall be appointed by the President of the Court of Arbitration of the International Chamber of Commerce (ICC) in Paris on the application of the other Party (notice of the intention to apply having duly given in writing by the applicant party to the other party) and when appointed the third arbitrator shall convene meeting and act as chairman thereat.  If an arbitrator fails or is unable to act, a successor shall be appointed by the respective party or by the arbitrators in the event the chairman must be

succeeded.    The arbitration award shall be binding upon the parties and the expenses shall be borne by the parties in such proportion and manner as may be provided in the award.    The Nigerian Arbitration and Conciliation Act Cap 19, Laws of the Federation of Nigeria, 1990 shall apply to this contract.    The venue of the arbitration shall be any where in Nigeria as agreed by the parties.

…"    (the "arbitration agreement") [HB-A/1, p. 35]

## The Tribunal

14.    Pursuant to the arbitration agreement, the Claimants nominated Lord Mark Saville of Newdigate (UK) ("Lord Saville") and the Respondent nominated Professor Paul Obo Idornigie (Nigeria) ("Professor Idornigie").    On 19 August 2011. Lord Saville and Professor Idornigie appointed Professor Lawrence Boo ("Professor Boo") (Singapore) to be the Chairman of the Arbitral Tribunal.

15.    The Arbitral Tribunal is thus constituted by:

**Lord Mark Saville of Newdigate**
c/o Essex Court Chambers
24 Lincoln's Inn Fields,
London
WC2A 3EG
    United Kingdom
    Tel: +44 0 20 7813 8000
    Fax: +44 0 20 7813 8080
    Email: lordsaville@essexcourt.net

**Professor Paul Obo Idornigie, PhD**
Department of Commercial Law
Nigerian Institute of Advanced Legal Studies
Supreme Court Complex
Three Arms Zone
P.M.B. 385, Garki
Abuja, Nigeria
Or
No. 1 Durban Street
Off Adetokumbo Ademola Crescent,
Wuse 2,
Abuja, Nigeria
Tel: +234 803 311 4797

Email: idornigie@hotmail.com

and

**Professor Lawrence Geok Seng BOO**
C/o The Arbitration Chambers Pte Ltd
32 Maxwell Road #02-03
Singapore 069115
Tel: +65 6538 1277
Fax: +65 6538 1727
Email: lawboo@arbiter.com.sg

16. The Tribunal with the Parties' consent appointed a Tribunal Secretary to assist in the administration of the arbitration. Ms Yewon Han, LLB, LLM was appointed Tribunal Secretary on 5 September 2011. Ms Earl J Rivera-Dolera, BSc, LLB, LLM took over as Tribunal Secretary on 20 November 2012.

## Seat and Language of Arbitration

17. The arbitration agreement provides that the venue of the arbitration shall be anywhere in Nigeria as agreed upon by the Parties.  The Parties agreed to have the hearing held in Abuja, Nigeria.  The arbitration proceedings have proceeded on the basis that the seat of the arbitration is Nigeria.

18. Clause 19.3 of the 217 PSC provides for the language of the arbitration:

    "All affairs related to this Contract shall be conducted in the language in which this Contract was drawn up."

    The 217 PSC was written in the English language.  It thus follows that the arbitration proceedings are to be conducted in the English language.

## Applicable Rules and Law

19. Pursuant to Clause 19.1 of the 217 PSC, the law applicable to the same and any dispute arising therefrom is the law of Nigeria.

9

20.  Pursuant to the arbitration agreement, the Nigerian Arbitration and Conciliation Act Cap 19, Laws of the Federation of Nigeria 1990 applies as the law of the arbitration.

## Procedural History

21.  This arbitration was commenced by the Claimants' Notice of Arbitration ("Notice") dated 23 May 2011 pursuant to Article 3 of the First Schedule to the Arbitration and Conciliation Act No. 11 of 1988 (Chapter A18 Laws of the Federation of Nigeria 2004) (the "Arbitration Act"). [HB-B/1]

22.  On 24 August 2011, the Tribunal set out its directions for *inter alia* the Parties' service of pleadings, submissions on challenge to the Tribunal's jurisdiction, and a proposed preliminary meeting to settle the procedural timetable on how to proceed with these arbitration proceedings.

23.  Pursuant to the directions made by the Tribunal on 24 August 2011 and appurtenant extensions thereto, the Parties served their respective pleadings as follows:

     a.  Claimants' Statement of Claim dated 21 September 2011 ("SOC"),

     b.  Respondent's (i) Preliminary Objection ("Objection")/ Statement of Defence ("Defence"), and (ii) Counterclaim ("Counterclaim") both dated 23 November 2011.

24.  At a meeting held on 29 November 2011 in London, the Parties agreed to the Tribunal's Terms of Engagement and adopted a schedule of steps for the further conduct of these arbitration proceedings.  The Terms of Engagement were signed by the Parties and the Tribunal on 5 December 2011.

25.  In accordance with the arrangements reached during the meeting of 29 November 2011, the Tribunal issued Procedural Order No. 1 ("PO 1") dated 8

December 2011 setting out further directions in the conduct of these arbitration proceedings.

26.    Pursuant to PO 1, the following pleadings have been served:

   a.  Claimants' Statement of Reply and Defence to Counterclaim dated 9 March 2012; and

   b.  Respondent's Rejoinder to Statement of Reply and Reply to Defence to Counterclaim both dated 6 April 2012.

27.    On 13 April 2012, the Parties served their respective Requests for Production of Documents and each responded to the respective requests on 4 May 2012. The Claimants served a rejoinder on 5 May 2012 to the Respondent's objections to the production of documents so requested.

28.    Upon considering the Parties' requests to produce documents and their respective objections thereto, the Tribunal issued Procedural Order No. 2 dated 5 June 2012 ("PO 2").

29.    On 21 June 2012 the Respondent relying on two decisions of the Federal High Court of Nigeria ("FHC"), in Suit No. FHC/ABJ/CS/774/11, *Federal Inland Revenue Service v Nigeria National Production Company Limited and 4 others* and in Suit No. FHC/ABJ/CS/764/11, *Federal Inland Revenue Service v NNPC & 2 others* sought a suspension of these proceedings.

30.    On 25 June 2012, the Claimants objected to any application for a stay or suspension of the arbitration proceedings.

31.    On 3 July 2012, the Tribunal took the view that there was no basis for the suspension of any part of the arbitration proceedings.

32.    The Respondents served an application for stay of proceedings and/or determination of the issue of jurisdiction on 10 July 2012 as allegedly necessitated by judgments of the FHC of Nigeria relating to non-arbitrability of

tax disputes under Nigerian law to which the Claimants objected on 3 August 2012. On 13 August, the Tribunal refused this application.

33.  On 3 and 9 August 2012, the Parties exchanged witness statements *viz.*

*From the Claimants:*

    a.  Mr. Owen Arasomwan ("Mr. Arasomwan"),

    b.  Mr. Babatunde Ale ("Mr. Ale") / ("Ale 1"), and

    c.  Ms. Ronke Ibrahim ("Ms. Ibrahim")/ ("Ibrahim 1").

*From the Respondent*:

    d.  Mrs. Juliet Ogedi David-West ("Mrs. David-West"),

    e.  Mr. Mele Kyari ("Mr. Kyari"),

    f.  Mr. Moses Dayo Olamide ("Mr. Olamide"),

    g.  Mr. Yusuf Shimingah Matashi ("Mr. Matashi"), and

    h.  Dr. Timothy Okon ("Dr. Okon").

34.  On 7 September 2012, the Respondent notified the Tribunal of the Respondent's application filed with the FHC, Lagos on 3 September 2012 for a review of the Tribunal's decision refusing to stay or bifurcate the arbitration proceedings and sought interim measures including:

> "…
> i. An Order setting aside the Arbitral Award made by Professor Lawrence Boo on behalf of the Arbitral Tribunal consisting of Professor Lawrence Boo, Lord Saville of Newgate (sic) and Professor Paul Idornigie on August 13, 2012 in the Arbitration proceedings between i) Statoil (Nigeria) Limited ii) Texaco Nigeria Outer Shelf Limited v. Nigerian National Petroleum Corporation;
>
> ii. An Order staying proceedings in the Arbitration between i) Statoil (Nigeria) Limited ii) Texaco Nigeria Outer Shelf Limited v. Nigeria National Petroleum Corporation currently pending before the Arbitral Tribunal (comprising of Professor Lawrence Boo, Lord Saville of Newgate (sic) and Professor Paul

Idornigie) from conducting further proceedings pending the hearing and determination of the appeal filed in Appeal No: CA/A/235/2012;

iii. A Declaration that the failure of the Arbitral Tribunal (comprising of the 3rd, 4th and 5th Respondents) to give reason(s) for its decision of August 13, 2012 in respect of the Applicant's Application dated July 10,2012 for stay of arbitration proceedings; is a denial and or breach of the Applicant's constitutional right to fair hearing."

35.   The Respondent sought leave to have its application for interim measures heard by the FHC during the court's vacation which the FHC had dismissed. Without waiting for the FHC's ruling on its application for interim measures, the Respondent then appealed against the FHC's decision refusing to hear the application during the court's vacation, to the Court of Appeal in Appeal No. CA/654/12 and applied therein for an injunction pending the hearing of the appeal.   The Respondent also asked that the Tribunal desist from continuing the arbitration pending the hearing of the Respondent's appeal to the Court of Appeal and stated it would be unable to proceed any further with this arbitration, submitting that:

   a. under Nigerian law, the Tribunal ought to stay the arbitration proceedings when it had been notified of the court papers filed in relation to the pending applications. Any further step taken in these proceedings would be tantamount to disobedience of the court; and

   b. further action on the arbitration proceedings would pre-empt the determination by the Court of Appeal on both the substantive appeal and the application for an injunction.

36.   On 7 September 2012, the Claimants served the Expert Report of Mr Babatope Ogunnowo ("Mr Ogunnowo").

37.   The Claimants objected to any attempt by the Respondent to stall the arbitration proceedings and stated that the Parties ought to comply with the procedural timetable set out in PO 1.   Following further exchanges of submissions on the issue of suspension of these proceedings, the Tribunal ruled on 13 September

2012, against suspending the arbitration proceedings and directing the Parties to comply with all directions and orders previously given.

38.   In the course of preparation for the hearing set for 22-30 October 2012, the Respondent informed the Tribunal that it was constrained from further participating in the arbitration proceedings pending the determination of its applications in the FHC.

39.   On 5 October 2012, the Respondent furnished the Tribunal with copies of three orders of the FHC in Lagos Judicial Division Holden at Lagos dated 4 October 2012 in Suit No.: FHC/L/CS/1043/2012. The orders included an  the order for an interim injunction (the "Interim Injunction Order") restraining the Tribunal and Parties from further conduct of these proceedings pending the hearing and determination of the Respondent's application for an interlocutory injunction filed in the suit. The Claimants filed a Notice of Appeal at the Court of Appeal challenging the Interim Injunction Order and applied for a stay or suspension of said order.

40.   In compliance with the Interim Injunction Order, the Tribunal directed the suspension of the arbitration proceedings on 8 October 2012. At the request of the Parties, a further letter of 15 October 2012 was issued to enable the Parties to confirm to the FHC the compliance with the Interim Injunction Order.

41.   Following hearings of the applications and appeals pending before the FHC and the Court of Appeal, the Court of Appeal in the course of a hearing set for 12 July 2013 in Suit No. FHC/L/CS/1043/2012 discharged, with immediate effect, the Interim Injunction Order of the FHC (the "Discharge Order").

42.   On 15 July 2013, the Tribunal directed the Parties to inform the Tribunal of the status of the court proceedings that may be related to Suit No. FHC/L/CS/1043/2012, and for the Parties' intentions on the further conduct of the arbitration proceedings.

43.   The Parties attempted to but were unable to agree on whether the arbitration proceedings should be revived or await the outcome of the Respondent's appeal of the Discharge Order.

44.   On 5 September 2013, the Tribunal proposed a meeting with the Parties in London to grant a further opportunity for the Respondent to show cause why the arbitration proceedings should not proceed.

45.   A hearing was held at the International Dispute Resolution Center ("IDRC") in London on 3 December 2013 in which Parties appeared through counsel, after which the Tribunal issued Procedural Order No. 3 ("PO 3") [HB-B/11], ordering that the arbitration proceedings should continue on both jurisdiction and the merits and setting out the remaining steps in these arbitration proceedings including the oral evidentiary hearing set for 21-25 April 2014 in Abuja, Nigeria.

46.   On 20 February 2014, the Respondent served the Expert Report of Mr. Desmond Guobadia dated 17 February 2014.

47.   On 6 March 2014, the Claimants served the Reply Expert Report of Mr. Babatope Ogunnowo.

48.   The experts submitted their Joint Experts' Report dated 20 March 2014 on 24 March 2014.

49.   On 28 March 2014, the Claimants served a Second Witness Statement of Ms. Ibrahim updating the factual information contained in the First Witness Statement of Mr. Arasomwan dated 13 July 2012.  Mr. Arasomwan had left the employ of the 1st Claimant.

50.   The Parties served their respective Pre-hearing Briefs on 7 April 2014.

51.   On 18 April 2014, the Respondent requested that Mr. Kyari be allowed to adopt the Witness Statement of Mrs. David-West who would be unavailable for cross-examination.

52. The oral evidentiary hearing was held on 21-23 April 2014 in Abuja, Nigeria.

53. At the close of hearing, arrangements were made for the submission of Post-hearing Briefs and Reply Post-hearing Briefs.

54. The Respondent served a copy of the slides it had shown during the 1st day of hearing of 21 April 2014.

55. The Parties exchanged Post-hearing Briefs and costs submissions on 21 July 2014 and Reply Post-hearing Briefs on 15 August 2014.

56. The Claimants submitted monthly updated calculations of the difference between the amount of lifting-generated proceeds which the Claimants claimed to be entitled to receive , and the amount of such proceeds which the Claimants had received (the "Proceeds Imbalance") together with interest accruing thereon at monthly intervals, the latest of which was as at 31 January 2015. The Respondent has made no objection or any comment thereon.

57. On 16 February 2015 the Tribunal granted the Parties an opportunity to comment on any matter that have been submitted on or occurred since the Reply Post-hearing Briefs.

58. On 3 March 2015, the Respondent served further submissions.  The Claimants did not submit any.

## Brief Background of the Dispute

59. The area within which the Parties are engaged is approximately 70 miles off the coast of the central Niger Delta region and is known as the Agbami field which straddles OML 127 and OML 128.   The Claimants do not have any participating interest in OML 127.  Having been unitized pursuant to a Unit Agreement dated 11 February 2005, those parts of OML 127 that contained the Agbami field were designated as "Tract 1" and those of OML 128 as "Tract 2".  OML 128, Tract 2 of the Agbami field is to date the exclusive source of oil production out of which the

Claimants' and Respondent's respective entitlements to lifting of ACO and the allocation of proceeds generated from the sale thereof arise (the "Proceeds").

60. Apart from the 213 PSC, 217 PSC and the 218 PSC referred to in paragraphs 6 and 7 above, the Honourable Secretary of Petroleum and Mineral Resources, acting for and on behalf of the Federal Government of Nigeria (the "Government"), signed a side letter dated 18 May 1993 addressed to the Managing Directors of Statoil and of BP (Side Letter-18 May 1993) [HB-A/3], referring to "*the Production Sharing Contract*" to be signed between NNPC, Statoil and BP "*relating to OPL(s) No. 213, 217 and 218 Deep Offshore and any subsequent OML(s) that may be derived therefrom*" and guaranteeing that:

> "… the following terms which require amendments to existing Nigerian laws are applicable and enforceable:
> (i) The OPL(s) shall be for a maximum term of ten (10) years;
> (ii) The Petroleum Profit Tax (PPT) for petroleum operations under the PSC shall be 50% flat in accordance with the PSC terms;
> (iii) The Investment Tax Credit (ITC) for NNPC and the Contractor in respect of petroleum operations under the PSC shall be 50% flat in accordance with the PSC terms;
> (iv) Royalty Rates shall be as provided in the PSC; and
> (v) Computation and payment of estimated and final PPT is to be made in US dollars on the basis of the US dollar returns filed.

[HB -A/3]

61. The dispute between the Claimants and the Respondent in the main concerns the Parties' different interpretation of the entitlement to lift ACO under the 217 PSC and the consequent allocation of oil for the purposes set out in that PSC. The Claimants and the Respondent are each entitled to lift, export and sell allocated quantities of ACO.  The ACO is stored in a floating production storage and offloading vessel in the Agbami field (the "Agbami FPSO") and the lifting occurs when either the Claimants or the Respondent load ACO from the Agbami FPSO onto a crude oil tanker ship.

62. It is not in dispute that the ACO and the Proceeds from the sale of the ACO are to be shared by the Parties in accordance to Clause 8 of the 217 PSC  on the basis of the following:

17

    a. Royalty Oil - this is allocated only to the Respondent for the Respondent to pay any and all royalties and rents due to the Government;

    b. Cost Oil - this is allocated only to the Claimants, to enable the Claimants to recover its Operating Costs;

    c. Tax Oil – this is allocated only to the Respondent, to enable the Respondent to pay, on behalf of the Parties, any Petroleum Profits Tax ("PPT") due to the Government;

    d. Profit Oil – this is the balance of ACO after deduction of Royalty Oil, Tax Oil, and Cost Oil (in said order), and is allocated to each Party on the basis of a percentage split, currently at 80% for the Claimants and 20% for the Respondent.

63. The relevant statutory instruments referred to herein are:

    a. "Petroleum Profits Tax Act Cap 354 Laws of the Federation of Nigeria 1990 as amended", i.e. the Petroleum Profits Tax Act Chapter P13 Laws of the Federation of Nigeria 2004 ("PPT Act 2004"); [HB-E1/2]

    b. "Deep Offshore Act" a reference to the Deep Offshore and Inland Basin Production Sharing Contracts Act Chapter D3 Laws of the Federation of Nigeria 2004 ("DOA"); [HB-E1/3]

## The Claims and Defence

### The Claimants' Claims

64. Commencing March 2009 until November 2010, the Claimants and the Respondent each lifted cargoes of ACO in accordance with the entitlement and allocation model prepared by the Claimants. (the "Claimants' E&A Model")

65.  Meetings were held in September 2010 and the Respondent notified the Claimants that the Claimants' E&A Model was incorrect and insisted that it had the right to lift more cargoes.

66.  Beginning in November 2010, the Respondent started lifting more ACO from Agbami FPSO than what had been set out as its entitlement and allocation in the Claimants' E&A Model. Despite the Claimants' protests, the Respondent had continued to do so resulting in a large Proceeds Imbalance.

67.  It is the Claimants' case that the terms of the 217 PSC give them the entitlement to lift ACO so as to recover more of its Cost Oil and Tax Oil on the following bases:

   a.  <u>*Cost recovery – Clause 8.1(b)*</u> - Clause 8.1(b) provides that Operating Costs incurred in OPLs 217, 213 and 218 and any OMLs derived therefrom (including OMLs 132 and 129) are recoverable through Cost Oil from OPL 217 / OML 128.

   b.  <u>*Cost recovery of Home Office Overhead Charges*</u> – Clause 13.3 provides that in any given year or in each of the years when the Claimants incurred significant capital expenditure prior to the commencement of production in September 2008, the maximum amount of home office overhead charges (which is US$ 4 million), forms part of Operating Costs and is thus recoverable through Cost Oil.

   c.  <u>*Consolidation for PPT purposes*</u> – PPT is to be calculated and Tax Oil allocated on a basis that consolidates not only OPL 217 (and any OML derived therefrom) but also OPLs 213 and 218 (and any OMLs derived therefrom) as specifically provided in Clause 8.1 (e).

68.  The Claimants raise several areas whereby the Respondent was said to have committed breaches of the terms of the 217 PSC, resulting in a net imbalance of lifting of ACO. Brief details are set out in the following paragraphs.

*Tax Oil and Cost Oil Timing issues*

a.  <u>*Timing of capital allowances*</u> - Capital allowances are provided in lieu of depreciation and pursuant to the PPT Act 2004, Second Schedule, paragraph 6 ("Capital Allowance"), 20% of the cost of qualifying capital expenditure is to be allowed or deducted from assessable profit to arrive at a chargeable profit in the accounting period in which that capital expenditure was incurred. A further 20% of the cost of capital expenditure is also to be deducted in each of the 2nd, 3rd and 4th accounting periods and in the 5th accounting period and thereafter, a further 19% of the cost is to be deducted.

b.  <u>*Timing of amortization and recovery of Capital Costs*</u> – The effect of Annex B, Article IV, paragraph 5(b)(ii), 217 PSC is to match the timing of amortization and recovery of capital costs (as defined in Annex B, Article II, paragraph 2, 217 PSC) ("Capital Costs") for Cost Oil purposes with the timing of capital allowances for Tax Oil purposes, such that Capital Costs are chargeable to Cost Oil in <u>five</u> equal annual instalments. A full capital allowance is available for the accounting period, without any pro-rating, in which an asset which is deemed a "qualifying expenditure" is acquired or first used regardless of when in that accounting period the asset was acquired or first used.

c.  <u>*Investment Tax Credit*</u> ("ITC") – The PPT Act 2004 and the DOA provide only for the ITC to be deducted from assessable tax. PPT should therefore be computed and Tax Oil allocated on the basis that ITC is to be deducted only from assessable tax and not also from the cost of capital assets to arrive at the amount of qualifying expenditure before calculating capital allowances.

*Treatment of specific cost items for Tax Oil purposes*

    d. <u>*Signature Bonuses*</u> – Clauses 8.1 (c) and 15.2(a), 217 PSC, provide that the total sum of Signature Bonuses which the Claimants are entitled to consolidate for PPT purposes pursuant to Clause 8.1(e) is subject to capital allowances under paragraph 6(1), Second Schedule of the PPT Act 2004 and PPT is to be computed and Tax Oil allocated on this basis.

    e. <u>*Production Bonuses*</u> – According to the Clauses 8.1(c) and 15.2(a), 217 PSC, Production Bonuses are deductible in computing PPT and Tax Oil is to be allocated on this basis.

    f. <u>*Interest expenses*</u> – The PPT Act 2004 expressly provides that interest expenses on any inter-company loans are deductible in the computation of PPT and the allocation of Tax Oil.

    g. <u>*Sole costs*</u> – Sole costs incurred wholly, exclusively and necessarily for the purposes of operations under the 217 PSC, the 213 PSC and/ or the 218 PSC are deductible. These include costs of technical support and internal administration costs.

69. The Claimants also assert that the Respondent had breached the 217 PSC when it failed to file with the Federal Inland Revenue Service ("FIRS") (the successor body of the Federal Board of Inland Revenue or the "FBIR") the PPT returns prepared and submitted by them to the Respondent for onward filing with FIRS as provided in Clause 7.1(h) and Annex B, Article III, paragraph 2(e) of the 217 PSC. Instead, the Respondent prepared and filed with FIRS its own PPT returns based on its incorrect calculations, due to its erroneous position on the disputes relating to the PPT computation.

70. The Claimants claim the following reliefs and remedies under three categories, namely:

*Monetary awards*

a. The Claimants request the Tribunal to make an award ordering that the Respondent shall pay to the Claimants:

    i. damages calculated up to the date of the Tribunal's Award, representing the Proceeds Imbalance as at that date.

    ii. interest on the damages calculated up to the date of the Tribunal's Award at the Central Bank of Nigeria Monetary Policy Rate, alternatively at the rate specified in Clause 8.5 and Clause 10.2 of 217 PSC one (1) month LIBOR plus 2% per annum.

*Declaratory and injunctive relief*

b. In addition to the monetary relief set out at paragraph 70 (a) above, the Claimants request the Tribunal to make an award granting the declaratory and injunctive relief that:

    i. without prejudice to the Claimants' right to enforce the Tribunal's monetary and other awards by any and all other means available to the Claimants, the Claimants shall be entitled to lift such quantum of ACO as would enable the Claimants to generate Proceeds sufficient to satisfy and ensure compliance with the Tribunal's monetary and other awards; and

    ii. the Respondent shall not in any way impede such liftings by the Claimants.

c. The Claimants request the Tribunal to make an award declaring that, pursuant to Clause 8.3, Annex C, Article III paragraphs 3, 4 and 6, and Annex C, Article II paragraph 1(c):

  i. the Respondent is not entitled to nominate, take in kind, lift or dispose of more ACO than is allocated to it from time to time; and

  ii. allocations of ACO are not subject to any form of approval by the Respondent.

d. The Claimants request the Tribunal to make an award declaring that the Respondent has breached the 217 PSC by purporting to nominate, lifting, receiving and retaining the Proceeds of the sale of quantities of ACO which the Claimants were entitled to lift.

e. The Claimants request the Tribunal to make an award declaring that, pursuant to Clause 2.4, the Claimants are engaged in petroleum operations as defined in Clause 1(y) of the 217 PSC and Section 2 of the PPT Act 2004 ("Petroleum Operations").

f. The Claimants request the Tribunal to make an award declaring and ordering that under the 217 PSC:

  i. Pursuant to Clause 2.2 and Clause 8.1(b), the Claimants are entitled, on an ongoing basis, to be allocated and to lift as Cost Oil from OPL 217 and any OML(s) derived therefrom (including OML 128) such quantum of ACO as will generate an amount of Proceeds sufficient for recovery of Operating Costs incurred in OPL 218 and OPL 213, and any OML(s) derived therefrom (including OML 129 and OML 132), as well as for recovery of Operating Costs incurred in OPL 217 and any OML(s) derived therefrom (including OML 128).

  ii. Pursuant to Clause 2.2 and Annex B Article IV paragraph 5(b)(ii), the Claimants are entitled, on an ongoing basis, to be allocated and to lift as Cost Oil from OPL 217 and any OML(s) derived therefrom (including OML 128) such quantum of ACO

23

as enables the Claimants to recover Capital Costs in five equal instalments over five consecutive accounting periods, without any pro-rating of instalments.

iii.  Pursuant to Clause 2.2, Clause 8.1(b) and Clause 13.3, the Claimants are entitled, on an ongoing basis, to be allocated and to lift as Cost Oil  from OPL 217 and any OML(s) derived therefrom (including OML 128) such quantum of ACO as generates an amount of Proceeds sufficient for recovery of home office overhead charges in an amount up to a maximum of US$ 4 million per year for each and every year of the term of the 217 PSC in which capital expenditure  is incurred, including each of the years prior to commencement of production.

iv.  Pursuant to Clause 2.2, Clause 7.1(h), and Annex B, Article III paragraph 2(a), the Claimants are entitled, on an ongoing basis, to compute the PPT (if any) payable, prepare and submit to the Respondent estimated and final PPT returns (which PPT returns the Respondent is obliged to file with the FIRS) and to lift ACO on the basis that:

1)  pursuant to Clause 8.1(e), the Claimants are entitled to consolidate for PPT purposes OPL 217, OPL 218 and OPL 213, and any OML(s) derived therefrom (including OML 128, OML 129 and OML 132);

2)  pursuant to Clause 15.3, ITC  is to be deducted only from assessable tax, and is not to be deducted from the cost of capital assets, nor from "qualifying expenditure" (as that term is defined in the Second Schedule of the PPT Act 2004);

3) pursuant to Annex B, Article III, paragraph 2 (a), a full accounting period's capital allowance (at the applicable rate set out in Table II of the Second Schedule to the PPT Act 2004) is available for the accounting period in which an asset which is "qualifying expenditure" (as that term is defined in the Second Schedule of the PPT Act 2004) is acquired or first used, regardless of when in that accounting period the asset was acquired or first used, without any pro-rating;

4) pursuant to Clause 15.2(a), the Signature Bonuses paid under the 217 PSC, the 218 PSC and the 213 PSC (which the Claimants are entitled to consolidate for PPT purposes) attract capital allowances under the Second Schedule of the PPT Act 2004;

5) pursuant to Clause 15.2(a), Production Bonuses paid under the 217 PSC, the 218 PSC and the 213 PSC (which the Claimants are entitled to consolidate for PPT purposes) are deductible pursuant to Section 10(1) of the PPT Act 2004;

6) pursuant to Clause 15.2(a) interest expenses on loans entered into by the Claimants for the purpose of financing operations under the 217 PSC, the 218 PSC and/or the 213 PSC are deductible pursuant to Section 10(1) of the PPT Act 2004;

7) pursuant to Clause 15.2(a), the sole costs that the Claimants deduct (as having been incurred "wholly, exclusively and necessarily" for the purposes of OPL 217, OPL 218 and/or OPL 213) are properly so deductible pursuant to Section 10(1) of the PPT Act 2004; and

25

8)  pursuant to Clause 15.2(a), whether a cost item is allowable or deductible for PPT purposes does not depend on whether that cost item is or is not recoverable as Cost Oil.

g.  The Claimants request the Tribunal to make an award ordering that, for the remainder of the term of the 217 PSC, the Respondent (whether acting by itself, its privies, agents, sub-contractors, or any person claiming through or under it):

i.   shall not nominate and shall not lift any ACO otherwise than in accordance with the Tribunal's Award on the disputed issues; and shall not in any way impede the Claimants' nomination and lifting of ACO in accordance with the Tribunal's Award on the disputed issues;

ii.  pursuant to Annex B, Article II, paragraph 2(e), shall not file with FIRS any PPT returns (whether estimated or final) in respect of the PSC other than the PPT returns prepared and submitted to the Respondent by the Claimants from time to time;

iii. pursuant to Annex B, Article III, paragraph 2(e), shall file with FIRS all PPT returns (whether estimated or final) which the Claimants submit to the Respondent for onward filing with FIRS);

iv.  shall, in accordance with Clause 15.6, make available to the Claimants copies of receipts issued by FIRS for all payments made (including past payments) for PPT.

h.  The Claimants request the Tribunal to make an award: declaring that the PPT returns which the Respondent had prepared and filed with the FIRS (instead of the PPT returns prepared by the Claimants and submitted to

26

the Respondent for onward filing with FIRS) are contrary to the 217 PSC in that they do not reflect the Claimants' entitlement to compute the PPT (if any) payable on the basis of the points set out above.

i.  Finally, the Claimants request the Tribunal to make an award dismissing the Respondent's counterclaims and other claims for relief in their entirety.

