UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STATOIL (NIGERIA) LIMITED and TEXACO NIGERIA
OUTER SHELF LIMITED,

Petitioners,

– against –

NIGERIAN NATIONAL PETROLEUM CORPORATION,

Respondent.

Case No. 18-cv-02392 (RMB)

**AMENDED PETITION TO RECOGNIZE AND ENFORCE
FOREIGN ARBITRAL AWARDS AND REQUEST FOR PRE-JUDGMENT SECURITY**

**FRESHFIELDS BRUCKHAUS
DERINGER US LLP**
601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
*Attorneys for Petitioners*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................... ii

GLOSSARY ................................................................................................................. ix

PRELIMINARY STATEMENT ................................................................................... 1

PARTIES ...................................................................................................................... 5

JURISDICTION AND VENUE .................................................................................... 6

    A.    This Court Has Subject Matter Jurisdiction ................................................ 6

    B.    This Court Has Personal Jurisdiction over NNPC ...................................... 7

    C.    This Court Has *In Rem* Jurisdiction over NNPC's Property in this District ........ 18

    D.    Venue Is Proper in this District .................................................................. 19

FACTUAL BACKGROUND ........................................................................................ 19

    A.    NNPC Markets Oil Fields in the United States ........................................ 19

    B.    Petitioners Enter into the PSC and Invest Billions of Dollars to Develop Oil Mining Lease 128 ............................................................... 19

    C.    Nigeria Orders NNPC to Overlift from PSC-Governed Fields ............................. 22

    D.    NNPC's Overlifting and Other Breaches of the PSC ......................................... 23

    E.    Petitioners Commence Arbitration to Vindicate Their Contractual Rights ......... 24

    F.    The Tribunal Awards Petitioners US$995 Million ............................................... 27

    G.    Nigeria's State-Owned Entities Commence a Multi-Pronged Litigation Campaign to Prevent Petitioners from Enforcing the Awards in Nigeria ........... 28

ARGUMENT ................................................................................................................. 37

    A.    The Nigerian Courts Have Denied, and Will Continue to Deny, Petitioners Due Process in the Set Aside Proceedings ........................................ 40

    B.    The Set Aside Decision Destroys Petitioners' Contractual Rights to Arbitrate Contractual Breaches ................................................................ 50

    C.    The Set Aside Decision Constitutes an Impermissible Retroactive Application of Law ................................................................................... 52

    D.    The Set Aside Decision Almost Certainly Denies Petitioners a Forum to Bring their Claims .............................................................................. 53

    E.    The Set Aside Decision Permits a Government Expropriation Without Compensation ........................................................................................... 54

REQUEST FOR PRE-JUDGMENT SECURITY ........................................................ 56

CONCLUSION .............................................................................................................. 57

# TABLE OF AUTHORITIES

**Cases**   **Page(s)**

*Ackermann v. Levine*,
   788 F.2d 830 (2d Cir. 1986)..................................................................................38, 41, 47

*Allied Structural Steel Co. v. Spannaus*,
   438 U.S. 234 (1978)............................................................................................................51

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*,
   39 F. Supp. 3d 516 (S.D.N.Y. 2014)...............................................................................12

*Asvesta v. Petroutsas*,
   580 F.3d 1000 (9th Cir. 2009) .........................................................................................46

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)...........................................................................................................36

*Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*,
   230 F. Supp. 2d 362 (S.D.N.Y. 2002)............................................................................57

*Bank Melli Iran v. Pahlavi*,
   58 F.3d 1406 (9th Cir. 1995) ................................................................................38, 40, 44, 45

*Bhatnagar v. Surrendra Overseas Ltd.*,
   52 F.3d 1220 (3d Cir. 1995)..............................................................................................49

*Burchette v. Abercrombie & Fitch Stores, Inc.*,
   No. 08 Civ. 8786 (RMB)(THK), 2009 WL 856682 (S.D.N.Y. Mar. 30, 2009) .....................18

*Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petrol. Corp.*,
   948 F.2d 111 (2d Cir. 1991).................................................................................................6

*Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petrol. Corp.*,
   No. 90 CIV. 4169 (JFK), 1990 WL 213030 (S.D.N.Y. Dec. 18, 1990) .................57

*CME Media Enters. B.V. v. Zelezny*,
   No. 01 CIV. 1733 (DC), 2001 WL 1035138 (S.D.N.Y. Sept. 10, 2001)................18

*CONPROCA, S.A. de C.V. v. Petróleos Mexicanos*,
   No. 11 CIV. 9165 (LLS), 2014 WL 7028318 (S.D.N.Y. Dec. 12, 2014)...............56

*Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*,
   832 F.3d 92 (2d Cir. 2016)..................................................................... *passim*

**Cases** Page(s)

*Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción,*
962 F. Supp. 2d 642 (S.D.N.Y. 2013)................................................................37, 41, 51

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.,*
932 F.3d 126 (3d Cir. 2019).....................................................................................10, 12

*Dardana Ltd. v. Yuganskneftegaz,*
317 F.3d 202 (2d Cir. 2003).............................................................................................18

*DeJoria v. Maghreb Petrol. Expl., S.A.,*
935 F.3d 381 (5th Cir. 2019).....................................................................................38, 44

*DeJoria v. Maghreb Petrol. Expl., S.A.,*
No. A-13-CV-654-RP-AWA, 2018 WL 1057029 (W.D. Tex. Feb. 26, 2018) .....................46

*E. Enters. v. Apfel,*
524 U.S. 498 (1998)..................................................................................................52, 53

*Eades v. Kennedy, PC Law Offices,*
799 F.3d 161 (2d Cir. 2015).............................................................................................17

*EM Ltd. v. Banco Central de la República Arg.,*
800 F.3d 78 (2d Cir. 2015)...............................................................................................9

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.,*
397 F. Supp. 3d 323 (S.D.N.Y. 2019)................................................................... *passim*

*Estin v. Estin,*
334 U.S. 541 (1948)........................................................................................................46

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.,*
156 F.3d 310 (2d Cir. 1998).............................................................................................54

*Filus v. Lot Polish Airlines,*
907 F.2d 1328 (2d Cir. 1990)...........................................................................................18

*First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba,*
462 U.S. 611 (1983)...................................................................................... *passim*

*Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic,*
582 F.3d 393 (2d Cir. 2009).............................................................................7, 8, 15, 18

*Funnekotter v. Agric. Dev. Bank of Zimbabwe,*
No. 13 Civ. 1917 (CM), 2015 WL 9302560 (S.D.N.Y. Dec. 17, 2015)...................9, 13, 15

**Cases**                                                                      **Page(s)**

*Gater Assets Ltd. v. AO Gazsnabtranzit,*
  16 Civ. 4118 (LAP), 2019 WL 4735811 (S.D.N.Y. Sept. 27, 2019) ..............................10, 12

*Gordon & Breach Sci. Publrs. S.A. v. Am. Inst. of Physics,*
  905 F. Supp. 169 (S.D.N.Y. 1995) ...............................................................................47

*Hausler v. JPMorgan Chase Bank, N.A.,*
  740 F. Supp. 2d 525 (S.D.N.Y. 2010) ..........................................................................18

*Hilton v. Guyot,*
  159 U.S. 113 (1895)..............................................................................................40, 45

*Hulley Enters. Ltd. v. Russian Fed'n,*
  211 F. Supp. 3d 269 (D.D.C. 2016) ..............................................................................54

*Hunt Constr. Grp. v. Brennan Beer Gorman/Architects, P.C.,*
  607 F.3d 10 (2d Cir. 2010)...........................................................................................52

*InterDigital Commc'ns, Inc. v. Huawei Inv. & Holding Co.,*
  166 F. Supp. 3d 463 (S.D.N.Y. 2016)......................................................................54, 56

*Landgraf v. USI Film Prods.,*
  511 U.S. 244 (1994)..............................................................................................50, 53

*Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.,*
  841 F. Supp. 2d 769 (S.D.N.Y. 2012) ............................................................................7

*Leon v. Shmulker,*
  992 F. Supp. 2d 179 (E.D.N.Y. 2014) ...........................................................................18

*MacArthur v. San Juan Cty.,*
  497 F.3d 1057 (10th Cir. 2007) ....................................................................................38

*Maersk, Inc. v. Neewra, Inc.,*
  No. 05-civ-4356 (CM), 2010 WL 2836134 (S.D.N.Y. July 9, 2010)....................................46

*Mantell v. Chassman,*
  512 F. App'x 21 (2d Cir. 2013) ....................................................................................46

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803)........................................................................................36

*McKesson Corp. v. Islamic Republic of Iran,*
  52 F.3d 346 (D.C. Cir. 1995) ...................................................................................13, 45

*Millennium, L.P. v. Dakota Imaging, Inc.,*
  No. 03 Civ. 1838 (RWS), 2003 WL 22940488 (S.D.N.Y. Dec. 15, 2003) ..........................18

**Cases**                                                                                          **Page(s)**

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)..............................................................................................36, 39

*Nigerian Nat'l Petrol. Corp. v. Citibank N.A.*,
    No. 98 Civ. 4960 (MBM), 1999 WL 558141 (S.D.N.Y. July 30, 1999) ..............................17

*Parsons & Whittemore Overseas Co. v. Société Générale de L'Industrie du*
    *Papier (RAKTA)*,
    508 F.2d 969 (2d Cir. 1974).....................................................................................37

*Penn Cent. Transp. Co. v. City of N.Y.*,
    438 U.S. 104 (1978)..................................................................................................51

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967)..................................................................................................55

*S & Davis Int'l, Inc. v. Republic of Yemen*,
    218 F.3d 1292 (11th Cir. 2000) ................................................................................17

*Sachs v. Republic of Austria*,
    737 F.3d 584 (9th Cir. 2013) ......................................................................................8

*Sangeorzan v. Yangming Marine Transp. Corp.*,
    951 F. Supp. 650 (S.D. Tex. 1997) ...............................................................41, 44, 46

*Scherk v. Alberto-Culver Co.*,
    417 U.S. 506 (1974)..................................................................................................37

*Seetransport Wiking Trader Schiffarhtsgesellschaft MbH & Co. v. Navimpex*
    *Centrala Navala*,
    989 F.2d 572 (2d Cir. 1993).....................................................................................17

*Shapiro v. Republic of Bol.*,
    930 F.2d 1013 (2d Cir. 1991)......................................................................................8

*Skandia Am. Reins. Corp. v. Caja Nacional de Ahorro y Segoro*,
    No. 96 CIV. 2301 (KMW), 1997 WL 278054 (S.D.N.Y. May 23, 1997)..............................56

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
    450 F.3d 100 (2d Cir. 2006).....................................................................................18

*Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*,
    263 F.3d 26 (2d Cir. 2001).......................................................................................55

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002)..................................................................................................55

**Cases**                                                     **Page(s)**

*Telenor Mobile Commc'ns AS v. Storm LLC,*
  584 F.3d 396 (2d Cir. 2009) ................................................................. 38

*Thai-Lao Lignite (Thai.) Co. v. Gov't of Lao People's Democratic Republic,*
  997 F. Supp. 2d (S.D.N.Y. 2014) ........................................................... 41

*Thai-Lao Lignite (Thai.) Co. v. Gov't of the Lao People's Democratic Republic,*
  864 F.3d 172 (2d Cir. 2017) .................................................................. 38

*TMR Energy Ltd. v. State Prop. Fund of Ukr.,*
  411 F.3d 296 (D.C. Cir. 2005) ................................................................ 7

*Topnotch Tennis Tours, LLC v. Glob. Tennis Connections Ltd.,*
  No. 13-CV-4844 (SLT)(VMS), 2014 WL 6389587 (E.D.N.Y. Nov. 14, 2014) ................... 18

*U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,*
  431 U.S. 1 (1977) .............................................................................. 7

*U.S. Trust Co. of N.Y. v. New Jersey,*
  No. 97-cv-06124 (JGK), 1999 WL 307666 (S.D.N.Y. May 17, 1999) ........................ 51

*Weisel Partners LLC v. BNP Paribas,*
  No. C 07-6198 (MHP), 2008 WL 3977887 (N.D. Cal. Aug. 26, 2008) ....................... 49

**Statutes**

Federal Arbitration Act, 9 U.S.C. § 1 et seq. .......................................... *passim*

Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1391, 1602-11 ..................... *passim*

**Treaties**

Convention on the Recognition and Enforcement of Arbitral Awards, June 10,
  1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ................................................. *passim*

**Foreign Authorities**

Constitution of the Federal Republic of Nigeria (1999) ................................ *passim*

*Eze & Ors v. Governor of Abia State & Ors*
  [2014] 5-7 SC (Pt. I) 171 .................................................................. 36

*IPCO (Nigeria) Ltd. v. Nigerian Nat'l Petrol. Corp. (No. 3)*
  [2015] EWCA Civ. 1144 & 1145 ............................................................. 49

**Foreign Authorities**                                                                                              **Page(s)**

Nigerian National Petroleum Corporation Act, Cap. N123 ...............................................10, 11, 12

Nigerian Arbitration and Conciliation Act ................................................................................1

Petroleum Profits Tax Act ..........................................................................................................31

*NNPC v. Okwor*
   [1998] 7 NWLR (Pt. 599) 637 ...............................................................................................9, 15

*NNPC v Tijani*
   [2006] 17 NWLR (Pt. 1007) 29 .............................................................................................9, 15

**Other Authorities**

2 J. Story, Commentaries on the Constitution of the United States § 1398 (5th ed.
   1891) ......................................................................................................................................53

Bonga Arbitration Hearing Transcript, *Esso Expl. & Prod. Nigeria Ltd. v.
   Nigerian Nat'l Petrol. Corp.*, 14-cv-08445 (S.D.N.Y. Nov. 16, 2018), ECF
   No. 187-3 ...............................................................................................................................14

Deposition Transcript of Mr. Olugbenga Oluwaniyi, *Esso Expl. & Prod. Nigeria
   Ltd. v. Nigerian Nat'l Petrol. Corp.*, 14-cv-08445 (S.D.N.Y. Nov. 16, 2018),
   ECF No. 187-1 .......................................................................................................................14

Erha Arbitration Hearing Transcript, *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian
   Nat'l Petrol. Corp.*, 14-cv-08445 (S.D.N.Y. Nov. 16, 2018), ECF No. 187-2 .......................14

*FG inaugurates new board for FIRS, targets 45 mn taxbase*, Business Day (Jan.
   16, 2020), https://businessday.ng/news/article/fg-inaugurates-new-board-for-
   firs-targets-45-mn-taxbase/ ...................................................................................................10

Gary B. Born, *International Commercial Arbitration* (2d ed. 2014) ............................................39

*Gas Firm Owed $9 Billion by Nigeria Can Seek Asset Seizures*, Bloomberg (Aug.
   16, 2019), https://www.bloomberg.com/news/articles/2019-08-16/gas-firm-
   owed-9-billion-by-nigeria-can-seek-asset-seizures ...............................................................48

Gbenga Bada, *President Replaces Kachikwu with Maikanti Baru as NNPC Boss*,
   Pulse (July 4, 2016), http://pulse.ng/local/buhari-president-replaces-kachikwu-
   with-maikanti-baru-as-nnpc-boss-id5226132.html ...............................................................11

Jude Egbas, *Here's Why Corporation Reshuffled 55 Top Executives*, Pulse (Aug.
   31, 2017), http://www.pulse.ng/news/business/heres-why-nnpc-reshuffled-55-
   top-executives-id7239335.html .............................................................................................11

**Other Authorities**                                                                 **Page(s)**

Linda Silberman & Nathan Yaffe, *The US Approach to Recognition &
Enforcement of Awards After Set-Asides: The Impact of the Pemex Decision*,
40 Fordham Int'l L. J. 799 (2016) ........................................................................41

Michael Eboh, *Henceforth, Nigeria to bear costs, risks of crude oil sales—NNPC*,
Vanguard (Sept. 28, 2017),
https://www.vanguardngr.com/2017/09/henceforth-nigeria-bear-costs-risks-
crude-oil-sales-nnpc/ .............................................................................................16

*Restatement (Fourth) of Foreign Relations Law* (2018) ..........................................40, 45