*Alternative and Additional claims under Clause 19.2 of the 217 PSC*

j.  In addition and/ or in the alternative to the requests for relief and remedies set out above, the Claimants request the Tribunal to make an award:

i.   declaring that there has been a change in policy within the meaning of Clause 19.2; and

ii.  modifying the 217 PSC, pursuant to Clause 19.2 to compensate the Claimants for the effect of the change in policy.

71.  It is submitted by the Claimants that the requested modifications fall under two categories:

a.  to compensate for the material and adverse effects of the change up to the date of the Tribunal's Award (the "Pre-Award Effects"); and

b.  to compensate for the material and adverse effects of the change after the date of the Tribunal's Award (the "Post-Award Effects").

72.  For the Pre-Award Effects:

The Claimants request that the Tribunal make an order modifying the 217 PSC from the date of the Award by the insertion of a new Clause 8.1(h). This is sought in the alternative to the primary claim for an award of damages for the Respondent's breaches of contract, but in addition to the Post-Award Effects reliefs set out in paragraphs 72-73 below.

27

73.   The Claimants suggest the proposed new Clause 8.1(h) should read as follows:

   a.  <u>either:</u>   *"Notwithstanding the terms of Clause 8.1(f) and (g), after [insert date of the Award] and until such time as the Profit Oil thereafter recovered by the CONTRACTOR is sufficient to generate Proceeds in the amount of [insert principal amount[1], computed up to the date of the Award] plus interest at the rate of [insert interest rate], Profit Oil shall be allocated entirely to the CONTRACTOR.  Thereafter, this Clause 8.1(h) shall cease to have any application, and Profit Oil shall be allocated to each Party as provided for in Clause 8.1(f) or 8.1(g) as the case may be.  In the event that the recovery of Profit Oil pursuant to this clause does not result in full compensation of the amount plus interest stated above, then any uncompensated amount shall be immediately payable by the CORPORATION to the CONTRACTOR, at the latest, upon the date of termination or expiration of this Contract"*;

   b.  <u>or:</u>  *"On or before [insert date], the CORPORATION shall pay to the CONTRACTOR  the amount of [insert principal amount, computed up to the date of the Award] in consideration of the FIRS' change in policy since the Effective Date of this Contract with respect to PPT"*.

74.   For the Post-Award Effects:

   <u>In addition</u> to the Claimants' request for an award of damages, for declaratory and injunctive reliefs and the Pre-Award Effects relief, the Claimants request an

---

[1] As set out at paragraph 32.5 of the Claimants' Post-hearing Brief, the principal amount  is computed as the difference (as at the date of the Tribunal's Award) between:
   1.   The amount of lifting-generated proceeds which the CONTRACTOR would have received as Profit Oil had there been no change in policy, and
   2.   The amount of such proceeds which the CONTRACTOR has received (again, as at the date of the Tribunal's Award) as Profit Oil as a result of the change in policy.  Such proceeds is quantified  at 80% of the difference between:
      a.   The amount by the CONTRACTOR as being chargeable  PPT for each of the Years 2010, 2011 and 2012, as shown in the PPT returns prepared by the CONTRACTOR for each of these Years; and
      b.   The amount assessed by the FIRS as being chargeable PPT for each of the Years 2010, 2011 and 2012.

order modifying the 217 PSC from the date of the Award by the insertion of a new Clause 8.1(i).

75.   The new Clause 8.1(i) would read as follows:

> "*Notwithstanding the terms of Clause 8.1(f) and (g), in the event that the change in policy by the FIRS with respect to PPT (as such change in policy is described in the Arbitral Award dated [...]) results (at any time after that date) in a difference in the determination of Tax Oil (i.e. a difference between the Tax Oil resulting from the application of the policy as it existed upon the Effective Date of this Contract and the Tax Oil resulting from the application of the policy as it exists as of [insert date of the Award]), then, until such time as the Profit Oil thereafter recovered by the CONTRACTOR is sufficient to generate Proceeds in the amount of 80% of such difference, Profit Oil shall be allocated entirely to the CONTRACTOR. In the event that the recovery if Profit Oil pursuant to this clause does not result in full compensation to the CONTRACTOR of such amount, then any uncompensated amount shall be immediately payable by the CORPORATION to the CONTRACTOR, at the latest, upon the date of termination or expiration of this Contract.*"

### Interest and Costs

76.   The Claimants also claim:

a.   interest upon all sums that may be found due to the Claimants until payment.

b.   the Claimants' costs and expenses, including but not limited to:

   i.   legal costs, expert and other professional fees, and disbursements (including but not limited to travel and accommodate costs);

   ii.   the travel and other expenses of all fact and expert witnesses;

   iii.   the fees and expenses of the Tribunal;

iv.   costs associated with hearings in this arbitration; and

c.  pre-award and post-award interest on costs and expenses.

## The Respondent's Defence

### *The Jurisdictional Challenge*

77.   The Respondent contends that in substance, most of the reliefs sought by the Claimants, if not all, are disputes arising from tax laws and are thus within the exclusive jurisdiction of the Tax Appeal Tribunal ("TAT")".

78.   The Respondent also submits that the subject matter in this dispute is not arbitrable to the extent that the arbitration agreement does not include any dispute that can be resolved by way of civil proceedings.  The disputes herein involve the interpretation of tax laws for the purpose of determining the tax to be paid and are thus interdependent on the quantum of tax to be paid.

79.   The fair test of whether a subject matter is arbitrable is, the Respondent contends, that: Can the difference be compromised lawfully by accord and satisfaction?  It is submitted that tax matters cannot be settled between the Parties and it thus cannot be settled by accord and satisfaction.  The dispute ought to have been referred to the TAT or to the Nigerian courts.

80.   The Tribunal having no jurisdiction to adjudicate the Claimants' claims, all the reliefs and monetary claims sought by the Claimants must accordingly be declined.

### *The Substantive Defence*

81.   In the event that the Tribunal finds jurisdiction over the disputes herein and the subject matter being arbitrable, the Respondent contends that the Claimants are <u>not</u> engaged in Petroleum Operations, the consequence of which the Claimants would be subjected to ordinary income taxation under the Companies Income Tax Act, and not under the PPT Act 2004. The Respondent asserts that Claimants did not explore petroleum for their own account but did so for and on behalf of

the Respondent as licence holder. Being the licence holder, the Respondent had the exclusive exploration and production license to undertake Petroleum Operations in the Contract Area. That being so, the Claimants are not entitled to claim allocation of Tax Oil under the PPT Act 2004.

82.   The Respondent also takes the position that Clause 2.4 of the 217 PSC which declares the Claimants as "engaged in Petroleum Operations" and that "the Companies Income Tax Act 1979 shall have no application" is an attempt to alter the incidence of tax under Nigerian law, which is not permissible by law. The Parties cannot by agreement contract out of statutory provisions.

83.   The Respondent claims the liftings it has made accorded with the rules and regulations of the PPT Act 2004 and other pertinent laws and provisions of the 217 PSC, *viz* Clause 8.3 and Annex D.  The Respondent proceeded and adopted what it considered to be the correct formula and said that the Claimants had conceded to it by its conduct in continuing to lift in accordance with the Respondent's formula[2].  In its view, the Claimants' model had not been prepared in accordance with the 217 PSC and the relevant laws on the basis, *inter alia,* that it was not computed using the Realizable Price, (as defined at Clause 1(ac) in the 217 PSC) which is fundamental to the performance of that PSC.

84.   As to the specific claims for more Tax Oil and Costs Oil allocations, the Respondent's responses are as follows:

    a.   *Cost recovery – Clause 8.1(b)* – Consolidation of costs from other contract areas would in effect, grant a tax incentive which is prohibited save with the express permission of law. The Claimants' interpretation of consolidation would undermine Section 3 of the DOA that requires the application of 50% PPT to the Contract Area. Applying the cost of non-producing fields (OPL 213 and 218) to a producing one (in this case OPL

---

[2] The Claimant has taken the position that it had come to an interim arrangement on lifting ACO with the Respondent and had never conceded that the Respondent's formula was correct. This issue was in any event not argued.

217) has the effect of expanding the cost base and thus reducing the taxable income.  The Respondent relies on the DOA and Petroleum Act, 1969 (Cap 10 Laws of the Federation of Nigeria 2004) [HB-E2/14] in support of its contention that any contractual provision that derogates from the provisions of law is unenforceable.

b. _Cost recovery of Home Office Overhead Charges_ – Until the resolution of an item as being cost recoverable, the Claimants cannot recover as Cost Oil that amount in respect of items the Respondent had raised as exceptions. The 217 PSC had provided for a "prior approval" procedure which the Claimants had failed to follow.

c. _Consolidation for PPT purposes_ –By statute, the license holder cannot seek to introduce contractual stipulations that relate to other contract areas beyond the scope of the license.  The Respondent argues that only federal legislation can grant what Clause 8.1(e) purports to have granted to the Parties under the 217 PSC. In its absence, such a contractual provision must be rejected as invalid.

85.  A summary of the Respondent's substantive defences is set out in the paragraphs following:

_Tax Oil and Cost Oil Timing issues_

a. _Timing of capital allowances_ - There is nothing in the 217 PSC which indicates that equal instalments over a five year period means 5 equal annual instalments.  The Respondent contends that instalments could be monthly or quarterly or yearly. Section 9 of the DOA requires the computation of actual monthly PPT and since Capital Allowance is a deduction from PPT liability, it has to be done in monthly instalments.

b. _Timing of amortization and recovery of Capital Costs_ – By the accounting formula in the 217 PSC, all allocations are required to be done on a monthly basis and consequently the Claimants are required to charge its

recoverable Capital Cost in a given year on a pro-rata basis such that every month the Claimants can claim 1/12 of the 20% of the cost of capital expenditure commencing from the date of acquisition of the asset. The PPT Act 2004 and the DOA guide the timing and recovery of costs which the Respondent follows.

c. *Investment Tax Credit* – The 217 PSC did not provide for the prerequisites in order for the Claimants to claim tax credits.  Investment tax credits being in the form of compensation to taxpayers for incurring certain expenditures, the Claimants must show that it is engaged in Petroleum Operations.  The ITC is allowed on the assumption that a party claiming it must have incurred a qualifying capital expenditure. Under the 217 PSC, the Claimants are only financiers of the capital assets and the actual cost of the asset is incurred by the license holder who pays the Claimants in full by an allocation of Cost Oil. ITC must then be applied in reducing the costs of the asset before being used to offset chargeable tax. The Claimants have therefore not incurred any qualifying capital expenditure and are therefore not entitled to ITC.

d. *Treatment of specific cost items for Tax Oil purposes: Signature Bonuses, Production Bonuses, Interest expenses, Sole costs* – The Respondent contends that a resolution of these cost items is a tax issue and the Tribunal has no jurisdiction on the same.  It nevertheless pleads that:

   i. *Signature Bonuses* – The Respondent had acted in accordance with the law as dictated by the FIRS *viz.* that what is not recoverable as cost could not be allowed as capital allowances in tax computation and any other interpretation would be to the contrary of the taxing authority's position. The Respondent relies on FIRS's letter of 24 May 2010 [HB-C2/670].

   ii. *Production Bonuses* – Production bonus is not an item recoverable as Cost Oil and such cost is not deductible in the computation of

PPT and Tax Oil. The Respondent relies on FIRS' letter of 24 May 2010 [HB- C2/670].

iii. _Interest expenses_ – This claim is denied by the Respondent and is not recoverable if not approved as a cost item. The Claimants have not sought and obtained the required approval from the Respondent. The Respondent relies on FIRS' letter of 24 May 2010 [HB-C2/670].

iv. _Sole costs_ – The Respondent reiterates its arguments in the other costs items above. The Respondent relies on FIR's letter of 24 May 2010 [HB-C2/670].

v. _PPT Administration_ – In accordance with the law, the Respondent is entitled to amend the PPT returns prepared by the Claimants for filing with the FIRS, pursuant to the PPT Act 2004. The Respondent contends that the returns prepared by the Claimants were not made in accordance with the law and the Respondent is thus <u>not</u> bound to accept them for transmission to the FIRS. If the Respondent were to accept the same despite its knowledge that the same were made erroneously, the Respondent would be in breach of its legal obligation to satisfy tax liabilities.

86. In view of the above defences, the Respondent also seeks declaratory awards that:

a. The Respondent has not committed any breach of contract on OML 128 or any other PSCs, including, OPL 213 and/or OPL 218;

b. Only the Respondent is in Petroleum Operations and as such, pursuant to the PPT Act 2004, only the Respondent is the Party required to pay PPT;

c. The Respondent is the Party who had incurred a qualifying capital expenditure and as such, is the Party entitled to Capital Allowance and ITC;

d. The Respondent's determination and application of the ITC is correct;

e. The Claimants cannot recover the operating costs of OML 129 and 132 or any other contract areas apart from OML 128;

f. Capital costs recoverable by the Claimants shall be amortized and recovered monthly over a 60 month period in accordance with the 217 PSC provisions.

87. The Respondent seeks an order of the Tribunal to order that the dispute be resolved in the appropriate forum and to terminate these proceedings by dismissing the Claimants' claims in their entirety either on the grounds of lack of jurisdiction or on the merits of the defence.

88. The Respondent also seeks for an order directing the Claimants to pay the costs of the arbitration incurred by the Respondent, *viz:*

a. arbitrators' fees,

b. travel expenses and other reasonable expenses incurred by the arbitrators in the course of the proceedings,

c. charges of the administrative secretary,

d. travel and other expenses of the Respondent's witnesses, and

e. costs of legal representation and assistance.

89. The Respondent seeks the following counterclaims:

a. A declaration that the Contract be interpreted in accordance with the PPT Act 2004 and the DOA and all other relevant legislation,

b.  An order setting aside or disregarding all PPT Returns created in violation of Section 13 of the DOA,

c.  An order directing the Parties to establish a formula in determining a Realizable Price in accordance with Clause 9 and 15 of the 217 PSC as well as Section 13 of the DOA,

d.  A consequential order that all computations created pursuant to an erroneous price be similarly disregarded and a directive that the computations be done using a Realizable Price in accordance with the terms of the 217 PSC,

e.  A declaratory award pursuant to Clause 11 of the 217 PSC, and paragraphs 3, 6 and 7 of the Second Schedule to the PPT Act 2004, that the Respondent is the owner of the assets and equipment used for the purpose of Petroleum Operations,

f.  A declaratory award that the Respondent is the Party who has incurred a qualifying capital expenditure pursuant to Section 4 of the DOA,

g.  A declaratory award that all benefits accruable and resulting from the Respondent's expenditure are attributable to the Respondent,

h.  A declaration order that pursuant to Section 4 of the DOA, the Respondent is entitled to the benefit accruable as a result of the application of the ITC.

i.  A declaration (subject to adjustments in sub-paragraph "c" above) that the Claimants are entitled to refund of the sum of US$1,631,925,031.81 or any sum representing tax savings accruable to the Respondent wrongfully claimed by the Claimants for assessment years 2008, 2009, and 2010 respectively.

j.  An order directing the Claimants to forthwith pay the Respondent the sum of US$ 1,631,925,031.81 representing tax savings belonging to the

Respondent wrongfully claimed by the Claimants for assessment years 2008, 2009 and 2010 respectively

k. In the alternative, an order that future allocations of the Claimants be adjusted to take account of its indebtedness and compensate the Respondent within a timeline as specified by the Tribunal.

l. A declaration in view of the Claimants' admission that the PPT returns were filed in violation of the law not having used the Realizable Price that PPT returns prepared and filed in 2008, 2009 and 2010 years of assessment be re-computed and filed using the Realizable Price.

m. And for such other orders as the Tribunal may deem fit in the circumstances of the case.

## Issues for determination

90.   In the course of the oral evidentiary hearing, the Parties agreed to a list of issues requiring determination by the Tribunal, which may be summarized as follows:

*Jurisdiction and Arbitrability:*

a. Whether the Claimants' claims are arbitrable under the laws of Nigeria.

   *[If the answer is YES]*

   Does the Tribunal have jurisdiction of the Claimants' claims under the 217 PSC?

*Claimants' claims:*

b. Claimants' engagement in petroleum operations/ liability to PPT;

c. Cost recovery pursuant to Clause 8.1(b);

d. Cost recovery of home office overhead charges;

37

e.  Timing of recovery of capital costs;

f.  Timing of capital allowances;

g.  Consolidation for PPT purposes pursuant to Clause 8.1(e);

h.  ITC: whether deductible from cost of capital assets prior to the computation of capital allowances;

i.  Signature bonus;

j.  Production bonus;

k.  Interest expenses on inter-company loans;

l.  Sole costs;

m. PPT administration;

n.  Modification of PSC under Clause 19.2;

*Respondent's Defence/Counterclaim:*

o.  Ownership of assets;

p.  Whether parties can grant fiscal incentives;

q.  The Realizable Price;

r.  Entitlement to benefit of capital allowances;

s.  Entitlement to benefit of ITC;

*Remedies and reliefs; interest and costs:*

t.  Whether the Claimants or the Respondent are entitled to relief.

u.  Interest and Costs.

Now, We, **Mark Saville, Paul Obo Idornigie and Lawrence G S Boo,** having carefully considered and accorded appropriate weight to all the testimonies, statements, documents and written submissions placed before us do hereby **MAKE AND PUBLISH THIS AWARD** which shall be final in respect of all matters in dispute in this arbitration save and except for the adjustments to be made in respect of the damages awarded as hereinafter set out.

## Findings and Reasons

91.   The reference to the "Tribunal" hereafter is a reference to the Majority members of the Tribunal (Lord Saville and Professor Boo). The signature of Professor Idornigie in this Award is merely to signify that he participated in the deliberations leading to the findings herein and for the reasons expressed in his dissenting opinion as annexed hereto, Professor Idornigie does not agree with the Majority's decisions, rulings and dispositive parts of this Award.

92.   Professor Idornigie's views are better expressed in his dissenting opinion annexed to this Award (the "Dissenting Opinion").

### Jurisdiction and Arbitrability

*a. Whether the Claimants' claims are arbitrable under the laws of Nigeria.*

   *[If the answer is YES]*

   *Does the Tribunal have jurisdiction over the Claimants' claims under the 217 PSC?*

93.   The Respondent asserts that the subject matter herein falls into a class of disputes that are "exempted from arbitration", the determination of which goes beyond the interest of the Parties presenting the dispute and has a significant impact on public policy. It argues that the disagreement between the Parties was substantially their different approaches in the interpretation of the law which ultimately had an impact on the quantum of ACO to be allocated to the respective Parties. The allocation of oil, the property of Nigeria, involves the proper interpretation of Nigerian law (in particular tax law) to guide the

39

effective application of the 217 PSC. Simply put, the Respondent contends that this is a "tax dispute" concerning matters of Nigerian tax law and therefore ought only to be decided by the Nigerian courts or the TAT and not before this Tribunal.

94. The Respondent suggests that to determine whether a matter is arbitrable is to ask the question whether it could be resolved by accord and satisfaction. If the Tribunal makes an award which cannot resolve the dispute in its finality, then that dispute is likely to be regarded as one that is not arbitrable. In its view, this is such a case as the Tribunal's award, if so made, would not be binding on the Nigerian tax authorities.

95. The Respondent cites in support of this contention, a decision of the Court of Appeal of Uganda in *Heritage Oil & Gas Limited v. Uganda Revenue Authority* (Civil Appeal No. 14 Of 2011) *("Heritage Oil")* [HB-G4/39] where in that case, which also concerned a PSC entitled Production Sharing Agreement ("PSA") containing an arbitration clause, the contractor Heritage Oil had sold its interest thereunder to another company, and was assessed for capital gains tax by the Ugandan tax authorities who filed relevant applications before the tax tribunal. Aggrieved, Heritage Oil resisted that assessment and sought to stay the proceedings in those applications so the matter would be brought to arbitration but the tax tribunal ruled against it. The High Court of Uganda at Kampala affirmed the refusal of stay ruling that –

> "…Allowing the tax dispute to go through the arbitration process in London would definitely not facilitate the timely payment of the taxes as agreed. This means that tax by inference was excepted from the scope of this arbitration agreement and as such it was not one of the contemplated arbitrable disputes under section 26.1 of the PSA." [HB-G4/39, p. 19]

96. The decision in *Heritage Oil* in our view adds little to advance the Respondent's arguments relating to its jurisdictional challenge as Heritage Oil was there being assessed for capital gains tax following its sale of interest in the PSA and was thus subject to the tax tribunal's jurisdiction. The matter in contention was

clearly between Heritage Oil and the Ugandan tax authority. The facts and relationships of the Parties herein are, however, quite different.

97.   The Respondent places substantial reliance on the judgment of the FHC in _Federal Inland Revenue Service v Nigerian National Petroleum Corporation & 4 Others (FHC/ABJ/CS/774/11)_ [HB-G1/17] _("FHC Judgment 774")_ [HB-G1/17] which was delivered on 29 February 2012 and which is presently under appeal. The facts in that case indeed bear remarkable similarity to those in this arbitration. There, the FIRS commenced court proceedings seeking declarations and restraining orders against NNPC (also a respondent in that arbitration) and the claimants in the arbitration from continuing the arbitration proceedings on the basis that the matters in dispute pertained to "tax and issues incidental" to tax.   The claimants in that case (Shell Nigeria Exploration and Production Company Limited, Esso Exploration and Production (Deep Water) Limited, Nigerian Agip Exploration Limited and Total Exploration and Production Nigeria Limited) argued unsuccessfully before the FHC that the FIRS had no _locus standi_ and that the matters in dispute were contractual and did not concern the FIRS.

98.   The learned judge held that the matters in dispute between NNPC and the contractors therein were matters of _"tax and issues incidental"_ to tax and that the FIRS being the Government organ whose _"statutory functions to assess and collect tax for the Federal Government will be adversely affected"_ (at para 17) had _locus standi_ to commence action to seek remedy. The court then went on to hold that the Constitution of the Federal Republic of Nigeria 1999 confers exclusive jurisdiction on the courts on issues arising from Federal Government revenue and other tax related subject matters such that any claims that involved issues of tax that come within the purview of the exclusive jurisdiction of the court, they would not be arbitrable. In its own words:

> "It is clear that the above provisions are all encompassing and leaves no one in doubt that this Court has the exclusive jurisdiction in any dispute relating to the revenue of the Government of the Federation in which the said Government or any organ thereof or a person suing or being sued on behalf of the Government of the Federation is a party. And in any dispute connected with or pertaining to the taxation of Companies and other bodies established

> or carrying on business in Nigeria and all other persons subject to Federal taxation." [[HB-G1/17, p 34]
>
> …
>
> "Having examined the provisions of section 3(g) of the PTA in conjunction with the provisions of sections 41 and 42 of the same Act, I am quite satisfied that there is no provision under the PPTA under which the parties to the PSC can refer tax disputes to Arbitration. The mechanism provided for resolution of such disputes under section 41 is to appeal to Tax Appeal Commissioners and thereafter an Appeal can come to this Court under section 42 of the same Act against the decision of the Tax Appeal Commissioners. The appeal from the Tax Appeal Commissioners/Tribunal comes to the Federal High Court in the exercise of its appellate jurisdiction but that does preclude a party from invoking the Original jurisdiction of the Court on Tax issues conferred by section 251 (1) (a) and (b) of the Constitution of the Federal Republic of Nigeria 1999." [[HB-G1/17, p. 36]])

99. The learned judge also considered that the claims and relief sought by the contractors in that case was in effect a claim for *"a refund of all overpaid taxes"* (at p. 41), *viz.* –

> "Looking at the above reliefs, I will say that shorn of all pretences, the issues in dispute between the Claimants and the 1st Defendant which were submitted to Arbitration arose out of the alleged breaches by NNPC of the Agreement in lifting tax oil based on its assessment of the taxes payable to the Plaintiff and by extention (sic) to the Federal Government of Nigeria, instead or using the tax returns sent to it for filing by the Contractor. So for all intents and purposes the claim of the Claimants before the Arbitral Tribunal is in effect for a refund of all overpaid taxes paid by NNPC on behalf of the 2nd - 5th Defendants, through what they alleged as overlifting of tax Oil by which means all taxes accruable to the Federal Government are paid…." (at pp 40-41)

100. The Tribunal has little difficulty accepting the principle that on all matters of tax such as the incidences and bases of taxation, assessments, allowances, credit etc impacting the state's revenue, Nigeria, as with many jurisdictions, has its own fiscal regime to regulate such matters which are thus generally not arbitrable. In the Tribunal's view, what is legally due from the Parties to the Government by way of tax is indeed a matter to be determined exclusively by the Nigerian tax authorities (i.e. FIRS) and, if their assessment is challenged, by recourse to the Nigerian courts or the TAT. What is legally due by way of tax cannot therefore be determined by either this Tribunal or indeed (it is important to note) by either of the Parties to this arbitration.

101. It is not disputed that many of the issues in dispute in this arbitration do relate to Nigerian tax legislation, the Parties differing in their views as to the meaning and effect of this legislation. It is however clearly misleading and quite wrong to conclude that the mere fact that the matters in dispute between the Parties relate to tax issues would make the matters non-arbitrable. In the Tribunal's view, issues between any contracting parties often arise out of law, including statutory rights or liabilities. The mere fact that they so arise or are so related to tax issues does not make them non-arbitrable. The parties in a contract could agree or disagree as between themselves on who should bear certain tax liability and / or the extent thereof but that of itself would not make the subject matter non-arbitrable.

102. The Claimants in this arbitration are not seeking any refund of taxes paid on their behalf by the Respondent and (save for the specific demand that the Respondent submits the PPT returns prepared by the Claimants to FIRS), all the other relief and claims sought would, if granted, merely be a re-allocation of the ACO to reconcile the contractual rights of the Parties under the 217 PSC and would not, in any way, affect the amount of tax due from the Parties under Nigerian tax legislation or the rights and obligations of the Parties in relation to the Nigerian tax authorities arising under the tax legislation. In this regard, the Tribunal would not adopt the same characterisation of the Claimants' claims as the learned judge did in *FHC Judgment 774* [HB-G1/17].

103. It bears emphasising that this Tribunal is concerned only with the contractual rights and obligations existing between the Parties to the 217 PSC, and with not of the rights and obligations existing between the Parties and the Nigerian tax authorities. No claim is being made for FIRS to re-calculate the tax it had already assessed in this arbitration.

104. Our view in relation to *FHC Judgment 774* seems consonant with the Court of Appeal's decision in *Nigerian Agip Exploration Limited v Nigerian National Petroleum Corporation & Another (CA/A/628/2011)* [HB-G2/27] which was delivered by the Court of Appeal on 25 February 2014. There, NNPC (who was

the respondent in that case) obtained an interlocutory injunction preventing the arbitral tribunal, which had delivered a partial award against it, from continuing with the arbitration to quantify the damages. The subject matter and issues in that arbitration were remarkably similar to those herein. The Court of Appeal set aside the injunction and permitted the tribunal to continue with the arbitration. Although the substantive challenge against the partial award was not discussed, the court made no remarks whatsoever with regard to the arbitrability of the matters in dispute notwithstanding the court's observations that the jurisdiction of FIRS could well be affected.

105. In our respectful view, we disagree with the *FHC Judgment 774* which we consider is plainly wrong, as it fails to distinguish between the contractual rights and obligations existing between parties to a contract such as the 217 PSC and the rights and obligations existing between these parties (or any of them) and the Nigerian tax authorities. This is clearly demonstrated by the learned judge's comment that the contractors' claims were in effect for a refund of taxes paid by the Respondent on behalf of the contractors (see paragraph 99 above). That is simply not so. Neither the claimants in that case nor the Claimants in the present case claim a refund of taxes, but from the Respondent (not the tax authorities) the losses the Claimants submit that they have sustained through breaches of the 217 PSC by the Respondent. For this reason, we do not accept that any of the disputes are properly to be described as "*tax matters*," or "*tax disputes*" in the sense that their resolution by this Tribunal will to any degree impinge upon either the amount of tax legally due from the Parties to the Nigerian tax authorities under Nigerian tax legislation or indeed the rights and obligations existing between the Parties to the 217 PSC on the one hand and the Nigerian tax authorities on the other.

106. The Tribunal also finds it curious that while the Respondent maintained that the Tribunal has no jurisdiction over the Claimants' claims, the Tribunal nevertheless has jurisdiction over its counter-claim. Interestingly, the counterclaim arises out of Respondent's counter-argument and own

interpretation of the terms of the 217 PSC and the relative legislation *viz.* the PPT Act 2004 and the DOA. So while it contends that the Claimants' claims and relief could never be finally determined and decided by an arbitral tribunal, its counter-arguments and relief sought on the same contractual and statutory bases could. The contradiction is not lost on the Tribunal. The Respondent must accept that disputes arising from its rights and liabilities vis-à-vis the Claimants under the 217 PSC are all subject to the arbitration agreement. It is wholly illogical to say that the same dispute could be arbitrable only if made by the Respondent by way of a counterclaim and not arbitrable because it was put forth by the Claimants.

107.    The Majority have read Professor Idornigie's views as set out in his Dissenting Opinion and with utmost respect, do not share his view that the Tribunal is bound by the FHC's decision in *FHC Judgment 774* (which in his view represents the current law of Nigeria) to hold that the Tribunal lacks jurisdiction.

108.    The Majority could see little by way of support from the decisions cited in his learned Dissenting Opinion and do not share his view that the matters in dispute are not arbitrable..

109.    The Tribunal therefore by majority, answers this issue in the affirmative and holds that the subject-matter in this arbitration is arbitrable.  The Tribunal therefore concludes that it has jurisdiction to resolve the contractual disputes arising between the Parties to the 217 PSC.

I.    **Claimants' claims:**

a.  **Claimants' engagement in petroleum operations/ liability to PPT**

110.    The Respondent raises this issue as a defence by challenging the Claimants' claim for additional allocation of Cost Oil and reduction of Tax Oil through allowances and credits. In its Post-Hearing Brief, the Respondent suggests that a finding that the Claimants not being in Petroleum Operations will render a

45

substantial part of the contract unenforceable and that Clause 2.1 of the 217 PSC was included to circumvent this effect

111. In order for the Claimants to claim for Cost Oil, the Claimants must have incurred costs "in carrying out Petroleum Operations" [Clause 1(w), 217 PSC]. The argument then is that if the Claimants are not engaged in "Petroleum Operations" it would not be entitled to claim recovery of certain costs through Cost Oil allocations. Similarly, it would not be entitled to claim any benefits for capital allowances or credits against any PPT paid on its behalf by the Respondent.