Rotimi T. Suberu, "The Supreme Court of Nigeria: An Embattled Judiciary More
Centralist Than Federalist" in *Courts in Federal Countries: Federalists or
Unitarists?* 290 (Nicholas Aroney & John Kinkaid eds., 2017),
https://www.jstor.org/stable/10.3138/j.ctt1whm97c.14?seq=13#metadata_info
_tab_contents ........................................................................................................43

"Statoil ASA changes name to Equinor ASA" (May 16, 2018),
https://www.equinor.com/en/news/16may2018-changes-name-equinor.html ........5

U.S. Const. amend. V ...............................................................................................55

United Nations Commission on International Trade Law, *Status Convention on
the Recognition and Enforcement of Foreign Arbitral Awards (New York,
1958)*,
https://uncitral.un.org/en/texts/arbitration/conventions/foreign_arbitral_awards
/status2 ...................................................................................................................6

# GLOSSARY

| | |
|---|---|
| Arbitration | *Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited v. Nigerian National Petroleum Corporation*, an Ad Hoc Arbitration pursuant to the Nigerian Arbitration and Conciliation Act. |
| Award | The award issued by the arbitral tribunal in the Arbitration, dated March 17, 2015. |
| *Bancec* | *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983). |
| Chevron | Chevron Corporation and its affiliates. |
| Equinor | Equinor ASA and its affiliates. |
| *Erha* decision | The Nigerian Court of Appeal's decision in *Esso Exploration and Production Nigeria Ltd. et al. v. Nigeria[n] National Petroleum Corporation*, No. CA/A/507/2012. |
| *Esso* | *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, 397 F. Supp. 3d 323 (S.D.N.Y. 2019). |
| FAA | The Federal Arbitration Act, 9 U.S.C. §1 et seq. |
| Final Award | The final award issued by the arbitral tribunal in the Arbitration, dated August 6, 2015. |
| FIRS | Nigeria's tax authority, the Federal Inland Revenue Service. |
| FSIA | The United States Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1391(f), 1441(d), 1602-11. |
| IOC | International oil company. |
| New York Convention | The Convention on the Recognition and Enforcement of Arbitral Awards, June 10, 1958, 21 U.S.T. 2517. |
| Nigeria | The Federal Republic of Nigeria. |
| NNPC Act | The Nigerian National Petroleum Corporation Act, Cap. N123. |
| NNPC or Respondent | Nigerian National Petroleum Corporation, Nigeria's State-owned oil company. |
| OML 128 | Oil Mining Lease 128, which governs the contractual area of the oil field at issue in this litigation. |

| | |
|---|---|
| Overlifting | The lifting of oil to which a party is not contractually entitled. |
| Overlifting Disputes | The contractual disputes between NNPC and various international oil companies that operate deep-water oil fields in Nigeria, relating to NNPC's Overlifting. |
| *Pemex* | *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92 (2d Cir. 2016). |
| PSC | The Production Sharing Contract for Oil Prospecting License 217, dated May 18, 1993, which governs OML 128. |
| Set Aside Decision | The Nigerian Federal High Court decision in *Nigerian National Petroleum Corporation v. Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited*, No. FHC/L/CS/638/2015. |
| Statoil | Statoil (Nigeria) Limited. |
| Substantive Action | The Nigerian Federal High Court proceeding captioned *Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited v. Nigerian National Petroleum Corporation*, No. FHC/L/CS/1275/2016. |
| TAT | The Nigerian Tax Appeal Tribunal. |
| TNOS | Texaco Nigeria Outer Shelf Limited. |
| Tribunal | The arbitral tribunal in the Arbitration. |

Statoil (Nigeria) Limited (**Statoil**) and Texaco Nigeria Outer Shelf Limited (**TNOS**, and, together with Statoil, **Petitioners**), by and through their attorneys, allege as follows in support of their amended petition (**Petition**) for entry of an order, under the Convention on the Recognition and Enforcement of Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the **New York Convention** or the **Convention**), as codified by the Federal Arbitration Act, 9 U.S.C. §§ 201, 202, and 207, recognizing and enforcing the arbitral award (the **Award**) and the final arbitral award (the **Final Award**; collectively, the **Awards**) in the arbitration between Petitioners and Respondent Nigerian National Petroleum Corporation (**NNPC**). That arbitration was captioned *Statoil (Nigeria) Limited and Texaco Nigeria Outer Shelf Limited v. Nigerian National Petroleum Corporation* and was conducted in Abuja, Nigeria under the rules of the Nigerian Arbitration and Conciliation Act (the **Arbitration**). In addition, Petitioners seek an order: (i) entering judgment in Petitioners' favor against NNPC in the amount of the Final Award, with interest and costs as provided therein, plus the costs of this proceeding; (ii) requiring NNPC to post a bond in the current amount of its outstanding obligation to Petitioners under the Final Award—US$1,144,519,213—pending the Court's resolution of the Petition; and (iii) awarding Petitioners such further relief as the Court deems just and proper.

## PRELIMINARY STATEMENT

1.  Petitioners seek the enforcement of foreign arbitral awards rendered against Respondent NNPC. For decades, the US Supreme Court and the courts in this Circuit have stressed the federal policy in favor of arbitral dispute resolution. That policy is given effect through a strong presumption in favor of enforcing arbitration agreements and awards, and it applies with particular force in the field of international commerce.

2. Petitioners have valid arbitration awards that benefit from this strong presumption of enforceability. Enforcement of Petitioners' awards is essential to vindicate fundamental notions of justice, including to enable Petitioners to protect their contractual rights. Absent enforcement, NNPC, a Nigerian State-owned corporation and Nigeria's alter ego, will, through the assistance of Nigeria's courts, be permitted to repudiate its contractual commitments to Petitioners with impunity. This will almost certainly leave Petitioners without a forum—arbitral or judicial—in which to pursue their substantive contractual rights.

3. Petitioners, subsidiaries of Chevron Corporation (together with its affiliates, **Chevron**) and Equinor ASA (together with its affiliates, **Equinor**), made a massive investment in Nigeria's oil sector pursuant to a contract with NNPC. In 1990, Nigeria set out to persuade international oil companies (**IOCs**) to develop and commercialize the country's deep-water oil resources. Extracting oil from Nigeria's offshore oil fields was one of the most technologically challenging operations in the global oil industry. To attract that large and risky investment, NNPC offered foreign investors favorable economic incentives, including the right to a share of the oil produced and the right to calculate that share in accordance with a contractual formula. NNPC also agreed to arbitrate any "difference or dispute" arising under the parties' contract. In reliance on these terms, the IOCs, including Petitioners, committed their extensive expertise and financial resources to Nigeria's nascent offshore oil industry.

4. After Petitioners invested billions of dollars over the course of more than a decade to develop a deep-water oil field in Nigeria, NNPC breached that contract by unilaterally taking (or "lifting") vast quantities of oil in excess of its contractual entitlement. Petitioners commenced arbitration to enforce their contractual rights and, after years of proceedings, won.

An international tribunal ordered NNPC to pay Petitioners US$995 million in damages, costs, and interest.

5.       NNPC has not paid Petitioners a cent of that amount.   Rather than abide by its promise to arbitrate, NNPC has waged a no-holds-barred litigation campaign in its home courts of Nigeria to have the Awards set aside.   NNPC succeeded, at least in Nigeria: the Nigerian Federal High Court set aside the Award.[1]   That result was unsurprising, given that the Nigerian courts routinely protect NNPC, the country's most important and lucrative sovereign entity, from claims for money damages by foreign litigants.[2]

6.       The Nigerian Federal High Court's judgment setting aside the Award denied Petitioners due process and is not entitled to comity in the courts of the United States.   In setting aside the Award, the High Court ignored long-standing precedent and binding authority from superior Nigerian courts, retroactively applied a novel and unprecedented interpretation of the 1999 Nigerian Constitution, deprived Petitioners of the benefit of the contractual bargain they had struck with NNPC, and endorsed a taking of property for the benefit of the State without compensation.   In the face of this injustice, Petitioners seek an order from this Court enforcing the Awards pursuant to the New York Convention.

7.       Under the New York Convention, US courts must enforce a foreign arbitral award absent extraordinary circumstances.   The Convention's strong pro-enforcement policy reflects the determination of the United States, Nigeria and other signatory nations that swift and certain enforcement of foreign arbitral awards is critical to international trade and

---

[1]   NNPC did not seek to set aside the Final Award.

[2]   Petitioners' experience in the Nigerian courts is consistent with the treatment received by other IOCs.   A number of other IOCs commenced separate arbitrations against NNPC for similar contractual violations.   Every one of them prevailed and obtained binding arbitral awards from neutral international arbitral tribunals, collectively worth several billion dollars. The Nigerian courts have not enforced any of these awards.

commerce.  Consistent with the Convention's text, history, and purpose, as well as controlling precedent, US courts have discretion to recognize and enforce an award that has been nullified by a foreign judgment where, as here, enforcing that foreign judgment would be "repugnant to fundamental notions of what is decent and just" in the United States.  *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92, 97 (2d Cir. 2016) (***Pemex***).

        8.     The Nigerian judgment setting aside Petitioners' Award is repugnant to fundamental notions of decency and justice in the United States, and therefore should not be afforded comity.  To induce Petitioners' investment, NNPC promised that it would arbitrate any dispute, and that the resulting arbitration award would be binding.  But after Petitioners invested billions of dollars in developing a deep-water oil field in Nigeria, were summarily stripped of their contractual rights by NNPC, pursued years of arbitration, and won that arbitration, NNPC convinced its home courts to render its agreement to arbitrate an illusion.  The Nigerian Federal High Court set aside the Award and held that the dispute could not be arbitrated at all.  In the process, the Nigerian courts denied Petitioners due process in multiple, fundamental respects.  Like the *Pemex* court, this Court should exercise its discretion to enforce the Awards—which were the product of an independent, fair decision-making process to which the parties agreed to submit their disputes—and refuse to give comity to the decision of the Nigerian Federal High Court.

## PARTIES[3]

9.      Petitioner Statoil (now known as Equinor Nigeria Energy Company Limited) is a corporation organized and existing under the laws of Nigeria, with its principal place of business in Lagos, Nigeria.  Statoil has its registered office at 13th Floor, Heritage Place, 21 Lugard Avenue, Ikoyi, Lagos, Nigeria.  Statoil is a wholly owned indirect subsidiary of Equinor ASA,[4] a corporation organized and existing under the laws of the Kingdom of Norway and majority owned by the Government of Norway, with its principal executive offices at Forusbeen 50, Stavanger, Norway.

10.      Petitioner TNOS is a corporation organized and existing under the laws of Nigeria, with its principal place of business in Lagos, Nigeria.  TNOS has its main office at 2 Chevron Drive, Lekki Peninsula, Lagos, Nigeria.  TNOS is a wholly owned, indirect subsidiary of Chevron Corporation, a corporation organized and existing under the laws of Delaware, United States, with its principal executive offices at 6001 Bollinger Canyon Road, San Ramon, California, United States.

11.      Respondent NNPC is a corporation headquartered at NNPC Towers, Central District, Herbert Macaulay Way PMB 190, Garki, Abuja, Nigeria.  NNPC is wholly owned by the Federal Republic of Nigeria.  NNPC—an agency or instrumentality of Nigeria and, additionally, an alter ego of Nigeria, *see Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l*

---

[3]   References to "Fagbohunlu Decl." refer to the Declaration of Babatunde Fagbohunlu, SAN in Support of Petitioners' Amended Petition, dated January 28, 2020.  References to "Page Decl." refer to the Declaration of Matthew T. Page in Support of Petitioners' Amended Petition, dated January 28, 2020.  References to "Shasore Decl." refer to the Declaration of Olasupo Shasore, SAN in Support of Petitioners' Amended Petition, dated January 28, 2020.  References to "Vandergeest Decl." refer to the Declaration of Christian Vandergeest in Support of Petitioners' Amended Petition, dated January 28, 2020.

[4]   Equinor was previously known as Statoil ASA.  The company changed its name as of May 16, 2018.  *See* "Statoil ASA changes name to Equinor ASA" (May 16, 2018), https://www.equinor.com/en/news/16may2018-changes-name-equinor.html.

*Petrol. Corp.*, 397 F. Supp. 3d 323, 333, 340 (S.D.N.Y. 2019) (***Esso***) (holding that NNPC is an alter ego of Nigeria)—is a foreign State as defined under Section 1603(a) of the Foreign Sovereign Immunities Act (***FSIA***), 28 U.S.C. §§ 1602-11. *See Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petrol. Corp.*, 948 F.2d 111, 112 (2d Cir. 1991) (recognizing NNPC as a foreign State for purposes of the FSIA).

## JURISDICTION AND VENUE

### A.     This Court Has Subject Matter Jurisdiction

12.     This Court has subject matter jurisdiction over the Petition pursuant to 9 U.S.C. § 203, which provides that the United States District Courts shall have original subject matter jurisdiction over a proceeding governed by the New York Convention. Both Nigeria and the United States are signatories to the New York Convention, which calls for the recognition and enforcement of the Awards in favor of Petitioners.[5]

13.     This Court also has subject matter jurisdiction pursuant to the FSIA, 28 U.S.C. § 1330(a), which provides that the United States District Courts shall have original subject matter jurisdiction over any non-jury civil action against a foreign State, as defined in 28 U.S.C. § 1603(a), if the State is not entitled to immunity under 28 U.S.C. §§ 1605-1607 or an applicable international agreement. NNPC is a "foreign State" within the meaning of this provision (even absent an alter ego finding), 28 U.S.C. § 1603(b), and the FSIA denies immunity to a foreign State in an action, such as the present one, to enforce an international commercial arbitration award, 28 U.S.C. § 1605(a)(6). The FSIA also denies immunity to a foreign State in an action based upon a commercial activity (here, the performance and breach of the PSC) that results in the fruit of that breach being transferred to, and therefore having a direct effect in, the

---

[5]   *See* United Nations Commission on International Trade Law, *Status Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958)*, https://uncitral.un.org/en/texts/arbitration/conventions/foreign_arbitral_awards/status2.

United States (which includes, here, both the overlifted oil and its cash proceeds). *See Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 791 (S.D.N.Y. 2012) (commercial activity exception satisfied where breach affected flow of goods into the United States); *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, No. 97-cv-06124 (JGK), 1999 WL 307666, at *14 (S.D.N.Y. May 17, 1999), *aff'd*, 199 F.3d 94 (2d Cir. 1999) (commercial activity exception satisfied where breach altered structure of payments in New York). Therefore, NNPC is not immune from this suit, and this Court has subject matter jurisdiction on this additional basis.

**B.      This Court Has Personal Jurisdiction over NNPC**

      **1.      Personal Jurisdiction Exists Under the FSIA**

      14.      This Court has personal jurisdiction over NNPC pursuant to 28 U.S.C. § 1330(b), which provides that a United States District Court shall have personal jurisdiction over a foreign State, including an agency or instrumentality of a foreign State such as NNPC, that is not immune from suit, provided that service of process is effected in accordance with 28 U.S.C. § 1608. Petitioners have served process on NNPC pursuant to 28 U.S.C. § 1608(b), and this Court therefore has personal jurisdiction over NNPC.

      15.      Because Petitioners have satisfied the requirements of the FSIA, the Court has, and can exercise, personal jurisdiction over NNPC without conducting any due process analysis that would be applicable to "persons." *See Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic*, 582 F.3d 393, 400 (2d Cir. 2009); *TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 302 (D.C. Cir. 2005) (an instrumentality of a sovereign State "is not a 'person' for purposes of the due process clause and cannot invoke the minimum contacts test to avoid the personal jurisdiction of the district court").

16.     Alternatively, satisfying the FSIA's commercial activity requirement, as Petitioners have done, *see supra* ¶ 13, satisfies the constitutional due process requirement necessary to exercise personal jurisdiction over NNPC.  *See Shapiro v. Republic of Bol.*, 930 F.2d 1013, 1020 (2d Cir. 1991) (satisfying the FSIA's nexus requirement is more than sufficient to satisfy the requirements of the Due Process Clause); *Sachs v. Republic of Austria*, 737 F.3d 584, 598-99 (9th Cir. 2013) (en banc) (same), *rev'd on other grounds sub nom. OBB Personenverkehr AG v. Sachs*, 136 S. Ct. 390 (2015).  Accordingly, this Court has personal jurisdiction over NNPC, and the Court's jurisdictional assessment need go no further.