112. The Respondent's case is that the Claimants are not engaged in "Petroleum Operations." In its Defence, the Respondent traces the development of the petroleum industry in Nigeria. Commencing from 1956 when the sole concessionaire was Shell D'Arcy, to Nigeria's joining the Organization of Petroleum Exporting Countries ("OPEC") in 1971, and the formation of the NNPC (then known as the Nigerian National Oil Corporation ("NNOC")) as the state-owned entity developing oil reserves through joint ventures with international oil companies ("IOC"). Under a joint venture scheme, NNPC and IOCs operate as co-owners and share profits and losses arising from the operations.

113. Although the first PSC was signed in 1973, the Respondent says that little attention was paid to its use until the 1990s with the consequence that the PSCs existed alongside exclusive licenses issued for joint venture operations. The 217 PSC with the Claimants herein was entered into May 1993. According to the Respondent, the DOA was enacted in 1999 with retrospective effect from 1993 [Defence/ p. 19]. These laws were enacted merely to give effect to some of the Parties' pre-contractual agreements as reflected in a Side Letter-18 May 1993[HB-A/3]. No new laws were created specifically to regulate the PSCs. It is therefore the Respondent's case that when considering the provisions of the 217 PSC, the Tribunal should take into account the "*reconciliation, integration and conceptual difficulties*" [Defence-para 2.2 (vii)] that arose as a result of the

change from the joint venture regime to that of the PSCs in the development of the oil and gas industry in Nigeria. These would include:

a. The difficulty of applying the provisions in the PPT Act 2004 to the contractor pursuant to a PSC, who ordinarily is not in petroleum operations.

b. The absence of a fundamental pre-requisite to claim Capital Allowance / ITC pursuant to the PPT Act 2004.

c. The legal capacity of the licence holder in a PSC to contract beyond his licensed area thus permitting incorporation of an unrelated contract area within the perimeters of his license. [Defence-para 3]

114. The Respondent submits that while the IOC under the joint venture regime is a joint owner operator and co-licensee, the Claimants under the PSC are but a mere contractor for services who is rewarded for its services by a share of the oil and/or gas produced.

115. The Respondent's argument relies on the definition in the PPT Act 2004 which states:

> "**petroleum operations**" means the winning or obtaining and transportation of petroleum or chargeable oil in Nigeria by or on behalf of a company **for its own account** by any drilling, mining, extracting or other like operations or process, not including refining at a refinery, in the course of a business carried on by the company engaged in such operations, and all operations incidental thereto and any sale of or any disposal of chargeable oil by or on behalf of thecompany"(emphasis added by the Respondent). [HB-E1/2, clause 2]

116. In the Respondent's submission, under the PSC scheme, it is the Respondent who is the licensee solely authorized to explore petroleum on its own account and not the Claimants who were merely contracted to act on Respondent's behalf [Defence-para 3.2]. The Claimants were not "*winning or obtaining and [transporting] petroleum or chargeable oil… for its own account*".

117. The Claimants on the other hand rely on the terms of the 217 PSC, in particular:

47

Clause 1 which defines:

> "(y) "**Petroleum Operations**" [as] the same as defined in the Petroleum Profits Tax (PPT) Act 1959 Cap 354 Laws of the Federation of Nigeria 1990 as amended," [i.e. the PPT Act 2004]

Clause 2.1 which provides that:

> "The CORPORATION.... hereby appoints and constitutes the CONTRACTOR the exclusive company to **conduct Petroleum Operations** in the Contract Area".

Clause 2.4 which acknowledges that:

> "The **CONTRACTOR is engaged in Petroleum Operations** pursuant to the Petroleum Profits Tax Act 1959 Cap 354 Laws of the Federation of Nigeria 1990 ("PPT Act") as amended and accordingly the Companies Income Tax Act 1979 Cap 60 Laws of the Federation of Nigeria 1990, as amended, shall have no application." (emphasis added)

118. It is clear beyond doubt that the Parties herein have therefore expressly agreed that as between themselves the Claimants are to be treated as engaged in Petroleum Operations within the meaning of the PPT Act 2004. Indeed, as noted above, Clause 8.1 of the 217 PSC expressly stipulates that Tax Oil shall be calculated on the basis of the PPT Act 2004.

119. The terms of the 217 PSC were also given specific sanction when the Secretary of Petroleum and Mineral Resources, acting for and on behalf of the Government provided the Side Letter-18 May 1993, assuring the contractors that applicable laws would be *"amended to reflect the terms of the PSC"*. [HB-A /3]. The fact that this was not done (or not satisfactorily done) could not of itself undermine the terms which the Parties had expressly entered into. To our minds, it follows that it is not open to the Respondent to resile from this agreement or to contend that the Claimants could no longer claim or be considered being engaged on Petroleum Operations simply because the contractual provisions do not comport with the law viz. the PPT Act 2004. If indeed there is any inconsistency, the same is attributable to the state's failure to abide by its undertaking to amend laws to accord with and give effect to the 217 PSC. The Tribunal finds it difficult to

accept that having entered into the clear terms of the 217 PSC, the Respondent should now be entitled to abrogate it on this basis.

120. In any event, the Tribunal has perused the <u>DOA in Section 15(1) and (2), which</u> provides that the DOA takes precedence over the PPT Act 2004 and any other enactments *viz*.:

> "**15. Adaptation of laws**
> (1) The relevant provisions of all existing enactments or laws, including but not limited to the Petroleum Act, and the Petroleum Profit Tax Act, shall be read with such modifications as to bring them into conformity with the provisions of this Act.
> (2) If the provisions of any other enactment or law, including but not limited to the enactments specified in subsection(1) of this section, are inconsistent with the provisions of this Act, **the provisions of this Act shall prevail** and the provisions of that other enactment or law shall **to the extent of that inconsistency, be void**" (emphasis added)

121. The provisions in the DOA clearly recognize a contractor under a PSC as being engaged in Petroleum Operations, for they would not have otherwise provided specifically that:

   a. NNPC is to pay PPT "on its behalf and the contractor" (Section 11(1));

   b. receipts are to be issued in the names of NNPC and the Claimants (Section 11(2)); and

   c. "chargeable tax on petroleum operations in the contract area under the production sharing contract shall be split between the Corporation or the holder and the contractor in the same ration as the split of profit oil as defined in the production sharing contract between them..." (Section 12).

122. The Tribunal would however add that whether the Claimants are in fact engaged in Petroleum Operations within the meaning of the PPT Act 2004 is in our view a quite different and separate question, as that question relates to the rights and obligations of the Parties in relation to the Nigerian tax authorities, and not the contractual rights and obligations between the Parties in the 217 PSC. We

reiterate that this Tribunal's concern relates only to the latter and not to the former.

123. The Tribunal therefore holds that the Claimants are engaged in "Petroleum Operations" within the meaning of the 217 PSC.

**b. Cost recovery pursuant to Clause 8.1(b);**

124. The Claimants claim that they are entitled to recover as Cost Oil, costs incurred in OPL 213 and OPL 218 as specifically mentioned in the 217 PSC.

125. It is not disputed that OPL 213 and OPL 218 have since been converted to OML 132, and OML 129 respectively but these OMLs have not as yet commenced commercial production.  The Respondent disputes the Claimants' entitlement to recover costs incurred in OPLs 213 and 218 from OML 128.

126. The Claimants rely on the  following provisions of the 217 PSC on this issue:

Clause 8 1 (b):

> "The allocation of Available Crude Oil shall be in accordance with the Accounting Procedure (Annex B), the Allocation Procedure (Annex C) and this Clause 8 as follows:
> a.   ...
> b.   Cost Oil shall be allocated to the CONTRACTOR in such quantum as will generate an amount of Proceeds sufficient for **recovery of Operating Costs in OPL 213, 217 and 218 and any OMLs derived therefrom**. All operating Costs expended in U.S Dollars or in U.S. Dollars equivalent will be recovered in U.S Dollars through Cost Oil allocations." (Emphasis added)

Clause 1(w) which defines "Operating Costs" as:

> "(w) "Operating Costs" means expenditures made and obligations incurred in carrying out Petroleum Operations as determined in accordance with the Accounting Procedure".

Annex B, Article 11 which defines "Operating Costs" as:

> "...all costs, expenses paid and obligations incurred by the CONTRACTOR in carrying out Petroleum Operations and shall consist of (1) Non-Capital Costs and (2) Capital Costs".

127. Since the Tribunal is of the view that the Claimants are engaged in Petroleum Operations, the Claimants' claim for Operating Costs arising from OPL 213 and 218 appears to be validly covered within the text of Clause 8.1(b), 217 PSC. However the Respondent contends that permitting the Claimants to do so would in effect be to grant a tax incentive to the Claimants, a power which the Parties could not have in the absence of an express provision of Nigerian law.

128. The Respondent's submission is that the DOA and the 217 PSC define and confine the recovery of Operating Costs to the Contract Area of the OPL viz. :

Section 8 of the DOA provides as follows:

> "8.1 Cost Oil shall be allocated to the contractor in such quantum as shall generate an amount of proceeds sufficient for the recovery of operating costs in oil prospecting licenses as defined in the Production Sharing Contracts and any Oil Mining Leases derived therefrom."

Clause 1(v) of the PSC defines an Oil Prospecting License as follows:

> "a licence granted by the Minister under the Petroleum Act 1969 Cap 350, Laws of the Federation of Nigeria as amended, to a licensee to prospect for petroleum"

129. The Respondent suggests that the words "a licence" necessarily mean that the area within which the licensee is permitted to explore oil is limited to that specific contract area and that costs recovery must necessarily also be limited to costs incurred within that contract area. The contract area of the license granted in OML 128 is the contract area that relates to that license. As a result, the Claimants do not have the capacity to recover costs incurred outside the Contract Area of the OML 128 license from Proceeds generated from OML 128.

130. The Tribunal is unable to see how Clause 8.1 (b) of the 217 PSC could be construed as a tax incentive for the Claimants. Tax incentives are indeed incentives that the state could grant either through legislation or some statutory instruments and are not a matter for private contract. What the Parties have done in this instance was to agree as between themselves that the Claimants could recover their costs incurred in the other OPLs they were involved in

(namely OPL 213 and 218) or from any of the "OMLs derived therefrom". It is not the Claimants' case that they could make double or multiple recoveries of these costs. What the Claimants are seeking is the liberty to recover them from any of the OMLs, which in this case, they have chosen to do so through OML 128, it being the only one in full commercial operation. The fact that the Respondent has agreed that the Operating Costs of all three OPLs/OMLs can be recovered from the Proceeds of oil allocated to the Claimants does not determine what costs may properly be deducted when calculating what tax is due.

131. Even if it could be said that Clause 8.1(b) was intended to have a tax incentive effect for the Claimants, as Respondent submits, this alone could not nullify it. Indeed it is quite understandable for the Parties to the 217 PSC to expect that tax incentives could and would be given to them, given that the state had in fact undertaken to enact or amend legislation to give effect to the terms of the 217 PSC. The fact that the state had failed to do so could not make the contractual provisions any less effective, much less unenforceable.

132. The Tribunal agrees with the Respondent that the licence to explore for oil under a prospecting licence must necessarily be limited to the contract area as defined within the 217 PSC. This limitation however does not extend to the right to recover Operating Costs as <u>Section 8.2 of the DOA</u> (which has precedence over the PPT Act 2004) specifically provides that:

> "**8. Allocation of Cost Oil**
> …
> (2) All operating costs shall be recovered in U.S. Dollars through cost oil allocations in accordance with the **terms of the production sharing contract**". (Emphasis added)

133. <u>Section 8.2 of the DOA</u> read with Clause 8.1(b) of the 217 PSC, which extends the recovery of Operating Costs to Operating Costs incurred in OPLs 213 and 218 and "any OMLs derived therefrom" in the Tribunal's view squarely justifies the basis for which the Claimants have made their claims for cost recovery.

134. The Respondent in its Defence also suggests that allowing the Claimants to recover Operating Costs incurred in the other OPLs undermines the essence of the 217 PSC under which the Claimants as contractors accept and bear the risks of losing their investments. The simple response to this is that far from not undertaking the risks, the Claimants had, in undertaking the exploration, taken on all the risks that the Contract Area might not produce any oil or oil of commercial quantity. At the very most, it could be said that allowing the Claimants to recover Operating Costs from one OML while prospecting from others is to alleviate such risks, and act as an incentive for the Claimants to undertake the exploration and its attendant risks. Such clauses are matters of contractual bargain and could not be used to argue against their legitimacy.

135. The Tribunal therefore holds that the Claimants are entitled to claim for Operating Costs incurred in OPL 217 as well as OPL 213 and 218 and the OMLs derived therefrom, subject only that there shall not be double or multiple recovery of such costs.

**c.  Cost recovery of home office overhead charges**

136. <u>Clause 13.3 of the 217 PSC</u> permits the Claimants as contractor to claim their home office overhead charges as Operating Costs, an amount represented by a pre-determined percentage of their annual capital expenditure as follows:

> "13.3  **Home Office Overhead Charges**
> The CONTRACTOR shall include the following percentages on total annual capital expenditure as overhead charges in calculating total operating costs:
>
> | | |
> |---|---|
> | First $200 million | 1.00% of Capex |
> | Next $200 million | 0.75% of Capex |
> | Next $100 million | 0.50% of Capex |
> | Above $500 million | 0%" |

137. <u>Annex B Article II 1(g)</u>, 217 PSC further clarifies that this is a claim based on the "*Head Office overhead charge – parent company overhead.*" Based on this formula, a maximum of US$ 4 million for each year of the term of the 217 PSC could be incurred and claimable.

138. The Claimants say that in each of the years prior to the commencement of oil production in September 2008, they incurred significant capital expenditure for which overhead charges amounting to US$ 4 million for each of those years before and after commencement of production would be claimable. The Claimants aver that the dispute with the Respondent is that the latter would only agree to a claim for overhead charges for the entire period prior to the commencement of production and limited to a total of US$ 4 million.

139. The Respondent did not, in its Defence, plead to the quantum of the claim or to the fact that the claim be limited to a fixed US$ 4 million for the entire period. Instead, in its Defence and Reply Post-Hearing Brief, it simply says that the Claimants are not entitled to recover any cost in respect of which the Respondent has raised an objection and until such objection is resolved in the Claimants' favour. It also alleges that the Claimants had not sought the prior approval of the Respondent or the Management Committee (as defined in Clause 6, 217 PSC) prior to incurring such costs. The Respondent says such *approval must thereafter be reflected in the books of accounts* (para 4.2 (b) Respondent's Reply Post-Hearing Brief) of the Claimants (which must be jointly prepared by the Claimants and the Respondent) in accordance with Clause 13.1 of the 217 PSC.

140. The Claimants' witness Mrs Ronke Ibrahim in her statement of 2 August 2012 [HB-D/3] states that the Claimants' account books have been kept in accordance with Clause 13.1, 217 PSC but while that clause envisages that the Respondent's seconded officers can inspect and ensure compliance, the Respondent has never sought to do so. She also pointed out that the 217 PSC does not provide for any procedure for the "approval" of such expenditure. This is understandably so as home office overhead charges are to be based on a simple formula consisting of a percentage of the Claimants' total annual capital expenditure.

141. The Respondent has neither in its submissions, oral argument nor any witness statement, explained its basis for the requirement that the Claimants' group capital expenditure has to be approved by it or by the Management Committee.

A perusal of Clause 6, 217 PSC (relating to the role and functions of the Management Committee) does not bear out that such matters are within its purview.

142. In the Tribunal's view, the very object of adopting the formula set out in Clause 13.3, 217 PSC is to obviate the necessity for the Claimants to prove how much they had actually incurred in head office overhead charges in support of the 217 PSC, by pegging it to a percentage of the aggregate annual capital expenditure of the Claimants. To suggest that such charges by the Claimants' head office should first be approved by the Respondent is highly unlikely to have been so agreed and it is therefore not surprising that nothing in the 217 PSC requires it to be so. The Tribunal is unable to accept that the mere refusal by the Respondent to approve or accept the claim, without more, is sufficient to disentitle the Claimants from a claim for cost recovery expressly provided for under Clause 13.3.

143. In the absence of any credible challenge by the Respondent as to the basis and quantum claimed by the Claimants, the Tribunal holds that the Claimants are entitled to a cost recovery for home office overhead charges of US$ 4 million for each year as from September 2008 to date hereof.

**d. Amortization and timing of recovery of capital costs**

144. There is no dispute that the Claimants are entitled to recover its capital costs incurred and to recover them as Cost Oil.

145. In Section 2, Article II , Annex B of the 217 PSC, "Capital Costs" is defined as :

> "…without limitations, expenditures which are subject to a Capital Allowance under the PPT Act…"

146. There is however a difference in the Parties' respective positions as to how the expenditure should be amortised and when the Claimants could recover such expenditure.

147. The Claimants' position is that in accordance with <u>Annex B Article IV paragraph 5(b)(ii)</u>, 217 PSC capital costs are to be amortised and recovered as Cost Oil in 5 equal instalments over 5 accounting periods :

> "Capital Costs recorded in the books and accounts of the CONTRACTOR shall be recoverable in full and chargeable in **equal instalments over a five (5) year** period or the remaining life of the Contract, whichever is less. **Amortization of such costs shall be in accordance with the method prescribed under the Second Schedule of the PPT Act, or over the remaining life of the contract, whichever is less.**" (emphasis added)

148. The Respondent's position is that Capital Costs are to be amortised and recovered as Cost Oil in five equal instalments of 20% per annum subject to the 1% retention requirements *viz.* 60 equal monthly instalments, starting from the month in which the capital cost was incurred and continuing for the following 59 months. It submits that *inter alia*:

   a. There is no provision in the 217 PSC for recovery of capital costs that "*equal instalments over a five year period means 5 equal annual instalments*" [Defence-para 11.5]. The only provision being "equal instalments over a five (5) year period" and it makes more sense to collect cost on a monthly basis as oil is allocated on a monthly basis. [Defence-para 11.16, a)]

   b. The reference to the methods prescribed under the Second Schedule of the PPT Act 2004, Table II (which stipulates the percentage of amortization over 5 years and beyond), is only to indicate the appropriate per centum of the Capital Costs that can be reimbursed or be recovered by the contractor and nothing more. [Defence-para 11.16(c)]

   c. The reference in paragraph 6(1) of the Second Schedule of the PPT Act 2004 read together with Section 9 of the DOA "*as from the accounting period*" does not mean as from January 1 of the relevant year. The simple meaning is that such benefits can be claimed as from any such accounting period and not necessarily for the whole year when the asset was purchased. [Defence-para 11.17]

149. The Respondent submits that the effect of the Claimants' interpretation is that if an asset is purchased in November, the Claimants will seek to recover the entire annual allowance by December of that year. It takes the position that this must be amortised over a period of 12 months after the acquisition.

150. If the Respondent's position be adopted, the Claimants' entitlement to lift Cost Oil in recovery of Capital Costs would be delayed and spread over a period of 12 months straddling different accounting periods.

151. <u>Annex B, Article IV paragraph 5(b)(ii), 217 PSC</u> makes specific reference to the amortization method prescribed in the Second Schedule of the PPT Act 2004 which contains the following provisions:

> At Para 6(1)-
>
> "Subject to the provisions of this Schedule, where in any accounting period, a company owning any assets has incurred in respect thereof qualifying expenditure wholly, necessarily and exclusively for the purposes of petroleum operations carried on by it, there shall be due to that company as ***from the accounting period in which such expenditure was incurred***, an allowance (in this Act referred to as "an annual allowance") at the appropriate rate per centum specified in Table II of this Schedule."
>
> At para 6(4) –
>
> "Any unrecovered capitalised expenditure prior to 1 April 1977 shall be deemed to have been   capitalised with effect from 1 April 1977 and shall, as provided for in sub-paragraph (1) of this paragraph, be amortised ***in five equal instalments*** and shall be subject to the provisions of sub-paragraphs (2) and (3) of this paragraph."
>
> At para 7 –
>
> "An initial or an ***annual allowance*** in respect of qualifying expenditure incurred in respect of any asset shall only be due to a company ***for any accounting period if at the end of such accounting period*** it was the owner of that asset and the asset was in use for the purposes of the petroleum operations carried on by it." (emphasis added)

152. In the Tribunal's view, although these provisions deal with the computation of Capital Allowances (which are discussed separately as part of the Tax Oil claims), the reference to the accounting period is a clear indication that the Parties had agreed that any Capital Costs incurred during that accounting period

would be recoverable within the same accounting period. The scenario that a capital asset is acquired in November and therefore qualifies for recovery as Capital costs by December of the same year is well within the contemplation of the Parties and is consistent with the scheme for Capital Allowances under the PPT Act 2004.

153.  The Tribunal therefore has little difficulty in accepting that the Claimants' method of amortization of Capital Costs is correct and that it would be entitled to claim for Capital Costs incurred in 5 equal annual instalments such that 20% of the cost of capital expenditure be chargeable and recoverable as Cost Oil in the accounting period in which the capital cost was incurred and  that a further 20% of the Capital Cost be recovered in the 2nd to 4th  accounting periods, and a further 19% of the capital cost in the 5th accounting period.

154.  Such an approach is also consistent with the saving provision made for capital expenditures incurred prior to 1 April 1977 as set out in paragraph 6(4) Second Schedule of the PPT Act 2004 which specifically mentions "five equal instalments".

## e.  Timing of capital allowances

155.  The same reasoning that justifies the Claimants in claiming for Capital Costs in  5 equal instalments (as opposed to 60 monthly instalments) over  5 accounting periods, extends also to the claim for Capital Allowances that could be deducted from any PPT payable. This in turn has a direct impact on the amount of Tax Oil that the Respondent could lift monthly.

156.  Section 9 of the DOA was discussed during the expert witness conferencing at the oral hearing [Transcript-23 April 2014/131 – 141]. It provides:

> **"9. Allocation of tax oil**
> Tax oil shall be allocated to the Corporation or the holder, as the case may be, in such quantum as shall generate an amount of proceeds equal to the actual petroleum profit tax liability payable during each month."

157.  The relevant clauses of the 217 PSC are as follows:

a. <u>Clause 8.1</u> provides that Tax Oil is allocated to the Respondent "in such quantum as will generate an amount of Proceeds **equal to the actual PPT liability payable during each month.**" (emphasis added)

b. <u>Annex B Article III paragraph 2(a)</u> requires the Claimants to compute the PPT payable by the Respondent in accordance with the provisions of the PPT Act 2004.

c. Similar provisions appear in <u>Section 3(1) and Section 9 of the DOA</u>.

158. The dispute between the Parties is, in essence, over the meaning to be given to the phrase "*the actual [PPT] liability during payable each month*" in these provisions. The Respondent submits that this entails that the Claimants calculate the amount of tax due for the month in question, so that qualifying capital allowances would only be taken into account from the specific month in which the qualifying capital asset is first acquired or used. The Respondent therefore contends that the phrase "actual PPT liability payable during each month" requires the Claimants to make a final computation of chargeable PPT for each month.

159. In our view this contention is unsustainable.

160. Under the PPT Act 2004, an "accounting period" is a period of one year commencing on 1st January and ending on 31st December of the same year, or any shorter period commencing on the date of "*first oil*"[3] and ending on 31st December of the same year. The PPT Act 2004 provides that 20% of the cost of capital expenditure incurred by the company wholly, necessarily and exclusively for the purpose of Petroleum Operations can be allowed (i.e. deducted) from profits in the accounting period in which the capital expenditure was incurred

---

[3] The term "first oil" is not defined in the legislation or the PSC. It was first used in the Respondent's Defence as a sub-title to paras 7.1-7.7 when responding to the Claimants' reference the date of the first lifting of Available Crude Oil from the Agbami field viz.7 September 2008 in para 10.1 of the Statement of Claim.

before tax is assessed; and the same percentage in each of the three following accounting periods; while in the fifth year the percentage is 19%.

161. According to  Section 33 of the PPT Act 2004, not later than two (2) months after the beginning of each accounting period, returns of "*estimated tax for such accounting period*" must be filed; and if later revisions are made, further returns must be filed setting out the revised estimated tax for the period.

162. Under Section 45 of the PPT Act 2004, while PPT is payable in equal monthly instalments, the amount is equal to one twelfth of the PPT *estimated* to be chargeable for the accounting period. The first payment must be made not later than the third month of the accounting period; while each of the remaining eleven monthly payments must be made by the end of the relevant month. Sections 30 and 45 of the PPT Act 2004 provide that within 5 months of the end of each accounting period, a final PPT tax return must be filed for that accounting period and an additional payment be made if this final return shows that the monthly amounts already paid fall short of the amount due under the final return. Quite clearly the provision of a final adjustment on month 13 is a confirmation that the previous monthly PPT computations must necessarily be estimates. The impossibility of an "actual" monthly computation is a notion shared by the Claimants' expert witness, Mr.Ogunnowo, who explained at the oral hearing:

> 8  MR OGUNNOWO:  Yes, that's the point I'm trying to also
> 9      clarify.  You cannot ascertain your final tax liability
> 10     before the end of the year.
> 11        So you are not able to ascertain your final tax
> 12     liability on a monthly basis, and that is because of the
> 13     very nature of business.  That you are in March does not
> 14     mean you can ascertain what should be the final tax
> 15     liability you can attribute to January.  That is because
> 16     a lot of what will go into your tax computation --
> 17     which, by the way, is an annual issue -- might come in
> 18     much later in the year.
> 19        So that is the point.  So you cannot say because you
> 20     are in March you know your final tax actual for January.
> 21     It doesn't work like that.
> …
> Page 141

60

15  MR OGUNNOWO:  I suspect you probably are mixing up the issue
16  of tax, you know, with the cost allocation and not
17  reconciliation.  Because for tax purposes, you cannot
18  get the final tax liability of any month until you have
19  the final tax returns.
20      But then the reconciliation you are talking about
21  would be with respect to the allocation you have made
22  based on estimate and not necessarily because of tax,
23  but because of other elements that had determined the
24  value of the crude produced during the period.
25      But as for the tax element of all those
Page 142
1  computations, they will remain estimates.  Those
2  estimates will be your actual liability all through the
3  year until you get to the end of the year.

[Transcript-23 April 2014/140-143]

163.  Mr. Kyari, the Respondent's witness, had at the oral hearing also confirmed that the PPT the Respondent had paid were based on estimates –

11  Q.  Thank you.  Now, my understanding, and correct me if you
12      think I'm wrong, is that in a particular year in which
13      tax is payable, the process starts with issuing
14      an estimated return for that year.  An estimate of what
15      the tax will be for that year.
16          The process starts with you preparing such
17      an estimate, and filing it with the Inland Revenue
18      Service by February of that year; is that correct?
19  A.  That's in the PPTA.  In the PPTA, yes.
20  Q.  So the PPTA requires that, thank you.
21  A.  They requires that.
22  Q.  Since you said just now that you comply with the PPTA,
23      in submitting your tax returns, I would imagine,
24      therefore, that you do that, you prepare an estimate for
25      that year which you then submit by February of that
Page 123
1  year.
2  A.  That's correct.
3  Q.  That's correct?
4  A.  Yes.

[Transcript-22 April 2014/122-123]

164.  We accept the view of Mr Ognunnowo, the Claimants' expert witness, that it would not be possible to assess the final amount of tax due on a monthly basis, but only after the end of the accounting period.

165. We therefore hold that as between the Parties, Capital Allowances are to be computed (and Tax Oil allocated accordingly) on the basis that a full accounting period's Capital Allowance (at 20 % for each of the first 4 accounting periods and 19% for the 5th accounting period) is available for the accounting period in which an asset which is a "qualifying" capital expenditure is acquired or first used, regardless when in that accounting period the asset was acquired or first used.

### f.  Consolidation for PPT purposes pursuant to Clause 8.1(e)

166. The issue of consolidation surfaces when ascertaining, as between the Parties, how much Tax Oil could be lifted for PPT. The issue is whether PPT can be calculated and Tax Oil allocated on the basis that costs (capital and non-capital) of both producing and non-producing fields of the OPLs and OMLs as defined in the 217 PSC could be aggregated for ascertaining PPT liability.

167. Clause 8.1(e) of the 217 PSC provides that:

> "The CONTRACTOR shall for PPT purposes be entitled to consolidate OPLs 213, 217 and 218 and any OMLs derived therefrom."

168. The Respondent could not dispute that Clause 8.1(e) expressly grants a contractual right to the Claimants as contractor the right to consolidate OPLs 213, 217 and 218 and any OMLs derived therefrom for PPT purposes.  It however takes the  position that the clause purports to grant a tax incentive which must be provided for expressly by law. It submits that the Parties could not, by contract, seek to grant a tax incentive as the Parties have no power to do so. Clause 8.1(e) is therefore of no relevance in the absence of an enabling statute. It points out that consolidation for tax purposes has been adopted in some countries including the United States of America, France, Australia and New Zealand where detailed rules and regulations govern tax consolidation in their respective tax statutes. It asserts that there is no such legislation in Nigeria. Instead, the combined effect of existing laws in Nigeria viz. Section 3 of the DOA, Section 22(3) of the PPT Act 2004 read with Clause 1 of the 217 PSC (which

62

defines a Contract Area) makes it impossible to arrive at the interpretation, as given by the Claimants, that Clause 8.1(e) of the 217 PSC permits such consolidation for tax purposes.

169. The legislative provisions relied upon by the Respondent are:

Section 22(3), PPT Act

"(3) In computing the tax payable, the investment tax credit shall be applicable in full to petroleum operations in the **contract area** such that the chargeable tax is the amount of the assessable tax less the investment tax credit."

Section 3 DOA:

(1) The petroleum profits tax payable under a production sharing contract shall be determined in accordance with the Petroleum Profits Tax Act: Provided that the petroleum profits tax applicable to the **contract area as defined in the production sharing contracts** shall be 50 per cent flat rate of chargeable profits for the duration of the production sharing contracts.

(2) Nothing contained in this Act shall be construed as having exempted the contractors from the payment of any other taxes, duties or levies imposed by any Federal, State or Local Government, or Area Council Authority." (emphasis added)

170. The Respondent's point seems to be that the use of the term "Contract Area" necessarily limits the claims for any tax incentives to the "Contract Area" which as defined in 217 PSC would only be OPL 217 and any OML's derived from that OPL and not beyond.

171. Such a reading, however, ignores the expressed provision of Clause 8.1(e). Hence, the Respondent takes the position that Clause 8.1(e) is unlawful and invalid.