**2.     NNPC is Nigeria's Alter Ego**

17.     In the alternative, because NNPC is an alter ego of Nigeria, NNPC is not entitled to the jurisdictional due process protections that otherwise would be applicable to "persons."  *See Frontera*, 582 F.3d at 400 ("foreign states are not 'persons' entitled to rights under the Due Process Clause").  Thus, because Petitioners have satisfied the requirements of the FSIA, the Court has, and can exercise, personal jurisdiction over Nigeria's alter ego, NNPC.  *See Esso*, 397 F. Supp. 3d at 340.

18.     A corporate instrumentality of a foreign State is considered an alter ego of the State when it is controlled so extensively by the State that a principal-agent relationship is created between them.  *See First Nat'l City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 628-30 (1983) (**Bancec**).  In making this determination, courts consider factors such as whether the sovereign:

> (1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state.

*Funnekotter v. Agric. Dev. Bank of Zimbabwe*, No. 13 Civ. 1917 (CM), 2015 WL 9302560, at *5

(S.D.N.Y. Dec. 17, 2015) (citing *EM Ltd. v. Banco Central de la República Arg.*, 800 F.3d 78,

91 (2d Cir. 2015)).  A corporate instrumentality also may be considered an alter ego of a foreign

State when failing to treat it as an alter ego "would work fraud or injustice."  *Bancec*, 462 U.S. at

629 (quotations and citations omitted).

          19.    Less than six months ago, in analogous circumstances, another court in

this District evaluated an evidentiary record obtained through jurisdictional discovery and held

that NNPC is Nigeria's alter ego.  *See Esso*, 397 F. Supp. 3d at 333-40.  In reaching that

conclusion, the court "weigh[ed] the totality of the circumstances," *Esso*, 397 F. Supp. 3d at 340,

including (i) Nigeria's "substantial control over NNPC's day-to-day business," *Esso*, 397 F.

Supp. 3d at 336; (ii) Nigeria's "use[] [of] NNPC's 'property as its own,'" *Esso*, 397 F. Supp. 2d

at 338-39 (quoting *EM Ltd.*, 800 F.3d at 91)); and (iii) Nigeria's use of NNPC to effect State

policy, *see Esso*, 397 F. Supp. 3d at 335-36.  An alter ego finding is also consistent with the

conclusions of Nigeria's own courts, which have found NNPC to be nothing more than Nigeria's

agent. *See, e.g.*, *NNPC v. Tijani* [2006] 17 NWLR (Pt. 1007) 29 at 42; *NNPC v. Okwor* [1998] 7

NWLR (Pt. 559) 637 at 650-51.  These hallmarks of an alter ego relationship continue to be

present here.

      (a)    *Nigeria exercises extensive control over NNPC's activities and finances*

          20.    From a governance perspective (factors two, three, and four above),

Nigeria wholly owns NNPC, *see Esso*, 397 F. Supp. 3d at 336, and exercises complete dominion

and control over NNPC's activities and finances.  The Nigerian President appoints the Minister

of Petroleum Resources, who also acts as the Chairperson of NNPC's Board, and who can be

removed by the President at any time and for any reason.  *See Esso*, 397 F. Supp. 3d at 336.  In

practice, however, the President often appoints himself the Minister of Petroleum Resources, and

is thereby simultaneously the President of Nigeria, the Minister of Petroleum Resources, and the Chairperson of NNPC's Board. *See Esso*, 397 F. Supp. 3d at 336; Page Decl. ¶ 18; *see also Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 932 F.3d 126, 148 (3d Cir. 2019) (finding that PDVSA, Venezuela's state-owned oil company, is Venezuela's alter ego because, *inter alia*, it is "[c]ommonplace . . . for PDVSA's president also to serve as Venezuela's oil minister"); *Gater Assets Ltd. v. AO Gazsnabtranzit*, 16 Civ. 4118 (LAP), 2019 WL 4735811, at *8 (S.D.N.Y. Sept. 27, 2019) (holding that Moldovan state-owned oil company is an alter ego of Moldova where "[t]he most recent Chairman of [the company] was a Moldovan government official"). Nigeria's President also appoints, and can remove at any time and for any reason: (i) every other member of NNPC's Board, depriving NNPC of any independent directors; (ii) NNPC's Group Managing Director (the title given to NNPC's Chief Executive Officer); and (iii) all of NNPC's senior executives, including NNPC's Chief Financial Officer, Chief Operating Officer, and the CEO of NNPC's Crude Oil Marketing Division, which is in charge of performing NNPC's obligations under the oil production sharing contracts with IOCs such as Petitioners. *See Esso*, 397 F. Supp. 3d at 336-37; Page Decl. ¶¶ 15-16; *see also Crystallex*, 932 F.3d at 148 (alter ego finding where Venezuela's President appoints the state-owned oil company's "president, directors, vice-presidents, and members of its shareholder council").[6]

21.     The NNPC Act also gives the President of Nigeria dominant control over NNPC's activities. The President frequently exercises that power: for example, between 2007

---

[6] Not only does the Nigerian government control NNPC's Board, but NNPC also has a representative on the Board of Directors of Nigeria's tax authority, the Federal Inland Revenue Service (**FIRS**). *See FG inaugurates new board for FIRS, targets 45 mn taxbase*, Business Day (Jan. 16, 2020), https://businessday.ng/news/article/fg-inaugurates-new-board-for-firs-targets-45-mn-taxbase/ ("Other members of [FIRS'] board include: . . . Umar Ajiya, representing the Group managing director, NNPC"); *see also Gater*, 2019 WL 4735811, at *15 ("intermingling of directorships" is "completely consistent" with an alter ego relationship).

and 2016, the President exercised his dismissal power under the NNPC Act by replacing the Group Managing Director of NNPC eight times, in addition to ordering the redeployment and/or termination of dozens of NNPC employees.[7]  *See also Esso*, 397 F. Supp. 3d at 336-37; Page Decl. ¶ 16.  In addition, pursuant to the NNPC Act, the President must personally approve all contracts entered into by NNPC in excess of 5 million Naira (less than US$15,000).[8] Fagbohunlu Decl. Ex. C (NNPC Act), § 6(2).  To put that into context, the annual revenue of NNPC exceeds US$7 billion.  *See Esso*, 397 F. Supp. 3d at 338.  And in the many instances where presidential approval is required for contracting, NNPC Board approval is not sought and is not required.  *See* Vandergeest Decl. Ex. F (Emelife Dep. Tr., *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, No. 14-cv-08445 (S.D.N.Y. Nov. 16, 2018), ECF No. 187-4), at 57:23-58:19.  This means that "the Nigerian President likely must approve a substantial portion of NNPC's contracts."  *Esso*, 397 F. Supp. 3d at 338; *see Gater*, 2019 WL 4735811, at *8 (alter ego finding where state-owned oil company did "not have the independence to make business decisions that have an effect [on] its own bottom line").  Upon information and belief, the President personally approved NNPC's entry into the contract at issue in this action, and has also

---

[7]   *See, e.g.*, Jude Egbas, *Here's Why Corporation Reshuffled 55 Top Executives*, Pulse (Aug. 31, 2017), http://www.pulse.ng/news/business/heres-why-nnpc-reshuffled-55-top-executives-id7239335.html; Gbenga Bada, *President Replaces Kachikwu with Maikanti Baru as NNPC Boss*, Pulse (July 4, 2016), http://pulse.ng/local/buhari-president-replaces-kachikwu-with-maikanti-baru-as-nnpc-boss-id5226132.html; Vandergeest Decl. Ex. Z (Premium Times, *Buhari Sacks Heads of NNPC*).

[8]   The President has exercised this power by delegating it to the NNPC Tenders Board for transactions up to 2.7 billion naira (approximately US$7.5 million which, upon information and belief, applies to contracts denominated in naira) or US$20 million (which, upon information and belief, applies to contracts denominated in dollars).  *See* NNPC Delegation of Authority Policy at 20, *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, No. 14-cv-08445 (S.D.N.Y. Dec. 12, 2018), ECF No. 197-1.  This is only 0.3% of NNPC's annual revenue.  *See Esso*, 397 F. Supp. 3d at 338 (NNPC's annual revenue exceeds US$7 billion).  Upon information and belief, the President retains unilateral power to revoke the delegation, and can do so at any moment.

exercised control over NNPC's conduct of disputes with IOCs (described in further detail below, *see infra* ¶¶ 42, 45), including the dispute between Petitioners and NNPC.

22.     Finally, Nigeria exercises control over NNPC's budget, which must be reviewed and approved annually by the President.  Fagbohunlu Decl. Ex. C (NNPC Act), §§ 7-8. The President can even "approve expenses that are not directly for the benefit of NNPC to be paid by NNPC, which NNPC would treat as [an interest-free] loan to the government."  *Esso*, 397 F. Supp. 3d at 337 (alteration in original) (quotations and citations omitted); *see also Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 525 (S.D.N.Y. 2014) (interest-free loans between two entities indicative of an alter ego relationship).

> (b)     *Nigeria uses NNPC's property as its own*

23.     Beyond the control exercised by Nigeria over NNPC's staffing, contracting, and budgeting, Nigeria routinely uses NNPC's property as its own (factor one).  For example, the Nigerian government has directed NNPC to use NNPC's funds to pay for government activities wholly unrelated to NNPC, including paying the operational expenses of the Nigerian Navy and the Nigerian National Intelligence Agency.  *See Crystallex*, 932 F.3d at 146 (finding that PDVSA is Venezuela's alter ego because, *inter alia*, "Venezuela requires PDVSA to fund 'Venezuelan programs that have nothing to do with its business'").  Nigeria has also used NNPC's helicopters, worth nearly US$40 million, for the government's own purposes. Similarly, Nigeria uses NNPC's real estate as its own, including housing the Ministry of Petroleum Resources' office in NNPC's facilities in Abuja, Nigeria without a lease and without the Ministry paying rent for the use of NNPC's property.  *See Esso*, 397 F. Supp. 3d at 338 ("lack of a lease or any written agreement suggests that [NNPC and the Ministry] are one and the same"); *see also Crystallex*, 932 F.3d at 148 (PDVSA is an alter ego of Venezuela where "PDVSA and Venezuela's Ministry of Petroleum and Mining share physical office space"); *Am.*

*Federated Title*, 39 F. Supp. 3d at 525 (lack of documentation for inter-entity agreements evidence of an alter ego relationship).  Further, NNPC shares at least three bank accounts at JPMorgan in New York with the Nigerian government.  *See Esso*, 397 F. Supp. 3d at 339-40.  Simply put, a third-party lender to NNPC has no certainty that NNPC's assets will not be diverted to satisfy Nigeria's needs—a hallmark of an alter ego relationship.  *See Bancec*, 462 U.S. at 625-26.

### (c)   NNPC implements State policy

24.   Furthermore, in overlifting oil from Petitioners, NNPC was effectuating government policy (factor five).  As explained below, *see infra* ¶¶ 42-45, beginning in 2007 the Nigerian government sought (extra-contractually) to increase its share of revenue under the production sharing contracts that NNPC signed with IOCs.  *See Esso*, 397 F. Supp. 3d at 330.  The Nigerian government used NNPC to do so, and NNPC dutifully complied with this policy directive.  *See infra* ¶ 42; Page Decl. ¶¶ 24-29; *Esso*, 397 F. Supp. 3d at 335 ("President Yar'Adua influenced NNPC's decision" to overlift).  Thus, Nigeria "issue[d] policies or directives that cause[d] [NNPC] to act on behalf of [Nigeria]."  *See Funnekotter*, 2015 WL 9302560, at *5.

25.   Where, as here, a State instrumentality is co-opted into a vehicle for implementing State policy, an alter ego relationship exists.  *See McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 352 (D.C. Cir. 1995) (recognizing that Iran's "pattern of conduct and policy statements that caused [a State-owned corporation] to believe [Iran] desired [it] to act on [Iran's] account" was sufficient to establish an alter ego relationship where a State-owned entity in fact acted in a manner consistent with government policy) (quotations and citations omitted).

(d)   *An alter ego finding is necessary to prevent fraud and injustice*

26.   Finally, failing to recognize NNPC as Nigeria's alter ego "would work fraud or injustice." *See Bancec*, 462 U.S. at 629.   Upon information and belief, NNPC has already taken advantage of its (formal) corporate separateness to avoid judgment creditors by moving funds between bank accounts, including into accounts held by other parts of the Nigerian government in an attempt to render them immune from attachment.   Moreover, when it is advantageous to NNPC, NNPC has conceded that it is an alter ego of Nigeria—its representatives have repeatedly stated that NNPC is nothing more than Nigeria's agent, including for purposes of entering into and performing production sharing contracts such as the one at issue here:

- Question: "So, for example, when NNPC enters into a production sharing contract, which will generate equity oil, it does so as an *agent* of Nigeria?"

  Answer: "That's correct."   Oluwaniyi Dep. Tr. at 173:1-12, *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, 14-cv-08445 (S.D.N.Y. Nov. 16, 2018), ECF No. 187-1 (emphasis added);

- "We were just *agents* of Government in collecting royalty oil and in collecting tax oil. Once we collect the oil, we sell them and we carry the money back to Government coffers," Erha Arbitration Hr'g Tr. at 125:17-20, *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, 14-cv-08445 (S.D.N.Y. Nov. 16, 2018), ECF No. 187-2 (emphasis added);

- "We only took the money, sold the oil and remitted the money to Government.   We were just an *agent* of government. . . . You know, we are only an *agent* of government, and the law is clear. . . . It is very clear we are just an *agent*," Erha Arbitration Hr'g Tr. at 228:9-21, *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, 14-cv-08445 (S.D.N.Y. Nov. 16, 2018), ECF No. 187-2 (emphasis added); and

- Mele Kyari, current Group Managing Director of NNPC: "The minister [of petroleum resources] is unlikely to [revoke the oil license] because the respondent [NNPC] is the *agent* of government," Bonga Arbitration Hr'g Tr. at 39:20-22, *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, 14-cv-08445 (S.D.N.Y. Nov. 16, 2018), ECF No. 187-3 (emphasis added).

*See also Pemex*, 832 F.3d at 104 ("[T]reating [Pemex] as separate from the Mexican government for the purpose of personal jurisdiction would work an 'injustice' insofar as it would allow [Pemex] to characterize its status vis a vis the Mexican government in whatever way is advantageous to its several arguments."). NNPC's assertions are consistent with the decisions of Nigeria's courts, which have held that NNPC is Nigeria's agent. *See, e.g., NNPC v. Tijani* [2006] 17 NWLR (Pt. 1007) 29 at 42; *NNPC v. Okwor* [1998] 7 NWLR (Pt. 559) 637 at 650-51.

27.    As the above facts demonstrate, Nigeria: (i) uses NNPC's property as its own; (ii) ignores NNPC's separate status or ordinary corporate formalities; (iii) deprives NNPC of the independence from close political control that is generally enjoyed by separate corporate entities; (iv) requires NNPC to obtain approvals for ordinary business decisions from a political actor; and (v) issues policies or directives that cause NNPC to act directly on behalf of Nigeria. *See Funnekotter*, 2015 WL 9302560, at *5. As US diplomats have recognized, it is not clear "[w]here the [government of Nigeria] ends and NNPC starts." Vandergeest Decl. Ex. NN (House Speaker Accuses State Oil Company of Withholding Revenues), at 2. In addition, failing to treat NNPC as an alter ego of Nigeria would permit NNPC to use its corporate form to continue to effect fraud or injustice. *See Bancec*, 462 U.S. at 629; *Pemex*, 832 F.3d at 104. On any one of these bases, NNPC should, for all purposes in this action, be considered the alter ego of Nigeria and thus indistinguishable, jurisdictionally and for purposes of confirmation and enforcement, from Nigeria. And because NNPC is an alter ego of Nigeria, it is not a "person" for purposes of the Due Process Clause, and so this Court can exercise jurisdiction over NNPC without conducting a due process analysis. *See Frontera Res.*, 582 F.3d at 400. All jurisdictional requirements have therefore been satisfied.