172. The Claimants point to Section 9 of the PPT Act 2004 which provides for consolidation:

"**9. Ascertainment of profits, adjusted profit, assessable profits and chargeable profits**
(1) Subject to any express provision of this Act, in relation to any accounting period, the profits of that period of a company shall be taken to be the aggregate of –

> *(a)* the proceeds of sale of all chargeable oil sold by the company in that period;
> *(b)* the value of all chargeable oil disposed of by the company in that period; and
> *(c)* all income of the company of that period incidental to and arising from any one or more of its petroleum operations.
>
> (2) For the purposes of subsection (1) (b) of this section, the value of any chargeable oil so disposed of shall be taken to the aggregate of --
> *(a)* the value of that oil as determined, for the purpose of royalty, in accordance with the provisions of any enactment applicable thereto and any financial agreement or arrangement between the Federal Government of Nigeria and the company;
> *(b)* any cost of extraction of that oil deducted in determining its value as referred to in paragraph (a) of this subsection; and
> *(c)* any cost incurred by the company in transportation and storage of that oil between the field of production and the place of its disposal."

173. The Respondent, in its Post-Hearing Brief, while accepting that Section 9(1) of the PPT Act allows for consolidation for PPT purposes, contended that this was intended for joint venture arrangements and was not applicable to PSCs [para 16.2]. The availability for consolidation is to allow the participating company that seeks to file its independent tax return to aggregate all its operations under one corporate filing. In the Respondent's view, the situation cannot apply to a PSC arrangement where tax returns are filed based on the Contract Area as defined in the PSC. It claims that consolidation in Section 9 of the PPT Act 2004 seeks to aggregate the interests of a company and not in a specific participating field. It is the Respondent's contention that the Parties could not, by Clause 8(1)(e) of the 217 PSC, make provision for consolidation of OPLs 213, 217 and 218 for tax purposes overriding the clear and unambiguous provisions of the DOA. It argues that if the legislature had intended to allow consolidation of OPLs for PPT purposes, it would have done so expressly in the DOA as part of the incentives for PSC operators in Nigeria.

174. The Respondent further asserts that "the DOA and the PPT Act expressly outlawed consolidation with respect to PSCs" [Respondent's Post-Hearing Brief/para 16.2].

175. There does not, however, appear to be any provision in the DOA and the PPT Act 2004 which suggests, much less prohibits or "outlaws", or even refers to any of the provisions in the 217 PSC as being considered unlawful. In fact, the long title of the DOA expressly declares that it is:

> "An Act to, among other things, **give effect to certain fiscal incentives given to the oil and gas companies**…under production sharing contracts between the Nigerian National Petroleum Corporation or other companies holding oil prospecting licenses or oil mining leases and **various petroleum exploration and production companies**."  (emphasis added)

176. There can also be no debate that the Claimants are a "contractor" within the meaning of the DOA being *"…any petroleum exploration and production company which has entered into a production sharing contract agreement with the [Respondent] or entered into an agreement or arrangement with any Nigerian holder of an oil prospecting licence or an oil mining lease within the Deep Offshore and Inland Basin".* [at Clause 17]

177. As discussed in paragraphs 119-120 above, the enactment of the DOA and the amendment of the PPT Act were intended to effectuate the various incentives promised by the Respondent to the Claimants (as successors in title), as expressed in the Side Letter-18 May 1993 by the Government [HB-A /3]. It is not open to the Respondent now to suggest that the very laws that were supposed to be "*amended to reflect the terms of the PSC*" [HB-A /3] actually contain provisions intended to "outlaw" and negate the very incentives promised.

178. The Parties' experts, Mr Ogunnowo and Mr Guobadia, both agree that Section 9, PPT Act 2004 permits consolidation and that by Clause 8.1(e), 217 PSC the Parties have agreed to "limit the extent to which their joint operations could be consolidated" [Joint Expert Report--HB-D/12, p. 165]. The difference in the approaches between the two experts on this issue stems from the premise from which each of them has started. Mr Ogunnowo takes the view that consolidation applies to a PSC as much as it had been applied to a joint venture arrangement [HB-D/9, para 7.3] whereas Mr Guobadia takes the view that the concept of consolidation was a legacy from the joint venture arrangements [Transcript-23

65

April 2014/ pp. 28-32]. The experts too disagree on the effect of the reference in Section 3(1), DOA to the "contract area". For Mr Guobadia, such a reference restricts any costs aggregation to the "contract area" which he takes to mean as a reference to OPL 217 alone and the OML's derived from that OPL.  Mr Ogunnowo disagrees.

179.  It seems to the Tribunal that the real question between the Parties is what the term "contract area" in the 217 PSC is intended to cover. The term is defined in the 217 PSC as the "area of the OPL and any OML(s) derived therefrom" [Clause 1(i)]. Read alone, this limits the rights and liabilities between the Parties under the 217 PSC to OPL 217 and any OMLs derived therefrom. However as between the Parties, they have expressly agreed in Clause 2.2, 217 PSC that:

> "During the term of this Contract the total Available Crude Oil shall be allocated to the Parties in accordance with the provisions of Clause 8…"

180.  In Clause 8, the Parties then agree that there are two aspects in which the ACO could be extended beyond the limits of the Contract Area, particularly for Cost Oil in sub-paragraph (b) and Tax Oil in sub-paragraph (e). In terms of Tax Oil, while *the Respondent* is entitled to lift oil in such amount as to generate Proceeds to pay for PPT, *the Claimants* are entitled "for PPT purposes... to consolidate OPLs 213, 217 and 218 and any OMLs derived therefrom". [Clause 8.1 (e)]

181.  In the Tribunal's view, the Parties have unequivocally agreed to an arrangement beyond the statutory definition of the term Contract Area in the PPT Act 2004. This does not, however, mean that there is any violation of the PPT Act 2004 or DOA. While the DOA and the PPT Act 2004 are concerned with tax incentives and taxation of profits from petroleum operations, Clause 8 of the 217 PSC does no more than to allocate ACO as between the Parties themselves. Nothing in the DOA and PPT Act 2004 speaks against Parties' agreeing as between themselves how to account for costs incurred beyond the Contract Area such as including the costs arising from OPLs 213 and 218. Again, it is worth reminding ourselves that the DOA is intended to give effect to terms granted in PSCs and not to unravel them. If it was the legislature's intention to prevent such terms or

66

incentives from being stipulated, specific prohibitory provisions should and would have been enacted. The absence of prohibitory provisions in the DOA and PPT Act 2004 speaks loudly against the Respondent's submission that such an agreement is against Nigerian law. Indeed, it would be most surprising that the Government would have intended so, for in 1998 the then Chairman of the FIRS, gave clear assurance that consolidation in the manner provided in Clause 8.1(e) is permissible in PSCs:

> "6. **Attractions to Investors**
> …
> …The Petroleum Profits Tax Act allows consolidation of a company's operating expenses, the effect of which is that the costs of drilling dry holes in any lease can be applied as a deduction in computing the taxable income from producing wells drilled in other oil mining leases…".[HB-C1/282, p. 294]

182. In Clause 7.1(h) and Annex B, Article III, 217 PSC, the Respondent undertook the responsibility to file tax returns and the Claimants are responsible for preparing estimated and final PPT returns for themselves and the Respondent.  Under Clause 15.4,217 PSC, the Respondent is to file and is responsible for making all required PPT payments to the FBIR out of the Tax Oil allocated to it under Clause 8.1.

183. The Respondent's submission that as a matter of Nigerian tax legislation, such consolidation is not permitted as it would affect the amount of tax due from the Parties is not the question before this Tribunal. The assessment and collection of revenue is a matter that can only be finally resolved by the Nigerian tax authorities, or if their view is challenged, by the Nigerian courts or the TAT. This Tribunal is concerned only with the rights of the Parties *inter se.*

184. On this issue, the Tribunal reaches the conclusion that Clause 8.1(e) remains binding between the Parties and, as between themselves, the Claimants are entitled to consolidate for PPT purposes, OPLs 213, 217 and 218 and any OMLs derived therefrom.

**g.  Investment Tax Credit: whether deductible from cost of capital assets prior to the computation of capital allowances?**

185.  By <u>Clause 15.3 of the 217 PSC</u>, the Parties agreed that:

> "a. The ITC shall be in accordance with the PPT Act as amended.
> b. The ITC rate applicable to the Contract Area shall be fifty percent (50%) flat rate for the duration of this Contract. In computing the PPT payable, the ITC shall be applicable in full to the Petroleum Operations in the Contract Area such that the chargeable tax is the amount of the assessable tax less tax offsets of which ITC is an item. The chargeable tax so derived shall be split between the CORPORATION and the CONTRACTOR in accordance with the proportion of the percentage of Profit Oil split."

186.  The Respondent challenges the Claimants' claim for ITC on two bases namely:

a.  Whether the Claimants are parties who are entitled to the benefit of ITC and

b.  Whether the Claimants are entitled to  ITC without a requirement to depreciate the capital base before offsetting the credit against chargeable tax

187.  The Respondent submits that the Claimants are not parties who had incurred any qualifying capital expenditure "wholly, exclusively and necessarily" (the "WEN" test") for the purposes of Petroleum Operations and are therefore ineligible to benefit from any ITC. It relies on <u>Section 4(1) of the DOA</u> which provides as follows:

> "**4. Determination of investment tax credit and investment tax allowance**
>
> (1)  Where the Nigerian National Petroleum Corporation ( in this Act referred to as "the Corporation") or the holder and the contractor have incurred any **qualifying capital expenditure wholly, exclusively and necessarily** for the purposes of petroleum operations carried out under the terms of a production sharing contract in the Deep Offshore or Inland Basin, there shall be due to the parties in respect of the production sharing contracts executed prior to 1 July 1998, a credit (in this Act referred to as: "investment tax credit") at a flat rate of 50 per cent of the qualifying expenditure in accordance with the production sharing contract terms for the accounting period in which that asset was first used for the purposes of such operations." (emphasis added)

188. The Respondent contends that in order to be entitled to ITC, the Claimants must have a "qualifying capital expenditure". It submits that the Claimants, in this instance, had not in fact incurred any such expenditure. This is because the arrangement under the 217 PSC is that the Claimants would merely finance the cost of purchasing the assets for the Petroleum Operations and could then recover it through the allocation of Cost Oil under Clause 8.1(b) (the definition of Operating Costs includes both capital and non-capital costs as defined in Annex B, Article II, 217 PSC). The Respondent points out that Clause 11.1 and 11.2, 217 PSC also specifies in terms that:

> "CLAUSE 11
> TITLE TO EQUIPMENT
>
> 11.1. The CONTRACTOR shall finance the cost of purchasing all equipment to be used in Petroleum Operations in the Contract Area pursuant to the Work Programmes and such equipment shall become the property of the CORPORATION on arrival in Nigeria...
> ...
> 11.5 Subject to Clause 11.2 hereof, all fixed assets purchased or otherwise acquired by the CONTRACTOR for the purposes of Petroleum Operations hereunder shall become the property of the CORPORATION. Upon termination of this Contract pursuant to Clause 3, the CONTRACTOR shall hand over possession of such fixed assets to the CORPORATION."

189. The Parties had, however, also entered into the Memorandum of 18 May 1993 when executing the 213, 217 and 218 PSCs where paragraph 6 thereof provides:

> "6. It is understood and agreed that notwithstanding Clause 11.1 of the PSCs which provides that all equipment purchased under the PSCs shall become the property of the CORPORATION on arrival in Nigeria, such equipment shall become the property of the CORPORATION on the earlier of either the termination of the relevant PSC or when the cost thereof is fully recovered under the Accounting Procedure to the PSC."
>
> [HB-A/2]

190. The Respondent suggests that the Memorandum of 18 May 1993 could not change the position that the Claimants remain merely a financier notwithstanding that the express intention of the Parties was that the property

and title would pass to the Respondent only upon the termination of the 217 PSC or when the cost of such expenditure is fully recovered.

191.   With respect, the Tribunal considers that such an argument distorts the clear intention of the Parties. There could be no clearer intention expressed in the Memorandum of 18 May 1993 than that they have covenanted to re-state the position in relation to <u>Clause 11.1 of the 217 PSC</u> and to ensure that the ownership and title to the assets acquired remain with the Claimants until the same is fully paid or when the 217 PSC is terminated. It follows therefore that the Claimants ought under the 217 PSC to be considered the owner of the assets and be entitled to claim ITC. To do otherwise is to sanction a blatant violation of the covenant set out in the Memorandum of 18 May 1993.

192.   The "financing" arrangement under <u>Clause 11, 217 PSC</u>, and the retention of ownership under the Memorandum of 18 May 1993, allows the Respondent to assert a certain degree of ownership rights to the asset to enable it to claim ITC under the DOA. But for Clause 11,217 PSC, the Respondent would not be able to seek any ITC for itself as it is the Claimants who had incurred the expenditure and not the Respondent. The co-existence of such rights under the Memorandum of 18 May 1993 read with Clause 11 of the 217 PSC is fully consistent with <u>Section 4(1) of the DOA</u> which expressly provides for the Respondent as well as "*the contractor... under...a production sharing contract*" who has incurred qualifying capital expenditure to be entitled to ITC. The Nigerian revenue authority is not in any manner deprived of any revenue it otherwise would be entitled to as this impacts only the Parties *inter se*.

193.   Even assuming that it could be argued that the Memorandum of 18 May 1993 could or should be ignored, it does not follow that as between the Parties, the Respondent alone is entitled to the benefit of tax allowances or ITC. This is because the Claimants are entities specifically addressed  at <u>Section 22 of the PPT Act 2004 which</u> provides that:

70

"(1) A ***crude oil producing company which executed_a Production Sharing Contract with the Nigerian National Petroleum Corporation in 1993*** shall, throughout the duration of the Production Sharing Contract, be entitled to claim an investment tax credit allowance as an offset against tax…".

…

(4) The chargeable tax computed under subsection (3) of this section shall be split between the Nigerian National Petroleum Corporation and the crude oil producing company in accordance with the proportion of the percentage of profit of oil split." (*emphasis added*)

194. The 217 PSC having been signed in 1993, the Claimants without any question are the parties which were contemplated under the PPT Act 2004 to be fully entitled to the ITC benefits.

195. The second question arises from the Respondent's contention that the ITC ought to be deducted from the cost of the asset to arrive at the amount of qualifying capital expenditure before calculating the annual allowance. If that be so, it would reduce the Capital Allowance deductible against profits.

196. The Respondent relies on the PPT Act in the 1990 Revised Edition of the Laws of the Federation of Nigeria ("PPT Act 1990 Rev Ed") [HB-E1/7], which published paragraph 5 of the Second Schedule to read as follows:

"5.(1) For the purposes of this Act and subject to the provisions of this Schedule, where a company has incurred any qualifying capital expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried on by it, there shall be due to that company, for the accounting period in which that asset was first used for the purposes of such operations, an allowance (in this Schedule called "investment tax credit") at the appropriate rate *per cent*, set forth in Table I to this Schedule, of such expenditure.

(2) For the purposes of this Act, the investment tax credit shall be deducted from the cost of the asset to arrive at the amount of qualifying expenditure and before calculating the annual allowance in the manner provided for in paragraph 6 of this Schedule.

(3) Notwithstanding any other provisions in this Act, investment tax credit shall be a credit against tax payable and not a charge against income."

197. It is the Respondent's contention that although the PPT Act 2004 provides for ITC in Section 22, the condition contained in paragraph 5 of the Second Schedule of the PPT Act 1990 Rev Ed would nevertheless apply to require that the ITC be

deducted from the costs of qualifying assets in computing the investment allowance. The Respondent reasons that the PPT Act 2004 does not do away with this requirement and that the Decree of 24 of 1979 as incorporated in the PPT Act 1990 Rev Ed continues to be applicable.

198. The Law Revision Committee ("LRC") formed under The Revised Edition (Laws of the Federation of Nigeria) Decree No. 21 of 1990 ("Rev Ed (LFN) Decree 1990") [HB-E1/8, p.214] was tasked to prepare the revised edition of the Laws of the Federation of Nigeria which were in force as of 31 January 1990. In doing so however, it adopted the provisions from Decree No 24 of 1979 and incorporated them as paragraph 5 of the Second Schedule to the PPT Act (No. 15 Laws of the Federation of Nigeria 1959) when there was in fact another Decree No 95 of 1979 which had amended and substituted Decree No 24 of 1979 with a new paragraph 5 of the Second Schedule.

199. It is not disputed that the LRC had no power to "make any alteration or amendment in the matter or in the substance of any Federal enactment" (Section 2(5), Rev Ed (LFN) Decree 1990). It follows it had no power to re-enact any repealed enactments.

200. The only plausible reason that the LRC could have incorporated <u>Decree No 24 of 1979</u> in the Rev Ed (LFN) Decree 1990, as <u>paragraph 5 of the Second Schedule</u> of the PPT Act instead of the <u>Decree No. 95 of 1979</u> is that it was a simple clerical error. <u>Section 5 of the Revised Edition Decree of 1990</u> provides that the Rev Ed (LFN) Decree 1990 shall be taken "*for all purposes whatsoever to be the authentic edition of the Federal enactments*". Would this also mean that courts and tribunals are thereby nevertheless bound and are to apply laws thoughtlessly without regard or concern that they have been repealed or erroneously included in the revised revisions of the law? Quite obviously not. It would be wrong to compound one wrong with yet another. This Tribunal takes the view that if the provisions of an enactment were erroneously revised, it is not so bound to accept it as reflective of the laws of Nigeria. To do so offends the intent of the Rev Ed (LFN) Decree 1990.

201. The question whether the <u>PPT Act 1990 Rev Ed</u> ought to have properly incorporated <u>Decree No 95 of 1979</u> or that the latter continues to be good law in Nigeria is not a matter of concern to this Tribunal. This is because the Parties have accepted that under the 217 PSC, the ITC is to be determined "in accordance with the PPT Act as amended" (per Clause 15.3) which both Parties have accepted as the PPT Act 2004 and which no longer contains the provisions incorporated from <u>Decree No 24 of 1979</u>. Notably, <u>paragraph 5 of Second Schedule of the PPT Act 2004</u> now contains provisions relating to "*petroleum investment allowance*" rather than to ITC.

202. <u>Section 22 of the PPT Act 2004</u> provides for ITC in the following terms:

> "**22. Chargeable tax**
>
> (1) A crude oil producing company which executed a Production Sharing Contract with the Nigerian National Petroleum Corporation in 1993 shall, throughout the duration of the Production Sharing Contract, be entitled to claim an **investment tax credit allowance as an offset against tax in accordance with the provision of the Production Sharing Contract.**
>
> (2) The investment tax credit rate applicable to the contract area shall be 50% flat rate of chargeable profit for the duration of the Production Sharing Contract."
>
> (3) In computing the tax payable, the investment tax credit shall be applicable in full to petroleum operations in the contract area such that the chargeable tax is the amount of the assessable tax less the investment tax credit.
>
> (4) The chargeable tax computed under subsection (3) of this section shall be split between the Nigerian National Petroleum Corporation and the crude oil producing company in accordance with the proportion of the percentage of profit of oil split." (emphasis added)

203. There is nothing in the PPT Act 2004 that requires that the ITC be deducted from the cost of qualifying assets to arrive at the investment allowance. Instead <u>paragraph 5 of Second Schedule, PPT Act 2004</u>, now provides that:

> "(1) For the purposes of this Act and subject to the provisions of this Schedule, where a company has incurred any qualifying capital expenditure wholly, exclusively and necessarily for the purposes of petroleum operations carried out by it, there shall be due to that company, for the accounting period in which that asset was first used or for the purposes of such operations, an allowance (in this Schedule called "Petroleum Investment Allowance") at the

73

> appropriate rate per cent, set forth in Table 1 to this Schedule, of such expenditure.
>
> (2) For the purpose of this Act, the Petroleum Investment Allowance shall be added to the annual allowance computed under paragraph 6 of this Schedule and shall be subject to the same rules under this Act."

204. These provisions say nothing about a requirement that the "investment allowance" (now termed "petroleum investment allowance") be arrived at by first deducting the ITC from the cost of the qualifying assets. The ghost of <u>Decree No. 24 of 1979</u> that appeared to have been lurking behind the PPT Act Rev Ed 1990 has been finally exorcised. Insofar as the Parties are concerned, Decree No. 24 of 1979 has no longer any hold on either of them. Any doubt as to the legality of such a position is put well to rest by the specific words of <u>section 22(1), PPT Act 2004</u> that the ITC is "an offset against tax in accordance with the provision of the Production Sharing Contract". The specific mention of the PSC in that provision is a recognition that the Parties' agreement in the 217 PSC has statutory sanction. Nothing could be clearer.

205. The Tribunal therefore rules that the Claimants are entitled, as against the Respondent to:

   a. ITC which shall be split in accordance with the terms of the 217 PSC; and

   b. Investment allowances without need to deduct the ITC from the cost of qualifying assets.

## h.  Signature bonuses and

## i.  Production Bonuses

206. Under <u>Clause 14, 217 PSC,</u> the Claimants agreed to pay a Signature Bonus of US$2 million and Production Bonuses to the Respondent. It was provided in Clause 14.2 and 14.4 (at rates based on the level of production) that these payments are not recoverable as Cost Oil *viz.* that that these bonuses would not as between the Parties, be treated as Operating Costs for the purpose of

allocating Cost Oil to the Claimants under Clause 8.1, 217 PSC. The Claimants had paid these bonuses to the Respondent as agreed.

207. The Respondent does not, in principle, disagree that Signature Bonus, although agreed to be not recoverable as Costs Oil, is nevertheless tax-deductible being an expense satisfying the WEN tests. It says, however, that the FIRS have taken a different view in its letter of 24 May 2010 that:

> "**5) Signature Bonuses, Loan Interest & Non-operator Costs**
> It is trite that accounting profit is not the same as taxable profit. By similar token, cost recoverability is not coterminous with tax deductibility. In effect, what is not cost recoverable cannot be tax deductible. To this extent therefore, any cost that the contractor cannot recover from the Concessionaire cannot be tax deductible for purposes of determining the PPT payable on the Contract Area. This position holds true in respect of signature bonuses, loan interest and non-operator Costs." [HB-C2/670]

208. Although the letter contains some contradictory remarks, the FIRS's stand is that "*what is not cost recoverable is not tax deductible*" and identified "*signature bonus and loan interest and non-operator costs*" as the specific costs items it considers not tax-deductible as a capital allowance.

209. The Respondent states in its Post-Hearing Brief that as far as tax deductibility or allowance for Signature Bonus, interest on loans and non-operator costs, it is united with the Claimants that these are tax-deductible. However, it disagrees that the tax deduction should be shared with the Claimants. Its position is made clear when it asserts in its Post-Hearing Brief (at para 20.4) that "*should the law be properly interpreted, signature bonus inures for the benefit of the Respondent*" being the Party who has incurred the expense (at para 8.7).

210. The 217 PSC is silent as to the Parties' right to claim for tax deductibility of Signature Bonuses. However, as the 217 PSC provides that the Parties shall share the Profit Oil in the proportion of 80/20 (for the Claimants and Respondent respectively), it is therefore not impermissible for each of them to claim the same proportion in their respective tax returns against their respective PPT tax liability.

211. There is also nothing in the PPT Act 2004 that suggests that a Signature Bonus or Production Bonus cannot be deductible as Capital Allowances for they would come within the description of "*expenditure wholly, exclusively and necessarily for the purposes of petroleum operations*" [Section 5(1), PPT Act 2004]. The Parties' experts too were one in agreeing that these bonuses can be claimed as Capital Allowances [Transcript-22 April 2014 /p 173; Joint Expert Report – HB-D/12, p. 167]. In the absence of any contrary provision in the 217 PSC, the Tribunal holds that the Claimants' submission that the same should be allowed to be claimed by both Parties in the same proportion as their share of Profit Oil, which reflects their share of assessable tax, is the correct one. Whether or not FIRS would so treat them (Signature and Production Bonuses) as deductible is not for us to decide.

## j.   Interest expense

212. The Claimants claim to have incurred interest expenses on inter-company loans secured in the financing of the Petroleum Operations. Details of the inter-company loans and the interest paid were set out in the witness statements of Mrs. Ibrahim [Ibrahim 1/para 16-24; HB-D/3, pp.47-50] for Statoil loans and in Mr Ale's [Ale 1/para 23-28; HB-D/1, pp.7-8] for loans to TNOS.

213. As at 29 June 2012, the interest on such loans said to have been incurred by Statoil amounted to US$210,690,140.93 [Ibrahim 1/ para 23; HB-D-3, pp. 494; HB-C2/ pp. 495-214]. As at 31 May 2012, TNOS was said to have incurred interest amounting to US$ 212.571.092.86 [HB-C3, p. 1298]

214. <u>Annex B, Article II, para 1(h), 217 PSC</u> defines "interest on loans" as part of the non-capital costs for Petroleum Operations:

> "(h) Interest – interest on loans to finance Petroleum Operations provided the terms of such loans were with the prior approval of the CORPORATION, and not higher than the prevailing commercial rates."

215. The Claimants do not dispute that they had neither sought the "prior approval" of the Respondent nor disclosed the terms of such loans to the Respondent. They

however said that details of these were subsequently made known to the Respondent. The Claimants did not and are not in these proceedings seeking to claim these expenses as "non-capital" operating costs for which Cost Oil could be allocated. What they are seeking is to be allowed to claim interest expense as deduction against their respective PPT tax liability.  In this respect, the Claimants are seeking a 100% tax-deduction in their favour as it is their case that these expenses were incurred wholly by them and not by the Respondent and as such the 80/20 sharing of the tax deduction benefit should not inure to benefit the Respondent.

216. Consistent with our ruling on Signature and Production Bonuses, the fact that an item of expenditure is not recoverable by the Claimants as Cost Oil does not mean that the same could not properly be claimed as a tax-deductible expenditure in their tax computation. Any suggestion by the Respondent that the mere failure to obtain prior approval of the loan bars the Claimants from seeking tax deduction against PPT liability must necessarily fail.

217. The Parties' statutory liability for PPT is governed by the PPT Act 2004 and as between themselves, they have also agreed to the provisions in the 217 PSC as to how they would regulate their PPT liability and the Tax Oil allocations. As such, if the Claimants seek to claim a deduction which they could not make as against the Respondent in accordance with a specific term of the 217 PSC, they must then justify their claim by a specific provision of the PPT Act 2004. The Claimants seek to do so in this instance by relying upon <u>Section 10(1)(g), PPT Act 2004</u>:

> "**10. Deductions**
>
> (1) In computing the adjusted profit of any company of any accounting period from its petroleum operations, there shall be deducted all outgoings and expenses wholly, exclusively and necessarily incurred, whether within or without Nigeria, during that period by such company for the purpose of those operations, including but without otherwise expanding or limiting the generality of the foregoing –
>
> [...]

(g) all sums incurred by way of interest on any inter-company loans obtained under terms prevailing in the open market, that is the London Inter-Bank Offer Rate, by companies that engage in crude oil production operations in the Nigerian oil industry. [...]"

218. At first reading of this provision alone suggests that the Claimants' claim on interest on the loans, although not previously approved by the Respondent, could still be allowed as a tax deduction in computing PPT liability. Unfortunately, the position is made uncertain by <u>Section 13(2) of the same PPT Act 2004</u>:

> "**13. Deductions not allowed**
> ...
> (2) Notwithstanding the provisions of subsection 1(d) of section 10 of this Act, in computing the adjusted profit of any company of any accounting period no deduction shall be allowed in respect of sums incurred by way of interest during that period upon any borrowed money where such money was borrowed from a second company if during that period:
>
> (a) either company has an interest in the other company; or
> *(b)* both have interests in another company either directly or through other companies; or
> *(c)* both are subsidiaries of another company."

219. While the term "inter-company" as used in <u>Section 10(1)(g), PPT Act 2004</u> has not been defined, the term appears to come within the relationships as set out in <u>Section 13(2),PPT Act 2004</u>. The Claimants seek to explain in its Post-Hearing Brief that <u>Section 13(2)</u> has effectively been rendered inapplicable and was in fact not removed due to an error at the time when <u>Section 10(1)(g)</u> was introduced in 1999. The Parties acknowledge that these provisions are conflicting and such a conflict has yet to be resolved by the Nigerian authorities. One telling indicator that <u>Section 13(2)</u> was erroneously not removed is the reference therein to <u>Section 10(1)(d)</u> which has nothing to do with interest on loans but with "royalties". Unfortunately while that could justify the Tribunal in ignoring the reference to <u>Section 10(1)(d),</u> it could not render <u>Section 13(2)</u> invalid so as to justify the Tribunal not to give effect to it. It remains a valid provision not removed by legislature. The Tribunal had in the course of the oral hearing informed the Parties that reconciling this issue is purely a matter for legal submissions and had invited the Parties to do make such submissions. In

their respective Post-Hearing Briefs however, the Parties seem content to repeat their respective positions without developing their arguments much further. The Tribunal has therefore to attempt to give effect to both provisions under the given circumstances as best as it could. The Tribunal acknowledges that whatever its view of the statutory provisions, the same is intended only for the purpose of determining the rights of the Parties in the implementation of the contractual bargain as between themselves.

220. One element in Section 10(1)(g) that appears not to have been neutralised by Section 13(2) is the proviso that interest on inter-company loans be *"obtained under terms prevailing in the open market, that is the London Inter-Bank Offer Rate"* or LIBOR. This appears to limit the recoverability of interest on inter-company loans only if the interest is capped at the LIBOR terms. Such a limitation is understandably intended to prevent the Claimants from using inter-company loans with high interest rates to benefit their related lenders and at the same time obtain the benefit of tax deduction from the assessable income from Petroleum Operations in Nigeria. Read in this manner, Section 10(1)(g) would therefore operate as an exception to Section 13(2) *viz.* that interest on inter-company loans would not be available for tax deductions unless the loans are "*obtained under terms prevailing in the open market, that is the London Inter-Bank Offer Rate*".

221. The 1st Claimant, Statoil, had disclosed the various loan agreements evidencing the inter-company loans given to it by and through the Statoil Coordination Center NV (a shared services company within the Statoil group of companies) and had drawn down about US$ 952,162,067.88 of loans as at 29 June 2012. [Ibrahim 1/ para 21]; [HB-C1/325-326; 327-334; 352-359; 377-384; 402-409]; [HB-C2/478-481; 427-434; 452-459; 482-485; 486-494].