**3.      NNPC Has Substantial Contacts with the United States**

28.      In the further alternative, to the extent that NNPC is not found to be the alter ego of Nigeria and a minimum contacts analysis is required to establish jurisdiction, more than adequate contacts exist.  NNPC has evidenced, and/or presently maintains, substantial and purposeful contacts with the United States, including that NNPC and/or its representatives:

- routinely travel to the United States to market investment and other business opportunities in Nigeria to US investors because, in its own words, "Houston is key," Vandergeest Decl. Ex. G (Emelife Dep. Tr., *Esso Expl. & Prod. Nigeria Ltd. v. NNPC*, No. 14-cv-08445 (S.D.N.Y. Jan. 16, 2019), ECF No. 222-3), at 126:9; *see also* Vandergeest Decl. Ex. DD (NNPC visits to the United States);

- affirmatively solicited American oil companies to participate in the tender process for deep-water oil exploration in Nigeria, including for the Agbami oil field (in which the oil block at issue here is located), and organized and participated in "roadshows" in the United States to market these opportunities to US investors, Vandergeest Decl. Ex. EE (1990-1991 Oil & Gas Journal Excerpts);

- NNPC's current Group Managing Director, Mele Kyari, personally attended meetings in Houston for the "Agbami Project Reservoir Studies" concerning the operation of the oil field at issue in this litigation, Vandergeest Decl. Ex. FF (Kyari LinkedIn);

- traveled to the United States to participate in meetings concerning the marketing and sale of oil extracted from the oil field at issue here.  During those meetings, NNPC's representatives stressed the need to increase sales of that oil to customers in the United States;

- repeatedly traveled to the United States between 2011 and 2018 to meet with Chevron's employees, including numerous meetings concerning the parties' respective performance of the contract at issue in the parties' dispute;

- communicated with Chevron's US-based employees to facilitate the performance of the contract at issue here, including by directing emails and telephone calls to Chevron's employees in the United States;

- regularly ships oil (including oil lifted from the block at issue here) and gas to the United States, including 17% of its 2017 exports[9] and 19 shipments to US ports (12 of which were shipped to the port of New York) in 2014 alone;[10]

---

[9]      *See* Michael Eboh, *Henceforth, Nigeria to bear costs, risks of crude oil sales—NNPC*, Vanguard (Sept. 28, 2017), https://www.vanguardngr.com/2017/09/henceforth-nigeria-bear-costs-risks-crude-oil-sales-nnpc/.

- registered its website—which NNPC uses to solicit business from, and market its services to, counterparties in the United States (*inter alia*)—to the address P.O. Box 234, San Ramon, CA 94583;

- regularly maintains, controls, and uses bank accounts in the United States, including correspondent banking and deposit accounts, including, but not limited to, account numbers 400941775, 816296438, and 11658366 at JPMorgan (collectively, the **JPMorgan Accounts**);

- purposefully directs that billions of dollars of payments for oil generated by the oil field at issue here, including the proceeds of oil it takes improperly from Petitioners, be made in US dollars and deposited in US banks, including in the JPMorgan Accounts;

- avails itself of the protections of US courts by commencing litigation in the United States;[11] and

- must have foreseen that arbitral award enforcement proceedings would occur in the United States: NNPC consented to a subsidiary of Texaco (which was subsequently acquired by Chevron), a major US corporation, becoming a party to a contract with NNPC; NNPC agreed to settle all disputes through arbitration; and Nigeria is a signatory to the New York Convention, which provides for international recognition and enforcement of arbitral awards—including in the United States. *Cf. Seetransport Wiking Trader Schiffarhtsgesellschaft MbH & Co. v. Navimpex Centrala Navala*, 989 F.2d 572, 578 (2d Cir. 1993) ("[W]hen a country becomes a signatory to the [New York] Convention, . . . the signatory State must have contemplated enforcement actions in other signatory States."); *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292, 1304-05 (11th Cir. 2000).

29.     Thus, even if the Court considers NNPC's jurisdictional contacts with the United States, they are more than sufficient to warrant the Court's exercise of personal jurisdiction over NNPC. *See, e.g.*, *Esso*, 397 F. Supp. 3d at 341-44 (contacts analogous to those alleged here sufficient to satisfy any minimum contacts requirement); *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (finding that sending two documents to, and calling one person in, New York was sufficient to establish "minimum contacts" under the Due Process

---

[10]   For example, NNPC shipped approximately 155,000 barrels of Naphta crude oil from Port Harcourt, Nigeria, which arrived in the port of New York on April 6, 2014. And, on May 13, 2014, approximately 154,000 barrels of NNPC's natural gas arrived in the port of New York.

[11]   *See, e.g.*, *Nigerian Nat'l Petrol. Corp. v. Citibank N.A.*, No. 98 Civ. 4960 (MBM), 1999 WL 558141, at *1 (S.D.N.Y. July 30, 1999).

Clause); *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 106 (2d Cir. 2006) ("the parties' conduct in negotiating, consummating, and performing the contract which ultimately led to the challenged arbitration" is relevant to jurisdictional analysis); *Topnotch Tennis Tours, LLC v. Glob. Tennis Connections Ltd.*, No. 13-CV-4844 (SLT)(VMS), 2014 WL 6389587, at *6 (E.D.N.Y. Nov. 14, 2014) (a single one-hour meeting soliciting business in the forum is sufficient to establish minimum contacts); *Millennium, L.P. v. Dakota Imaging, Inc.*, No. 03 Civ. 1838 (RWS), 2003 WL 22940488, at *4 (S.D.N.Y. Dec. 15, 2003) (attendance at a trade show to solicit business sufficient to establish minimum contacts).[12]

## C.    This Court Has *In Rem* Jurisdiction over NNPC's Property in this District

30.    In addition, as a further, independent basis for the exercise of personal jurisdiction over NNPC, this Court has *in rem* jurisdiction over NNPC's assets located in New York, including the JPMorgan Accounts used by NNPC for commercial activity (including for the deposit of proceeds from the sale of oil from the field at issue here). *See Hausler v. JPMorgan Chase Bank, N.A.*, 740 F. Supp. 2d 525, 539 (S.D.N.Y. 2010); *CME Media Enters. B.V. v. Zelezny*, No. 01 CIV. 1733 (DC), 2001 WL 1035138, at *3 (S.D.N.Y. Sept. 10, 2001); *see also Frontera Res.*, 582 F.3d at 396-98; *Dardana Ltd. v. Yugansknefetgaz*, 317 F.3d 202, 208 (2d Cir. 2003).

---

[12] In the event that NNPC seeks dismissal on jurisdictional grounds, Petitioners will respectfully request jurisdictional discovery to test NNPC's contacts with the forum and its status as Nigeria's alter ego. Petitioners have, at the very least, made a "sufficient start" toward establishing jurisdiction by asserting "specific, non-conclusory facts that, if further developed, could demonstrate" jurisdiction. *Leon v. Shmulker*, 992 F. Supp. 2d 179, 195 (E.D.N.Y. 2014). Petitioners are therefore entitled to jurisdictional discovery in order to test their allegations. *See Burchette v. Abercrombie & Fitch Stores, Inc.*, No. 08 Civ. 8786 (RMB)(THK), 2009 WL 856682, at *5 (S.D.N.Y. Mar. 30, 2009); *see also Filus v. Lot Polish Airlines*, 907 F.2d 1328, 1332 (2d Cir. 1990) (holding, in an alter ego case, that "generally a plaintiff may be allowed limited discovery with respect to the jurisdictional issue").

**D.     Venue Is Proper in this District**

31.     Venue in this Court is proper pursuant to 9 U.S.C. § 204 and 28 U.S.C. § 1391(c), (d), and (f).

## FACTUAL BACKGROUND

**A.     NNPC Markets Oil Fields in the United States**

32.     From the start, Nigeria sought to market the development and exploitation of its offshore oil fields internationally, including to US investors such as Chevron and Chevron's predecessor entities.   Beginning in October 1990, Nigerian officials, including the then-Minister of Petroleum Resources, made statements to international publications, which were published and distributed in the United States, inviting IOCs, including those in the United States such as Chevron and its predecessor entities, to bid for the exploration and development rights to Nigeria's offshore oil fields.   In addition, as is NNPC's regular practice, Nigeria and NNPC traveled to Houston to market these new investment opportunities to US oil companies.

**B.     Petitioners Enter into the PSC and Invest Billions of Dollars to Develop Oil Mining Lease 128**

33.     After extensive negotiations, on May 18, 1993, Petitioner Statoil, non-party BP Exploration (Nigeria) Limited (**BP**), and Respondent NNPC entered into a contract for the exploration and exploitation of the field currently at issue, which was eventually denominated as Oil Mining Lease 128 (**OML 128**).   *See* Fagbohunlu Decl. Ex. A (Award), at ¶¶ 6, 59.   The contract for OML 128 took the form of a production sharing contract (**PSC**).

34.     In 1996, Statoil and BP each assigned a fifteen percent interest in the PSC to Petitioner TNOS.   *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 9.   As a result of these and other assignments, from 1999 onwards, Statoil has held 53.85% of the IOCs' interest in the PSC and TNOS the remaining 46.15%.   *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 10.

19

35.    Under the PSC, Petitioners are required to explore for, develop, and extract oil from OML 128, which lies thousands of feet below sea level.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 134.  Petitioners bear the full risk of this enterprise, including geological risk (*e.g.*, whether oil exists, and if so in what quantities and at what quality) and financial risk (*e.g.*, whether the market price for the oil will be higher than the cost of extracting it).

36.    At the time, the development of OML 128 was one of the most challenging operations in the global oil industry and required substantial upfront investment.  In order to attract this massive and highly risky investment, the PSC offered certain incentives designed to compensate Petitioners for the financial and technical risks they faced.  Compensation primarily came in the form of oil.  The rights to that oil formed the basis of Petitioners' claims against NNPC.

37.    The PSC directs how the oil discovered in OML 128 is divided between Petitioners, on the one hand, and NNPC and the Nigerian Government, on the other.  The PSC allocates the oil into four tranches, as follows:

- **Royalty Oil**, which is a tranche of oil allocated to NNPC to cover royalty payments to the Nigerian government.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 62; Fagbohunlu Decl. Ex. D (PSC), at Clause 8.1.

- **Cost Oil**, which is allocated to Petitioners to cover their capital expenditures and operating costs.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 62; Fagbohunlu Decl. Ex. D (PSC), at Clause 8.1.

- **Tax Oil**, which is allocated to NNPC to cover tax payments to the Nigerian government.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 62; Fagbohunlu Decl. Ex. D (PSC), at Clause 8.1.

- **Profit Oil**, which is what is left over: it is derived by subtracting Royalty Oil, Cost Oil, and Tax Oil from the oil extracted from OML 128, and is then split between Petitioners and NNPC pursuant to a contractual formula.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 62; Fagbohunlu Decl. Ex. D (PSC), at Clause 8.1.

38.     Under the PSC, Petitioners have the exclusive right to calculate the oil allocated between these categories per the terms of the contract.  *See* Fagbohunlu Decl. Ex. D (PSC), at Annex B, Art. III; Fagbohunlu Decl. Ex. A (Award), at ¶ 306(b).  By contrast, NNPC has no role in calculating the allocations and is only permitted to take the oil (known as "lifting" the oil) that Petitioners have allocated to NNPC in accordance with the terms of the PSC.  *See* Fagbohunlu Decl. Ex. D (PSC), at Clause 8.3; Fagbohunlu Decl. Ex. A (Award), at ¶ 310(a)(i).  Petitioners also have the exclusive right to prepare tax returns reflecting the overall allocations, and NNPC is obliged to file the tax returns prepared by Petitioners.  *See* Fagbohunlu Decl. Ex. D (PSC) at Annex B, Art. III; Fagbohunlu Decl. Ex. A (Award), at ¶ 310(a)(iii).

39.     Petitioners were aware that NNPC is a state-owned entity, and that Nigeria—NNPC's parent—could seek to change the rules, regulations, and policies over the lifetime of the contract to Petitioners' detriment.  To mitigate the risk that those changes would undermine the economic bargain that the parties struck in the PSC, the contract includes what is known as a "stabilization" clause (the ***Stabilization Clause***).  *See* Fagbohunlu Decl. Ex. D (PSC) at Clause 19.2.  The Stabilization Clause provides that in the event of any change in Nigerian law, regulation or policy that adversely affects Petitioners' economic rights under the PSC, the parties would be required to modify the PSC's terms to compensate Petitioners for any such changes.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 239; Fagbohunlu Decl. Ex. D (PSC), at Clause 19.2.

40.     Finally, the PSC provides that any dispute thereunder would be submitted to arbitration and that the result of the arbitration "shall be binding upon the parties." Fagbohunlu Decl. Ex. A (Award), at ¶ 13; Fagbohunlu Decl. Ex. D (PSC), at Clause 21.  The arbitration clause was a fundamental term of the PSC.  Arbitration clauses are common in

contracts concerning the extraction of natural resources, especially where, as here, an IOC contracts with a powerful state-owned entity and does not wish to subject its substantial investment to the courts of that same state.  In this case, the proposed deal would not have been attractive to Petitioners without the assurance that any contractual dispute over the allocation of oil (which was, and remains, the economic heart of the PSC) would be resolved by independent arbitration, rather than the courts of Nigeria.

41.     In reliance on the contractual promises set out in the PSC, including the right to arbitrate oil allocation disputes with NNPC, Statoil and TNOS invested substantial sums to explore and develop OML 128—indeed, Petitioners have invested over US$7.8 billion in the block.  It was not until 2008—fifteen years after the PSC was signed—that production of oil finally began.  In accordance with the terms of the PSC, once production began, Petitioners calculated the proper allocation of oil between Petitioners and NNPC every month.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 64.  NNPC's contractual compliance did not last long, however.

## C.     Nigeria Orders NNPC to Overlift from PSC-Governed Fields

42.     Beginning in 2007, the Nigerian government sought to increase its share of petroleum revenue under the PSCs that NNPC had signed with IOCs.  *See Esso*, 397 F. Supp. 3d at 330.  To evaluate the best way to do so, Nigeria's then-President Umaru Musa Yar'Adua organized a committee of government officials, including representatives of NNPC (the **Committee**), to assess whether any revenue opportunities had been "lost" by Nigeria in the implementation of PSCs for two nearby oil fields (the "Bonga" and "Erha" fields, which entered into production before OML 128).  *See Esso*, 397 F. Supp. 3d at 330; Vandergeest Decl. Ex. ZZ (Committee Report), at 8.  The Committee concluded that Nigeria should seek to recover billions of dollars that were allegedly outstanding from these fields in Tax Oil and Royalty Oil—both of

which NNPC collects on behalf of the Nigerian government, rather than for its own account.  *See Esso*, 397 F. Supp. 3d at 335-36; Vandergeest Decl. Ex. ZZ (Committee Report), at 21-22.  The President then ordered NNPC to take immediate steps to recover the sums that were allegedly owed to Nigeria, *see* Vandergeest Decl. Ex. D (May 2008 Press Statement), and NNPC did so. *See Esso*, 397 F. Supp. 3d at 335 ("President Yar'Adua influenced NNPC's decision [to overlift]").

**D.    NNPC's Overlifting and Other Breaches of the PSC**

43.    Thus, even before Petitioners had recovered the monumental sum invested to make OML 128 operational, NNPC breached the PSC in multiple respects.  In September 2010, NNPC began to insist that it was entitled to more oil than was provided for by the PSC's allocation mechanism.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 65.  NNPC appeared to contend that Petitioners owed the Nigerian government more Tax Oil, and were taking too much Cost Oil.  Even though Petitioners had the exclusive right to calculate the lifting allocations under the PSC (with any dispute to be resolved in arbitration), NNPC demanded to lift oil in excess of the amount it was allocated.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 65.  Petitioners disagreed, maintaining that their allocations were correct.  In addition, and in the alternative, Petitioners argued that to the extent Nigerian tax policy had changed so as to require the allocation of additional Tax Oil to NNPC, such a change triggered the Stabilization Clause and, therefore, the PSC should be modified to compensate Petitioners for the change.