222. The 2nd Claimant, TNOS, was granted financing facilities by Chevron Nigeria LLC (a Delaware limited liability company) and had drawn down about US$ 881,669,942.32 of loans as at 31 May 2012. [HB-C1/ 300, 335, 360, 385, 410, 435, 460]; [HB-C3/1298].

223. The Claimants have disclosed copies of the loan agreements in support of these transactions. It could be seen from these loan arrangements that the Claimants' related companies were charging interest at 3.5% above LIBOR. The figure of 3.5% represents the margin over the LIBOR that the inter-company lenders would charge for granting and maintaining the loans.

224. The Claimants submit that the rate of 3.5% above LIBOR is lower than the interest rate of 3.75% above LIBOR that the Respondent had agreed to in a US$1.5 billion 6–year loan for pre-export financing that the Government had in 2012 offered to raise. The Claimants cited a press report of 12 July 2012 in support. [HB-C3/1307]. Essentially, the Claimants adopt the position that the rate of interest charged in all the loans extended (both by Chevron Nigeria LLC and Statoil Coordination Center NV) were in line with commercial rates of interest and accordingly such interest falls within <u>Section 10(1)(g) of the PPT Act 2004</u> as deductible in computing the PPT due.

225. The Tribunal is aware that in commercial banking loans, it is not unusual for bank lenders to charge a margin over and above the interbank offered rate. The interbank offered rate represents the costs of funds to the banks and they would therefore charge a margin against other borrowers.

226. <u>Section 10(1)(g),</u> however, makes no such provision. Instead the text of the provision states clearly that the interest must be under "*terms prevailing in the open market, <u>that is the London Inter-Bank Offer Rate</u>*". Any argument that the phrase "*prevailing in the open market*", allows for any margin above LIBOR is negatived by the words "*that is the London Inter-Bank Offer Rate*", the words "*prevailing open market*" are merely descriptive of LIBOR and nothing more. In the Tribunal's view, <u>Section 10(1)(g)</u> allows deduction of tax for interest payable to related companies only if the interest charged under such transactions is at LIBOR and no more. If the intention is otherwise, some liberty would have been expressly provided so in the text of <u>Section 10(1)(g)</u>.

227. It follows that as all the loans were made with interest rates higher than the prevailing LIBOR, the Claimants' claim for interest payable for their inter-company loans do not fall within the exception of <u>Section 10(1)(g)</u> and accordingly the Claimants are not entitled to the tax deduction claimed and a consequent reduction of allocation of Tax Oil to the Respondent.

**k. Sole costs**

228. These costs are administrative or exploration costs incurred by either of the Claimants for the purpose of conducting Petroleum Operations. They include the costs of materials, travel and services. These were listed in the PPT returns prepared by the Claimants and submitted to the Respondent. In their Joint Expert Report [HB-D/12], the experts agree that these are qualifying expenses and are deductible allowances.

229. Although the Respondent had contested these, its resistance became noticeably muted in the course of these proceedings. The Tribunal can see no reason for the Respondent to resist these claims. The Tribunal holds that such allowances should be treated in a similar manner as all other deductible expenses credited to the Parties in the ratio of 80/20.

**l.   PPT administration**

230. The Claimants have also alleged that the Respondent had breached the 217 PSC by failing to file with the FIRS the PPT returns they have prepared and submitted to the Respondent but had instead prepared and filed its own PPT returns with the FIRS (allegedly incorrectly calculated). The Respondent had also not furnished the Claimants with the PPT receipts issued by the FIRS.

231. The Claimants rely on the following provisions in the 217 PSC:

<u>Annex B, Article III, paragraph 2(a) and (e)</u> [HB-A/1, pp.49-50] which provides:

"**Computation of Royalty, Concession Rentals and PPT**

2 (a) The CONTRACTOR shall compute the PPT payable by CORPORATION pursuant to Clause 8.1 of this Contract in accordance with the provisions of the PPT Act and any prevailing Government fiscal incentives including, but not limited to, any credit which offset PPT liability.

...

(e) The CORPORATION shall make all required PPT payments to the Federal Board of Inland Revenue. The CONTRACTOR shall prepare all returns required under the PPT Act and timely submit them to the CORPORATION for onward filing with the Federal Board of Inland Revenue. The monthly PPT shall be determined from such PPT returns.

<u>Clause 15.6</u> [HB-A/1, p. 29] provides:

"The CORPORATION shall make available to each entity constituting the CONTRACTOR copies of receipts issued by the Federal Board of Inland Revenue bearing the name of each entity [...] for the payment made for PPT in accordance with each Party's Tax oil allocation as provided in Annex B Schedule B1 in the same proportion of the percentage of profit Oil split in clause 8(1)(f)."

232. As we have set out above, under the 217 PSC it is for the Claimants to calculate the PPT payable (if any) and to prepare the PPT returns to be filed with the FIRS; and then to submit the returns to the Respondent, who in turn must file them with the FIRS and provide the Claimants with receipts for the tax paid.

233. It is common ground that the Respondent did not file with FIRS the returns prepared by the Claimants, but instead, without reference to or consultation with the Claimants, prepared and filed returns which it had prepared itself. These latter returns were, as we understand it, calculated on the basis of what the Respondent considered was the correct computation of the PPT due. The Respondent did not provide the Claimants with receipts for the tax paid.

234. The Respondent asserts that it was entitled and indeed bound by law, to take this course, since in its view the returns supplied by the Claimants incorrectly calculated the tax due and were thus not prepared in accordance with Nigerian law.

235. With respect, the Respondent is not entitled to take a high horse approach and adopt a position that it alone could decide if the PPT returns were compliant with the statutory position. There can be no debate that the correctness and

compliance assessment could only be made by the FIRS. The contractual arrangement between the Parties is however that the Respondent is to file the PPT returns as prepared by the Claimants and the decision on any tax issues and deductions would then be dealt with by the FIRS. In failing to submit the PPT returns prepared by the Claimants and in departing from the agreed contractual procedure relating to the preparation and filing of PPT returns, the Respondent took the liberty to substitute its own view as to how PPT should be calculated and had deprived the Claimants of their right to have their views considered by FIRS. This, in the Tribunal's view, breached the terms of the 217 PSC as set out above.

236. There is no suggestion in this arrangement that the Respondent is expected to do anything illegal or improper. All that it needed to do was to file the PPT returns as prepared by the Claimants, which it had covenanted to do under the terms of the 217 PSC. The Tribunal reiterates that whatever tax is legally due to the Government is a matter for the Nigerian tax authorities and if their assessment is challenged, for the Nigerian courts or the TAT. The Respondent may, of course, disagree with the Claimants on how PPT should be calculated, but its view is not and cannot be binding on the Parties to the 217 PSC. If there is any disagreement between the Parties, the remedy is to take the matter to arbitration, not unilaterally to rewrite the contract in the way the Respondent had sought to do.

237. Having breached their obligation to file the PPT returns as prepared by the Claimants, the Respondent cannot now rely on the FIRS' assessment in defence of its position. The Claimants, not having given their authority or consent for the Respondent to do as it did, are therefore not bound by the PPT returns filed by the Respondent.

**m. Modification of the 217 PSC pursuant to Clause 19.2**

238. The Claimants first raised this claim in the Reply, the Pre-Hearing Brief and at the oral opening statement [Transcript-21 April 2014/p. 35]. Under this head the Claimants seek to rely on Clause 19.2, 217 PSC which provides as follows:

> "**CLAUSE 19**
> **LAWS AND REGULATIONS**
> …
> 19.2 In the event that any enactment of or change in the laws or regulations of Nigeria or any rules, procedures, guidelines, instructions, directives, or policies, pertaining to the Contract introduced by any Government department or Government parastatals or agencies occurs subsequent to the **Effective Date** of this Contract which **materially and adversely affects the rights and obligations or the economic benefits of the CONTRACTOR**, the Parties shall use their best efforts to agree to such modifications to this Contract as will       compensate for the effect of such changes. If the Parties fail to agree on such modifications within a period of ninety (90) days following the date on which the change in question took effect, the matter shall thereafter be referred at the option of either Party to arbitration under Article 21 hereof. Following arbitrator's determination, this Contract shall be deemed forthwith modified in accordance with that determination." (emphasis added) [HB-A/1, p. 33]

239. Clause 19.2 is sometimes referred to as a stabilisation clause and is intended to give certainty to the rights of the Claimants under the 217 PSC. It is triggered if there are:

    a. Changes in *"laws or regulations of Nigeria or any rules, procedures, guidelines, instructions, directives, or policies"* ; and

    b. Such changes *"materially and adversely affects the rights and obligations or the economic benefits of the CONTRACTOR"* (the "Clause 19.2 claim")

240. The Claimants' case is that for some years following the signing of the 217 PSC, it was the consistent practice and policy of the FBIR to apply and assess PPT on the basis that ITC was not deducted from capital expenditure in order to arrive at the value of capital assets upon which capital allowances were calculated; that companies could consolidate the results of their operations from different OPLs/OMLs for PPT purposes; that a full accounting period's capital allowance was available for the accounting period in which the capital asset was first

acquired or used, regardless of when in that accounting period the asset was first acquired or used; and that all outgoings and expenses wholly, exclusively and necessarily incurred for the purpose of petroleum operations were tax deductible. [Reply/ para 35.1]; [HB-B/7, p. 203-204]

241. The Claimants rely, by way of example, on returns and assessments prepared by Chevron Nigeria Limited and issued by the FBIR for the years 1992 and 1993, which show that PPT was assessed on the bases set out above at paragraph 245 [HB-C1/199 and 242];   and further rely on a presentation made to prospective investors in the Nigerian oil industry in March 1998 (the "March 1998 presentation")  by the then Chairman of the FIRS (the successor body to the FBIR) who made the following assurances:

> "…all outgoings and expenses wholly, exclusively and necessarily incurred for the purpose of the operations are to be deducted…
> …
> [ITC] does not diminish the cost of the asset for the calculation of Capital Allowances…
>
> …the Petroleum Profits Tax Act allows consolidation of a company's operating expenses, the effect of which is that the costs of drilling dry holes in any lease can be applied as a deduction in computing the taxable income from producing wells drilled in other oil mining leases.
> …
>
> "all expenses incurred in petroleum operations which are not capitalised are allowed to be set off against income to arrive at the profit which is chargeable to tax.
> …"

[HB-C1/282-295]

242. The Claimants submit that since then there have been several changes that operate adversely against them.  In support of this, they rely on PPT notices of assessment issued by the FIRS for the years 2008, 2009, and 2010 [HB-C3/1229,1230,1231] and on a letter written by the Director of Tax Policy on behalf of the Executive Chairman of the FIRS to the Respondent dated 24 May 2010 (the "FIRS letter-24 May 2010") [HB-C2/670-672]. Although the letter was written in response to the Respondent's query raised in relation to another PSC

85

(involving another oil company Agip), the Respondent applied the approach stated in the FIRS letter-24 May 2010.

243. In that letter, the FIRS stated that:

(i) *"the amortisation of Capital Allowance over a period of Sixty months is correct and therefore justified";* [HB-C2/670]

(ii) *"the act of consolidation as enshrined in clause 8.1(e) of the PSC agreement is null and void ab initio and therefore of no legal consequence whatsoever";* [HB-C2/670]

(iii) *"ITC is to be treated as a deduction from qualifying Capital expenditure before arriving at the value of the asset that is available for Capital Allowances computation";* [HB-C2/671]

(iv*) "any cost that the contractor cannot recover from the Concessionaire cannot be tax deductible for purposes of determining the PPT payable on the Contract Area. This position holds true in respect of signature bonuses, loan interest and Non-operator Costs."* [HB-C2/671]

244. The PPT notices of assessment, which were prepared from the tax returns submitted by the Respondent, were made on the basis of the above provisions.

245. In these circumstances, the Claimants submit that there has been a change within the meaning of Clause 19.2,217 PSC and that this change has materially and adversely affected the rights and obligations of the Claimants under the 217 PSC, by significantly increasing the amount of oil to be allocated to the Respondent as Tax Oil, and thus reducing the amount of oil available to be allocated as Profit Oil. The Claimants have sought in vain for more than 90 days to secure the agreement of the Respondent to make appropriate changes to the 217 PSC to compensate the Claimants for this material change in the allocation of Profit Oil. Accordingly, they seek an order from this Tribunal to make such appropriate changes.

246. The Claimants accept that if they succeed in their claims for damages against the Respondent for the past and current breaches of the 217 PSC, then they cannot simultaneously seek modifications to the same, since this would result in double recovery. As far as the situation up to the date of our Award is concerned, the Claimants put forward their Clause 19.2 claim as an alternative to their claim for damages. As to the continuing performance of the 217 PSC during post-Award period, the Claimants submit that there is a risk that the Respondent may continue to overlift oil and to justify doing so on the basis of the changed practices and policies of the FIRS, and that the Tribunal should order modifications to the 217 PSC to guard against such an eventuality.

247. For the reasons set out earlier in this Award, the Tribunal has ruled that the Respondent is in breach of the 217 PSC and that the Claimants are entitled to an award of damages for such breaches. As such, the Clause 19.2 claim only concerns the post-Award situation, namely whether the Tribunal should exercise its power under that clause to order modifications to the 217 PSC to guard against the risk of the Respondent continuing to act on the basis of the changed policies to the detriment of the Claimants.

248. The Respondent denies that the Tribunal has jurisdiction to make changes to the 217 PSC as requested by the Claimants and submits that, in any event, there has been no change sufficient to trigger Clause 19.2.

249. As to jurisdiction, the Respondent submits that the question whether there has been a change in practice or policy by the FIRS cannot be decided in this arbitration, since any ruling by this Tribunal would necessarily involve deciding as between the Claimants and the Respondent, which of them has correctly interpreted the tax laws in the preparation of tax returns and the payment of tax. The Respondent submits that such questions can only be decided by the TAT or (as far as matters of law are concerned) by the Nigerian courts.

250. We do not accept the Respondent's analysis of the position. The question whether it is the Claimants or the Respondent who had correctly interpreted the

tax laws does not arise in this context. The Tribunal's concern is not whether the FIRS had correctly or incorrectly interpreted the law in making its assessments and the same is irrelevant in this arbitration. It may be correct now but incorrect formerly, or *vice versa*. The question whether there has been a change in policy is separate from questions as to the true meaning and effect of the tax legislation in question. The latter are clearly outside our jurisdiction, but the former is essentially a question of fact, which the Tribunal has jurisdiction to decide.

251. The Tribunal takes the view that any ruling in favour of the Claimants on the matter under consideration would not have any effect on any party other than on the Parties to this arbitration. Any modification made to the terms of the 217 PSC would bind only these Parties and not the FIRS or indeed any other third parties, none of whom are parties to this arbitration.

252. Apart from the question of jurisdiction, the Respondent denies that there has been any change within the meaning of Clause 19.2. In particular, it submits that what the FIRS has done is to interpret the law, and whether its interpretation is right or wrong, this does not amount to a change of policies within the meaning of this clause. In other words, whatever the FIRS' views may be they do not change the law and policies existing when the 217 PSC was signed. The Respondent also criticised the reliance by the Claimants on the tax assessments and returns in the case of Chevron Nigeria Limited, submitting that the same is misplaced, since those assessments and returns were made in the context of the joint venture contractual arrangements for oil operations that preceded the regime of PSCs.

253. The main substantive ground raised by the Respondent is that the FIRS' actions do not amount to a change in law or policy. Such an argument, in the Tribunal's view, ignores the fact that FIRS is the agency of the Government empowered to implement the state's tax laws and policies. For all intents and purpose, its actions, omissions and interpretations of the law and policies have a direct impact on the rights and tax liabilities of the Claimants under the 217 PSC. In the Tribunal's view, Clause 19.2 is not limited to changes in the written laws or

regulations of Nigeria, but extends to *"rules, procedures, guidelines, instructions, directives, or policies pertaining to the [217 PSC] introduced by any Government department or Government parastatals or agencies"*. In other words, every act of the FIRS that could adversely affect the Claimants' tax liability falls well within the contemplation of Clause 19.2. The FIRS is not merely offering a passive interpretative view but is actively requiring and ordering the Parties to comply with their directives. To describe such steps as merely offering an "interpretation" is indeed an understatement. The Tribunal is left with no doubt that the FIRS' actions amount to a change of Government policy which occurred after the 217 PSC was signed.

254. The Respondent's suggestion that the policy relating to ITC, tax deductions, amortisation of expenses and consolidation which the Claimants are relying on were applicable only to joint ventures and not to production sharing arrangements lacks sound legal support. Quite clearly, the PPT Act 2004 makes no distinction between joint ventures and production sharing arrangements. If anything, the PPT Act 2004 makes specific mention of PSCs, the provisions thereof and policies that were then existing in March 1998 for petroleum operations and must therefore apply to the Parties in the 217 PSC as it would apply to parties in a joint venture arrangement.

255. The Tribunal therefore holds that there was a change in the policies of the FIRS, who is indisputably a Government agency, since 18 May 1993. Apart from the tax assessments and returns of Chevron Nigeria Limited, the statement in the March 1998 presentation by the then Chairman of the FIRS is, in effect, wholly contradicted by the letter written by the Director of Tax Policy on behalf of the Executive Chairman of the FIRS to the Respondent dated 24 May 2010 and the assessments made by the FIRS from 2008 onwards. No attempt was made by the Respondent to reconcile the presentation with the letter and the assessments, perhaps because in truth they are irreconcilable.

256. Based on the Tribunal's findings on the issues of consolidation, ITC, and tax deductible allowances, the Tribunal reaches the inescapable conclusion that the

policy changes made by the Government agencies have materially and adversely affected the Claimants' rights and obligations or economic benefits under the 217 PSC as they would significantly increase the amount of oil to be allocated to the Respondent as Tax Oil, and thus reduce the amount of oil available to the Parties to be allocated as Profit Oil.

257.  The question whether an order that the terms of the 217 PSC be modified in the terms sought for by the Claimants will be discussed and considered below, together with all other reliefs and remedies sought.

## II.   The Counterclaim

258.  The Respondent also alleges that the Claimants had breached the 217 PSC in several aspects namely:

## a. Lifting Allocation

259.  This relates to the allocation and actual physical lifting of ACO by the Parties. The oil is to be allocated in accordance with the accounting and allocation procedures set out in Annex B and C,217 PSC. Annex D,217 PSC then sets out "*the procedure for the nomination, ship scheduling and lifting of Available Crude Oil from the Contract Area.*"  [HB-A/1, p. 64]

260.  Paragraphs 1 and 2 of Annex B, Article IV of the 217 PSC requires that:

> "Article IV
>
> **Accounting Analyses**
>
> 1.   A monthly accounting analysis in the form of Schedule B-1 attached to this Accounting Procedure shall be prepared by the CONTRACTOR and furnished to CORPORATION within sixty (60) days of the end of the period covered by such analysis, for consideration and approval.
>
> 2. The Realizable Price and the quantities actually lifted by the Parties shall be used to compute the proceeds as reflected in Section A of each Schedule B-1 and the allocation of such proceeds in the categories described under Clause 8.1 of the Contract shall be reflected in Section B thereof." [HB-A/1, p. 51]

261. The Claimants are therefore under an obligation to prepare the monthly accounting analysis in the form of Schedule B-1 recording details of the past month's lifting of ACO and how liftings had been allocated as a matter of accounting among the different financial categories.

262. Annex C, 217 PSC, provides that the lifting allocations for each preceding quarter (which means two (2) Schedule B-1s) shall be transposed into form Schedule C-2 which would also show a record of the liftings over the past months, total amount of Proceeds allocated (contractual allocation), and compares this against the total amount of Proceeds physically received by the Parties during the quarter.

263. The difference between the contractual allocations and the amount actually received is recorded as the "Proceeds Imbalance" (as defined in Paragraph 1(f) of Annex C of the 217 PSC [HB-A/1, p. 59]) of that preceding quarter.

264. A forecast in the form of Schedule C-1 is to be prepared (the "Forecast") using the Proceeds Imbalance of the preceding quarter and an estimate of any Proceeds Imbalance for the current quarter in which Schedule C-1 is prepared. The Forecast is determined by taking into account the Proceeds Imbalance between the Parties through debiting and crediting to each other's estimated lifting allocation.

265. Paragraph 5 of Article IV of Annex C, requires that "*All Lifting Allocations and actual liftings shall be audited at the end of each calendar year by a mutually acceptable independent auditor.*" [HB-A/1, p. 61]

*Realizable Price (Clause 9.1 of 217 PSC)*

266. It is not disputed that the allocation procedure set out above was not strictly followed by the Parties. For one, it was said that the Parties never in fact ascertained the "Realizable Price" which is supposed to be determined in accordance with a prescribed method set out in Clause 9.1 of the 217 PSC. The method contemplated under it includes  engaging an independent laboratory to

determine and assay the crude oil to be sold; going through a trial marketing period of 6 months and then discussions between the Parties to agree on a valuation method to determine the value which should reflect the true market value of the crude oil. If the Parties are not able to agree to the valuation, the determination shall then be referred to the Ministry responsible for petroleum resources.

267. Shortly following the trial marketing period ("TMP"), the Parties met in Houston on 26-27 May 2009 [see minutes at HB-C2/577] in an attempt to agree to a valuation method. The meeting did not achieve any agreement and the Parties agreed to schedule another meeting on 22 June 2009 to close out on the Realizable Price methodology. According to 1st Claimant's Tax Accountant, Mr Arasomwan, who was at that meeting, it was the Respondent who had come to that meeting and insisted on using the official selling price ("OSP") instead of trying any other methodology to determine the Realizable Price. According to him, this was what had occurred:

> 14  A. We had a follow-up meeting in Abuja.  I was at that
> 15     meeting.  The GM marketing came into the meeting and
> 16     said the methodology that the Ministry of Petroleum had
> 17     actually recommended, which would be the RP methodology
> 18     going forward, would be the OSP.  So to my mind,
> 19     I don't -- I don't know if there was -- even if you went
> 20     to the Ministry of Petroleum, there was already
> 21     something that they have recommended, which is the OSP.
> 22        So we agreed.  And so to us, there wasn't
> 23     a disagreement in regards to the pricing.  Because we
> 24     actually agreed to what the minister, who was the final
> 25      arbiter, has recommended to everybody to use in the industry.

[Transcript-21 April 2014/pp. 165-166]

268. The Respondent's Mr. Kyari also agreed that it was the Respondent who had taken the position that the Realisable Price should be the OSP:

> 9  Q. Who was taking the position that it should be the
> 10     official selling price?  Because you say there was
> 11     apparently some discussion as to whether it would be
> 12     official selling price or realisable price.  Who was
> 13     taking the position that it should be the official

```
14    selling price?
15  A.  It must be the corporation.
```

[Transcript-22 April 2014/p. 98]

269. Mr Kyari also explained that the OSP represents a *"mark-up over the benchmark crude"* which the Respondent uses to determine the value of the crude oil [Transcript-22 April 2014/p. 100].

270. In the face of this evidence and admission, the Tribunal finds that the Parties had reached an agreement to use the OSP in lieu of the Realizable Price or, in other words, had agreed that the OSP was to be the Realizable Price. The Claimants in using the OSP, could not on any count be held to be in breach of the 217 PSC. If there could indeed be any breach it could well be said to have been committed by the Respondent who appears to have been insistent in using the OSP.

271. The Respondent's counsel seems to be arguing that it was the Claimants who had insisted on disregarding the agreed method of determining the Realizable Price, and that the failure to do so would offend Section 13 of the DOA which states as follows:

> "**13. Use of realisable price in determining royalty and petroleum profit tax in respect of crude oil, etc.**
>
> (1) The realisable price as defined in the production sharing contract established by the Corporation or the holder in accordance with the provisions of the production sharing contract, shall be used to determine the amount payable on royalty and petroleum profit tax in respect of crude oil produced and lifted pursuant to the production sharing contract."

272. In its Post-Hearing Brief, the Respondent then suggested that it is irrelevant that the Respondent had suggested the OSP (at paragraph 7.1.10). It submits that a failure to ascertain/use a Realizable Price will automatically mean that the fiscal value of ACO had been incorrectly determined which in turn distorted the cascade of distribution as provided in Clause 8 of the 217 PSC. It would also derogate from the requirement that Tax Oil would be computed on the basis of Realizable Price and not on any alternate pricing formulation (at paragraph 7.1.11 i) and ii))

273. With respect, the Tribunal finds such an argument rather curious. <u>Section 13 of DOA</u> requires the Realizable Price to be determined according to the provisions of the PSC which allows for discussions to enable the Parties to reach a mutually agreed method of valuation. The Parties had agreed on the Respondent's proposal (or insistence) that the OSP (which represents a mark-up over the benchmark value of crude oil) be used instead. It follows that the Parties had, in accordance with the 217 PSC discussed and agreed to use the OSP as the Realisable Price and were complying with Section 13 of the DOA. How could it then be said that the Claimants who had accepted the Respondent's (an agency of the Government) proposal had disregarded the position in  law? The Parties' agreement is compliant with the law.

274. If the position were otherwise, or if the Respondent were of the view, at any time, that the OSP is not reflective of the "*true market value*", the Respondent could (as provided for in <u>Clause 9.2 of the 217 PSC</u>) and should have reopened the issue and negotiated the same with the Claimants again to agree on the method to determine the Realisable Price. The Respondent did nothing.

275. The Tribunal therefore holds that the Claimants were not in breach of the 217 PSC in using the OSP in its computation of allocation entitlement or that the computation of the PPT returns based on the OSP were in any way tainted with illegality.

*Lack of Approval by Respondent*

276. The Respondent also alleges that the Claimants failed to seek the "consideration and approval" of the Respondent to the Schedule B-1s. All that was said to have been done by the Claimants was to submit the Schedule B-1s to the Respondent and acted on them as if they had been approved. The Respondent sought to rely on the oral evidence of the Claimants' Mr Arasomwan who testified that all he had done was indeed to submit the Schedule B-1s to the Managing Director of the National Petroleum Investment Management Services ("NAPIMS") but did

not obtain their consideration and approval. Mere silence by the Respondent would not amount to approval.

277. Mr Arasomwan had, in the Tribunal's view, acquitted himself under cross-examination. He expressed bewilderment as to what else could he have done apart from submitting the Schedule B-1s for the Respondent's consideration. When cross-examined repeatedly on this, his responses   were candid and logical:

> 13  Q.  First of all, I would -- you would like to -- I would
>
> 14    like you to identify the number of B-1s you have
> 15    exhibited where you've got consideration and approval.
> 16    But I'll come to that.
> 17       The question I'm going to ask you: do you understand
> 18    what it means to have a document considered and
> 19    approved?  Those are the adjectives I would like you to
> 20    deal with.  Do you know what that means?
> 21  A.  The accounting schedule for the PSC puts the
> 22    responsibility on the contractors to submit the
> 23    schedule.
> 24       Now, when you ask me consideration and approval,
> 25    I don't know where or how I'm supposed to do.  What I'm
> Pg 148
> 1    supposed to do is to submit the schedules, and I said
> 2    personally I submitted those schedules on a monthly
> 3    basis.
> 4  Q.  It was not your duty to obtain that consideration and
> 5    approval.  That's what you are telling me.  You acted --
> 6  LORD SAVILLE:  That's a rather difficult question for this
> 7    or indeed any witness.  If you've got to submit
> 8    a document and approval, you are not promising to get
> 9    approval.  Ex hypothesi, an approval may not be
> 10    forthcoming.  I think all this witness is saying is it
> 11    was his job to prepare these documents in accordance
> 12    with what he understood to be the contractual position
> 13    and send them off to you.  At that stage I would have
> 14    thought, speaking for myself, it was a matter for your
> 15    clients to consider them and either to approve them or
> 16    to say that they didn't approve them and, in the latter
> 17    case, no doubt to explain why.
> 18       If they didn't approve them, then surely
> 19    a commercial contract like this would continue on with
> 20    your clients saying "I'm afraid we don't approve these,
> 21    there is a dispute between us because you say we should
> 22    approve them because they're in accordance with the
> 23    contract, and you either try and sort it out amicably or

```
             24    you can go off to arbitration".
             25      I don't see how you can suggest to this witness that
       Pg 149
              1    it's up to him to get approval.  All he can do is
              2    present the documents.
              3  MR EGHOBAMIEN:  Let me put the question slightly
              4    differently.
              5      You continuously sent B-1s, notwithstanding the
              6    fact -- or it was irrelevant whether a consideration and
              7    approval it be obtained.  All you did was send the B-1s
              8    out?
              9  A.  We had an obligation under the PSC, and that obligation
             10    said every 60 days you submit a B1.
```

[Transcript-21 April 2014/pp. 147-149]

278.  There really is no logic in suggesting that there is a positive duty imposed on the Claimants to sit the Respondent down for the latter to "consider" and "approve" the Schedule B-1s before the Claimants could proceed to prepare the Schedule C-1s. The argument is an attempt to turn the Respondent's own inaction, omission or failure to give its consideration into a positive duty of the Claimants to ensure that this was done. The Tribunal cannot accept such a submission. Such an argument could never sustain the allegation of breach by the Claimants of their obligations for failure to comply with the procedure set out in Annex B of the 217 PSC. The Respondent ought to have considered the Schedule B-1s and signified its disapproval if it disagreed with them.

**b. Tax savings**

279.  The Respondent, in its Counterclaim, claims "tax savings" which it says would ordinarily accrue to it but for the Claimants' wrongful and illegal claims for such deductions when preparing the tax returns on a single line basis. It says that in doing so, the Claimants had assumed that each Party incurred expenditures in the proportion of 80/20 and that any benefit that has been derived from a reduction in the tax liability is equally shared in the proportion of 80/20 as well. The Respondent says that these assumptions are incorrect and contrary to the provisions of the 217 PSC and the law. In its submission, the Claimants are merely a financier of certain assets and as such whenever the cost of that asset is

recovered by the Claimants, the Respondent suffers the qualifying expenditure and not the Claimants. The Respondent should ordinarily be the party who would benefit from Capital Allowance and ITC and not the Claimants.