44.    Rather than follow the agreed contractual process to resolve this dispute (arbitration), NNPC engaged in self-help: it started taking quantities of oil that far exceeded its contractual entitlement.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶¶ 11, 66.  In addition, NNPC refused to transmit the tax returns prepared by Petitioners to Nigeria's tax authority, FIRS,

instead unilaterally preparing and submitting its own version of the returns, thereby further breaching its obligations under the PSC.  *See* Fagbohunlu Decl. ¶ 18.[13]

45.     NNPC's helping itself to oil to which it was not contractually entitled became known as "overlifting."   As discussed above, Petitioners were not alone in suffering NNPC's overlifting: NNPC (on the instructions of the Nigerian government) did so in a number of other oil fields in what became known as the ***Overlifting Disputes***.  *See supra* ¶ 42.   The Overlifting Disputes led to at least four separate arbitrations, including the arbitration at the center of this dispute.   After one of the first overlifting arbitrations had been filed, Petitioners

████████████████████████████████████████████████████

████████████████████████████████████████████     *See* Vandergeest Decl. Ex. AAA (Meeting Minutes), at 2.   NNPC did not abide by this promise.

**E.     Petitioners Commence Arbitration to Vindicate Their Contractual Rights**

46.     Because the disputes between Petitioners and NNPC were contractual in nature—concerning Petitioners' exclusive rights under the PSC to determine oil allocations and prepare tax returns—on May 23, 2011, Petitioners invoked Clause 21 of the PSC (the arbitration clause) and commenced arbitration, seeking declaratory relief and compensation for NNPC's contractual breaches.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶¶ 13, 21.

47.     The tribunal was constituted on August 19, 2011 and was composed of three eminent jurists (the ***Tribunal***).   Pursuant to the terms of the PSC, each party was entitled to

---

[13]   NNPC's submission of unilateral and erroneous tax returns gave rise to inflated tax assessments levied by FIRS against Petitioners.   Petitioners challenged these assessments in the Tax Appeal Tribunal (***TAT***).   These claims were not submitted to arbitration because they involve FIRS (a non-party to the PSC) and pursue tax claims, rather than the purely contractual claims at issue in the Arbitration.

appoint one arbitrator and the two party-appointed arbitrators were together charged with selecting the President of the Tribunal.

48.     Petitioners appointed as arbitrator Lord Mark Saville of Newdigate, QC, a British national.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 14; Fagbohunlu Decl. Ex. E (Lord Saville's CV).  Lord Saville is a former Justice of the Supreme Court of the United Kingdom, that country's highest court.  NNPC appointed Professor Paul Obo Idornigie, a Nigerian national and Professor of Law at the Nigerian Institute of Advanced Legal Studies.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 14; Fagbohunlu Decl. Ex. F (Professor Idornigie's CV).  The President of the Tribunal, appointed jointly by Professor Idornigie and Lord Saville, was Professor Lawrence Boo, a Singaporean national and Adjunct Professor at the National University of Singapore Faculty of Law.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 14; Fagbohunlu Decl. Ex. G (Professor Boo's CV).  Professor Boo has served on more than 170 arbitral tribunals, most of which involved international disputes, and is regarded as one of the leading international arbitrators in Asia.

49.     The Arbitration proceedings were extensive.  Prior to the hearing, the parties submitted a combined six substantive briefs, eight factual witness statements, and three expert reports, as well as more than 90 exhibits.  *See* Fagbohunlu Decl. ¶ 23; Fagbohunlu Decl. Ex. A (Award), ¶¶ 21-58.  The experts provided testimony on whether the PSC was valid under Nigerian law and the proper methodology for calculating the oil allocations under Nigerian law and the PSC.

50.     The Arbitration hearings were held in Abuja, Nigeria from April 21 to 23, 2014.  Both sides were represented by counsel who called and cross-examined witnesses.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶¶ 33, 36, 46-49, 51-52; Fagbohunlu Decl. ¶ 24.

51.     During the arbitration, NNPC sought to escape its obligation to arbitrate, arguing that:

- most, if not all, of the relief sought by Petitioners related to disputes and controversies arising from tax laws and accordingly were within the exclusive jurisdiction of the Tax Appeal Tribunal; and

- the dispute between the parties was a "tax dispute" and Section 251 of the 1999 Nigerian Constitution barred the arbitration of tax disputes.[14]

*See* Fagbohunlu Decl. ¶¶ 28-32.

52.     Despite its position that the Tribunal lacked jurisdiction to determine the claims brought by Petitioners, NNPC asserted a counter-claim against Petitioners based on the same provisions of the PSC on which Petitioners relied.  *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 106.  The Tribunal recognized the contradiction in NNPC's position:

> The Tribunal also finds it curious that while the Respondent [NNPC] maintained that the Tribunal has no jurisdiction over the Claimants' claims, the Tribunal nevertheless has jurisdiction over its counter-claim. Interestingly, the counterclaim arises out of Respondent's counter-argument and own interpretation of the terms of the . . . PSC and the relative legislation . . .  So while [NNPC] contends that the Claimants' claims and relief could never be finally determined and decided by an arbitral tribunal, its counter-arguments and relief sought on the same contractual and statutory basis could.  The contradiction is not lost on the Tribunal.  The Respondent must accept that disputes arising from its rights and liabilities vis-à-vis the Claimants under the . . . PSC are all subject to the arbitration agreement.  It is wholly illogical to say that the same dispute could be arbitrable only if made by the Respondent by way of a counterclaim and not arbitrable because it was put forth by the Claimants.

*See* Fagbohunlu Decl. Ex. A (Award), at ¶ 106.

53.     In response to NNPC's jurisdictional objections, Petitioners argued that their claims were not tax claims, but were instead grounded in the parties' respective *contractual* allocation entitlements.  With respect to the claim surrounding the allocation of Tax Oil in

---

[14]   Section 251 of the 1999 Nigerian Constitution enumerates those matters over which the Federal High Court has exclusive jurisdiction, to the exclusion of Nigerian state courts.  *See* Shasore Decl. ¶¶ 47-48.

particular (only one of many claims), Petitioners argued that the dispute turned not on the amount of tax assessed, but on NNPC's failure to comply with its *contractual* obligation to lift only the quantities of oil allocated to it by Petitioners. *See* Fagbohunlu Decl. Ex. A (Award), at ¶¶ 67-69. Therefore, Petitioners contended that the parties' dispute was not in any way a tax dispute and could not, in fact, be litigated before the TAT; it was instead required to be submitted to arbitration. The Tribunal agreed with Petitioners.

## F.     The Tribunal Awards Petitioners US$995 Million

54.     On March 17, 2015, in a 120-page, well-reasoned Award, the Tribunal rejected NNPC's arguments and found for Petitioners.[15]   The Tribunal found that it had jurisdiction over the dispute because it was contractual in nature and related to the interpretation and performance of the PSC, and thus was not, as NNPC had claimed, a "tax dispute" subject to the exclusive jurisdiction of the Nigerian courts or tax authorities. *See* Fagbohunlu Decl. Ex. A (Award), at ¶ 109.   In doing so, the Tribunal also rejected NNPC's constitutional arguments about the non-arbitrability of tax disputes, given that this was not a tax dispute.

55.     The Tribunal examined Nigerian law and determined that it had jurisdiction to adjudicate Petitioners' contractual claims and to award damages if NNPC had breached its contractual obligations. The Tribunal noted that

> [t]he Claimants in this arbitration are not seeking any refund of taxes paid on their behalf by the Respondent and . . . all the other relief and claims sought would, if granted, merely . . . reconcile the contractual rights of the Parties . . .

Fagbohunlu Decl. Ex. A (Award), at ¶ 102.   Furthermore, even though the disputes touched incidentally on matters of taxation, they were not properly categorized as "tax disputes" because

> their resolution by this Tribunal will [not] to any degree impinge upon either the amount of tax legally due from the Parties to the Nigerian tax

---

[15]   Nigeria's appointed arbitrator, Professor Idornigie, dissented.

> authorities under Nigerian tax legislation or indeed the rights and
> obligations existing between the Parties to the [PSC] on the one hand and
> the Nigerian tax authorities on the other.

Fagbohunlu Decl. Ex. A (Award), at ¶ 105.

56.     As to liability, the Tribunal found that NNPC had violated the PSC by failing to submit the tax returns prepared by Petitioners, Fagbohunlu Decl. Ex. A (Award), at ¶ 237, and by taking far more oil than its contractual entitlement, Fagbohunlu Decl. Ex. A (Award), at ¶¶ 246-47.  The Tribunal then issued a separate award, the Final Award, dealing with remedies.   In the Final Award, the Tribunal: prohibited NNPC from taking more oil than its contractual entitlement (an obligation that NNPC continues to breach); and ordered NNPC to compensate Petitioners for their past losses, in the amount of US$941 million (a figure to which NNPC did not object), plus an additional US$54 million in interest and costs.  *See* Fagbohunlu Decl. Ex. A (Award), at 118; Fagbohunlu Decl. Ex. B (Final Award), at ¶¶ 15-16.  With interest, the current value of the Final Award is at least US$1,144,519,213.  *See* Vandergeest Decl. ¶ 61.  To this day, NNPC has not paid a cent of these damages to Petitioners.

## G.   Nigeria's State-Owned Entities Commence a Multi-Pronged Litigation Campaign to Prevent Petitioners from Enforcing the Awards in Nigeria

57.     Twice NNPC promised that it would arbitrate contractual disputes under the PSC and abide by those decisions: first in the PSC itself, and again ███████████ ████████████████████████   *See* Fagbohunlu Decl. Ex. D (PSC), Clause 21; Vandergeest Decl. Ex. AAA (Meeting Minutes), at 2.  NNPC reneged on both promises.  Rather than comply with the Awards, NNPC commenced a litigation campaign to prevent their enforcement.  The centerpiece of NNPC's effort to escape its contractual liability is a variation on the argument put to, and rejected by, the Tribunal: according to NNPC, because enforcing the Awards will affect Nigeria's bottom line, the contractual disputes submitted to arbitration should

be reclassified as "tax disputes" and deemed non-arbitrable. Fagbohunlu Decl. Ex. H (Set Aside Decision), at 1-4 (summarizing NNPC's arguments in the proceedings to set aside the Award). NNPC's argument finds no support in Nigerian law, either as the law existed when the PSC was entered into or at present. It has, nonetheless, found favor with the Nigerian Federal High Court, which can only be explained as an attempt by the Nigerian judiciary to shield NNPC, and the federal government itself, from a billion-dollar liability to IOCs. *See infra* ¶¶ 59-66, 92-95; *see also* Page Decl. ¶ 31; Shasore Decl. ¶ 65.

58. NNPC did not wait until the Awards were rendered to seek to nullify them. Apparently recognizing that it would likely lose an arbitration presided over by a neutral decision-maker, NNPC, acting in concert with FIRS (Nigeria's tax authority, whose Board includes a representative of NNPC's Group Managing Director, *see supra* ¶ 20 n.6), worked to shut down the Arbitration by any means possible. *See* Fagbohunlu Decl. ¶ 50. Initially, NNPC tried to enjoin the Arbitration altogether. *See* Fagbohunlu Decl. ¶ 50. That action was ultimately unsuccessful. Meanwhile, FIRS sought to enjoin the Arbitration or otherwise prevent Petitioners from enforcing any arbitral award, even though FIRS was neither a party to the PSC nor to the Arbitration. *See* Fagbohunlu Decl. ¶¶ 50-51. That action remains pending. *See* Fagbohunlu Decl. ¶ 52. Unable to enjoin the Arbitration, NNPC then petitioned a Nigerian court to set aside the resulting Award. *See* Fagbohunlu Decl. ¶ 53. The Nigerian court granted the request.

### 1. The Federal High Court Sets Aside the Award, Eviscerating Petitioners' Right to Arbitration

59. On May 5, 2015, NNPC sought to have the Award set aside by the Nigerian Federal High Court. *See* Fagbohunlu Decl. ¶ 53. In turn, Petitioners asked that court to enforce the Award and Final Award. The Federal High Court, Nigeria's federal court of first instance, consolidated the set aside and enforcement actions.

60.     On March 7, 2017, the Federal High Court set aside the Award.  It ruled that the dispute between the parties was a tax dispute, and that tax disputes are non-arbitrable under Section 251 of the 1999 Nigerian Constitution (the **Set Aside Decision**).  *See* Fagbohunlu Decl. ¶ 56.

61.     Finding that the parties' dispute was a tax dispute is not only wrong—the dispute concerned the parties' respective *contractual* rights to the allocation of oil in accordance with the provisions *of the contract*, Petitioners' *contractual* rights under the Stabilization Clause, and Petitioners' *contractual* right to submit tax returns, *see* Shasore Decl. ¶ 20—but it also ignored binding precedent from superior Nigerian courts, as well as the direct precedent from Nigeria's Court of Appeal arising out of an analogous Overlifting Dispute concerning the Erha oil field (the **Erha** decision).

62.     In *Erha*, the claimants, subsidiaries of IOCs Exxon Mobil and Royal Dutch Shell, likewise obtained an arbitration award compensating them for NNPC's lifting of oil in excess of its contractual rights.  NNPC sought to set aside that award as well, also on the basis that what was submitted to arbitration was a tax dispute.  The Federal High Court agreed with NNPC's characterization and set aside the *Erha* award.  On July 22, 2016, however, the Court of Appeal disagreed, finding that the claimants' claims were contractual in nature and therefore properly submitted to arbitration:

> There is no doubt in my mind that the claims before the [*Erha*] arbitral tribunal as to the Petroleum Profit Tax returns preparation and calculation of lifting allocations can be severed from the tax dispute.  This is because they are strictly based on the Production Sharing Contract.  The trial court therefore ought to have severed them in setting aside the arbitral award.

Fagbohunlu Decl. Ex. I (Erha decision), at 20; *see* Fagbohunlu Decl. ¶ 55.  The Court of Appeal confirmed the liability holding in the *Erha* award, but nevertheless denied the *Erha* claimants any relief: it held that while the arbitral tribunal had jurisdiction to find that NNPC had breached

the contract, the tribunal lacked jurisdiction to award damages for those breaches.  *See* Fagbohunlu Decl. ¶ 55.  That remarkable decision is addressed further below.  *See infra* ¶ 72.

63.     The Court of Appeal rendered the *Erha* decision nearly eight months before the Federal High Court's decision in the present (OML 128) case.  Naturally, after the Court of Appeal issued the *Erha* decision, Petitioners submitted supplemental briefing to the Federal High Court hearing the OML 128 case.   In that briefing, Petitioners highlighted the Court of Appeal's rejection of NNPC's attempt to characterize the entirety of the Overlifting Disputes as taxation disputes, and noted that the *Erha* decision was controlling precedent in this case.  *See* Fagbohunlu Decl. ¶ 55.  However, notwithstanding that the OML 128 dispute involved claims materially identical to those at issue in *Erha*, based on nearly identical misconduct, asserted against the same defendant, and arising out of a nearly identical contract, the Federal High Court ignored the *Erha* Court of Appeal's finding that the claims at issue were contractual in nature.  *See* Fagbohunlu Decl. ¶ 57; *see also* Fagbohunlu Decl. Ex. I (*Erha* decision), at 20, 25-27.  Instead, relying on abrogated reasoning of the Federal High Court (*i.e.* a lower court) in litigation related to a third Overlifting Dispute concerning the Bonga field, the Federal High Court hearing Petitioners' case concluded that, because the relief requested required consideration of the Petroleum Profits Tax Act, the dispute between Petitioners and NNPC was a tax dispute rather than a contractual one.  *See* Fagbohunlu Decl. Ex. H (Set Aside Decision), at 11; Fagbohunlu Decl. ¶ 56.

64.     In addition, the Federal High Court in Petitioners' case failed to apply long-standing binding precedent from the Supreme Court and adopted an interpretation of Section 251 of the 1999 Nigerian Constitution that sharply deviated from decades of consistent Nigerian precedent.  Prior to the Overlifting Disputes, Section 251 of the 1999 Constitution had

31

consistently been interpreted as regulating which Nigerian courts—federal or state—had jurisdiction to decide disputes over certain subjects. *See* Shasore Decl. ¶¶ 46-50. Until the Overlifting Disputes, Section 251 had never been interpreted to provide any guidance about whether disputes could validly be arbitrated, or itself prohibit arbitration of the subjects listed in Section 251. *See* Shasore Decl. ¶¶ 48, 68. Arbitrability as a matter of Nigerian law is the subject of a different legal framework, to which Section 251 is irrelevant. *See* Shasore Decl. ¶¶ 29-30, 37-38. Indeed, disputes relating to the subject matters listed in Section 251, which include, for example, maritime and banking disputes, have been lawfully arbitrated for many years without any jurisdictional objections from the parties or adverse findings by Nigerian courts. *See* Shasore Decl. ¶¶ 54-56.