280. The Respondent submits that whether the tax savings be a tax allowance, a tax-deductible item or a tax credit, the justification for attributing the tax savings should depend on the contribution of each Party. In relation to each of these kind of "tax savings" the Respondent says:

    a. General deductibles: This covers outgoings and expenses, whether incurred in or outside Nigeria, and would be attributed to the Respondent even if initially incurred by the Claimants as most of these would be recovered by the Claimants through lifting of Cost Oil. Only where such expenditure was incurred by the Claimants and not recovered by them through Cost Oil would the benefit of any tax savings inure to the Claimants.

    b. Capital Allowance:  Based on the WEN test set out in Paragraphs 3, 6(1) and 7 of the 2nd Schedule of the PPT Act 2004, the Respondent is the company that has incurred the expenditure as it had paid for the cost through Cost Oil lifting by the Claimants and as such, only the Respondent should be entitled to such allowance deduction before applying the profit split of 80/20.

    c. ITC: This is an incentive which gives a direct deduction against the tax payable and is available to the Party who had incurred the qualifying capital expenditure. Again, the Respondent asserts that Section 4 of the DOA permits only the owner of the asset as such expenditure had been recovered by the Claimants through Cost Oil lifting. As such, it is the Respondent and not the Claimants who had incurred the qualifying expenditure.

281. The Respondent says that in breach of <u>Clauses 11.1 and 11.5 of the 217 PSC</u> and the express provisions of the law aforesaid, the Claimants applied the Capital Allowances and ITC on the basis that they were entitled to them even after they have fully recovered such expenses through the allocation of Cost Oil. By doing so, the Claimants claimed for itself 80% of the amount of taxes saved without taking into consideration the contribution of the Respondent in reducing the overall tax obligations.

282. The Respondent submits that the single line computation used by the Claimants was wrong and proposes that a double-line computation be applied where each Party's contribution to the respective tax savings be attributed and credited to that Party prior to ascertaining the assessable tax.  It says that relying only on the computations prepared by the Claimants, the tax savings that should  accrue to the Respondent and for which it is entitled to a refund for the tax assessment years 2008, 2009 and 2010 shows that the Claimants ought to refund to the Respondent the total sum of  US$ 1,631,925,031.81:

| Year | Amount Due (US$) |
|------|------------------|
| 2008 | 76,146,088.78 |
| 2009 | 696,087,887.64 |
| 2010 | 859,691,055.39 |
| **Total:** | **1,631,925,031.81** |

[HB-B/4, p. 124]

283. In arriving at these amounts the Respondent had used the Realizable Price applied by the Claimants (*viz.* the OSP).

284. The Respondent did not update these figures but had instead in its Post-Hearing Brief (para 24.2) stated that it may seek an interim award if the amount is challenged by the Claimants, as the breakdown of the various overlift of the Claimants into the various heads of claim is complex and cannot be calculated by

the simple addition of the various elements of that over lift. Otherwise it seeks an award for the refund of the sum of US$ 1,631,925,031.81.

285. The question as to whether the Claimants could be considered 'owners' of the assets for the purposes of the tax allowances and the ITC, has been discussed in paragraphs 187-194 above. The Tribunal has ruled that the Parties have under the Memorandum of 18 May 1993 covenanted to re-state the position in relation to Clause 11.1 of the 217 PSC to ensure that the ownership and title to the assets acquired remain with the Claimants until the same is fully paid or when the 217 PSC is terminated. It follows therefore that the Claimants ought, under the 217 PSC, to be considered as the owner of the assets and consequently satisfies the WEN tests. The Tribunal's finding puts paid to the Respondent's primary basis that the Claimants' claims for tax allowances and ITC were improperly attributed to them as they lack the ownership criterion under the WEN test.

286. From the brief breakdown of the claims submitted by the Respondent [HB_B4/126a-126n], the bulk of the counterclaim sum of US$ 1,631,925,031.81 consists of capital tax allowances and ITC which the Respondent said the Claimants had wrongly attributed to themselves. In fact, the figures for tax savings due to capital tax allowances (US$ 911,327,329) and ITC (US$ 873,561,625) [HB-B4/126c, 126h and 126n] all add up to US$1,784,888,954. Based on these alone, without even considering other attributions, the Respondent's counterclaim would have been reduced to a net balance of US$ 152,963,922.19 due to the Claimants.

287. In the circumstances, the Respondent's counterclaim for the refund of US$1,631,925,031.81 being the alleged over payment and tax savings that ought to have been attributed to the Respondent must fail.

288. The Respondent's bases for the other declaratory reliefs sought under its Counterclaim are essentially defences to the Claimants' claims *viz.* ownership of assets, realizable price, benefit of capital allowances and ITC. On the bases of the

findings and holdings made in respect of the Claimants' claims, the Respondent's other reliefs sought under the Counterclaim also fail *in limine*.

## Relief and Remedies

289. The Claimants seek relief and remedies in the form of damages for the Respondent's breaches of the 217 PSC, declaratory and injunctive relief to ensure the compliant performance of the 217 PSC by the Respondent and modifications of the terms of the 217 PSC under Clause 19.2 thereof, as well as costs and interest.

### Damages

290. The Claimants' claim for damages is based on the Proceeds Imbalance they have calculated based on their interpretation of the terms of the 217 PSC. The Claimants have presented their quantification on a high-level basis and did not provide details as to how each of the disputed items ought to be computed. At the close of the oral hearing, the Tribunal requested the Parties to provide the Tribunal with the breakdown or formulae from which the calculations could be verified or from which the Tribunal could make extrapolations [Transcript-23 April 2014, pp. 147-149]. The Parties did not however take up the Tribunal's offer. Instead, they appear content to allow the Tribunal to indicate its thinking behind each claim from which they could work towards how they could continue in the performance of their contractual relations.

291. It appears to the Tribunal that the Parties do not dispute each other's calculations and the figures used in their calculations. What is disputed is what goes into the formula for the determination of the damages.

292. The Claimants had submitted an original claim for US$ 123 million (as at 30 April 2011) in its Notice of Arbitration. The amount based on the widening Proceeds Imbalance increased to US$ 1,002,440,206 as at 28 February 2014, just prior to the oral hearing. The latest formulation as at 31 January 2015 shows a

sum of US$1,173,847,477 in the Claimants' favour. The figure is expected to fluctuate as it depends also on the amount of ACO lifted and the OSP used in each subsequent quarter by either of the Parties.

293. The figures as prepared by the Claimants included their claim for PPT tax deduction for the interest expense incurred on their inter-company loans which the Tribunal has held as not claimable. The damages that the Claimants are entitled to will have to take into account this element.

294. While the Tribunal is aware of the amount of interest expense claimed by the Claimants (see paragraphs 212-213 above and the attachments referred therein), it has no information as to the amount of additional tax that the Parties would have to bear as a result of the Tribunal's decision to disallow this as being tax-deductible.

295. The Tribunal would therefore award damages up to the date of this Award excluding the additional tax that would have been payable for the inter-company loans. The amount of such damages shall be calculated based on the Proceeds Imbalance as at 31 January 2015 adjusted to take into account the liftings of ACO by the Parties during the period from 1 February 2015 and the date hereof <u>less</u> the amount representing the additional tax payable due to the non-deductible nature of the interest expense incurred on inter-company loans secured by the Claimants. If the Parties are unable to reach agreement on the amount to be deducted, the same shall be referred to the Tribunal for final determination.

**Interest**

296. The Claimants are seeking:

   a. Pre-award interest on the amount of damages calculated up to the date of the Tribunal's Award at the Central Bank of Nigeria Monetary Policy Rate, alternatively at the rate specified in Clause 8.5 and Clause 10.2 of one (1) month LIBOR plus 2% (two per cent) per annum; and

b.  Post-award interest on all sums that may be found due to the Claimants from the date of the Award until the date of payment at the Central Bank of Nigeria Monetary Policy Rate (said to be currently 12% per annum).

297.  The Tribunal has no difficulty accepting that interest shall be payable on the amount of Proceeds Imbalance accruing from the respective dates such imbalances occurred until the same have been fully paid. The 217 PSC provides in Clause 8.5 and Clause 10.2 that overdue payments shall bear interest at the rate of *"one (1) month LIBOR plus 2%"* (two per cent) per annum. There is no reason why this rate should be displaced by the Central Bank of Nigeria Monetary Policy Rate.

298.  The Claimants have submitted computations of the interest accrued on these amounts at the LIBOR (1 month) +2 % the latest being made up to 31 January 2015. These interest are however computed on the basis of the full amount of the Claimants' claim on Proceeds Imbalance as being correct. There is a need to re-compute these to take into account the reduction arising from the Tribunal's decision relating to the disallowance of the interest expense on inter-company loans as tax-deductible.

299.  The Tribunal will therefore allow interest on a simple basis to be payable at the rate of LIBOR (1 month) +2 % on the respective amounts of Proceeds Imbalance (adjusted to take account of the Tribunal's disallowing of interest expense on inter-company loans as tax deductible) up to date of full and final payment.

300.  The Claimants having been allowed interest on the damages up to date of full and final payment, its claim for post-award interest no longer arises for consideration.

**Declaratory relief**

301.  The Claimants seek various declaratory orders, each of which would be considered below.

*Liberty to uplift ACO to satisfy monetary award*

302. The Claimants seek a declaration in the following terms:

> "(a) without prejudice to the CONTRACTOR's right to enforce the Tribunal's monetary and other awards by any and all other means available to the CONTRACTOR, the CONTRACTOR shall be entitled to lift such quantum of Available Crude Oil as enables the CONTRACTOR to generate Proceeds sufficient to satisfy and ensure compliance with the Tribunal's monetary and other awards; and
>
> (b) the CORPORATION shall not in any way impede such liftings by the CONTRACTOR"

303. This order, if made, has the effect of facilitating the enforcement and execution of the monetary terms of this Award. The Tribunal is of the view that steps in relation to the enforcement of the Award are beyond the scope of its reference and lie properly within the province of the courts of the enforcement regime.

304. The Tribunal therefore declines to grant this relief.

*Recovery of Cost Oil*

305. The Claimants have asked that the Tribunal makes declarations on their rights with regards to recovery of Cost Oil.

306. Based on and consistent with such findings and holdings, the Tribunal will make the following orders and declarations:

   a. Pursuant to Clause 2.2 and Clause 8.1(b), the Claimants are entitled, on an ongoing basis, to be allocated and to lift as Cost Oil from OPL 217 and any OML(s) derived therefrom (including OML 128) such quantum of ACO as will generate an amount of Proceeds sufficient for recovery of Operating Costs incurred in OPL 218 and OPL 213, and any OML(s) derived therefrom (including OML 129 and OML 132), as well as for recovery of Operating Costs incurred in OPL 217 and any OML(s) derived therefrom (including OML 128).

b. Pursuant to Clause 2.2 and Annex B Article IV paragraph 5(b)(ii), the Claimants are entitled, on an ongoing basis, to be allocated and to lift as Cost Oil from OPL 217 and any OML(s) derived therefrom (including OML 128) such quantum of ACO as enables the Claimants to recover Capital Costs in five equal instalments over five consecutive accounting periods, without any pro-rating of instalments.

c. Pursuant to Clause 2.2, Clause 8.1(b) and Clause 13.3, the Claimants are entitled, on an ongoing basis, to be allocated and to lift as Cost Oil from OPL 217 and any OML(s) derived therefrom (including OML 128) such quantum of ACO as generates an amount of Proceeds sufficient for recovery of home office overhead charges in an amount up to a maximum of US$ 4 million per year for each and every year of the term of the 217 PSC in which capital expenditure is incurred, including each of the years prior to commencement of production.

*Tax Oil and Preparation of PPT Returns*

307. The Claimants seek declarations with regards to their right to prepare PPT returns and the proper elements to be included in the PPT returns.

308. Based on the Tribunal's findings and holdings, the Tribunal will make the following declarations and orders:

a. Pursuant to Clause 2.2, Clause 7.1(h), and Annex B Article III paragraph 2(a), the Claimants are entitled, on an ongoing basis, to compute the PPT (if any) payable, prepare and submit to the Respondent estimated and final PPT returns (which PPT returns the Respondent is obliged to file with the FIRS) such that:

   i. Pursuant to Clause 8.1(e), the Claimants are entitled to consolidate for PPT purposes OPL 217, OPL 218 and OPL 213, and any OML(s) derived therefrom (including OML 128, OML 129 and OML 132);

104

ii.   Pursuant to Clause 15.3, ITC is to be deducted only from assessable tax, and is not to be deducted from the cost of capital assets, nor from "qualifying expenditure" (as that term is defined in the Second Schedule of the PPT Act);

iii.   Pursuant to Annex B Article III paragraph 2(a), a full accounting period's capital allowance (at the applicable rate set out in Table II of the Second Schedule to the PPT Act) is available for the accounting period in which an asset which is a "qualifying expenditure" (as that term is defined in the Second Schedule of the PPT Act) was acquired or first used,  regardless when in that accounting period the asset was acquired or first used, without any pro-rating;

iv.   Pursuant to Clause 15.2(a), the Signature Bonuses paid under the 217 PSC, the 218 PSC and the 213 PSC (which, as set out above, the Claimants are entitled to consolidate for PPT purposes) attract capital allowances under the Second Schedule of the PPT Act;

v.   Pursuant to Clause 15.2(a), Production Bonuses paid under the PSC, the 218 PSC and the 213 PSC (which, as set out above, the Claimants are entitled to consolidate for PPT purposes) are deductible for the purposes of Section 10(1) of the PPT Act;

vi.   Pursuant to Clause 15.2(a), the sole costs that the Claimants deduct (as having been incurred "wholly, exclusively and necessarily" for the purposes of OPL 217, OPL 218 and/or OPL 213) are properly deductible for the purposes of Section 10(1) of the PPT Act;

vii.   Pursuant to Clause 15.2(a), whether a cost item is allowable or deductible for PPT purposes does not depend on whether that cost item is or is not recoverable as Cost Oil; and

105

> viii.   All interest expenses on inter-company loans entered into by the Claimants (up to date of this Award) for financing the operations under the 217 PSC, the 218 PSC and/or the 213 PSC are NOT deductible for the purposes of Section 10(1) of the PPT Act.

b. The PPT returns which the Respondent had itself prepared and filed with FIRS (instead of the PPT returns prepared by the Claimants and submitted to the Respondent for onward filing with FIRS) are contrary to the provisions of the 217 PSC in that they do not reflect the Claimants' entitlement to compute the PPT (if any) payable on the basis as set out in this Award.

*Future Performance of the 217 PSC*

309. The Claimants have sought the following injunctions against the Respondent from continuing to act in breach of the 217 PSC for the remainder of the term of the same.

310. Upon considering the proposed texts, the Tribunal will make the following orders:

a. That the Respondent (whether acting by itself, its privies, agents, sub-contractors, or any person claiming through or under it):

> i.   shall not lift any ACO otherwise than in accordance with the Award on the disputed issues made herein; and shall  not in any way impede the Claimants' nomination and lifting of ACO in accordance with the Award on the disputed issues;

> ii.   pursuant to Annex B Article III paragraph 2(e), shall not file with FIRS any PPT returns (whether estimated or final) in respect of the 217 PSC other than the PPT returns prepared and submitted to the Respondent by the Claimants from time to time;

    iii.   pursuant to <u>Annex B Article III paragraph 2(e)</u>, 217 PSC shall only file with FIRS all  PPT returns (whether estimated or final) which the Claimants submit to the Respondent for onward filing with FIRS;

    iv.   shall, in accordance with <u>Clause 15.6</u>, 217 PSC make available to the Claimants copies of receipts issued by FIRS for all payments made (including past payments) for PPT.

*Modification under Clause 19.2 of the PSC*

311. On the basis of the Tribunal's finding that there are changes in the law and/or policy which "*materially and adversely affects the rights and obligations or the economic benefits of the CONTRACTOR*", the Claimants are entitled to seek a modification of the 217 PSC provisions to compensate them for the effect of such changes.

312. However, with the monetary award made in favour of the Claimants, no further consideration needs to be made to address the pre-award effect of such changes to the Claimants.

313. The Claimants suggest that the following text be ordered to be added to the 217 PSC to address the adverse effect of the policy changes in the further performance of the same:

> "Notwithstanding the terms of Clause 8.1(f) and (g), in the event that the change in policy by the FIRS with respect to PPT (as such change in policy is described in the Arbitral Award dated [●]) results (at any time after that date) in a difference in the determination of Tax Oil (i.e. a difference between the Tax Oil resulting from the application of the policy as it existed upon the Effective Date of this Contract and the Tax Oil resulting from the application of the policy as it exists as of [insert date of the Award]), then, until such time as the Profit Oil thereafter recovered by the CONTRACTOR is sufficient to generate Proceeds in the amount of 80% of such difference, Profit Oil shall be allocated entirely to the CONTRACTOR. In the event that the recovery of Profit Oil pursuant to this clause does not result in full compensation to the CONTRACTOR of such amount, then any uncompensated amount shall be immediately payable by the CORPORATION to the CONTRACTOR, at the latest, upon the date of termination or expiration of this Contract."

314. The proposed text equates the effect of the changes in the tax regime that have been implemented as depriving the Claimants of their full 80% share of the Profit Oil which the Claimants would have been entitled to had those changes not been made.   In the Tribunal's view, the proposed text adequately compensates the adverse effect these changes will have on the Claimants' share in the Profit Oil. In the Tribunal's view, it requires only drawing against the share of the Respondent's Profit Oil, and no Tax Oil, no third party (*viz.* the Nigerian revenue authorities) would be in any way affected.

315. The Tribunal will order that the 217 PSC be so amended and modified to take effect from the date of this Award and shall be binding upon the Parties.

**Costs**

316. The Claimants has succeeded in all of their claims save for the item relating to interest expense on the inter-company loans. The Respondent has substantially failed in its Defence of the Claimants' claims and wholly in its Counterclaim. In these circumstances, there can be no dispute that costs necessarily follow the event. The Respondent shall therefore bear its own costs and the costs of the arbitration as well as the legal costs incurred by the Claimants in the conduct of this reference.

317. The Claimants had submitted a schedule of costs showing that it had incurred US$ 2,882,922.08 in legal fees and disbursements incurred for expenses of expert's fees, hotel and travel expenses.  They have added to this, the advances paid towards the LCIA and the Tribunal's fees and expenses (US$ 444,626) as well as interest on all sums disbursed which they claim to be accruing at US$ 950.83 daily and as at 15 August 2014 amounted to US$ 567,826.16 based on 12% per annum being the Central Bank of Nigeria Monetary Policy Rate.

318. The breakdown of the Claimants' legal costs and disbursement is:

| Legal fees and Expenses | US$ | |
|---|---|---|
| • Hogan Lovells | 2,039,291.22 | 2,711,767.40 |
| • Aluko & Oyebode | 672,476.18 | |

| | | |
|---|---|---|
| **Disbursements** | | |
| • Experts fees of Mr Babatope Ogunnowo | 91,122.81 | 171,154.68 |
| • Travel expenses | 50,358.57 | |
| • Hotel accommodation expenses | 29,673.30 | |
| Total: | | **2,882,922.08** |

319. The Tribunal is fully aware that the legal teams for both Parties have prepared and have taken their responsibility for the conduct of the case on behalf of their respective Parties very seriously and professionally. The amount of work done and the responsibility they shouldered must not be underestimated. Both teams should be commended for the work they have done and the assistance they have given to this Tribunal.

320. The Claimants' legal team comprises of counsel, solicitors and advocates from London and Nigeria. Given the complexity and the implications the matters in dispute could have on the interests of both Parties, the Tribunal is left with little doubt that the time spent and work put into the preparation and conduct of this case by the Claimants are fully justified. The legal costs incurred by the Claimants' team appear to the Tribunal to be commensurate with the time and efforts put into the case and require no moderation. The sum of US$ 2,882,922.08 would therefore be allowed to the Claimants as recoverable from the Respondent in full.

321. The Tribunal has also considered the Claimants' claim for interest on costs which as at 15 August 2014 amounted to US$567,826.16. Apart from the high rate claimed, the Tribunal takes the view that legal costs and expenses are ancillary to and are incurred during the proceedings and could not be considered part of the losses resulting from any breach of the contract. The Tribunal is therefore not inclined to so order.

322. The cost of this arbitration which consists of the Tribunal's fees and expenses and the LCIA's administrative charges for undertaking the financial management of this case amounts in all to **£626,872.03** the breakdown of which is as follows:

| Tribunal's Members | Fees | Expenses | Total |
|---|---|---|---|
| • Lord Mark Saville | 154,275 | 25,014.20 | 179,289.20 |
| • Paul Idornigie | 167,000 | 11,751.36 | 178,751.36 |
| • Lawrence Boo (Chairman) | 207,625 | 41,629.10 | 249,254.1 |
| | | | |
| Earl Dolera (Secretary) | | 16,263.30 | 16,263.30 |
| LCIA | | 3,314.07 | 3,314.07 |
| | | | **£626,872.03** |

323. The amount of **£626,872.03** shall be deducted from the advances paid by the Parties and held by the LCIA. Any balance in account with the LCIA after full payment of the costs of the arbitration shall be refunded to the Claimants (net of any banking transaction charges).

324. The Claimants shall be entitled to be reimbursed by the Respondent, in full the amounts they have paid towards the cost of the arbitration less any amount that they have received by way of refund from the LCIA.

## Summary of Decisions

| No. | Issues | Tribunal's Findings/Decisions |
|---|---|---|
| | **Jurisdiction and Arbitrability** | |
| a. | Whether the Claimants' claims are arbitrable under the laws of Nigeria | As to the contractual rights and obligations between the Parties to the 217 PSC, the Claimants' claims are arbitrable under the laws of Nigeria. |
| | *[If the answer to YES]* Does the Tribunal have jurisdiction of the Claimants' claims under the 217 PSC? | The Tribunal has jurisdiction to resolve the contractual disputes arising between the Parties to the 217 PSC. |

|   | **Claimants' Claims** | |
|---|---|---|
| b. | Contractor engagement in petroleum operations/ liability to PPT; | The Claimants are engaged in Petroleum Operations within the meaning of the 217 PSC and the PPT Act. |
| c. | Cost recovery pursuant to Clause 8.1(b); | The Claimants are entitled to claim recovery of operating costs incurred in OPLs 217 as well as OPL 213 and 218 and the OMLs derived therefrom. |
| d. | Cost recovery of home office overhead charges | The Claimants are entitled to a cost recovery of US$ 4 million for each year as from September 2008 to date hereof. |
| e. | Timing of recovery of capital costs | The Claimants are entitled to amortization of capital costs incurred in 5 equal annual installments, i.e. 20% of the cost of capital expenditure is recoverable as Cost Oil in the accounting period when such capital cost was incurred. A further 20% of the capital costs to be recovered in the 2nd to 4th accounting periods and a further 19% in the 5th accounting period. |
| f. | Timing of capital allowances | Capital allowances are to be |

|  |  | computed and Tax Oil allocated accordingly on the basis that a full accounting period's capital allowance (at 20% for each of the first 4 accounting periods and 19% for the 5th accounting period) is available for the accounting period when an asset which is a "qualifying capital expenditure" is acquired or first used. |
|---|---|---|
| g. | Consolidation for PPT purposes pursuant to Clause 8.1(e) | The Claimants are entitled to consolidate for PPT purposes, OPLs 213, 217 and 218 and any OMLs derived therefrom. |
| h. | Investment Tax Credit: whether deductible from cost of capital assets prior to the computation of capital allowances | The Claimants are entitled to ITC which shall be split in accordance with the terms of the 217 PSC and to investment allowances without need to deduct the ITC from the qualifying assets. |
| i. | Signature Bonus | The Signature and Production Bonuses are deductible as capital allowances. The same are allowed to be claimed by the Parties in the same proportion as their share of Profit Oil. |
| j. | Production bonus |  |
| k. | Interest expense (inter- | The Claimants are not entitled to |

| | | |
|---|---|---|
| | company loans) | claim interest on inter-company loans as a tax deductible expense. |
| l. | Sole costs | This is a deductible allowance and should be treated in a similar manner as with all other deductible expenses in the ratio of 80/ 20. |
| m. | PPT administration | The contractual arrangement between the Parties was for the Respondent to file the PPT returns as prepared by the Claimants.   In refusing to do so, the Respondent breached the terms of the 217 PSC. |
| n. | Clause 19.2 | Clause 19.2 to be amended in terms as set out at para 313 above. |
| **II.** | **Respondent's Defence and Counterclaims:** | |
| o. | Ownership of assets | The Claimants retain the ownership and title of the assets until the same is fully paid or when the 217 PSC is terminated. |
| p. | Whether parties can grant fiscal incentives | This issue is irrelevant.  Clause 18.1 (b), 217 PSC was not intended to have a fiscal incentive effect. |
| q. | The realizable price (RP) | The Parties had agreed to use OSP in lieu of the Realizable Price or |

| | | |
|---|---|---|
| | | alternatively, had agreed that the OSP is to be the Realizable Price. |
| r. | Entitlement to benefit of capital allowances | Claimants are entitled to capital allowances which shall be split in accordance with the terms of the 217 PSC. They are to be computed based on a full accounting period basis. |
| s. | Entitlement to benefit of ITC. | Claimants are entitled to: <br><br> a.  ITC which shall be split in accordance with the terms of the 217 PSC; and <br><br> b.  Investment allowances without need to deduct the ITC from the qualifying assets. |
| t. | Whether the Claimants or the Respondent are/ is entitled to relief | The Claimants are entitled to the damages and reliefs they have sought in this arbitration save for the claim on interest expense on inter-company loans incurred. |

Now for all the reasons set out above,

# We FIND, HOLD and DECLARE that:

I.  Pursuant to Clause 2.2 and Clause 8.1(b), of the 217 PSC the Claimants are entitled, on an ongoing basis, to be allocated and to lift as Cost Oil from OPL 217

and any OML(s) derived therefrom (including OML 128) such quantum of Available Crude Oil as will generate an amount of Proceeds sufficient for recovery of Operating Costs incurred in OPL 218 and OPL 213, and any OML(s) derived therefrom (including OML 129 and OML 132), as well as for recovery of Operating Costs incurred in OPL 217 and any OML(s) derived therefrom (including OML 128).

II.   Pursuant to Clause 2.2 and Annex B Article IV paragraph 5(b)(ii) of the 217 PSC, the Claimants are entitled, on an ongoing basis, to be allocated and to lift as Cost Oil from OPL 217 and any OML(s) derived therefrom (including OML 128) such quantum of Available Crude Oil as enables the Claimants to recover Capital Costs in five equal instalments over five consecutive accounting periods, without any pro-rating of instalments.

III.   Pursuant to Clause 2.2, Clause 8.1(b) and Clause 13.3 of the 217 PSC, the Claimants are entitled, on an ongoing basis, to be allocated and to lift as Cost Oil from OPL 217 and any OML(s) derived therefrom (including OML 128) such quantum of Available Crude Oil as generates an amount of Proceeds sufficient for recovery of home office overhead charges in an amount up to a maximum of US$4 million per year for each and every year of the term of the PSC in which capital expenditure is incurred, including each of the years prior to commencement of production.

IV.   Pursuant to Clause 2.2, Clause 7.1(h), and Annex B Article III paragraph 2(a) of the 217 PSC, the Claimants are entitled, on an ongoing basis, to compute the PPT (if any) payable, prepare and submit to the Respondent estimated and final PPT returns (which PPT returns the Respondent is obliged to file with the FIRS) such that -

   a.   Pursuant to Clause 8.1(e) of the 217 PSC, the Claimants are entitled to consolidate for PPT purposes OPL 217, OPL 218 and OPL 213, and any OML(s) derived therefrom (including OML 128, OML 129 and OML 132);

   b.   Pursuant to Clause 15.3 of the 217 PSC, Investment Tax Credit is to be deducted only from assessable tax, and is not to be deducted from the cost

of capital assets, nor from "qualifying expenditure" (as that term is defined in the Second Schedule of the PPT Act);

c. Pursuant to Annex B Article III paragraph 2(a) of the 217 PSC, a full accounting period's capital allowance (at the applicable rate set out in Table II of the Second Schedule to the PPT Act) is available for the accounting period in which an asset which is "qualifying expenditure" (as that term is defined in the Second Schedule of the PPT Act) is acquired or first used, regardless of when in that accounting period the asset was acquired or first used, without any pro-rating;

d. Pursuant to Clause 15.2(a) of the 217 PSC, the Signature Bonuses paid under the PSC, the 218 PSC and the 213 PSC (which, as set out above, the Claimants are entitled to consolidate for PPT purposes) attract capital allowances under the Second Schedule of the PPT Act;

e. Pursuant to Clause 15.2(a) of the 217 PSC, Production Bonuses paid under the PSC, the 218 PSC and the 213 PSC (which, as set out above, the Claimants are entitled to consolidate for PPT purposes) are deductible for the purposes of Section 10(1) of the PPT Act;

f. Pursuant to Clause 15.2(a) of the 217 PSC, the sole costs that the Claimants deducts (as having been incurred "wholly, exclusively and necessarily" for the purposes of OPL 217, OPL 218 and/or OPL 213) are properly so deductible for the purposes of Section 10(1) of the PPT Act;

g. Pursuant to Clause 15.2(a) of the 217 PSC, whether a cost item is allowable or deductible for PPT purposes does not depend on whether that cost item is or is not recoverable as Cost Oil; and

h. All interest expenses on inter-company loans entered into by the Claimants for financing the operations under the 217 PSC, the 218 PSC and/or the 213 PSC are NOT deductible for the purposes of Section 10(1) of the PPT Act.

V.   The PPT returns which the Respondent had itself prepared and filed with FIRS (instead of the PPT returns prepared by the CONTRACTOR and submitted to the CORPORATION for onward filing with FIRS) are contrary to the 217 PSC in that they do not reflect the Claimants' entitlement to compute the PPT (if any) payable on the basis as set out in this Award.

## We hereby ORDER and DIRECT -

VI.   That the Respondent (whether acting by itself, its privies, agents, sub-contractors, or any person claiming through or under it):

a.   Shall not lift any Available Crude Oil otherwise than in accordance with the Award on the disputed issues made herein; and shall  not in any way impede the Claimants' nomination and lifting of Available Crude Oil in accordance with the Award on the disputed issues;

b.   Pursuant to Annex B Article III paragraph 2(e) of the 217 PSC, shall not file with FIRS any PPT returns (whether estimated or final) in respect of the PSC other than the PPT returns prepared and submitted to the Respondent by the Claimants from time to time;

c.   Pursuant to Annex B Article III paragraph 2(e) of the 217 PSC, shall only file with FIRS all  PPT returns (whether estimated or final) which the Claimants submit to the Respondent for onward filing with FIRS;

d.   Shall, in accordance with Clause 15.6, of the 217 PSC make available to the Claimants copies of receipts issued by FIRS for all payments made (including past payments) for PPT.