65. Ignoring this body of longstanding precedent, the Federal High Court held that Section 251 prohibited arbitration concerning any of the subjects identified in that section, including disputes touching upon taxation. *See* Shasore Decl. ¶ 67; Fagbohunlu Decl. Ex. H (Set Aside Decision), at 30 ("In my view, the question is not whether the Tribunal, as constituted, can construe and interpret the contractual obligations of the parties in the [OML 128] PSC. Rather it is whether the parties can, by contract, confer on the Tribunal the jurisdiction to determine disputes that are by constitutional and statutory provisions exclusively referred for the [Federal High Court] and other organs."). The Federal High Court did not even engage with, distinguish, or discuss the well-established precedent that Section 251 allows for arbitration of disputes concerning the topics enumerated in Section 251, and merely regulates judicial competence between Nigeria's state and federal courts. The court simply ignored Petitioners' arguments on this central issue. *See* Fagbohunlu Decl. ¶¶ 55-57.

66.     By finding that contractual disputes under the PSC are not arbitrable, the Federal High Court effectively tore up the PSC and destroyed the parties' bargain.  While inexplicable as a matter of law, this result is not surprising: over the past twenty years, the Nigerian courts have *never once* ordered NNPC to pay damages to a foreign-owned plaintiff. *See* Vandergeest Decl. ¶¶ 7-8, 10; Vandergeest Decl. Ex. B (Nigerian Cases – Foreign Plaintiffs Against NNPC); Page Decl. ¶ 53.

67.     The Set Aside Decision is currently on appeal to the Court of Appeal, but given the undue delays in the Nigerian courts, any decision is years away.[16]  Moreover, in light of the large sums of government revenue at stake and the powerful incentives that the Nigerian judiciary has to protect the government's interests in politically-sensitive cases like this one, *see* Page Decl. ¶¶ 36-51, there is no more than a remote possibility that the Nigerian appellate courts will ever enforce the Awards.

68.     Finally, while NNPC sought to set aside the Award, it did not commence a similar action with respect to the Final Award (*i.e.*, the remedial decision).  The Final Award has therefore not been set aside in Nigeria and continues to be binding and fully enforceable. Nevertheless, the Federal High Court has refused to enforce it and NNPC has refused to pay it. *See* Fagbohunlu Decl. ¶ 53, n.1.

## 2.     NNPC Seeks to Block Another Avenue of Relief

69.     Throughout the Arbitration and subsequent Nigerian litigation, NNPC contended that the parties' dispute was non-arbitrable and that Petitioners must look to Nigerian courts for redress.  *See* Fagbohunlu Decl. Ex. H (Set Aside Decision), at 1-2, 30.  Accordingly, in

---

[16]   NNPC's counsel in a parallel case has admitted that cases in the Nigerian courts often take "ten, 12, 15 years" to be resolved.  Vandergeest Decl. Ex. XX (Hr'g Tr., *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, No. 14-cv-08445 (WHP) (S.D.N.Y. Mar. 20, 2015), ECF No. 33), at 7:17-20.

September 2016, Petitioners commenced an action in the Federal High Court for protective purposes, seeking compensation for NNPC's violations of the PSC (the **Substantive Action**). Petitioners commenced the Substantive Action while efforts to confirm the Awards in Nigeria were still pending, and therefore undertook not to recover twice for the same harm and requested a stay of the Substantive Action pending the resolution of the appeal of the Set Aside Decision. *See* Fagbohunlu Decl. ¶ 59.  NNPC promptly sought to have the Substantive Action dismissed with prejudice as an abuse of process, and the Federal High Court stayed the case pending the appeal of the Set Aside Decision.  *See* Fagbohunlu Decl. ¶ 60.

### 3.   Nigerian Courts Refuse to Recognize Other Arbitral Awards Rendered Against NNPC

70.    While regrettable, and contrary to basic due process protections, the treatment Petitioners received in the Nigerian courts is hardly surprising.  As noted above, the dispute between Petitioners and NNPC is part of a broader series of Overlifting Disputes between IOCs and NNPC.  In each Overlifting Dispute, NNPC unilaterally took far more oil than its contractual entitlement, and in each case the IOCs responded by bringing arbitrations against NNPC.  These claims (including Petitioners' claim) were heard by four separate arbitral tribunals, the panelists of which included a former Acting Legal Adviser of the US Department of State and current US judge on the Iran-United States Claims Tribunal; a former Justice of the Supreme Court of the United Kingdom; a former Canadian Ambassador to the United Nations; and prominent Nigerian lawyers.  Every one of those tribunals found for the IOCs and awarded them, in the aggregate, billions of dollars in damages.  In each case, NNPC and Nigeria have sought to nullify the Awards.

71.    Every one of the Overlifting Dispute awards has faced the same fate at the hands of the Nigerian judiciary: not one of the awards has been enforced, and the Nigerian courts

have rendered a series of decisions that eviscerate the IOCs' contract rights—including their right to arbitration—and ignore applicable Nigerian precedent.  In sum, the Nigerian courts have effectively insulated Nigeria's most important state-owned entity from paying the billions of dollars it owes.  *See* Fagbohunlu Decl. ¶¶ 43-44.  The Nigerian courts have refused to confirm these awards on various pretextual procedural grounds.  Two representative examples illustrate the point.  In another Overlifting Dispute, brought by affiliates of Royal Dutch Shell, Exxon Mobil, and others concerning the Bonga oil field, the Nigerian Court of Appeal struck out the entire arbitral proceeding because the oil companies' notice of arbitration—the initial *pro forma* document commencing the dispute—had not been signed by an individual attorney admitted in Nigeria but instead in the name of that attorney's Nigerian law firm.  *See* Fagbohunlu Decl. ¶ 46; Shasore Decl. ¶¶ 75-76.  This decision represents an unprecedented interpretation of law by the Nigerian courts that relies on statutory provisions relating to court proceedings that had never before been applied to arbitration proceedings.  *See* Fagbohunlu Decl. ¶ 46; Shasore Decl. ¶¶ 75-76.

72.     Similarly, in the parallel *Erha* Overlifting Dispute, discussed above, the Nigerian Court of Appeal held that the dispute between the parties was at its heart a contractual dispute, and that the arbitral tribunal had jurisdiction to find NNPC in breach of contract. *See* Shasore Decl. ¶ 72.  Nevertheless, the court found that an award of damages was somehow outside the arbitral tribunal's jurisdiction, and therefore that the claimants, while admittedly suffering a contractual breach, were not entitled to any remedy for that breach.  *See* Shasore Decl. ¶ 77.

73.     In all of these cases, the Nigerian courts have ruled in favor of NNPC, Nigeria's most important state-owned entity.

*     *     *

74.     If successful, NNPC's sustained and multi-pronged efforts to prevent Petitioners from obtaining relief in Nigeria will mean that Petitioners have no forum in which to pursue their substantive contractual rights.  This outcome is directly contrary to the PSC, which enshrined in contract Petitioners' right to arbitrate disputes with NNPC.  It would also be contrary to the strong federal policy promoting the binding nature of arbitration, particularly for international disputes.  *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (recognizing and stressing the "liberal federal policy favoring arbitration" (quotations and citations omitted)); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985) (recognizing an "emphatic federal policy in favor of arbitral dispute resolution," particularly "in the field of international commerce").  Indeed, to deny Petitioners any forum in which to seek compensation for adjudged wrongs would run contrary to the most basic notions of decency and justice in the United States.  *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 147 (1803) ("It is a settled and invariable principle, that every right, when withheld, must have a remedy, and every injury its proper redress.").[17]

75.     Given the current state of the proceedings in the Nigerian courts, the prospect of Petitioners obtaining relief in Nigeria is remote.  Further, in light of the sheer length of time required for Petitioners' Nigerian appeals to conclude, no matter the outcome, Petitioners face a real risk that the prospect of a judicial remedy in Nigeria is so temporally remote as to be no remedy at all.  *See* Shasore Decl. ¶¶ 86-87.

76.     Based on its strategy in other Overlifting Disputes, Petitioners expect that NNPC will seek to dismiss this Petition.  If NNPC is successful in escaping this action, NNPC

---

[17]   This is a principle under Nigerian law as well, at least in theory.  *See Eze & Ors v. Governor of Abia State & Ors* [2014] 5-7 SC (Pt. I) 171, 199 ("[W]here there is a violation of right there must be a remedy.") (Onnoghen JSC, concurring).

will not only have eviscerated the arbitration agreement for which Petitioners bargained, but it will also have foreclosed another judicial route to the recovery of damages.  NNPC should not be permitted to do so.  On the facts of this case, the Court should recognize and enforce the Award and the Final Award.

## ARGUMENT

77.     Petitioners and Respondent agreed, over twenty-five years ago, that their disputes would be resolved exclusively by arbitration.  Petitioners invested billions of dollars in reliance on that agreement.  When disputes concerning the parties' performance of the PSC arose, an independent and impartial arbitral tribunal resolved those disputes in favor of Petitioners, awarding them nearly US$1 billion in damages.  The Nigerian judiciary then struck down the Award on pretextual grounds.  Where, as here, a US court is asked to recognize and enforce an award that has been set aside by a foreign court, it must decide "[w]hich is to be given primacy, the award or the nullifying judgment." *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 962 F. Supp. 2d 642, 643 (S.D.N.Y. 2013).  The Awards must be given primacy here.

78.     Arbitration awards benefit from a strong presumption of enforceability. This approach is dictated by the New York Convention, as incorporated by the Federal Arbitration Act (*FAA*), which governs the recognition and enforcement of foreign arbitral awards in the United States.  9 U.S.C. § 201.  The New York Convention is designed to "encourage the recognition and enforcement of commercial arbitration agreements." *See Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974).  The Convention effectuates its "pro-enforcement bias" by "remov[ing] preexisting obstacles to enforcement" of arbitration awards. *See Parsons & Whittemore Overseas Co. v. Société Générale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 973 (2d Cir. 1974).  Thus, the FAA and Convention make enforcement mandatory

unless certain narrow defenses are proved, in which case enforcement becomes discretionary. A court "shall" enforce an arbitral award, save where one of the defenses is proven, in which case "[r]ecognition and enforcement of the award *may* be refused." *See* New York Convention, art. V (emphasis added); 9 U.S.C. § 207. In short, the New York Convention places a "heavy" burden on the party seeking to "avoid summary confirmance" of an arbitral award. *See Telenor Mobile Commc'ns AS v. Storm LLC.* 584 F.3d 396, 405 (2d Cir. 2009). NNPC cannot meet that burden here, and so the Awards should be enforced.

79.     The well-established law on the recognition of foreign judgments dictates that where, as here, the judgment nullifying an arbitral award is "repugnant to fundamental notions of what is decent and just" in the United States because it "tends clearly to undermine . . . the public confidence in the administration of the law, or security for individual rights . . . of private property," the judgment should not be given comity in US courts. *Pemex*, 832 F.3d at 106; *see also Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986). Instead, the arbitral award should be enforced. *Pemex*, 832 F.3d at 107; *see also Thai-Lao Lignite (Thai.) Co. v. Gov't of the Lao People's Democratic Republic*, 864 F.3d 172, 176 (2d Cir. 2017).

80.     This is particularly true when a set aside judgment protects the forum State from an adverse award. The comity usually afforded to foreign judgments is not an "inexorable command," *MacArthur v. San Juan Cty.*, 497 F.3d 1057, 1067 (10th Cir. 2007), and should not be given when deference to the foreign judgment would offend US public policy, *Ackermann*, 788 F.2d at 837; *see also Pemex*, 832 F.3d at 107 (denying comity to foreign decision protecting an alter ego of the forum state); *DeJoria v. Maghreb Petrol. Expl., S.A.*, 935 F.3d 381, 389 (5th Cir. 2019), *as revised* (Aug. 16, 2019) (denying comity to Moroccan judgment when party did not receive "fair treatment"); *Bank Melli Iran v. Pahlavi*, 58 F.3d 1406,

1410 (9th Cir. 1995) (refusing enforcement to Iranian judgment when party "could not have had due process in Iran").  Where, as here, the foreign court sets aside an arbitral award in order to protect its government, the set aside runs counter to the "emphatic federal policy in favor of arbitral dispute resolution," which "applies with special force in the field of international commerce," *Mitsubishi*, 473 U.S. at 631.  For this reason, commentators agree that "where a court in the arbitral seat annuls an award based upon local public policy or nonarbitrability rules, . . . this should generally have no preclusive effect on foreign courts that are considering whether to recognize the award under the Convention."   Gary B. Born, *International Commercial Arbitration* 3642 (2d ed. 2014).

    81.    The Set Aside Decision is repugnant to fundamental notions of decency and justice in the United States, and therefore is not entitled to comity in a US court, for at least five independent reasons.  First, the Nigerian courts have denied Petitioners due process in the proceedings that led to the Set Aside Decision, while endemic delays in the Nigerian courts continue to deny Petitioners due process and a judicial remedy.  *See infra* ¶¶ 83-99.  Second, the Set Aside Decision eviscerates Petitioners' contractual rights and NNPC's promise to arbitrate disputes "concerning the interpretation or performance of" the PSC, Fagbohunlu Decl. Ex. D (PSC), at Clause 21.  *See infra* ¶¶ 100-04.   Third, the Set Aside Decision constitutes an impermissible retroactive application of the law in order to cancel Petitioners' contract rights.  *See infra* ¶¶ 105-07.  Fourth, enforcing the Set Aside Decision would leave Petitioners without any forum—whether in Nigeria or the United States—to vindicate their contractual rights under the PSC.   *See infra* ¶ 108.   Finally, enforcing the Set Aside Decision would endorse a government expropriation without compensation.  *See infra* ¶¶ 109-10.

82.    For any one of these reasons, enforcing the Set Aside Decision would be repugnant to fundamental notions of what is decent and just in the United States, and each provides an independent, stand-alone basis for this Court to deny comity to the Set Aside Decision and enforce the Awards.   Together, they compel the conclusion that the Set Aside Decision is not entitled to comity in the United States, and that the Award should be enforced. *See Pemex*, 832 F.3d at 107.

A.    **The Nigerian Courts Have Denied, and Will Continue to Deny, Petitioners Due Process in the Set Aside Proceedings**

  1.    **A Foreign Judgment Rendered Without Due Process Is Not Entitled to Comity in the United States**

83.    As the Supreme Court explained more than a century ago, comity is "the recognition which one nation allows within its territory to the . . . acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895).  Here, the Set Aside Decision is not entitled to comity from this Court because the Nigerian courts have denied Petitioners due process and a fair hearing in the set aside proceedings.  *See infra* ¶¶ 85-94.  It is black letter law that US courts should deny comity to a foreign decision resulting from legal proceedings that deny a party due process.  *See Hilton*, 159 U.S. at 202 (recognition is appropriate only when "likely to secure an impartial administration of justice between the citizens of its own country and those of other countries"); *Bank Melli*, 58 F.3d at 1410 ("It has long been the law of the United States that a foreign judgment cannot be enforced if it was obtained in a manner that did not accord with the basics of due process."); *Restatement (Fourth) of Foreign Relations Law* §§ 483-84 (2018) (**Restatement**) (identifying twelve bases on which a court may deny comity to a foreign judgment, including when the foreign courts "systematically discriminate on the basis of . . .

nationality" or when the judgment was "rendered in circumstances that raise substantial doubt about the integrity of the rendering court").

84.     Moreover, in order to avoid "impos[ing] upon American citizens doing business abroad an undue risk," *Ackermann*, 788 F.2d at 844, US courts are especially cautious when, as here, a foreign court decision favors the foreign sovereign or its instrumentality at the expense of an American investor in a dispute that implicates the foreign sovereign's interests. *See Thai-Lao Lignite (Thai.) Co. v. Gov't of the Lao People's Democratic Republic*, 997 F. Supp. 2d 214, 227 (S.D.N.Y. 2014) (local courts are often "eager to graciously aid" their government and its instrumentalities); *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 962 F. Supp. 2d at 657 ("[N]ational sovereignty runs strong, and sometimes results in judicial interventions, and even nullifications, of arbitration proceedings and awards."); *Sangeorzan v. Yangming Marine Transp. Corp.*, 951 F. Supp. 650, 654-55 (S.D. Tex. 1997) ("The Court . . . has doubts about the ability of the government courts to fairly and justly decide claims against a government money-making enterprise.").[18]  That concern must be especially heightened where, as here, the dispute before that foreign court is both politically sensitive and of great value.