VII.   In exercise of the power under Clause 19.2, that the 217 PSC shall be modified by the addition of the following clause, *to wit*:

"Notwithstanding the terms of Clause 8.1(f) and (g), in the event that the change in policy by the FIRS with respect to PPT (as such change in policy is described in the Arbitral Award dated 17 March 2015) results (at any time after that date) in a difference in the determination of Tax Oil (i.e. a difference between the Tax Oil resulting from the application of the policy

as it existed upon the Effective Date of this Contract and the Tax Oil resulting from the application of the policy as it exists as of [17 March 2015], then, until such time as the Profit Oil thereafter recovered by the CONTRACTOR is sufficient to generate Proceeds in the amount of 80% of such difference, Profit Oil shall be allocated entirely to the CONTRACTOR. In the event that the recovery of Profit Oil pursuant to this clause does not result in full compensation to the CONTRACTOR of such amount, then any uncompensated amount shall be immediately payable by the CORPORATION to the CONTRACTOR, at the latest, upon the date of termination or expiration of this Contract."

## And we AWARD and ADJUDGE that -

VIII.  The Respondent shall pay to the Claimants (jointly):

    a.  Damages calculated up to the date of this Award excluding the additional tax that would have been payable for the inter-company loans and the amount of such damages shall be calculated based on the Proceeds Imbalance as at 31 January 2015 adjusted to take into account the liftings of ACO by the Parties during the period from 1 February 2015 and the date hereof **less** the amount representing the additional tax payable due to the non-deductible nature of the interest expense incurred on inter-company loans secured by the Claimants. If the Parties are unable to reach agreement on the amount to be deducted, the same shall be referred to the Tribunal for final determination.; and

    b.  Interest at the rate of LIBOR (1 month) +2 % on a simple basis on the respective amounts of Proceeds Imbalance (less such amount as properly representing the additional tax resulting for disallowing inter-company loans as tax deductible) up to date of full and final payment.

IX.  The Respondent shall bear and forthwith pay to the Claimants the costs they have incurred in this arbitration which we hereby assess and fixed at US$2,882,922.08.

X.  The Respondent shall bear and pay the costs of arbitration amounting in all to £626,872.03. The Claimants having paid advances towards the costs of

118

arbitration shall be entitled to immediate reimbursement by the Respondent for such sum they have paid towards the cost of arbitration.

XI.   The Respondent's Counterclaim stands wholly dismissed.

## And we further DIRECT that:

XII.   If within 60 days from the date of this Award, Parties are unable to reach agreement on the adjustments to be made as regard the award of damages and interests granted in Paragraph VIII(a) above,

   a.   the Claimants shall thereafter promptly file its submission and computation of the amount of such adjustments; and

   b.   the Respondent shall be at liberty to serve reply submissions and computation within 21 days thereafter.

XIII.   Save and except that the Tribunal has retained its jurisdiction to make a final determination on the damages awarded herein, this Award is final as regard all other matters and claims made in this arbitration.

Seat of Arbitration:  Abuja, Nigeria

Date: *17 March*   2015

**LORD MARK SAVILLE OF
NEWDIGATE**
Co-arbitrator

**LAWRENCE GS BOO**
Chairman

I dissent with the Majority and append my Opinion hereto

**PAUL OBO IDORNIGIE**
Co-arbitrator

120

IN THE MATTER OF THE ARBITRATION AND CONCILIATION ACT NO. 11 OF 1988

(CHAPTER A18 LAWS OF THE FEDERATION OF NIGERIA 2004)

AND

IN THE MATTER OF AN ARBITRATION

Between

1. **STATOIL (NIGERIA) LIMITED**
2. **TEXACO NIGERIA OUTER SHELF LIMITED**

*(Claimants)*

And

**NIGERIAN NATIONAL PETROLEUM CORPORATION**

(*Respondent*)

---

# DISSENTING OPINION OF PROFESSOR PAUL OBO IDORNIGIE

---

*The Arbitral Tribunal:*

Professor Lawrence Boo (Chairman)
Lord Mark Saville of Newdigate
Professor Paul Obo Idornigie

*Secretary to the Tribunal:*
Earl J Rivera- Dolera

17 March 2015
NIGERIA

## I. INTRODUCTION

1. With all due respect to my Tribunal colleagues, I disagree with the majority decision on the issue of jurisdiction and arbitrability.  In addition, I part ways with them with respect to the claim for the modification of the 217 PSC pursuant to Clause 19.2 therein.  However, I concur with the Award on the issue of the Respondent's Counterclaim.   In this Dissenting Opinion, I will adopt paragraphs of the Award as indicated hereunder.    I also adopt the abbreviations, acronyms and bundles used in the hearing and the Award. Thus, I adopt paragraphs 1 to 90 of the  Award dealing with  the following:

   (a)  The Parties
   (b)  The Representatives
   (c)  The Contract and Arbitration Agreement
   (d)  The Tribunal
   (e)  The Seat and Language of Arbitration
   (f)   The Applicable Law and Rules
   (g)  Procedural History
   (h)  Brief Background of the Dispute
   (i)   The Claims and Defence
   (j)   The Respondent's Defence
   (k)  Issues for Determination

2. I part ways with the majority decision from the Findings and Reasons.  My Dissenting Opinion is structured as follows:

   (a)  Jurisdiction and Arbitrability
   (b)  Modification of the 217 PSC Pursuant to Clause 19.2
   (c)  Counterclaim of the Respondents
   (d)  Summary and Conclusions.

## II. JURISDICTION AND ARBITRABILITY

3.  I intend to set out the case of the Respondent and that of the Claimants on the issue of jurisdiction and arbitrability.

### (a) Respondent's Position

4.  The Respondent asserts that the subject matter herein fall into a class of disputes that are exempted from arbitration, the determination of which goes beyond the interest of the Parties presenting the dispute and has a significant impact on public policy of Nigeria.  It argues that the disagreement between the Parties was substantially their different approaches in the interpretation of the 217 PSC and the law which ultimately had an impact on the quantum of oil to be allocated to the respective Parties and the rights and obligations of the Parties under the 217 PSC.

5.  The Respondent contends that the procedure by which the ACO is allocated is set out in Clause 8 of the 217 PSC;  clause 8 deals with allocation of ACO to cover Royalty Oil, Cost Oil, Tax Oil and Profit Oil; the Tax Oil and approved expenses incurred in respect of an OPL are determined under the PPT Act 2004 [HB-E1/2] while Cost Oil is regulated by the DOA [HB-E1/3] and Clause 1(k) of the 217 PSC;  Cost Oil is allocated to the Contractor (the Claimants) in such quantum as will general an amount of Proceeds sufficient for recovery of Operating Costs;  Operating Costs are categorized into Capital Costs and Non-Capital Costs; the assessment and computation of Cost Oil for tax purposes is dealt with in the PPT Act 2004 particularly in Section 2 of the Second Schedule thereof;  the question whether cost qualifies as capital cost and the incidences that follows is determined by reference to both the 217 PSC  and the PPT Act 2004;  and that the computation and quantum allocated to the Parties has a direct impact on tax while recoverability is determined by the 217 PSC and the PPT Act 2004.[1]

6.  The Respondent asserts that the dispute is principally a dispute involving controversies arising from tax laws, as most if not all of the reliefs sought border on the determination of tax treatment applicable under the 217 PSC

---

[1] See paras 3.4 to 3.11 of the Defence.

and that the dispute is not a mere contractual dispute as the Claimants seek to categorize it.[2]

7.  The Respondent referred to Clause 21, 217 PSC that states, in part, that any difference or dispute concerning the interpretation or performance of the 217 PSC shall be referred to arbitration and invited the Tribunal to consider the decision of the Nigerian FHC in *Federal Inland Revenue Service v. Nigerian National Petroleum Corporation & Ors*[3] [HB-G1/17] or "*FHC Judgment 774*" where the court, per His Lordship A Bello held that *"[i]t is not therefore intended by the Constitution of the Federal Republic of Nigeria that issues of taxation or tax matters should go to arbitration.  I hold that such matters are not attributable*" and added that the Tribunal has a duty to give effect to Nigerian law and that parties cannot contract outside the law. The Respondent urged the Tribunal to resist any attempt to mislead the Tribunal to a view that the controversies are simply "*as to the interpretation and performance of the PSC".*[4]

8.  The Respondent contends that arbitrability or otherwise of tax disputes is a matter of Nigerian law and not that of contract between the parties, reliance being placed on "*FHC Judgment 774"* and *Kano State Urban Development Board v Fanz Construction Company Limited*[5] *("Kano State")* adding that tax cannot be compromised lawfully by way of accord and satisfaction.

9.  The Respondent asserts that the Tribunal has no jurisdiction over matters reserved for the jurisdiction of the FHC under Section 251 of the Constitution of the Federal Republic of Nigeria, 1999 (the "Constitution") especially subsection 1(a) of Section 251 relating to the revenue of the Government in which the said Government or any organ thereof or a person suing or being sued on behalf of said Government is a party; and (b) connected with or pertaining to the taxation of companies and other bodies established or carrying on business in Nigeria and all other persons subject to federal taxation.

---

[2] See para 11 of the SOC.  See also para 24 of the Reply.
[3] Suit No. FHC/ABJ/CS/774/11 (Unreported) [G2/17].
[4] Para. 19.3 of the Rejoinder dated 6 April 2012.
[5] (1990)  4 NWLR (Pt 142) 1 [HB-G1/9].

10. The Respondent contends that the jurisdiction of the FHC in such matters is *"to the exclusion of any other court"* (including any tribunal) and that the Claimants have wrongly relied on *The Owners of the M.V Lupex v Nigerian Overseas Chartering and Shipping Limited*[6] *("MV Lupex")* adding that tax disputes are for the TAT and / or the FHC and not arbitral tribunals.[7]

11. The Respondent relied on the test of arbitrability as adopted by the Supreme in *Kano State*, *supra* thus:

> *"The dispute or difference which the parties to an arbitration agreement agree to refer must consist of justiciable issue triable civilly. A fair test of this is whether the difference can be compromised lawfully by way of accord and satisfaction. Thus an indictment for an offence of a public nature cannot be the subject of an arbitration agreement; nor can disputes arising out of an illegal contract nor disputes arising under agreements void as being by way of gaming or wagering. Equally, disputes leading to a change of status, such as a divorce petition, cannot be referred, nor, it seems, can any agreement purporting to give an arbitrator the right to give a judgment in rem. Similarly, there is no dispute within the meaning of an agreement to refer disputes where there is no controversy in being, as when a party admits liability but simply fails to pay, or when a cause of action has disappeared owing to the application, where it now continues to apply, of the maxim, **actio personalis moritur cum persona**."* (emphasis added) [HB-G1/9, para H, p 228]

12. The Respondent argued that the reliefs sought in this arbitration are similar, if not identical, to those sought and canvassed in *FHC Judgment 774* and the trial court made the following pronouncements:

> *"..the issues in dispute between the Claimants and the 1st Defendant which were submitted to Arbitration arose out of the alleged breaches by NNPC of the Agreement in lifting tax oil based on its assessment of the taxes payable to the Plaintiff and by extension, to the Federal Government of Nigeria, instead of using the tax returns sent to it for filing by the Contractor. So for all intents and purposes the claim of the Claimants before the Arbitral Tribunal is in effect for a refund of all overpaid taxes paid by the NNPC on behalf of the 2nd-5th Defendants, through what they alleged as overlifting of tax Oil by which means all taxes*

---

[6] (2003) 15 NWLR (Pt 844) 469 [HB-G1/14].
[7] See paras 19.1 to 22 of the Rejoinder dated 6 April 2012.

*accruable to the Federal Government are paid.   While it is conceded that parties are bound by the sanctity of their contract and the issues in dispute arose out of the Contract Agreement (PSC) the question still remains whether the parties can by an Agreement purport to confer jurisdiction on an Arbitration Tribunal to determine issues relating to taxation of Companies or connected with the Federal Government Revenue when such jurisdiction is exclusively conferred on this Court by the Constitution of the Federal Republic of Nigeria.  **The answer I must say is an emphatic No. . . .***

**...*the issues of Tax are statutory and in the case at hand, they form part of the terms and conditions of the PSA and the PSA is anchored on the laws of Nigeria and the laws of Nigeria are explicit on the forum for the resolution of Tax disputes and Arbitration is not one of them.  To the contrary the Constitution which is the groundnorm (sic) confers exclusive jurisdiction on tax matters and revenue of the Federal Government of Nigeria on the Federal High Court.  It is not therefore intended by the Constitution of the Federal Republic of Nigeria that issues of taxation or tax matters should go to arbitration.*[8]** (emphasis added) [HB-G1-17/ pp 376-377, 379]

13. It is the case of Respondent that the Tribunal lacks the jurisdiction to entertain the main claims of the Claimants and distinguished the facts of this arbitration from that of *Nigerian Agip Exploration Limited ("NAEL") v NNPC & Anor*[9] *("Nigerian Agip")* where the courts were at best obiter adding that it is trite law that a court's obiter is not binding: *N.A.B. Ltd v Barri Eng. (Nig) Ltd.*[10] Furthermore, the extant position of Nigerian law is that where the law has been pronounced upon by a court of record, it remains the law until overturned by a  higher court (for instance, by the Court of Appeal) and that the Supreme Court in recognizing this trite principle of law held in the case of

---

[8] See para 8.12 of the Respondent's Post-Hearing Submissions of 21 July 2014.

[9] CA/A/628/2011 [HB-G2/27].   See also para 13 of the Respondent's Reply Post-Hearing Brief dated 15 August 15 2014.

[10] (1995) 8 NWLR (Pt 413) 257 at 289-290.  See also *Dalhatu v Turaki* (2003) 15 NWLR (Pt 843) 310 at 350-351 and *Clement v Iwuanyanwu* (1989) 3 NWLR (Pt 107) 8.  See page 39 of Respondent's Reply Post-Hearing Brief *ibid.* [These cases are not in the Hearing Bundle as they were filed after the hearing].

*Udeh v Okoli*[11] in respect of the judgment of the High Court of Anambra State that:

> "[i]t is settled law that a judgment or ruling of a court remains valid and binding on the parties until set aside by a court of competent jurisdiction.  In fact there is no evidence on record that the decision was later set aside by an appellate court."[12]

14. It is the submission of the Respondent that tax disputes, the disputes before the Tribunal, are not arbitrable under Nigerian law; that *Nigerian Agip* is not determinative of arbitrability of a tax dispute under Nigerian law and thus irrelevant to that question;  that none of the legal authorities cited by the Claimants advance their contention that Section 251 of the Constitution is liable to an interpretation that a tax dispute is arbitrable and urged the Tribunal to hold that *FHC Judgment 774*, represents the correct position of Nigerian law that tax disputes are not arbitrable.[13]

15. It is the further submission of the Respondent that arbitrability involves the question of what type of disputes can and cannot be submitted to arbitration; that  it would be contrary to public policy to permit the Tribunal to determine issues of public law and in particular, a tax dispute.  Relying on the Uganda case of *Heritage Oil & Gas Limited v Uganda Revenue Authority,*[14] (*"Heritage Oil")* the Respondent argues that tax disputes are not arbitrable.[15]

16. Finally, the Respondent urged the Tribunal to hold that the Claimants' submissions on jurisdiction and arbitrability are misconceived.  Consequently they should be discountenanced.  The Respondent urged the Tribunal to hold that under Nigerian law the Tribunal is without jurisdiction to determine the fundamental and substantive claims before it.[16]

---

[11] (2009) 7 NWLR (Pt 1141) 571 at 588.  See also cases of *Aje Printing (Nig) Ltd v Ekiti LGA* (2009) 7 NWLR (Pt 1141) 512 at 529, *Opobiyi v Muniru* (2005) 15 NWLR (Pt 948) 320 and *Ogueze v Ojiako* (1962) 1 SCNLR 112.  See page 40 of the Respondent's Reply Post Hearing Brief *ibid*. [Cases not in the Hearing Bundle].

[12] See para 13.28 of the Respondent's Reply Post Hearing Brief *ibid*.

[13] See para 13.30 to 13.33 of the Respondent's Reply Post Hearing Brief *ibid*.

[14] (Civil Appeal No. 14 of 2011) [HB-G4/39].

[15] See Respondent's pre-hearing Written Submissions dated 7 April 2014, para 5.

[16] Para 13.38 of the Respondent's Reply Post Hearing Brief

### (b) Claimants' Position

**17.** The Claimants contend that in Clause 21 of the 217 PSC, the Parties agreed that all differences or disputes concerning the interpretation or performance of that PSC would be resolved exclusively by arbitration thus:

> *"If a difference or dispute arises between the CORPORATION and the CONTRACTOR concerning the interpretation or performance of this Contract, and if the parties fail to settle such difference or dispute by amicable settlement, then either Party may serve on the other a demand for arbitration."*

**18.** The Claimants further contend that the disputes referred to arbitration and before the Tribunal are within the parameters of Clause 21 of the 217 PSC as they relate to the interpretation and performance of that PSC; they relate to specific aspects of the contractual basis upon which oil produced under the 217 PSC is to be shared between and administered by the Parties; the disputes are therefore contractual as they pertain to the rights and obligations established by the agreed contractual provisions.[17]

**19.** It is the submission of the Claimants that the fact that the resolution of certain of the contractual disputes requires consideration of Nigerian tax legislation does not transform the disputes from contractual disputes into "tax disputes". Thus to the extent that certain provisions of Nigerian tax legislation need to be considered merely reflects the Parties' contractual agreement that the 217 PSC would be performed in accordance with the provisions of the Nigerian tax legislation adding that the consideration of statutory provisions relating to the PPT and ITC in relation to the PPT Act 2004 is a function of deciding the correct interpretation and/or performance of the Parties' contractual agreement that the Claimants should compute PPT in accordance with the provisions of the PPT Act 2004.

**20.** The Claimants compared the nature of the breaches and the disputes arising therefore in relation to the provisions of the 217 PSC and averred that the disputes are contractual.

---

[17] See para 23 of the Claimants' Reply.

**21.** In relying on the case of _Kano State_ the Claimants listed the non-arbitrable
issues as derived from Halsbury's Laws of England thus:

> "A dispute or difference which the parties to an arbitration
> agreement agreed to refer must consist of a justiciable issue
> triable civilly.  A fair test of this is whether the difference can be
> compromised lawfully by way of accord and satisfaction.  Thus,
> an indictment for an offence of a public nature cannot be the
> subject of an arbitration agreement."[18]

**22.** It is the contention of the Claimants that the issue of how the ACO is to be
shared between the Parties pursuant to the 217 PSC which is the overarching
contractual dispute between the Parties is a _"difference [that] can be
compromised lawfully by way of accord and satisfaction"_[19]; that arbitral
tribunals have shown themselves able to distinguish between their functions
and those of national taxation authorities;[20]  and that leading commentators
do not support the position that _"tax disputes"_ are not arbitrable.[21]

**23.** The Claimants reproduced the provisions of Section 251(1) of the Constitution
and submitted that Section 251 of the Constitution established the jurisdiction
of the FHC as between itself and other Nigerian courts such as State Courts
and not that of arbitral tribunals and that where the Constitution wishes to
refer to tribunals, it does so expressly as it does in Section 285(2) of the
Constitution which is not the same as Section 251(1) thereof.  Consequently,
the jurisdiction conferred by Section 251 of the Constitution is not conferred
to the exclusion of an arbitral tribunal.

**24.** The Claimants, therefore, contended that Section 251 of the Constitution does
not have any impact whatsoever on the jurisdiction of privately-constituted

---

[18] See para 26.1 of the Claimants' Reply.

[19] See para 26.3, _ibid_.

[20] See the ICC Case No. 6233: _Owner of a Lebanon Company v African State_ (1992) [Exh19 to
Claimants' Reply] where the arbitral tribunal concluded that it had _"…jurisdiction to
decide all contractual matters falling within the scope of the arbitration clause; even when such
matters are relevant to the tax court, which itself will be the judge of such relevance"_.

[21]  See Emmanuel Gaillard _"Tax Disputes Between States and Foreign Investors_ [Exh 20 to
Claimants' Reply], _L.Yves Fortier "Arbitrability of Disputes"_ [Exh 21 to Claimants'
Reply] and Professor Paul Obo Idornigie _"The Principle of Arbitrability in Nigeria
Revisited"_ [Exh 18 to Claimants' Reply].

9

arbitral tribunals and relied on _MV Lupex_[22] where the Supreme Court reversed the decision of the Court of Appeal and the High Court refusing to stay an action filed in disregard of an arbitration agreement adding that the subject matter of the arbitration agreement related to an admiralty dispute (which is one of the subject matters in respect of which the FHC has exclusive jurisdiction under Section 251(1)(g) of the Constitution).

25. The Claimants assert that the TAT has no jurisdiction over the disputes referred to arbitration on the following grounds: first, the FIRS must be a party to any proceeding before the TAT; that the FIRS is not a party to this arbitration; and the Federal Inland Revenue Service (Establishment) Act, 2007 ("FIRS Act 2007") [HB-E2/15] Fifth Schedule, paragraph 11(1)  states that the TAT _"shall have power to adjudicate on disputes, and controversies arising from"_ various statutes including the PPT Act; and that the matters over which the TAT will have jurisdiction is necessarily those involving tax assessment while the Claimants are not asking the Tribunal to _"confirm, reduce, increase or annul"_[23] any tax assessment.

26. In the Claimant's Pre-Hearing Brief dated 7 April 2014, they repeated the above submissions in the Reply.[24]  In addition, the Claimants relied on _Nigerian Agip_, _MV Lupex, Onward Enterprises Limited v MV Matrix & Ors_[25]_("Onward Enterprises")  Williams v Williams & Ors_[26] _("Williams v Williams")_  and _NNPC v Tax Appeal Tribunal & Ors._[27]  Similarly, the Claimants re-examined the FHC decision in _FHC Judgment 774_[28] and submitted that the FHC was clearly wrong in relation to its interpretation of the provisions of Section 251 of the

---

[22] See also _Econet Wireless Limited v Bronley Investment Limited_ (2005) 3 FHCLR 253 (Exh 24 to Claimants' Reply).

[23] See para 15(8) of the FIRS Act 2007, Fifth Schedule (HB-E2/15)

[24] See para 30 of the Claimant's Pre-Hearing Brief dated 7 April 2014.  The Claimants' submission in the Post-Hearing Brief dated 18 July 2014 is substantially the same as the Pre-Hearing Brief _ibid_.  See also para 22 of the Claimants' Reply Post-Hearing Brief dated 15 August 2014.

[25] (Unreported) Judgment of the Court of Appeal, Lagos in CA/L/510/04, 27 June 2008 [HB-G2/23] where reliance was placed on _MV Lupex_

[26] (Unreported) Judgment of the Court of Appeal, Lagos in CA/L/268/2008, 14 March 2013 [HB-G2/24].

[27] [HB-G2/26].

[28] See para 33 of the Claimants' Pre-Hearing Brief of 7 April 2014.

Constitution and that the FHC's decision directly contradicts decisions of higher courts in Nigeria.[29] In my analysis, I will examine these cases.

27. Finally, the Claimants urged the Tribunal to reject the jurisdictional challenge and hold that it has jurisdiction to decide all the claims, all of which are arbitrable.

## (c)  My Analysis

28. In filing the Defence, the Respondent raised a preliminary objection to the jurisdiction of the Tribunal to hear and determine this reference because the subject matter borders on "tax disputes" (the "Preliminary Objection") which under Nigerian law are not arbitrable and relied on the FHC decision in _FHC Judgment 774_. The Respondent also relied on _Kano State_ among other cases.

29. The Claimants contend that the disputes are purely contractual and therefore arbitrable and that the legal position in Nigeria is captured in the Court of Appeal decision in _Nigerian Agip_.  The Claimants also relied on _Kano State_.  It has been contended by the Claimants that the decision of the Court of Appeal in _Nigerian Agip_ affirmed the correct position on this matter.  Furthermore, the exclusive jurisdiction of the FHC is in relation to other courts like State High Courts and not to arbitral tribunals.

30. In my analysis, it is pertinent to set out clearly what was the claim before the FHC in respect of the dispute in _FHC Judgment 774_ on the one hand, and that of the Court of Appeal in _Nigerian Agip_ on the other.  I will also examine the reliefs sought at the FHC that led to the appeal.

31. In _FHC Judgment 774_[30] the Originating Summons dated 9 September 2011 (the "Originating Summons") sought the determination of three questions and upon determination of such questions, six reliefs were sought.  The questions are:

---

[29] See _Nigerian Agip_, _MV Lupex_, _Onward Enterprises_ and _Williams v Williams_.

[30] There is also _FIRS v NNPC & Ors_, Suit No. FHC/ABJ/CS/764/11.  Judgment delivered by Bello J on 9 March, 2012 that is on all fours with the _FHC Judgment 774_.

*"...*

*1) Whether the Arbitral Tribunal in the matter of arbitration between; (1) Shell Nigeria Exploration and Production Limited (2) ESSO Exploration and Production (Deepwater Limited) (3) Nigerian Agip Exploration Limited; (4) Total E & P Nigeria Limited AND Nigerian National Petroleum Corporation, has jurisdiction to determine the subject matter of Arbitration which deals with taxation of the Defendants by the Federal Inland Revenue Service, which jurisdiction is conferred on the Federal High Court by Section 251 of the Constitution of the Federal Republic of Nigeria, 1999 as amended.*
*2) Whether the Arbitral Tribunal has jurisdiction to enter a valid award on the taxation of the Defendants which will have a binding effect on the Plaintiff in the interpretation, application and administration of the Petroleum Profit Tax Act and the Deep Offshore Act, Education Tax Act, and Company Income Tax Act, and any other statute for the time being in force in Nigeria, as to entitle the Plaintiff to seek reliefs being sought in this suit.*
*3) Whether upon a proper reading of Section 251(1) (u) of the Constitution of the Federal Republic of Nigeria 1999 (as amended) the questions in dispute raised regarding the operation of production sharing contract the subject matter of dispute between the parties therein is not within the exclusive jurisdiction of the Federal High Court and thereby rendering the entire purported arbitral proceedings unconstitutional, null and void ab-initio."*

The reliefs as set out in the Originating Summons include:

*"...*

*1. A declaration that the claim of the 2nd to 5th Defendants touching on taxation upon which reference has been made to arbitration is not one which is allowed by law to be settled by Arbitration.*
*...*
*3. A declaration that the reference of the claim of the other Defendants against the 1st Defendant upon which terms reference has been made to Arbitration is contrary to public policy.*
*...*
*5. An order restraining the Defendants by themselves, servants, agents or Counsel from continuing with, or purporting to take any benefit from or abiding by an obligations or rights no matter howsoever described or arising from the arbitral proceedings or awards made pursuant thereto.*
*..."*

**32.** At page 22 of the *FHC Judgment 774*, the claims before the arbitral tribunals in respect of the arbitral proceedings between NNPC and the 2nd – 5th

Defendants were set out.  They include a determination of how cost oil is computed, determination of the method by which PPT is to be computed, determination of the method by which ITC is to be computed and whether certain costs e.g. signature bonus, loan interest and non-operator costs are deductible or otherwise subject to capital allowances for PPT purposes.

33. In my view, the issues in dispute in this reference are substantially the same as those in the arbitral proceedings challenged in the _FHC Judgment 774_.  At page 23, line 13 of the _FHC Judgment 774_, Justice Bello held, among others, that the reliefs sought and the affidavit in support of the Originating Summons left him in no doubt that the issues raised by FIRS _"pertains to tax and issues incidental thereto"_. These are matters within the exclusive jurisdiction of the FHC as provided in Section 251 of the Constitution.  At page 25, line 5 of the _FHC Judgment 774_, the judge held thus:

> _"The Plaintiff is not challenging the contractual obligations of the parties per se but is challenging their agreement to confer on the Arbitral Tribunal jurisdiction to decide on tax issues over which by law the Plaintiff believes that the Tribunal has no jurisdiction."_

34. On the issue of the jurisdiction of the FHC to interpret the provisions of the Constitution, His Lordship, at page 27, line 3, referred to section 251(q) of the Constitution that provides that the FHC shall have and exercise jurisdiction exclusive of any other court in civil causes and matters, "_subject to the provisions of this Constitution, the operation and interpretation of this Constitution in so far as it affects the Federal Government or any of its agencies"_.  Both the FIRS and NNPC are agencies of the Government. At page 27 of the _FHC Judgment 774_, reference was made to Appeal No. SC.281/2010: _Hon Justice Raliat Elelu-Habeen & Or v The Attorney General of the Federation & Ors_ where the Supreme Court held that _"any action which involves the operation and interpretation of the Constitution in so far as it affects the Federal Government or any of its agencies, the Federal High Court has jurisdiction to entertain and determine the actions"_ even though under Sections 153(1)(1), 271(1), and 292(1)(a)(ii) of the Constitution, powers are

vested in other organs like the National Judicial Council.  At page 29, line 11 of the *FHC Judgment 774*, the Court held that it:

> "….has the jurisdictional competence to adjudicate over the subject matter of this suit as presently constituted even if it involves the construction of the PSC between the Defendants to the extent that it relates to issues of taxation and I so hold".

35. At page 10, para 3.4(iv) of the Respondent's Post-Hearing Brief, the Respondent asserted that "[*u*]*nlike other general contracts where the intention of the parties will ordinarily give guidance to interpretations of its provisions, it is the express law that underpins a PSC contract*."  I share this view because the 217 PSC is essentially regulated by the DOA, PPT Act 2004, and Petroleum Act, FIRS Act 2007, among others.  At page 29, line 19 of the *FHC Judgment 774*, the Court affirmed this position thus:  '*The contract [PSC] in this case is a special contract with statutory flavour*' and at page 30 lines 1-10, the court stated thus:

> "..I say it is a contract with statutory flavour because some of its terms and conditions are governed by statutes  - e.g. the Petroleum Profit Tax Act, Deep Offshore and Inland Basin Production Sharing Contract Act and other related Tax legislations in force in Nigeria i.e. Companies Income Tax Act and Education Tax Act. Thus the contract comes within the purview/jurisdiction conferred on this Court by virtue of the provisions of section 251(1)(u) of the Constitution relating to Mines and Minerals (including Oil field, Oil mining, Geological Surveys and Natural Gas)…."