### 2.     The Set Aside Decision Is Not Entitled to Comity Because the Nigerian Courts Cannot Provide an Impartial Administration of Justice in the Present Circumstances

85.     As explained by Matthew Page, the former State Department subject matter expert on Nigeria, and as set out in numerous reports, including from the United States

---

[18]  *See also* Linda Silberman & Nathan Yaffe, *The US Approach to Recognition & Enforcement of Awards After Set-Asides: The Impact of the Pemex Decision*, 40 Fordham Int'l L. J. 799, 810 (2016) ("[C]oncerns about local bias and parochialism at the situs cannot be entirely disregarded where a state-owned entity is involved and that state was the only realistic place of arbitration.").

government and civil society, bias in favor of government interests is prevalent in the Nigerian courts. *See* Page Decl. ¶ 31. These observers have all concluded that Nigerian judges will not rule against the Nigerian government (which includes NNPC) in cases where political interests loom large and great amounts of government money are at stake. *See* Page Decl. ¶¶ 31-57. The US State Department, for example, has concluded that "[a]lthough the [Nigerian] constitution and law provide for an independent judiciary, the judicial branch remains susceptible to pressure from the executive and legislative branches." Vandergeest Decl. Ex. J (Investment Climate Statement); *see also* Vandergeest Decl. Ex. KK (2018 Human Rights Report), at 14. Meanwhile, the United States Department of Commerce warns of a "lack of effective judicial due process" in Nigerian courts. Vandergeest Decl. Ex. I (Country Commercial Guide: Nigeria – Market Challenges). Nigerian civil society agrees, including Nigerian lawyers, Nigerian professors, and the President of the Nigerian Bar Association, who has stated that there are "[j]udges literally walking on egg-shells, notably, where governments and their agencies have interest in matters that they adjudicate upon."[19] Vandergeest Decl. Ex. JJ (June 20, 2019 Address by the President of the Nigerian Bar Association), at ¶ 9; *see* Page Decl. ¶¶ 36-47, 50.

      86.    These conclusions are consistent with the empirical data. A systematic review of reported Nigerian cases over almost twenty years has revealed that the Nigerian courts have *never* enforced an arbitral award for money damages against NNPC, and have *never* ordered NNPC to pay damages to a foreign-owned company. *See* Vandergeest Decl. ¶¶ 4-10;

---

[19] The Nigerian Bar Association has likewise "noted with concern the worrisome trend of disparaging the judiciary and judicial officers by the political class and other disgruntled persons in the course of the performance of their judicial duties in an attempt to malign, intimidate them and infuse fear." Vandergeest Decl. Ex. HH (Feb. 2016 Nigerian Bar Association Communique).

Vandergeest Decl. Ex. A (Nigerian Cases – Enforcement of Awards); Vandergeest Decl. Ex. B (Nigerian Cases – Foreign Plaintiffs Against NNPC).

87.     NNPC's remarkable record of success in Nigerian courts is unsurprising. As Nigerian jurists and legal scholars have observed, there is a politicization of appointments that results in judges "who contemplate a higher judicial office often show[ing] restraint in cases that involve" government interests, Vandergeest Decl. Ex. L (Oko, *Seeking Justice in Transitional Societies*), at 38, and the executive branch's control over the timing and amount of payments to the judiciary, including judicial "allowances" that account for as much as 80% of judges' remuneration and are frequently manipulated by the executive.[20]  *See* Page Decl. ¶¶ 36-45.  As Nigeria's Chief Justice recently lamented, "If you say that I am independent, but in a way whether I like it or not I have to go and bend down asking, (for funds) I have lost my independence."  Vandergeest Decl. Ex. U (The Nation, *CJN on judicial independence*).

88.     In addition, the Nigerian Bar Association, the US government, and the United Nations have all noted that the Nigerian government has engaged in politically-motivated anti-corruption investigations, harassment, and public criticism of the judiciary.  *See* Page Decl. ¶¶ 46-51.  In 2016, for example, Nigeria through its Department of State Services arrested a number of judges in armed raids on their homes, without the necessary warrants, which the Nigerian Bar Association described as a "Gestapo-style operation," Vandergeest Decl. Ex. V (Reuters, *Nigeria releases judges arrested by security agency*), and the former US Ambassador to Nigeria decried as "compromising the independence of the judiciary," Vandergeest Decl. Ex. T (Campbell, *Fallout Continues in Nigeria from Judges' Arrest for Alleged Corruption*).  In

---

[20] Rotimi T. Suberu, "The Supreme Court of Nigeria: An Embattled Judiciary More Centralist Than Federalist" *in Courts in Federal Countries: Federalists or Unitarists?* 290, 302 (Nicholas Aroney & John Kinkaid eds., 2017).

2019, faced with a potentially close election that could be decided in the courts, President Muhammadu Buhari suspended the Chief Justice of Nigeria without following constitutional process. Vandergeest Decl. Ex. O (Economist, *Nigeria's president sacks the chief justice weeks before an election*). *See also* Page Decl. ¶¶ 48-50. The United Nations Special Rapporteur on the Independence of Judges and Lawyers, the United States, the European Union, and the American Bar Association all expressed alarm at the lack of due process in the Chief Justice's removal and condemned this most recent attack on judicial independence in Nigeria. *See* Page Decl. ¶¶ 48-50; Vandergeest Decl. Ex. P (United Nations, *Judicial independence under threat in Nigeria*); Vandergeest Decl. Ex. Q (U.S. Embassy Abuja, *Statement*); Vandergeest Decl. Ex. R (EU Election Observation Mission Nigeria, *Statement*); Vandergeest Decl. Ex. S (American Bar Association, *Statement*).

89.     The lack of independence of Nigerian courts in cases, such as the present one, where NNPC would be required to pay out material sums of money if a Nigerian court ruled against it, alone is sufficient for this Court not to extend comity to the Nigerian Set Aside Decision and to recognize the Awards instead. *See DeJoria*, 935 F.3d at 395-96; *Bank Melli*, 58 F.3d at 1412 (refusing recognition to an Iranian judgment because Iranian courts were not impartial); *see also Sangeorzan*, 951 F. Supp. at 653-54 (Taiwan not an adequate alternative forum for a dispute with 48%-owned Taiwanese government entity because of US court's concerns about government bias in the Taiwanese courts).

90.     The decision in *Bank Melli* is particularly instructive. In *Bank Melli*, the Ninth Circuit affirmed the district court's refusal to enforce an Iranian judgment because the Iranian courts could not provide a fair forum for the defendant. In reaching that decision, the Ninth Circuit relied on State Department reports noting the lack of judicial independence in Iran,

as well as a declaration of a State Department official stating that Iranian judges are "subject to continuing scrutiny and threat of sanction and cannot be expected to be completely impartial." *Bank Melli*, 58 F.3d at 1412.   The State Department has reached the same conclusions about Nigeria.   *See* Vandergeest Decl. Ex. J (Investment Climate Statement); Vandergeest Decl. Ex. H (2018 Human Rights Report); Page Decl. ¶¶ 32-34.   Indeed, the World Economic Forum has concluded that Nigeria's judiciary is even less independent than that of Iran.   *See* Vandergeest Decl. Ex. H (Global Competitiveness Report), at 287, 431.   The Set Aside Decision is not entitled to comity as a result.   *See Hilton*, 159 U.S. at 164; *Restatement*, §§ 483-84.

### 3.     Petitioners Were Denied Due Process in the Set Aside Proceedings

91.     In addition, the Nigerian courts denied Petitioners due process on the particular facts of this case by refusing to consider Petitioners' arguments.   *See supra* ¶¶ 61-65. That is unsurprising: consistent with the Nigerian courts' approach to cases involving claims for money damages against NNPC, the Nigerian courts could not order NNPC to pay Petitioners nearly US$1 billion in damages, and therefore did not enforce the Awards.   *See* Page Decl. ¶¶ 31, 61.

92.     The interest of Nigeria in this dispute is manifest.     As the State Department notes, it is hard to know where Nigeria ends and NNPC begins; NNPC is Nigeria and Nigeria is NNPC.   *See* Vandergeest Decl. Ex. NN (House Speaker Accuses State Oil Company of Withholding Revenues), at 2; *Esso*, 397 F. Supp. 3d at 340 (NNPC is Nigeria's alter ego).   Nigeria's President ordered NNPC to overlift from IOC-operated oil fields in 2008, *see Esso*, 397 F. Supp. 3d at 330, and senior NNPC officials (who serve at the pleasure of the President, *see Esso*, 397 F. Supp. 3d at 336-37) were acting on the instructions of the Nigerian government in seizing Petitioners' oil.   *See supra* ¶¶ 24-25; Page Decl. ¶ 28; *see also McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 352 (D.C. Cir. 1995).   The two entities share

bank accounts that NNPC uses to fund expenses for itself and other governmental entities.  *See Esso*, 397 F. Supp. 3d at 339; *supra* ¶ 23.   And the Awards order NNPC to pay Petitioners a material sum: $995 million in damages, which has grown with interest to over $1 billion today. *See supra* ¶ 4; Vandergeest Decl. ¶ 61.   The Nigerian courts therefore reached a decision that saves NNPC—and, effectively, Nigeria—from having to pay the amounts owed under the Awards.  *See* Page Decl. ¶ 31; *DeJoria v. Maghreb Petrol. Expl., S.A.*, No. A-13-CV-654-RP-AWA, 2018 WL 1057029, at *19 (W.D. Tex. Feb. 26, 2018), *adopted by*, No. 1:13-CV-654-RP, 2018 WL 1830789 (W.D. Tex. Mar. 28, 2018), *aff'd*, 935 F.3d 381 (5th Cir. 2019) (foreign judgment not compatible with due process requirements where royal family had clear political interest in outcome of case); *Sangeorzan*, 951 F. Supp. at 654 (where Taiwanese government owned 48% of the defendant, US court "ha[d] doubts about the ability of the government courts to fairly and justly decide claims against a government money-making enterprise").

   93.  Where, as here, a foreign court refuses even to consider a party's arguments, a US court should not recognize its decision.  *See Maersk, Inc. v. Neewra, Inc.*, No. 05-civ-04356 (CM), 2010 WL 2836134, at *14-15 (S.D.N.Y. July 9, 2010) (refusing to grant comity to a foreign judgment which, *inter alia*, failed to consider one party's arguments); *see also Asvesta v. Petroutsas*, 580 F.3d 1000, 1017-18 (9th Cir. 2009) (where, as here, foreign court's judgment is legally deficient, including because it failed to address key legal arguments, comity is not warranted); *Estin v. Estin*, 334 U.S. 541, 547-48 (1948) (New York court correctly denied full faith and credit to Nevada court judgment affected by procedural infirmities); *Mantell v. Chassman*, 512 F. App'x 21, 24 (2d Cir. 2013) (district court's failure to consider argument by party was reversible error); Vandergeest Decl. Ex. II (Nigerian Bar Association, *Practical Steps to Reforms of the Administration of Justice in Nigeria*), at 8 ("a judgment or Court order that

does not follow judicial precedent or is inherently defective" is indicative of "corruption" in the Nigerian courts).

94. In the course of its Set Aside Decision, the Federal High Court ignored binding precedent from the *Erha* decision, as well as basic principles of law and fairness, by refusing to consider Petitioners' arguments (which were even the subject of special briefing) as to why the dispute before the Tribunal was not an inarbitrable "tax dispute." *See supra* ¶¶ 61-65; Shasore Decl. ¶ 73. Had the Federal High Court considered Petitioners' arguments and applied binding precedent, it would have had no choice but to hold that the dispute that Petitioners submitted to arbitration was a contractual one—which is a result that the binding *Erha* decision from Nigeria's Court of Appeal, issued eight months before the High Court's Set Aside Decision, compels. *See* Shasore Decl. ¶¶ 71-73. Principles of fundamental fairness dictate that the Set Aside Decision—which violated Petitioners' basic due process rights—not be granted recognition. *See Gordon & Breach Sci. Publrs. S.A. v. Am. Inst. of Physics*, 905 F. Supp. 169, 179 (S.D.N.Y. 1995); *see also Ackermann*, 788 F.2d at 842 (recognition of foreign judgments should be guided by, *inter alia*, "fairness to litigants").

### 4. The Likelihood of Petitioners Receiving a Fair Hearing in Their Appeal of the Set Aside Decision Is Remote

95. Although Petitioners are appealing the Set Aside Decision, the likelihood of the Court of Appeal enforcing the Awards is remote: the Court of Appeal is subject to the same vulnerabilities and political pressures as all other Nigerian courts. *See* Page Decl. ¶ 31. This is particularly true in light of recent events described below, which underscore Nigeria's desire for additional petroleum revenue regardless of the contracts it has struck.

96. First, in October 2018 the Nigerian Supreme Court approved a "settlement" between the federal government and three state governments that required the

federal government to recover billions of dollars in "lost" revenue from IOCs, including Petitioners, operating under the PSCs.  The IOCs were not parties to this legal proceeding. When the Lagos Chamber of Commerce and Industry sought to intervene to protect the interests of fundamental rights, due process, and the investment environment in Nigeria, its counsel was fined personally.  *See* Vandergeest Decl. Ex. WW (Consent Judgment), at 1-4.  Since then, Nigeria has reportedly demanded US$62 billion from the IOCs, based on a retrospective assessment of alleged outstanding revenue due to the Federal Government from August 2003. *See* Vandergeest Decl. Ex. W (ThisDay, *Malami Tells IOCs to Pay $62.1bn PSC Arrears*). Nigeria has additionally passed a new law that imposes royalty rates on deep offshore oil production activities going forward, including from OML 128, on which no royalties were previously due.  *See* Vandergeest Decl. Ex. W (ThisDay, *Malami Tells IOCs to Pay $62.1bn PSC Arrears*).

97.     Second, the government's reaction to an arbitration award issued in favor of Process & Industrial Developments Limited (*P&ID*) and against Nigeria is similarly concerning.  In 2017, an arbitration tribunal presided over by a former Justice of the UK's highest court awarded P&ID US$6.6 billion after a failed gas project in Nigeria.[21]  In August 2019, a court in London recognized and enforced the award, ordering Nigeria to pay P&ID what is now over US$9 billion, including interest.[22]  The reaction in Nigeria was swift and severe: the government made clear that anyone associated with the P&ID award would be summoned for questioning by the anti-corruption authorities, up to and including a former Chief Justice of the

---

[21]  *See Gas Firm Owed $9 Billion by Nigeria Can Seek Asset Seizures*, Bloomberg (Aug. 16, 2019), https://www.bloomberg.com/news/articles/2019-08-16/gas-firm-owed-9-billion-by-nigeria-can-seek-asset-seizures.

[22]  *See Gas Firm Owed $9 Billion by Nigeria Can Seek Asset Seizures*, Bloomberg (Aug. 16, 2019), https://www.bloomberg.com/news/articles/2019-08-16/gas-firm-owed-9-billion-by-nigeria-can-seek-asset-seizures.

Nigerian Supreme Court who had been a legal consultant to P&ID in the arbitration.  *See* Page Decl. ¶ 60.  The message is plain—the government will retaliate against material threats to its coffers—and has doubtless been heard by the Nigerian courts presiding over Petitioners' litigations in Nigeria concerning the Awards.  Whatever the chances were that the Nigerian courts would enforce the Awards prior to P&ID, the government's reaction to the P&ID case makes the likelihood that a Nigerian judge will rule for Petitioners even more remote.