36. With profound respect, I do not share the submission of the Claimants and the views of the Majority members of the Tribunal that *FHC Judgment 774* is plainly wrong as it fails to distinguish between the contractual rights and obligations existing between the Parties, on the one hand, and that existing between the Parties and Nigerian tax authorities, on the other.   The decision of the FHC was based on the facts and evidence before it.  From the legal authorities cited, in Nigeria, as in most common law jurisdictions, arbitrability is not determined by statute but case law after taking into account public policy considerations.  Similarly, the Arbitration Act [HB-E1/1] has not defined

14

"arbitrability" but gives the courts powers to determine what type of dispute cannot be submitted to arbitration either because the subject matter of the dispute is not capable of settlement by arbitration under the laws or Nigeria or that the award is against public policy.[31]

37. I, therefore, do not share the view of the Majority that an award in this arbitration against the Respondent will not amount, in effect, to a refund of taxes paid already by the Claimants.  If an award is given by this Tribunal to correct the Proceeds Imbalance,[32] where will the money be paid from?  Is it from future allocation of ACO or from the tax revenue that has accrued to the Government?  In my view, the award will be paid from taxes already collected including that paid by the Claimants.

38. One of the objections to the Originating Summons in the _FHC Judgment 774_ was that Section 34 of the Arbitration Act prohibits courts from intervening except as provided by that Act.  The Court stated that Section 34 of the Arbitration Act cannot be read in isolation of Section 35 thereof that provides that _"[t]his Act shall not affect any other law by virtue of which certain disputes (a) may not be submitted to arbitration or (b) may be submitted to arbitration only in accordance with the provisions of that or another law"_.  In this regard, the Court relied on _Obembe v Wemabod Estates_ (1977) SC 115 (as cited in _Kano State_) where the Supreme Court held that "_[a]s we have pointed out earlier, any agreement to submit a dispute to arbitration such as the one referred to above does not oust the jurisdiction of the Court_".  The Court referred to section 3(g) of the PPT Act which has provided the mechanisms for the resolution of disputes on tax matters and Sections 41 and 42 of the same Act which provided for the mechanism – appeal to the Tax Appeal Commissioners.  The provisions on Tax Appeal Commissioners have now been substituted with TAT by virtue of the provisions of the FIRS Act 2007.

39. Section 59(2) of the FIRS Act 2007 expressly provides that disputes arising from the operations of said Act and in respect of the PPT Act are to be settled

---

[31] See sections 48(b) and 52(2)(b) of the Arbitration Act. [HB-E1/1].

[32] As at 31 January 2015, the Proceeds Imbalance is put at US$1,173,847,477 (excluding interest).  See the email from the Claimants dated 10 February 2015 sent by Hamid Abdulkareem.

by the TAT.[33]   The FHC relied on the Ugandan case of _Heritage Oil_ and held that tax disputes are statutory and not contractual.

**40.** I will now set out the facts in _Nigerian Agip_. On 20 October 2011, NNPC as the plaintiff filed Suit No. FHC/AB/CS/875/2011 by way of Originating Motion against NAEL & Oando Oil 125 & 134 Ltd seeking the following reliefs:

> "...
> (i) AN ORDER setting aside the Arbitral Award dated 3 October, 2011 and delivered by the Arbitral Tribunal...
> (ii) AN ORDER of this Honourable Court refusing the recognition and enforcement of the Arbitral Award dated 3 October, 2011.
> (iii) AN ORDER staying further and/or any other proceedings/actions in respect of the Arbitration proceeding, including but not limited to the taking of any steps or doing anything whatsoever towards reconvening, reconstituting and or concluding the Partial Award dated 3 October, 2011 delivered by the majority of the Arbitral Panel... and/or by any means including email communication, video conferencing, teleconferencing and or any electronic means towards delivery the Final Award pursuant to the Partial Award dated 3 October, 2011."

**41.** Along with the Originating Motion, the NNPC filed a Motion Ex Parte for Interim Injunction dated 19 October 2011 seeking an Order of Interim Injunction restraining NAEL & anor from taking and or continuing to take any further steps in the arbitral proceedings and particularly from submitting any updated and revised damages in accordance with the terms of the Partial Award or any other monetary claims pursuant to the Partial Award dated 3 October 2011 pending the hearing and determination of the Motion on Notice for Interlocutory Injunction filed before the Court ("Motion on Notice").

**42.** By Order dated 24 October 2011, the FHC granted the reliefs sought in the Motion Ex Parte.  NAEL and Oando Oil 125 and 134 Ltd filed a Motion on Notice on 31 October 2011 by which they prayed the Court to discharge the interim orders.  In its Ruling of 18 November 2011, the FHC dismissed the Motion on Notice seeking to discharge the interim injunction and granted the NNPC's Motion for Interlocutory Injunction.  In other words, in the course of

---

[33] See also the First and Fifth Schedules to the FIRS Act 2007. Para 11(1) of the Fifth Schedule provides that the TAT shall have power to adjudicate on controversies arising from the tax laws including the PPT Act.

ruling on a Motion on Notice to discharge interim orders, the Court granted the reliefs in the Originating Motion.   It is this Ruling of 18 November 2011 that gave rise to Appeal No. CA/A/628/2011 – *Nigerian Agip* [G2/27].

43. The position of the Claimants on this decision of the Court of Appeal is captured at page 74, para 25.5 of the Claimant's Post-Hearing Brief as follows:

> "...
>
> (a) The appeal arose of NNPC's proceedings to set aside the Partial Award made in the Abo arbitration.
> (b) NNPC obtained an injunction from the Federal High Court to prevent the issuance of a Final Award (on damages and costs).
> (c) The Abo Contractor challenged the injunction on appeal.
> (d) In the appeal, NNPC argued that the injunction ought to be upheld on the alleged basis that a possible shortfall in the computation by the Abo Contractor of Tax Oil (in compliance with the Partial Award) would cause NNPC irreparable damage.
> (e) The Court of Appeal rejected NNPC's arguments.   In addition to holding that the alleged damage complained of by NNPC would be suffered by the Federal Government and not NNPC, the Court of Appeal affirmed that nothing done by the parties pursuant to the Partial Award would prevent FIRS from exercising its statutory power to assess the tax payable on a different basis.   The Court of Appeal held as follows (at **[G2/27/679]**:
>
>> "Furthermore by the combined effect [of] Sections 33 of the Petroleum Profits Tax Act, No 15 of 1959 and S. 34 of the Federal Inland Revenue Service (Establishment) Act No 13 of 2007, the Federal Inland Revenue Service (FIRS) has the power to make assessment on a company engaged in petroleum operations and power to sue for tax.   Specifically if by the Partial Award of the Arbitral Panel the actual quantum of Petroleum Tax Oil   to be paid under the Production Sharing Contract (PSC) is wrong, by S.15 of the Petroleum Profits Tax Act, the FIRS has the power to refuse the tax returns submitted to it on the PSC by the Partial Arbitral Award.   In that   circumstance, if there is any injury, it will be to the Federal Government and since FIRS can sue on it, the alleged injury can be compensated in damages."

44. I have read *Nigerian Agip* [HB-G2/27] and I found nothing touching on arbitrability of tax disputes in the judgment.   The decision dealt extensively with the grounds for granting an interim injunction, among others.   However, there are references to the following:

a) That the grant of an injunction will affect the revenue of the Government.

b) That the computation of PPT payable by NAEL will cause irreparable damages to NNPC.

c) That by the relevant statutory provisions in the PPT Act 2004 and FIRS Act 2007 the only statutory authority capable of computing actual tax liability in Nigeria for petroleum operations is the FIRS.

d) Definition of 'arbitration'.

e) The extent of court's intervention in arbitral proceedings (Section 34 of the Arbitration Act).

f) The grounds on which an arbitral award can be set aside (Sections 29 30, and 48 of the Arbitration Act).

g) Reluctance of courts in granting injunctions to restrain arbitral proceedings.

h) Reliance on *Statoil Nigeria Limited & Anor v NNPC & Ors* (2014) 14 NWLR (Pt 1373) 1 in interpreting section 34 of the Arbitration and Conciliation Act.

**45.** Otherwise, I cannot find anything in this decision of the Court of Appeal dealing with arbitrability of tax disputes. Instead, the focus as it relates to this dispute is whether the resolution of the present dispute will affect, or impinge upon the functions of the FIRS.     I, therefore, hold and determine that <u>*Nigerian Agip*</u> is not on all fours with this reference. As rightly pointed out by the Respondent at page 39, para 13.23 of the Reply Post-Hearing Brief, this was an interlocutory appeal against a grant of an interlocutory injunction. The main originating process is still pending at the FHC.

**46.** The   observation of the Respondent   at page 39, para 13.24 of the Respondent's Reply Post-Hearing Brief is also relevant here:

> "It is pertinent to point out, as the Claimant was in fact required to have done, that the jurisdiction of the FIRS was not an issue in the **Nigerian Agip Exploration Limited v NNPC** appeal; and that being so, the comments of their Lordships which the Claimant relies on at paragraph 25.5 of the Claimants' PHB are at best obiter; given the

18

> *issues for determination by the court.  It is trite law that a court's obiter comments are not binding.  The Respondent respectfully relies on the case of NAB Ltd v Barri Eng. (Nig) Ltd (1995) 8 NWLR (Pt 413) 257 at 289-290 where the Court of Appeal held thus:  '....A statement made in passing by a Judge which is not necessary to the determination of the case in hand is not a ratio decidendi of the case but an obiter dictum and it has **no binding effect** for the purposes of the doctrine of judicial precedent'.*

**47.** I have decided to quote *in extenso*, the relevant portions of the _FHC Judgment 774_, that of the FHC and the Court of Appeal to show clearly that although the issue of the tax revenue to the FIRS was also canvassed in the _FHC Judgment 774_, my focus is on whether tax disputes are arbitrable.  I cannot find anything in the Court of Appeal judgment bordering on this essentially because the appeal was argued on the basis of the conditions for granting interlocutory injunctions and not arbitrability.    My view therefore is that the Court of Appeal judgment has no effect on the issue of arbitrability of tax disputes which was the main relief sought in the _FHC Judgment 774_.

**48.** On the issue of the exclusive jurisdiction of the FHC, the Claimants at pages 79-84 of the Post-Hearing Brief relied on several cases and asserted that the exclusion was in relation to other courts like State High Courts and not arbitral tribunals.  Out of all the cases, it is only _MV Lupex_ [G1/14] that is the decision of the Supreme Court on the issue of stay of proceedings. The Supreme Court held thus:

> *"[t]he mere fact that a dispute is of a nature eminently suitable for trial in a court is not a sufficient ground for refusing to give effect to what the parties have, by contract, expressly agreed to... So long as an arbitration clause is retained in a contract that is valid and the dispute is within the contemplation of the clause, the court ought to give due regard to the voluntary contract of the parties by enforcing the arbitration clause as agreed to by them."*

**49.** The position of the Claimants on this case, _MV Lupex_, is that the dispute bordered on the admiralty jurisdiction of the FHC (Section 251(1)(g) of the Constitution) and yet, the Supreme Court ordered a stay of proceedings in

favour of arbitration.   At page 79, para 26.16 of the Post-Hearing Brief, the Claimants stated thus:

> *"When one considers the Federal High Court's judgment in this light, it becomes clear that the decision is contrary to a long line of decisions of higher Nigerian courts which have upheld arbitration agreements relating to subject matters contained in Section 251(1)(a – s).*

**50.** I have read the judgment of the Supreme Court in *MV Lupex* carefully and I found no reference to the admiralty jurisdiction of the FHC in the judgment. Similarly, there was no objection to jurisdiction based on Section 251(1)(g) of the Constitution.   Instead the objection was based on Sections 4 and 5 of the Arbitration Act.   Consequently, the Supreme Court's decision in this matter and that of the FHC in the *FHC Judgment 774* can easily be distinguished.

**51.** It is trite that a decision is authority for what it actually decides and judgments should be read in the light of the facts on which they were decided.   As such, cases are not to be removed from their factual milieu.   Furthermore, it is neither desirable, nor permissible in the determination of a matter for the court or arbitral tribunal to take into consideration issues neither relevant nor necessary for its decision.   Indeed    it is wrong to base judgment on such matters.   Thus the application for stay of proceedings in *MV Lupex* was not based on Section 251(1)(g) of the Constitution dealing with the admiralty jurisdiction of the FHC.

**52.** While I believe in the principle of sanctity of contract and the imperative of giving effect to arbitration agreements, I do not share the view that the decision in *MV Lupex* applies in all cases without qualification.   This is so because the principle of separability is circumscribed by arbitrability.   Court decisions on this are legion.   Thus while parties should give effect to voluntary contract and the courts should enforce such contracts, such clauses are subject to the principle of arbitrability.

**53.** Another case relied on by the Claimants is *Onward Enterprises*.   This is a Court of Appeal decision.   However, the quotation in para 33.16(b) of the Claimants' Post-Hearing Brief is incomplete.   The portion left out reads thus:

20

*In [MV Lupex] the appellant requested the trial Federal High Court to stay proceedings of the action filed by the respondent in view of the agreement the two parties entered in clause 7 of the Charterparty which reads:*

*"7. That parties agreed inter alia on arbitration in London under English law in the event of any dispute"*

*The Federal High Court refused the stay of proceedings and on appeal this court affirmed the decision of the trial court.   On further appeal to the Supreme Court, the appeal was allowed and stay of proceedings was ordered."* [G2/23/p. 515]

54. Although both MV Lupex and Onward Enterprises are admiralty cases, the above quotation (which the Claimants left out in their own quotation) makes it clear that the basis of the objection was that there was a clause on arbitration reliance being placed on Sections 4 and 5 of the Arbitration Act and not because it is an admiralty matter and therefore a matter within the exclusive jurisdiction of the FHC.  The issue of the exclusive jurisdiction of the FHC on admiralty matters was never canvassed in the two cases, that is, MV Lupex and Onward Enterprises.

55. The Claimants also relied on Williams v Williams [HB-G2/24] where the Claimants submitted that the Court of Appeal referred a dispute to arbitration even though the substantive suit included a request for winding up of a company that is caught by Section 251(1)(e) of the Constitution. With due  respect, this is not my understanding of the decision of both the FHC and that of the Court of Appeal in this matter for the following reasons:

   a) At page 2, line 6  of the judgment, it is clear that the basis of the dispute was a written agreement (Exh TEW 1) by the four sons  of the late Chief FRA Williams ("Chief Williams") in respect of the distribution of the Estate of Chief Williams pending the grant of Letters of Administration.  Exh TEW 1 had a clause on arbitration.

   b) One of the assets referred to in Exh TEW 1 is the 4th Respondent, a separate and distinct legal entity that was not a signatory to the Exh

TEW 1.  In other words, the 4th Respondent is not a party to the arbitration agreement.

c)  The shareholders in the 4th Respondent never entered into a Shareholders Agreement that had a clause on arbitration.  Neither was there a clause in the Articles of Association referring disputes to arbitration.

d)  Exh TEW 1 (concerned with the administration of the Estate of Chief Williams) was the basis of the application for stay of proceedings in the suit filed by one of the signatories to Exh TEW 1.[34]  Clause 19 of Exh TEW 1 is the clause on arbitration.

e)  Clause 14 of Exh TEW 1 provides for "entire agreement".  In other words, Exh TEW 1 was the entire agreement between the four sons in relation to the administration of the estate of their father.

f)  The 4th Respondent, as a distinct and separate company has its constitutional documents in the Memorandum and Articles of Association ("Memart").  The Memart is not part of Exh TEW 1.

g)  At page 19, 2nd para of the judgment, the Respondents therein conceded that the petition at the court below was not for the winding up of the 4th Respondent but an action in personam against the 1st and 2nd Respondents.

h)  At page 22, 2nd para of the judgment, Chief Williams  agreed that the petition was limited to Sections 310-312 of Companies and Allied Matters Act ("CAMA") in relation to the 4th Respondent.

**56.** Consequently, _Williams v Williams_ [HB-G2/24] is not a judgment supporting a proposition that a winding up petition was referred to arbitration despite the provisions of Section 251(1)(e) of the Constitution. The material facts are not the same as in the _FHC Judgment 774_.  As has been stated above, a decision is authority for what it actually decides and judgments should be read in the light of the facts on which they were decided.   As such, cases are not to be removed from their factual milieu.

---

[34] See page 24 of the judgment for the relevant portions of TEW 1.

**57.** However, there is the case of *NPA v Eyamba*[35] *("NPA v Eyamba")* referred to in *NNPC v Tax Appeal Tribunal & 3 Ors* [HB-G2/26/ p. 584] cited by the Claimants. This is a Court of Appeal decision. Buba, JCA, at page 441 held thus:

> *"By virtue of s.251(1)(p)(q)(r) and (s) of the 1999 Constitution, jurisdiction to hear suits challenging or touching on the administration, management and control of the Federal Government or any of its agencies are vested exclusively in the Federal High Court. In the instant case, the appellant is a Federal Government agency. Consequently, only the Federal High Court has jurisdiction to hear the respondent's claims against it."*

**58.** In my view, *NPA v Eyamba* which affirms the <u>FHC Judgment 774</u>, represents the correct position of Nigerian law on the issue of the exclusive jurisdiction of the FHC.

**59.** Both Parties have relied on <u>Kano State</u> on the issue of arbitrability. The real test formulated in this case is whether the difference between the parties can be compromised lawfully by way of accord and satisfaction. My view is that the Parties lack the capacity to compromise lawfully tax deductibility. This is statutory and the powers to determine this are vested in the FIRS, in the first instance and ultimately, in case of dispute, on the TAT and the FHC.

**60.** In other jurisdictions, tax disputes, fraud, corruption, among others, may be arbitrable. I have read the opinions of commentators on the issue of tax disputes. Indeed, the categories of non-arbitrable disputes have not closed in Nigeria. However the jurisprudence evolving in Nigeria with a written Constitution and a plethora of statutes on tax is that tax disputes are not arbitrable. The FHC is a creature of the Constitution[36] and statute.[37] These enactments determine its jurisdiction. Consequently, whatever positions taken by these commentators and judgments in other jurisdiction are inconsequential if they are inconsistent with the provisions of the Constitution

---

[35] (2005) 12 NWLR (Pt 939) 409 at 441.
[36] See Section 249 of the Constitution.
[37] See the Federal High Court Act, Cap F12, Laws of the Federation of Nigeria, 2004.

more so that this is a domestic arbitration, regulated by Nigerian Law and a court of competent jurisdiction has ruled that tax disputes are not arbitrable.

61. I have read the Arbitration Act especially Sections 48(b) and 52(2)(b) of the Act   dealing with arbitrability.  These sections provide that a Nigerian court may set aside or refuse to recognize and enforce an award where it finds that the subject matter of the dispute is not capable of settlement by arbitration under the laws of Nigeria or that the recognition or enforcement of the award is against public policy in Nigeria.   "Court" is defined in Section 57 (1) of the Arbitration Act as a *"High Court of a State,the High Court of the Federal Capital Territory, Abuja or the Federal High Court."*.  A <u>Federal High Court</u>  in the *<u>FHC Judgment 774</u>* has found that tax disputes are not capable of settlement by arbitration.  This is a court of competent jurisdiction.

62. In relation to the exclusive jurisdiction of the FHC especially the contention of the Claimants that it relates to other Courts like State High Courts, "Court" is defined in *Blacks' Law Dictionary*[38] as *"a governmental body consisting of one or more judges who sit to adjudicate disputes and administer justice"* while a "Tribunal" is defined *as "a court or other adjudicatory body"*.   The Claimants also contended that if the intention was to refer to courts or tribunals, Section 251(1) of the Constitution should have expressly stated so and referred to Section 285(2) of the Constitution.  However, in Section 36(1), (3), and (4) of the Constitution, the words "court" or "other tribunal" are given the same status in the determination of the rights to fair hearing.

63. On the status of the TAT, Sections 6(4)(a) and 251(1) of the Constitution as well as paragraph 20(3) of the Fifth Schedule to the FIRS Act 2007 support the view that the TAT established under Section 59(2) of the FIRS Act 2007 was properly constituted and that TAT is deemed to have powers of a civil court.  According to the provisions of Section 59(2) of the FIRS Act 2007, disputes arising from the operations of the FIRS Act 2007 and the PPT Act are matters for the TAT.[39]

---

[38] 9th Edition, pp. 406 and 1646 respectively.
[39] See the First and Fifth Schedule to the FIRS Act 2007.

64. I note the attempt by the Respondent to declare that the TAT is unconstitutional.  However, this position was rejected.  I concede that there are controversies regarding the exact status of the TAT.  However, Section 6(4)(a) of the Constitution of Nigeria provides that:

> *"(4) Nothing in the foregoing provisions of this section shall be construed as precluding:-*
>
> *(a) the National Assembly or  any House of Assembly  from establishing courts, other than those to which this section relates, with subordinate jurisdiction to that of a High Court."*

65. It was also contemplated that the Federal High Court could be given additional powers other than those specified in Section 251.  Thus section 251(1) of the Constitution provides:

> *"Notwithstanding anything to the …….in this Constitution and* **in addition to such other jurisdiction as may be conferred upon it by an Act of the National Assembly**, *the Federal High Court shall have and exercise  jurisdiction to the exclusion of any other court in civil causes and maters* (emphasis added)

66. That appeals lie from the decisions of the TAT to the FHC demonstrates the fact that the TAT is not unconstitutional.   Similarly, paragraph 20(3) of the Fifth Schedule to the FIRS Act 2007 provides that *"[a]ny proceeding before the Tribunal shall be deemed to be a judicial proceeding and the Tribunal shall be deemed to be a civil court for all purposes'"*.  In my view, in so far as appeals lie from the decisions of the TAT to the FHC, it is a subordinate court   and also a civil court for all purposes.

67. In my view, the question is not whether the Tribunal, as constituted, can construe and interpret the contractual obligations of the parties in the 217 PSC.  Rather it is whether the Parties can, by contract, confer on the Tribunal the jurisdiction to determine disputes that are by constitutional and statutory provisions exclusively referred for the FHC and other organs. Sections 251(1)(a), (b) and (q) of the Constitution and other provisions of the PPT Act 2004 and the FIRS Act 2007 especially Section 59(2) and  paragraphs 11(1) and 20(3) of the Fifth Schedule to the FIRS Act  2007 are relevant.

25

**68.** In my view, other than the case of _Kano State_ that formulated the test of arbitrability generally, it is only _FHC Judgment 774_ that has pronounced on arbitrability in relation to Section 251(1) of the Constitution.  The other cases especially _Nigeria Agip_ and _MV Lupex_ are clearly distinguishable from _FHC Judgment 774._

**69.** It is noteworthy that the decision in _FHC Judgment 774_ is that of a FHC and not that of a Court of Appeal or Supreme Court.  However, I am  guided by the Supreme Court's decision in _Udeh v Okoli_, _supra_ in respect of the judgment of the High Court of Anambra State  that:

> _"[i]t is settled law that a judgment or ruling of a court remains valid and binding on the parties until set aside by a court of competent jurisdiction.  In fact there is no evidence on record that the decision was later set aside by an appellate court_."

**70.** I therefore uphold the Preliminary Objection filed by the Respondent and hold that the subject matter of this arbitration is not arbitrable.  Furthermore, I conclude that I have no jurisdiction to resolve the disputes arising between the Parties to the 217 PSC for reasons stated above.  Consequently, I dismiss all the main claims (save the alternative claim set out below) of the Claimants in their entirety.

## III.  MODIFICATION OF THE PSC PURSUANT TO CLAUSE 19.2

**71.** This is the Claimants' Clause 19.2 Claim and I agree with the submission of the Claimants that the jurisdictional challenge does not extend to this claim.[40]   In issue (m) of the Award, the background to this request was well laid out.  I hereby adopt it.  I other words, I adopt paragraphs 238 to 257 of the Award.  While I agree that there is a change in the policies of the FIRS, I do not agree that the Claimants have complied with the provisions of Clause 19.2 of the 217 PSC in requesting for the modification.

**72.** For ease of exposition and analysis, I will reproduce Clause 19.2 of the 217 PSC thus:

---

[40] See Footnote 29 at p 64 of the Claimants' Pre-Hearing Brief.

26

> *"In the event that any enactment of or change in the laws or regulations of Nigeria or any rules, procedures, guidelines, instructions, directives, or policies, pertaining to the Contract introduced by any Government department or Government parastatals or agencies occurs subsequent to the Effective Date of this Contract which materially and adversely affects the rights and obligations or the economic benefits of the CONTRACTOR, the Parties shall use their best efforts to agree to such modifications to this Contract as will compensate for the effect of such changes.  If the Parties fail to agree on such modifications within a period of ninety (90) days following the date on which the change in question took effect**, the matter shall thereafter be referred at the option of either Party to arbitration under Article 21 hereof**.  Following arbitrator's determination, this Contract shall be deemed forthwith modified in accordance with that determination."* (emphasis added).

**73.** The Notice of Arbitration in this matter was filed on 23 May 2011 and on 24 August 2011, the Tribunal set out its directions for the Parties' service of pleadings and submissions on challenge to the Tribunal's jurisdiction.  A preliminary meeting was held on 29 November 2011 and PO 1 dated 8 December 2011 was issued by the Tribunal.  The Claimants filed their SOC on 21 September 2011 while the Respondent filed its Defence on 23 November 2011.  The Claimants were due to file their Reply on 9 March 2012 and the Rejoinder to be filed by the Respondent on 6 April 2012.

**74.** In the Reply,[41] the Claimants averred that they received a Notice of Assessment of PPT on 26 October 2011. That is, after the Notice of Arbitration has been filed.   The Claimants subsequently received two other documents on 15 December 2011 and 19 December 2011 and such documents especially the FIRS letter dated 24 May 2010 (which was received from the NNPC on 19 December 2011) constitute a change of policy within the contemplation of Clause 19.2 of the 217 PSC.  On 24 January 2012, the Claimants invoked Clause 19.2 of the 217 PSC and requested for a meeting with the NNPC to attempt to agree on such modifications to the 217 PSC as would compensate for the effect of the change.   On 5 March 2012, NNPC wrote to the Claimants

---

[41] See para 34 of Reply.

27

requesting for a withdrawal of the arbitral proceedings before the meeting to negotiate the modifications could take place.[42]

**75.** In the Respondent's Rejoinder,[43] the Respondent rejected the contention of the Claimants that there has been a change in policy and urged the Tribunal to dismiss the claim.  The Respondent also argued that the question whether there has been a change in practice or policy by the FIRS could not be decided as it borders on the arbitrability of the dispute and determination of whether it is the Claimants or the Respondent that has correctly interpreted tax laws.  I share the view of the Majority that the question whether it is the Claimants or the Respondent who is right in the interpretation of tax laws does not arise in the context of the request for modification of the 217 PSC.  However, my position is not based on the findings on the issues of consolidation, ITC or tax deductibility but on the fact that such changes relate to rules, procedures, guidelines, instructions, directives or policies and not necessarily to changes in laws or enactments. The FIRS Letter of 24 May 2010 falls in this category.

**76.** It is noteworthy that while Clause 19.2 of the 217 PSC deals with modification of that PSC, Clause 21 of the same deals with consultation and arbitration. The clauses also flow chronologically.   In my view, what is contemplated in Clause 19.2 is that modification should precede arbitration and not the other way round.  It is not contemplated in Clause 19.2 that in the course of arbitral proceedings, Clause 19.2 should be invoked.  Quite the contrary, it is when negotiations under Clause 19.2 fail that arbitration under Clause 21 is invoked.

**77.** I therefore agree with the position of the Respondent that if the Claimants wanted to invoke Clause 19.2 of the 217 PSC, they should have withdrawn the arbitral proceedings commenced pursuant to the Notice of Arbitration issued on 23 May 2011.

---

[42] I note another letter dated 24 January 2012 from NAPIMS, a subsidiary of the NNPC agreeing to such a meeting.  I have no hesitation in dismissing this letter because NAPIMS is a not a party to the arbitration.  Section 57(1) of the Arbitration Act defines a "party" as a party to the arbitration agreement.  In any case, this arbitration is between the Claimants and NNPC and not between Claimants and NAPIMS.

[43] See paragraph 24 of the Respondent's Rejoinder.

**78.** I hereby dismiss the claim for modifications pursuant to Clause 19.2 of the 217 PSC.  Thus, the Claimants are not entitled to this relief.

## IV.  COUNTERCLAIM OF THE RESPONDENT

**79.** Generally a counterclaim is an independent claim and not dependent on the success or failure of the main claim.   However, an arbitral tribunal cannot decline jurisdiction in respect of the claim of the Claimants and assume jurisdiction in respect of the claim of Respondent arising from the same contract.   I hereby adopt the position of the Majority decision in paragraphs 259 to 288 that the counterclaim must fail.

**80.** Having held that the Tribunal lacks the jurisdiction to inquire into the reliefs sought by the Claimants arising from 217 PSC, I also hold that the Tribunal lacks the jurisdiction to determine the reliefs sought by the Respondent by way of a counterclaim.

**81.** Consequently, I dismiss the counterclaim in its entirety.

**82.** In my view, the best remedy for the Parties as canvassed at the oral hearing[44] is Section 16 of the DOA that provides thus:

> "**16.  Periodic review**
>
> (1)  The provisions of this Act shall be subject to review to ensure that if the price of crude oil at any time exceeds $20 per barrel, real terms, the share of the government of the Federation in the additional revenue shall be adjusted under the production sharing contracts to such extent that the production sharing contracts shall be economically beneficial to the government of the Federation.
> (2)  Notwithstanding the provisions of subsection (1) of this section, the provisions of this Act shall be liable to review after a period of fifteen years from the date of commencement and every five years thereafter."

---

[44] See Transcript, Day 2/200-203.

At the time that the 217 PSC was signed in May 1993, the price of crude oil was less than $20 but by the time that the DOA was promulgated in 1999, the PSCs were due for review.

## V. SUMMARY AND CONCLUSIONS

**Now for all the reasons set out above**

I find, hold and determine:

a) That the Tribunal lacks the jurisdiction to inquire into the claims of the Claimants in this arbitration.

b) I dismiss the claim for modification of the 217 PSC pursuant to Clause 19.2 of the 217 PSC.

c) I dismiss the counterclaim.

**And** I make no order as to costs.

Professor Paul Obo Idornigie