98.     Finally, the significant delays that Petitioners have suffered, and will continue to suffer, at the hands of the Nigerian court system is a further, independent denial of due process and basis to enforce the Awards immediately.  *See, e.g.*, *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1227-28 (3d Cir. 1995) (recognizing that "[a]t some point, . . . the prospect of judicial remedy becomes so temporally remote that it is no remedy at all"); *Weisel Partners LLC v. BNP Paribas*, No. C 07-6198 (MHP), 2008 WL 3977887, at *9 (N.D. Cal. Aug. 26, 2008) (same).[23]  Even if Petitioners are ultimately successful in the Nigerian courts, they will be required to wait years, if not more than a decade, to obtain satisfaction of their Awards in Nigeria.  *See* Shasore Decl. ¶¶ 82-87; Vandergeest Decl. Ex. XX (Hr'g Tr., *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, No. 14-cv-08445 (WHP) (S.D.N.Y. Mar. 20, 2015), ECF No. 33), at 7:17-20 (cases in the Nigerian courts often take "ten, 12, 15 years" to be resolved).

*            *            *

---

[23]   *See also IPCO (Nigeria) Ltd. v. Nigerian Nat'l Petrol. Corp. (No. 3)* [2015] EWCA Civ 1144 & 1145, ¶ 170 (preserving a claimant's ability to pursue enforcement of a Nigeria-seated arbitral award in the English courts notwithstanding pending set aside proceedings in Nigeria, based on evidence that delays in the Nigerian courts would prolong resolution of the set aside proceedings for a commercially "absurd" number of years).

99.     In sum, the Set Aside Decision is not entitled to comity in the United States because, in denying Petitioners due process and "tend[ing] clearly to undermine . . . the public confidence in the administration of law," enforcing that decision would be "repugnant to fundamental notions of what is decent and just in the United States."  *Pemex*, 832 F.3d at 106. Nor is there anything more than a remote chance that the Court of Appeal will remedy the Federal High Court's errors and due process violations, even though it will take years, or even more than a decade, for litigation in Nigeria to conclude.  Under these circumstances, the Awards should be enforced.

## B.     The Set Aside Decision Destroys Petitioners' Contractual Rights to Arbitrate Contractual Breaches

100.     The Set Aside Decision must also be denied comity because it shatters Petitioners' investment-backed expectations and destroys Petitioners' core contractual rights. *See Pemex*, 832 F.3d at 107-08.

101.     NNPC voluntarily and knowingly entered into a contract whereby all disputes "concerning the interpretation or performance of [the contract]," including those concerning compliance with the contractual oil allocations, would be subject to binding arbitration.   Fagbohunlu Decl. Ex. D (PSC), at Clause 21.   Indeed, even when the dispute between the parties first arose, NNPC reiterated its commitment to arbitration, accepting that

██████   Vandergeest Decl. Ex. AAA (Meeting Minutes).  Given NNPC's promises, Petitioners had every reason to expect that NNPC would abide by the bargain it struck.  When contractual rights are at issue, "predictability and stability are of prime importance."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 271 (1994).  "Contracts enable individuals to order their personal and

business affairs according to their particular needs and interests." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978).

102.    Its promises notwithstanding, almost twenty years after the PSC was signed, and after Petitioners had invested billions of dollars to develop OML 128, NNPC reversed course and claimed that Petitioners could not arbitrate their breach of contract claims. *See* Fagbohunlu Decl. ¶¶ 15-17; Fagbohunlu Decl. Ex. A (Award) ¶¶ 29, 93-109.  This argument was based on the 1999 Constitution and a statute enacted in 2007 to establish the Tax Appeal Tribunal, neither of which were enacted at the time the PSC was entered into nor have ever been interpreted in this way prior to the Overlifting Disputes.  Shasore Decl. ¶¶ 32-44.  In finding for NNPC, the Nigerian courts abandoned the long-established understanding of the scope and impact of Section 251 of the 1999 Constitution and its irrelevance to arbitration.  Shasore Decl. ¶¶ 48-60.

103.    In *Pemex*, the Second Circuit held that the vindication of contractual undertakings, and particularly contractual undertakings to arbitrate disputes, is a "powerful consideration" in favor of enforcing an annulled award.  *Pemex*, 832 F.3d at 107.  The Set Aside Decision constitutes a clear evisceration of Petitioners' expectations that any dispute between Petitioners and NNPC concerning the PSC would be subject to arbitration—as the PSC expressly provides.  *See* Fagbohunlu Decl. Ex. D (PSC), Clause 21.  It is well-settled that deprivation of reasonable investment-backed expectations gives rise to grave public-policy concerns.  *See Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978).  Making matters worse, the abrogation of NNPC's agreement to arbitrate favored the State over a private party.  *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 25-26 (1977) (Contract Clause scrutiny heightened when the "State's self-interest is at stake"); *Corporación Mexicana de Mantenimiento Integral,*

*S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 962 F. Supp. 2d at 659 (finding the Mexican court's set aside all the more objectionable because it was "undertaken to favor a state enterprise over a private party").

104.    Giving effect to the Set Aside Decision, and thereby disregarding the findings in the Awards, would "shatter [Petitioners'] investment-backed expectation in contracting, thereby impairing one of the core aims of contract law," and would accordingly be contrary to United States public policy. *See Pemex*, 832 F.3d at 108; *Hunt Constr. Grp. v. Brennan Beer Gorman/Architects, P.C.*, 607 F.3d 10, 14 (2d Cir. 2010) ("[C]ontract law . . . is designed to enforce parties' contractual expectations . . . ." (quotations and citations omitted)).

## C.    The Set Aside Decision Constitutes an Impermissible Retroactive Application of Law

105.    Giving effect to the Set Aside Decision would also impair the closely-related concept of avoiding retroactive application of the law. *Pemex*, 832 F.3d at 108. As the Second Circuit has explained, "[r]etroactive legislation that cancels existing contract[ual] rights is repugnant to United States law. That repugnance is 'deeply rooted in [Supreme Court] jurisprudence, and embodies a legal doctrine centuries older than our Republic.'" *Pemex*, 832 F.3d at 108; *see also E. Enters. v. Apfel*, 524 U.S. 498, 532 (1998) ("Retroactivity is generally disfavored in the law, in accordance with fundamental notions of justice that have been recognized throughout history." (quotations and citations omitted)).

106.    At the time the parties entered into their contract, they agreed that disputes concerning the interpretation and implementation of contractual rights—such as those at issue here—would be adjudicated by an independent arbitral tribunal. *See* Fagbohunlu Decl. Ex. D (PSC), at Clause 21. It was only decades later that NNPC asserted that disputes related to the allocation of oil—the very heart of the PSC—were not arbitrable. The Nigerian courts then

endorsed that argument through their retroactive application of law. *See* Shasore Decl. ¶¶ 66-69. The reasoning of the Nigerian Federal High Court is based on a provision of the 1999 Nigerian Constitution that was interpreted in a novel and unprecedented way to nullify Petitioners' vested contractual rights retroactively. *See* Shasore Decl. ¶¶ 66-69; *see also Landgraf*, 511 U.S. at 277-78 (refusing to apply laws retroactively because laws affecting vested substantive rights, liabilities, or duties are strongly disfavored). In adopting such an "abrupt" departure from past precedent, the Nigerian Federal High Court effectively "cancel[led Petitioners'] existing contractual rights" to arbitrate disputes concerning the PSC. *Pemex*, 832 F.3d at 108 (a retroactive application of the law is "repugnant to United States law"); *see also* Shasore Decl. ¶¶ 68-69.

107.    This Court should not give effect to such a retroactive application of Nigerian law and should instead preserve the parties' legitimate contractual expectations and enforce the Award. *See Pemex*, 832 F.3d at 107-08; *see also Landgraf*, 511 U.S. at 265 ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted."); *E. Enters.*, 524 U.S. at 532; 2 J. Story, Commentaries on the Constitution of the United States § 1398 (5th ed. 1891) ("Retrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact.").

## D.    The Set Aside Decision Almost Certainly Denies Petitioners a Forum to Bring their Claims

108.    In addition, Petitioners face the almost certain reality that they will not have any forum in Nigeria to vindicate their contractual rights. After NNPC moved to set aside the Award, arguing that the matters brought to arbitration should instead have been submitted to

a Nigerian court, Petitioners commenced the Substantive Action in the Nigerian Federal High Court to protect their rights under the PSC, seeking a stay and committing not to recover twice for the same harm. *See supra* ¶ 69. Incredibly, NNPC then moved to dismiss that action as an abuse of process on the basis that Petitioners refused to abandon their efforts to enforce the Awards. *See* Fagbohunlu Decl. ¶ 60. The Substantive Action is currently stayed, but the Federal High Court has dismissed a similar action in another Overlifting Dispute as an abuse of process. *See* Fagbohunlu Decl. ¶ 60. Given the trajectory of the other Overlifting Disputes and the Nigerian courts' documented refusal to order NNPC to pay damages to IOCs, the likelihood of the Nigerian courts ordering NNPC to pay damages to Petitioners is remote. Petitioners therefore have no forum in which to litigate their contractual claims or any meaningful opportunity to be heard. That constitutes an independent basis for enforcing the Award. *See Pemex*, 832 F.3d at 109-10.[24]

## E. The Set Aside Decision Permits a Government Expropriation Without Compensation

109.    In *Pemex* the Second Circuit held that a judicial decision nullifying an arbitral award to facilitate a foreign sovereign's taking of private property without compensation is repugnant to fundamental notions of decision and justice because it "undermine[s] . . .the public confidence in the . . . security for individual rights . . . of private property." *Pemex*, 832 F.3d at 106. The importance of protecting private property cannot be overstated: it is a

---

[24]    Should the Court not be inclined to confirm the Award, Petitioners respectfully request that the Court stay these proceedings pending the resolution of Petitioners' appeal of the Set Aside Decision in the Nigerian courts, the hearing in which is currently scheduled for March 31, 2021. To do otherwise would leave Petitioners without a forum once the Nigerian courts reject their appeals. Courts have routinely granted such relief in similar circumstances. *See InterDigital Commc'ns, Inc. v. Huawei Inv. & Holding Co.*, 166 F. Supp. 3d 463, 473-74 (S.D.N.Y. 2016); *Hulley Enters. Ltd. v. Russian Fed'n*, 211 F. Supp. 3d 269, 280-88 (D.D.C. 2016); *see also Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310, 316-18 (2d Cir. 1998).

fundamental principle of US law that private property shall not be taken for public use without just compensation. *See* U.S. Const. amend. V. Here, not only have the Nigerian courts expropriated, by retroactively nullifying, Petitioners' right to arbitration of lifting disputes,[25] NNPC has also taken without compensation nearly US$1 billion of Petitioners' oil, which another court in this District held in analogous circumstances "amounted to a taking of private property without compensation for the benefit of the government." *Esso*, 397 F. Supp. 3d at 354 (internal quotations omitted). This Court should reach the same conclusion here.

110. Nigeria solicited investment by foreign oil companies, including Petitioners, and Petitioners invested billions of dollars in OML 128 relying on the terms of their contract. Those terms granted Petitioners the right to a certain share of the oil recovered, the protections of a Stabilization Clause, and the right to have all disputes arbitrated. *See supra* ¶¶ 37-40. Once Petitioners had made their massive investment and were finally starting to recover their enormous costs, Nigeria changed its mind and directed NNPC to take nearly a billion dollars' worth of oil from Petitioners without any compensation. *See supra* ¶¶ 33-45. If the government "physically tak[es] possession of an interest in property" without compensation, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002), it is an unconstitutional taking under US law. The Set Aside Decision endorses this unconstitutional taking, and is therefore not entitled to comity in the United States. *See Pemex*, 832 F.3d at 110-11.

\* \* \*

---

[25] Under the "severability" doctrine, an arbitration clause is severable from the remainder of the contract and exists as a separate, and separately enforceable, right. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967); *Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001).

111.     Given the extreme—and extremely unjust—circumstances of this case, the Court should decline to grant comity to the Set Aside Decision and instead recognize and enforce the Awards.  The Court may do so on any one of the bases cited above; while Petitioners have satisfied all of them, these bases are stand-alone, individually-sufficient reasons to enforce the Awards over the Set Aside Decision.  Failing to recognize the Awards will endorse a result that is repugnant to this country's most basic notions of justice.  *See Pemex*, 832 F.3d at 107-11.

## REQUEST FOR PRE-JUDGMENT SECURITY

112.     In light of the ongoing Nigerian litigations, Petitioners respectfully request that the Court issue an order requiring NNPC to post a bond in the amount of its outstanding obligation to Petitioners—US$1,144,519,213, the value of the Final Award as of January 15, 2020—pending the Court's resolution of the Petition.

113.     The Court has the authority to order pre-judgment security pursuant to Article VI of the New York Convention, which provides:

> If an application for the setting aside or suspension of the award has been made to a competent authority referred to in article V(1)(e), the authority before which the award is sought to be relied upon may, if it considers it proper, adjourn the decision on the enforcement of the award and may also, on the application of the party claiming enforcement of the award, order the other party to give suitable security.

114.     The elements of Article VI are satisfied here.  *See InterDigital*, 166 F. Supp. 3d at 473 (ordering that respondent post security, in the amount of the arbitral award with interest, while set aside action was pending in foreign court); *CONPROCA, S.A. de C.V. v. Petróleos Mexicanos*, No. 11 CIV. 9165 (LLS), 2014 WL 7028318, at *2 (S.D.N.Y. Dec. 12, 2014) (same); *Skandia Am. Reins. Corp. v. Caja Nacional de Ahorro y Segoro*, No. 96 CIV. 2301 (KMW), 1997 WL 278054, at *5 (S.D.N.Y. May 23, 1997) ("I find that Article VI of the New York Convention allows me to require sovereigns [*viz.* an alleged instrumentality of

Argentina] to post pre-judgment security if they move to set aside or suspend an arbitration award . . . ."); *Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, 230 F. Supp. 2d 362, 372-75 (S.D.N.Y. 2002) ("Several courts have held . . . that prejudgment security may be imposed on a foreign state in the context of arbitration.").

115.    Indeed, this Court has previously ordered NNPC to do precisely what Petitioners request here: post security in the amount of the award. *Caribbean Trading & Fid. Corp. v. Nigerian Nat'l Petrol. Corp.*, No. 90 CIV. 4169 (JFK), 1990 WL 213030, at *8 (S.D.N.Y. Dec. 18, 1990).

116.    The Court should exercise its discretion under Article VI of the New York Convention to grant this request.  Absent an order requiring NNPC to post a bond in the amount of US$1,144,519,213 pending the determination of Petitioners' Petition, there is substantial doubt that NNPC will satisfy the ultimate judgment should the Court enforce the Awards. NNPC has given no indication that it intends to pay Petitioners upon eventual confirmation of the Awards.  Indeed, NNPC has steadfastly refused to pay the arbitral awards against it in this and all of the other Overlifting Disputes, seeking instead to set aside those awards before the Nigerian courts and to dismiss enforcement actions in other jurisdictions.  Without the protection of a pre-judgment bond, Petitioners face the very real possibility that the Awards, if enforced, will go unpaid.

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court enter an order: (i) recognizing the Awards pursuant to 9 U.S.C. §§ 201, 202, and 207; (ii) entering judgment in favor of Petitioners and against NNPC and in the amount of the Final Award, with the interest and costs as provided therein, plus the costs of this proceeding; (iii) pursuant to Article VI of the New York Convention, requiring NNPC to post a bond in the amount of its

current outstanding obligation to Petitioners under the Awards—US\$1,144,519,213—pending the Court's resolution of the Petition; and (iv) awarding Petitioners such further relief as the Court deems just and proper.  In the alternative, in the event the Court is disinclined to confirm the Awards, Petitioners respectfully request that the Court stay these proceedings pending the resolution of Petitioners' appeal of the Set Aside Decision in the Nigerian courts.

Dated:  New York, New York
       January 28, 2020

FRESHFIELDS  BRUCKHAUS  DERINGER  US  LLP

By:      /s/ *Timothy P. Harkness*
        Timothy P. Harkness
        Elliot Friedman
        David Y. Livshiz
        Paige von Mehren
        Christian Vandergeest
        Nathan Hembree

601 Lexington Avenue, 31st Floor
New York, New York 10022
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
timothy.harkness@freshfields.com
elliot.friedman@freshfields.com
david.livshiz@freshfields.com
paige.vonmehren@freshfields.com
christian.vandergeest@freshfields.com
nate.hembree@freshfields.com

*Attorneys for Petitioners*